**GAUNTLETT & ASSOCIATES**
David A. Gauntlett (SBN 96399)
info@gauntlettlaw.com
James A. Lowe (SBN 214383)
jal@gauntlettlaw.com
18400 Von Karman, Suite 300
Irvine, California 92612
Telephone: (949) 553-1010
Facsimile: (949) 553-2050
Attorneys for Plaintiff
HURRICANE ELECTRIC, LLC

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

HURRICANE ELECTRIC, LLC, a Nevada limited liability company,

                    Plaintiff,

          vs.

NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, an Illinois corporation,

                    Defendant.

Case No.:

**COMPLAINT FOR DECLARATORY RELIEF**

Plaintiff Hurricane Electric, LLC ("Plaintiff" or "HE"), by counsel, for its Complaint against Defendant National Fire Insurance Company of Hartford ("Defendant" or "NFI"), alleges on knowledge as to its own actions, and otherwise Plaintiff is informed and believes and thereon alleges, as follows:

### NATURE OF THE ACTION

1.   HE seeks declaratory judgment that NFI, HE's insurer, has a duty to pay policy benefits for HE's defensive pursuit of declaratory relief in the action styled *Hurricane Electric, LLC, v. Dallas Buyers Club, LLC, et al.*, Case No. 4:20-cv-03813 in the United States District Court for the Northern District of California (hereinafter

referred to as "the California Action"). A true and correct copy of the operative complaint in that action is attached as **Exhibit "1"**.

2.   HE also seeks a declaratory judgment that NFI has a duty to pay policy benefits for HE's defensive pursuit of declaratory relief in the action styled *Hurricane Electric, LLC, v. Millennium Funding, Inc., et al.*, Case No. 2:20-cv-01034 in the United States District Court for the District of Nevada (hereinafter referred to as "the Nevada Action"). A true and correct copy of the operative complaint in that action is attached as **Exhibit "2"**.

3.   Both the California Action and the Nevada Action are collectively referred to as the "HE Declaratory Relief Actions."

## PARTIES

4.   NFI is an insurance company that provides insurance to HE.

5.   HE is informed and believes and based thereon alleges that NFI is a corporation incorporated in the State of Illinois, with its principal place of business in Chicago, Illinois.

6.   HE is a small privately-held company started in Silicon Valley by a start-up individual entrepreneur. The sole owners and members of HE are Mike Leber and Paula Leber, who are citizens of California and reside in Fremont, California. HE is a limited liability company organized and existing under the laws of the State of Nevada, with its principal place of business in Fremont, California.

7.   HE's primary business is as an upstream service provider and its business model for this service does not include hosting data on servers for customers to be accessed by third parties. HE, as an upstream service provider, does not have access to, or have control over, the content communicated through the Internet by its customers, which are account holders such as internet service providers ("ISPs"), or by its customers' customers, such as end-user subscribers to an ISP.  HE's customers and its customers' customers are sometimes collectively referred to herein as "Customers/End-Users."

8.   As an upstream service provider, HE simply acts as a "highway" that passively provides its Customers/End-Users with internet access. HE internet connections are business-to-business ("B2B") type connections and are most often sourced from data centers. HE's customers in turn provide service to thousands or tens of thousands of end users, and ISPs that provide Internet to thousands or tens of thousands of third-party subscribers over large geographic areas.

9.   HE has grown, in the niche upstream service provider market, to be a global provider of access to the backbone of the internet, offering Internet Protocol version 4 ("IPv4") and Internet Protocol version 6 ("IPv6") Internet access, transit, tools, and network applications, as well as data center services in San Jose, California, and in the company's home base in Fremont, California.

10. HE operates a global IPv4 and IPv6 network and is considered the largest IPv6 backbone in the world.

11.  In addition to its vast global network, HE owns and operates two data center facilities in Fremont, California. HE offers IPv4 and IPv6 transit solutions, which allow Customers/End-Users to access destinations on the Internet.

12.  HE also offers free connectivity to the IPv6 internet through a page on its website (hereinafter referred to as the "IPv6 Tunnel Broker").

13.  In the upstream service provider business, HE does not have the connections to go the "last mile" to end-users, and such end-users must utilize a service provider to connect to HE.

## JURISDICTION

14. This Court has subject matter jurisdiction over this case pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. As described below, there exists an important case and controversy between the parties as to whether NFI has a duty to pay policy benefits for HE's defensive pursuit of declaratory relief in the presently-pending HE Declaratory Relief Actions.

15. This Court also has subject matter jurisdiction over this case pursuant to 28

U.S.C. § 1332(a) and (c), because there is complete diversity of citizenship between HE and NFI, and the amount in controversy exceeds $75,000.

16. Commonly-represented copyright assertion entities (hereinafter collectively referred to as the "Claimants") asserted statutory damages for over $75,000 in payments alleged in a March 19, 2020 cease and desist letter (the "C&D Letter") sent by Claimants' counsel. Claimants' demand for damages allegedly arose from the known and unknown claims allegedly emanating from HE's advertisements. The damages exceed the $75,000 amount-in-controversy requirement for diversity jurisdiction. A true and correct copy of the C&D Letter is attached as **Exhibit "3"**.

17. The C&D Letter stated that:

> Thousands of infringements of my clients' motion pictures have occurred at the above [five] IP addresses. . . . . Remedies available to [Claimants] include: . . . Actual and statutory damages of up to $150,000/motion picture; and costs and attorney's fees.

18. On May 1, 2020, the Claimants sent HE a list of over 2,300 IP addresses ("2300 IP List") along with a letter from Claimants' counsel referencing the downloading of additional movies that purportedly evidenced alleged copyright infringement at IP addresses associated with HE's customers. True and correct copies of this list and letter are attached as **Exhibits "4" & "5"**, respectively.

19. According to the C&D Letter, the computation of the alleged monetary damages referenced in the C&D Letter and 2300 IP List would be calculated by multiplying the 30 to 40 movies, which Claimants' counsel alleges were infringed, by $150,000. **[Ex. 5]** Even if HE were to pay a portion of those damages as demanded in the C&D Letter, the allegations of multiple infringements in the C&D Letter clearly demonstrate that the $75,000 amount-in-controversy requirement is exceeded.

20. Personal jurisdiction is proper in the Northern District of California over non-resident NFI, because this Court has specific personal jurisdiction over NFI for at least the reasons provided below:

    **a. First**, NFI has purposefully directed its activities at, and consummated

transactions with, HE in the Northern District of California. NFI purposefully availed itself of the privilege of conducting activities in the Northern District of California thereby invoking the benefits and protections of its laws. These benefits and protections include NFI being licensed to sell insurance in California, and NFI selling one or more insurance policies to HE in the Northern District of California to protect HE's business which it conducts world-wide from the Northern District of California;

b. **Second**, this declaratory relief action arises directly out of the insurance policy that NFI sold to HE in the Northern District of California to protect HE's business in the Northern District of California;

c. **Third**, the exercise of jurisdiction over non-resident NFI in the Northern District of California to resolve these issues comports with fair play and substantial justice. It is reasonable for NFI, an insurer, to expect to be haled into court in the judicial district where its insured, HE, is located, because California law governs NFI's obligations to HE under applicable California choice of law rules. This is especially true because there is a dispute over the applicability of the insured's policy relating to the insured's activities in the HE Declaratory Relief Actions, which are subject to ongoing litigation in this judicial district.

## VENUE

21. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), (b)(1), (b)(2), (c)(2), and (d) because NFI is subject to personal jurisdiction in this judicial district, and because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, in this judicial district.

## INTRADISTRICT ASSIGNMENT

22. Pursuant to Civil L.R. 3-2(d), this action should be assigned to the San

Francisco or Oakland divisions, because this is a civil action that arose in Fremont, California, which is in Alameda County.

23. The California Action pending before Judge Breyer is a "related case" to this declaratory relief action under Civil L.R. 3-12 which defines a related case as one where:

(1) The actions concern substantially the same parties, property, transaction or event; and

(2) It appears likely that there will be an unduly burdensome duplication of labor and expenses or conflicting results if the cases are conducted before different Judges.

24. The California Action involves the "same . . . event" as this declaratory relief action, that is the demands by commonly-represented copyright assertion entities (hereinafter collectively referred to as the "Claimants") for over $500,000 in payments plus other concessions alleged in a March 19, 2020 C&D Letter sent by counsel for the Claimants.

25. The C&D Letter broadly alleges:

[T]he Internet [S]ervice [HE] provides to its subscribers at IP addresses . . . . . ha[s] [been used] repeatedly [by subscribers to] infringe[] the copyright in [Claimants'] motion pictures . . . . [Claimants] request that: (1) HE agree to immediate[ly] terminate all Internet [S]ervice to the subscribers at the above IP addresses; (2) HE agrees to take the appropriate action to terminate subscriber accounts in response to all further copyright notifications received from [Claimants'] agent; and (3) pay a portion of my clients' damages.

26. HE filed the California Action to obtain a judgment that it did not infringe as alleged in the C&D Letter or if it did that it was protected from liability by the "safe harbor" provisions of 17 U.S.C. § 512 (Title II of the Digital Millennium Copyright Act).

27. HE filed this declaratory relief action against NFI to obtain reimbursement for the money it expended in bringing the HE Declaratory Relief Actions, including the California Action.

28. Without the C&D Letter there would be neither a California Action nor this declaratory relief action. Accordingly, the C&D Letter is the "same . . . event" that gave rise to both the California Action and this declaratory relief action per L.R. 3-12.

29. If this case were assigned to a different judge there would be "unduly burdensome duplication of labor and expenses . . . ." because resolution of the copyright infringement issues in the California Action would impact this declaratory relief action.

30. More specifically, the determination of any alleged copyright infringement or filing of a counterclaim by Claimants in the California Action has the potential to directly impact NFI's defensive duty and the coverage analysis in this action.

## STATEMENT OF FACTS

31. HE filed the HE Declaratory Relief Actions in response to the C&D Letter.

32. The C&D Letter made broad allegations that IP addresses associated with HE's customers utilized what the C&D Letter referred to as HE's "Internet [S]ervice[s]." The term "Internet [S]ervice" is undefined in the C&D Letter and includes all of HE's IPv4 and IPv6 services that it has advertised about on the internet and its website as the C&D Letter explicitly alleged infringing IPv4 and IPv6 addresses.

33. The C&D Letter also demanded that HE "take the appropriate action to terminate subscriber accounts in response to further copyright notifications" and specifically asserted a claim for monetary damages.

34. The Claimants purport to be owners of copyrighted movies, and include but are not limited to Dallas Buyers Club LLC, Millennium Funding Inc., Bodyguard Products, Inc., UN4 Productions, Inc., LHF Productions, Inc., Rambo V Productions, Inc., Fallen Productions, Inc., and HB Productions, Inc.

35. The HE Declaratory Relief Actions seek declaratory judgement that HE has not infringed, neither directly nor contributorily nor vicariously, any copyrighted materials of Claimants, and in the alternative event that HE is found to have infringed any such rights, that HE is shielded from liability by the "safe harbor" provisions of 17 U.S.C. § 512 (Title II of the Digital Millennium Copyright Act).

36.  NFI's duty to reimburse HE for the HE Declaratory Relief Actions arises from alleged contributory and/or vicarious copyright infringement that allegedly occurred within HE's advertisements during NFI's policy period of January 24, 2015 to January 24, 2016, (hereinafter referred to as the "2015 Policy") by allegedly engaging in advertising or promoting of services that facilitated the alleged infringement of copyrights. A true and correct copy of the 2015 Policy is attached hereto as **Exhibit "6"**.

37.  There are a number of HE customers who signed up during the 2015 Policy for HE's IPv4 "Internet [S]ervice[s]," as referred to in the C&D Letter. A group of those were also customers in 2018 the same year the C&D Letter alleges the infringement occurred. These online sign-ups include but are not limited to sign-ups on September 24, 2015 and January 21, 2016, contemporaneous with and in response to HE's Internet advertisement on Google.

38. The C&D Letter allegations that the advertisements for "Internet [S]ervice[s]" encouraged anyone, whether an HE customer, end user, or any other person, to commit any copyright infringements, including but not limited to the alleged copyright infringements referenced in the C&D Letter are contested by HE.

39. An HE customer signed up for HE's IPv6 Tunnel Broker, an "Internet [S]ervice" as referred to in the C&D Letter in 2018. HE's IPv6 Tunnel Broker allows owners of IPv4 website address or other equipment and software to test if they will work on an IPv6 address. The C&D Letter alleged an IPv6 address associated with HE's customer of infringing in the C&D Letter on September 18, 2018. Multiple sign-ups, however, for the IPv6 "Internet [S]ervice[s]" occurred within the 2015 Policy.

40. A reasonable inference from the C&D Letter is that Claimants will assert customers that signed up during the 2015 Policy allegedly committed copyright infringement at a later date through HE's IPv6 Tunnel Broker, an "Internet [S]ervice" as referred to in the C&D Letter, for two reasons:

   **a. First**, the C&D Letter lists an IPv6 address associated with an HE

customer that allegedly committed copyright infringement demonstrating IPv6 infringement can allegedly occur;

b. **Second**, Claimants have referenced "[t]housands" of alleged copyright infringements at five IP addresses—including the noted IPv6 address—listed in the C&D Letter, evidencing an inference that more alleged IP infringements, including the end users associated with HE IPv6 customers that signed up within the 2015 Policy and who are still customers, are forthcoming.

41. HE customers who signed up for HE's IPv6 Tunnel Broker, an "Internet [S]ervice" per the C&D Letter, utilized the services in HE's advertisement to test whether their IPv4 equipment would work on an IPv6 address. The IPv6 Tunnel Broker also allows end users to test whether their IPv4 addresses work on an IPv6 address.

42. The C&D Letter's broad reference to "Internet [S]ervice" suggests that HE's IPv6 Tunnel Broker advertisement encouraged the alleged copyright infringement. HE contests that was its effect.

43. Certain end users allegedly used HE's IPv6 Tunnel Broker, an "Internet [S]ervice[s]" as referred to in the C&D Letter, to allegedly commit the copyright infringements referenced in the C&D Letter, though HE contests it did not directly or indirectly encourage the alleged infringement.

44. The C&D Letter, in addition to the reasonable inference of Claimants' forthcoming allegations of further copyright infringement on IPv6 addresses, allege that HE owes Claimants damages for the alleged copyright infringements that allegedly arose from HE's IPv6 advertisement.

## THE 2015 POLICY

45. NFI issued to HE the 2015 Policy [**Ex. 6**]. The 2015 Policy incorporates occurrence-based coverage per Form CG0001 4-13. The NFI Policy provides "Personal & Advertising Injury" limit of $1,000,000 and a "General Aggregate" limit of $2,000,000.

46. The NFI Policy states in pertinent part:

COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

1. Insuring Agreement

a. We will pay those sums that the Insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the Insured against any suit seeking those damages. . . . .We may, at our discretion, investigate any offense and settle any claim or suit that may result. . . .

…

SECTION V – DEFINITIONS

1. Advertisement means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet . . . ; and

b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

…

14. . . . [A]dvertising injury means injury . . . arising out of one or more of the following offenses: . . .

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement."

…

18. Suit means a civil proceeding in which damages because . . . "advertising injury" to which this insurance applies are alleged. Suit includes: . . .

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the Insured submits . . . .

**NFI'S DENIAL OF ANY DUTY TO DEFEND THE C&D LETTER CLAIMS**

47. On or about May 27, 2020, HE gave notice to NFI through CNA, the parent company of NFI, of the alleged copyright claims made against HE. CNA functions as

NFI's claim representative entity that interacts with insureds on behalf of NFI, through its insurance broker. HE requested that NFI provide coverage for the claims. A true and correct copy of this notice is attached as **Exhibit "7"**.

48. A true and correct copy of NFI's acknowledgement of notice email dated June 4, 2020 is attached as **Exhibit "8"**.

49. By letter dated July 1, 2020, NFI acknowledged tender of the matter but denied HE coverage for the alleged claims of copyright infringement. In its denial letter, NFI denied coverage based on its stated view that NFI had no duty to defend or indemnify HE in the absence of a "suit." A true and correct copy of NFI's July 1, 2020 denial letter is attached as **Exhibit "9"**.

50. HE submitted a demand for policy benefits in connection with a notice of mediation, but NFI did not agree to participate in mediation, which was scheduled for July 30, 2020. NFI has not revisited the potential for coverage in light of the fact that the suit requirement in its policy has now been met. A true and correct copy of the Notice to NFI and NFI's Denial to Participate in HE's and Claimants' Scheduled Mediation Proceeding is attached as **Exhibit "10".**

51. NFI also asserted in its denial letter that the HE Declaratory Relief Actions did not allege an "advertising injury" offense within the NFI policy period. NFI failed to identify any facts to support its assertion that the HE Declaratory Relief Actions do not assert any claims for "advertising injury."

## NO SUIT NEED BE FILED AGAINST HE BECAUSE A MEDIATION OCCURRED

52. On July 30, 2020 HE and Claimants, mediated the disputes addressed in the HE Declaratory Relief Actions. **[Ex. 10]**

53. A "mediation" is an "alternative dispute resolution" proceeding within the meaning of NFI's policy because per section "3-4. ADR Options" of the local rules on Alternative Dispute Resolution for the Northern District of California state that: "[t]he court sponsored ADR options . . . include: . . . 2. mediation." A true and correct copy

of these local rules is attached as **Exhibit "11"** and the relevant section can be found on page seven.

54. NFI's representative, Catherine Gardner, was duly advised about the mediation on Friday July 24, 2020. This event occurred one week prior to the mediation. On July 27, 2020, NFI refused to recognize any coverage obligations arising from the C&D Letter. NFI's agreement to allow the mediation to proceed to resolve these disputes was not a requirement to proceed.

55. Moreover, in an email on July 28, 2020, NFI acknowledged the communications and declined to participate in the mediation. **[Ex. 10]** Under the terms of the 2015 Policy, NFI cannot refuse to agree that a mediation proceeding after its declination of a defense does not satisfy the definition of an "alternative dispute resolution" within the suit provision of its policy.

56. NFI's duty to participate in settlement is not impacted by whether there may be coverage for a judgment entered in any lawsuits that Claimants pursue against HE. Rather, it is impacted by whether there is a potential for coverage for the claims asserted including the demand for monetary damages in the C&D Letter.

57. NFI's denial of its obligation to defend the claims asserted in the C&D Letter forfeited its ability to control resolution of the claims asserted therein. Any settlement for a reasonable sum which fell within the 2015 Policy's coverage would obligate NFI to pay that sum.

58. At no time has NFI contended that pursuit of a mediation was contrary to HE's right as an NFI insured. Nor that the pursuit of mediation did not meet the requirement for implementation of an "alternative dispute resolution" procedure meeting the definition of a "suit" within the 2015 Policy. NFI thereby effectively conceded that any resolution achieved in mediation might govern NFI's legal obligations.

59. Any contention by NFI that only a counterclaim would trigger its duty to participate in funding defensive activity after the filing of the C&D Letter ignores the

ability of parties to pursue "alternative dispute resolution" in lieu of a "suit."

60. Accordingly, any resolution achieved in HE's mediation, that is within the 2015 Policy's coverage, is binding on NFI.

## HE IS ENTITLED TO COVERAGE BECAUSE OF INJURY ARISING OUT OF ALLEGED INFRINGEMENT IN ITS ADVERTISEMENTS

### The 2015 Policy Language And The Possibility For Coverage Triggering Event To Occur After The 2015 Policy

61.    The 2015 Policy provides:

> We will pay those sums that the Insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the Insured against any suit seeking those damages. . . . We may, at our discretion, investigate any offense and settle any claim or suit that may result

62.    The 2015 Policy defines advertising injury as:

> . . . injury . . . arising out of one or more of the following offenses: . . . g. Infringing upon another's copyright . . . in your "advertisement."

63. Damages because of "injur[ies] arising out of . . . [i]nfringement" need not occur within the temporal time frame of the 2015 Policy, but rather can arise subsequently, so long as the event that originally triggered the subsequent coverage obligation occurred during the policy.

64. Here the event that originally triggered the subsequent coverage obligation, namely the HE advertisements, occurred during the 2015 Policy. Specifically, the HE advertisements were published during the 2015 Policy. These advertisements promoted services referenced in the C&D Letter's as "Internet [S]ervice[s]." The C&D Letter thereby alleges HE's advertisements contributed to the alleged infringements in the C&D Letter (as well as inducing or contributing to subsequently-discovered infringements).

### The Copyright Infringement Requirement Of The 2015 Policy Is Met

65. Copyright infringement has two essential elements. The first is ownership of

1    a valid copyright. The second is the copying of constituent elements of the work that
2    are original.

3        66. Regarding the first element, the C&D Letter states the Claimants are "the
4    owners of the copyright protected motion pictures . . ." Thus, the first element is met.

5        67. Regarding the second element, the C&D Letter alleges that IP addresses
6    associated with HE's customers committed "[t]housands of infringements of
7    [Claimants'] motion pictures." The C&D Letter also alleges that IPv4 addresses and an
8    IPv6 address utilized HE's "Internet [S]ervice," to access "movie piracy websites." The
9    alleged download of an entire movie is alleged copying the constituent elements of the
10   work that are original. Therefore, the C&D Letter alleges wholesale copying of the
11   Claimants' copyrighted movies. This allegation satisfies the second element of
12   copyright infringement.

13   **The Google Advertisement For HE's "Internet Service" Constitutes An**
14   **"Advertising Injury Arising Out Of Infringement In Your Advertisement"**

15       68. The "advertising injury . . . arising out of" requirement of the 2015 Policy is
16   met. "Arising out of" as used in the definition of "advertising injury," is undefined in
17   the 2015 Policy. The plain meaning of the term "arising out of" means "originating
18   from," "having its origin in," "growing out of," "flowing from," incident to," or "having
19   connection with."

20       69. The "advertising injury . . . arising out of" requirement is met here, because
21   the C&D Letter alleges that HE's "Internet [S]ervice[s]" advertised in HE's Google
22   advertisement were used by end-users of those services to commit the alleged copyright
23   infringement. Attached as **Exhibit "12"** is a true and correct copy the referenced Google
24   advertisement.

25       70. Claimants' allegations that the Google advertisement encouraged any of the
26   alleged copyright infringements referenced in the C&D Letter or the 2300 IP List are
27   contested by HE.

28       71. HE's Google advertisement for services during the 2015 Policy advertised

services including:

> IP Transit For Your Network, Reach More Networks With Lower Latency. Price Matching. Turn up within 7 days. 24 x 7 NOC. Features: Port Availability, Flexible Billing, Rapid Turnaround Capability, Ability To Grow With You.

72. HE's IPv4 and IPv6 customers gain access to services such as, connection to a high speed port, referenced in the Google advertisement and hereinafter referenced as "Port Availability." HE also offers Port Availability within one day and 24-hour Network Operation Centers that can respond to any technical difficulty customers are having (these services, along with other services including IP Transit, Lower Latency, and Rapid Turnaround Capability are sometimes referred to as HE's "Internet Service Connection").

73. Multiple customers associated with IP addresses that were alleged to be used by Customers/End-Users to infringe Claimants' copyrights signed-up with HE's Internet Service Connection during the 2015 Policy to gain access to HE's services and features, such as Port Availability, for example, as advertised in HE's Google advertisement.

74. Claimants' allege that HE's Google advertisement may have encouraged Customers/End-Users to commit the alleged infringement, but HE contends otherwise.

75. Thus, "advertising injury . . . arising out of" is met because the Claimants demands for monetary damages "originat[ed] from" HE's Google advertisement for HE's Internet Service Connection services during the 2015 Policy.

76. The "in your advertisement" element of the 2015 Policy is also met.

77. One of the services in HE's Google advertisement was Port Availability. It allows HE's customers, including those with allegedly infringing IP addresses in the 2300 IP List and C&D Letter, to connect at a data center. Thereby the advertised Port Availability allegedly allowed the alleged copyright infringers to access the Internet and allegedly download and/or upload Claimants' copyrighted movies.

78. Thus the services advertised in HE's Google advertisement that enticed HE's

customers to sign up for the Internet Service Connection during the 2015 Policy later allegedly led to the alleged copyright infringement that Claimants assert in the C&D Letter. These infringements allegedly occurred at some point thereafter within the three-year statute of limitations as tolled from the date of discovery in 2018. For example, the C&D Letter states there was an alleged infringement of a movie "at the IP address . . . at time stamp 2018-10-19 . . . ."

79. Claimants' allegations that the Google advertisement may have encouraged the alleged infringements referenced in the C&D Letter or the 2300 IP List, are contested by HE.

80. Thus, the Port Availability feature referenced in the Google advertisement for the Internet Service Connection has allegedly contributed to the Claimants' alleged copyright infringement in the C&D Letter, and satisfies the 2015 Policy requirement that damages arise out of "[i]nfringing upon another's copyright . . . in your advertisement".

**The IPv6 Tunnel Broker Advertisement For HE's "Internet Service" Constitutes An "Advertising Injury Arising Out Of Infringement In Your Advertisement"**

81. The "arising out of" injury is met for the IPv6 Tunnel Broker as well. As referenced above, the 2015 Policy does not define "arising out of" and can be defined as "originating from."

82. The IPv6 Tunnel Broker webpage advertisement in 2015 that allowed IPv6 customers to sign up for easy access in response to this advertisement, advertised "Internet [S]ervice," as referred to in the C&D Letter, that the alleged infringers allegedly used to download and/or upload Claimants' movies. Although Claimants' allegations appear to assert the IPv6 Tunnel Broker webpage advertisement may have encouraged the alleged infringement referenced in the C&D Letter, HE contends otherwise. Attached as **Exhibit "13"** is a true and correct copy of an Archive from Way Back Machine of HE's IPv6 Tunnel Broker webpage advertisement dated March 7, 2015.

83. The IPv6 Tunnel Broker webpage advertisement stated:

Welcome to the Hurricane Electric IPv6 Tunnel Broker! Our free tunnel broker service enables you to reach the IPv6 Internet by tunneling over existing IPv4 connections from your IPv6 enabled host or router to one of our IPv6 routers. To use this service you need to have an IPv6 capable host (IPv6 support is available for most platforms) or router which also has IPv4 (existing Internet) connectivity. Our tunnel service is oriented towards developers and experimenters that want a stable tunnel platform.

84. The C&D Letter lists an IPv6 address associated with one of HE's Customers/End-Users that allegedly committed copyright infringement by facilitating the IPv6 address's seamless utilization through the IPv6 Tunnel Broker supplied by HE as it advertised the IPv6 Tunnel Broker in 2015. Claimants' allegations appear to state the IPv6 Tunnel Broker advertisement may have encouraged the alleged infringement, but HE contends otherwise.

85. The C&D Letter also states that "[t]housands of infringements of my client's motion pictures have occurred at the above IP addresses," which includes an address for HE's IPv6 Tunnel Broker service.

86. There is a reasonable inference from the C&D Letter that Claimants will assert customers that signed up during the 2015 Policy allegedly committed copyright infringement at a later date through HE's IPv6 Tunnel Broker, an "Internet [S]ervice" as referred to in the C&D Letter, for two reasons:

    **a. First**, the C&D Letter lists an IPv6 address associated with an HE customer that allegedly committed copyright infringement demonstrating IPv6 infringement can allegedly occur;

    **b. Second**, Claimants have referenced "[t]housands" of alleged copyright infringement at five IP addresses—including the noted IPv6 address—listed in the C&D Letter, evidencing an inference that more alleged IP infringements, including the end users associated with HE IPv6 customers that signed up within the 2015 Policy and who are still customers, are forthcoming.

87. Multiple customers signed-up for HE's IPv6 Tunnel Broker service during the 2015 Policy. These customers used the IPv6 Tunnel Broker to test whether they could change their IPv4 services to IPv6 during the 2015 Policy. Customers would be wary to switch if they could not first test whether their IPv4 equipment and software will work on IPv6.

88. Thus, "advertising injury . . . arising out of" is met because the Claimants' demands for monetary damages in the C&D Letter "originat[ed] from" HE's advertisement of its IPv6 Tunnel Broker service during the 2015 Policy.

89. The "in your advertisement" requirement of the 2015 Policy is met here as well because:

a. **First**, the advertised services on HE's website for the IPv6 Tunnel Broker include allowing HE's customers to offer newer and improved IP addresses to all of that customer's end users. The end users can allegedly then utilize the new IPv6 setup to allegedly download and/or upload copyrighted movies at their new IPv6 addresses as alleged in the C&D Letter. Although the Claimants' allegations appear to state the advertisement on HE's webpage for the IPv6 Tunnel Broker may have encouraged the alleged infringements referenced in the C&D Letter, HE contends otherwise.

b. **Second**, the end users allegedly downloaded the copyrighted movies easier with HE's IPv6 addresses and HE's IPv6 Tunnel Broker. The service advertised on the IPv6 Tunnel Broker webpage enticed Customers/End-Users to sign up during the 2015 Policy, and is alleged to have led to the alleged copyright infringements and demand for monetary damages in the C&D Letter, and satisfies the "infringing upon another's copyright . . . in your advertisement" requirement of the 2015 Policy. Claimants' allegations appear to state the advertisement on HE's webpage for the IPv6 Tunnel Broker may have encouraged the alleged

infringements referenced in the C&D Letter. HE contends otherwise.

90. Thus, the C&D Letter's reference to "Internet [S]ervice[s]" includes HE's Google advertisement and HE's IPv6 Tunnel Broker Webpage Advertising and satisfies the "infringing upon another's copyright . . . in your advertisement" under the 2015 Policy.

### The 2015 Policy's Definition Of Advertisement

91.   The 2015 Policy defines an "advertisement" as:

1. a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

### HE's Google Advertisement

92. HE advertisement for HE's IPv4 and IPv6 "Internet [S]ervice" that was broadcasted to the general public on the Internet via Google. The Google advertisement was a "notice" that was "placed on the internet" pursuant to the 2015 Policy. **[Ex. 6]**

93. The Google advertisement included the following statements:

IP Transit For Your Network, Reach More Networks With Lower Latency. Turn up within 7 days. 24 x 7 NOC. Features: Port Availability, Flexible Billing, Rapid Turnaround Capability, Ability to Grow With You.

94. The Google advertisement was "placed on the Internet" at HE's behest. It describes HE's "goods, products or services." HE paid Google to arrange the words in this advertisement to "attract[] customers and supporters."

95. The Google advertisement appeared during the 2015 Policy. It enticed multiple customers to sign up for HE's "Internet [S]ervice," as the C&D Letter references. Some of the IPv4 addresses identified as allegedly associated with end-user infringement by the 2300 IP List and/or C&D Letter in 2018 were associated with these

customers that signed-up in 2015. The C&D Letter may contend via its blanket reference to "Internet [S]ervice[s]" that the Google advertisement encouraged these customers or IP addresses to commit the alleged infringement. HE, however, contends otherwise.

96. HE's IPv4 and IPv6 customers gain access to services such as Port Availability and the Internet Service Connection. Once HE has connected a customer to a data center, the customer may contact a service provider to take that connection from the port and provide it to end users like residences and businesses.

97. This service, and the others listed in the Google advertisement, attract customers like the ones that signed-up in 2015 and which have IP addresses identified as allegedly associated with end-user infringement by the 2300 IP List and/or C&D Letter in 2018.

98. The Google advertisement therefore evidences a covered "advertisement" within a reasonable construction of that term in the 2015 Policy.

### HE's IPv6 Tunnel Broker Advertisement

99. The IPv6 Tunnel Broker webpage also constitutes an advertisement within the 2015 policy. The IPv6 Tunnel Broker webpage is a "web site that is about [HE's] [Tunnel Broker] service for the purposes of attracting customers."

100.   During the 2015 Policy, and prior to the customers signing up for the IPv6 Tunnel Broker service in March, 2015, the IPv6 Tunnel Broker webpage stated:

> Welcome to the Hurricane Electric IPv6 Tunnel Broker! Our free tunnel broker service enables you to reach the IPv6 Internet by tunneling over existing IPv4 connections from your IPv6 enabled host or router to one of our IPv6 routers. To use this service you need to have an IPv6 capable host (IPv6 support is available for most platforms) or router which also has IPv4 (existing Internet) connectivity. Our tunnel service is oriented towards developers and experimenters that want a stable tunnel platform.

> Advantages of using our tunnel service over others include:

> Run by a Business ISP with 24 x 7 staff at multiple locations and an International backbone . . .

Ability to get your own /48 prefix once your tunnel is up

Ability to get a full view of the IPv6 BGP4+ routing table

Ability to use your tunnel now after a simple registration process. (It takes less than a minute.)

Ability to create your tunnel on geographically diverse tunnel-servers (Ashburn, Chicago, Dallas, Denver, Fremont, Kansas City, Los Angeles, Miami, New York, Palo Alto, Phoenix, San Jose, Seattle, Toronto, Winnipeg, Amsterdam, Berlin, Budapest, Frankfurt, London, Paris, Prague, Stockholm, Stockholm, Warsaw, Zurich, Hong Kong, Singapore, and Tokyo.

101.   The definition of an "advertisement" in the 2015 Policy is met because the IPv6 Tunnel Broker webpage is a "notice . . . broadcast . . . to a specific market segment," i.e. HE's IPv4 clients, developers, and experimenters.

102.   The IPv6 Tunnel Broker webpage is a "web site[] . . . that is about [HE's] goods, products, or services for the purpose of attracting customers or supporters . . . ." The IPv6 Tunnel Broker is free to encourage developers and experimenters to be sure their devices, software, and webpages are compatible with IPv6. This is to encourage these groups to switch from an IPv4 address to an IPv6 address from which HE would profit since it offers IPv6 connections. The IPv6 Tunnel Broker webpage's entire purpose is to "attract[] customers" to switch from IPv4 to IPv6, for which HE is the world leader.

103.   Thus, the IPv6 Tunnel Broker webpage constitutes an "advertisement" within the terms of the 2015 Policy.

### THE 2015 POLICY REQUIREMENT OF "DAMAGES BECAUSE OF INJURY ARISING OUT OF 'ADVERTISING INJURY'"

### Pertinent 2015 Policy Language

104.   The 2015 Policy states:

We will pay those sums that the Insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.

105.  The 2015 Policy goes on to define "advertising injury" as:

14. . . [I]njury . . . arising out of . . . : . . .
g. Infringing upon another's copyright . . . in your "advertisement."

**The 2015 Policy "Injury Arising Out Of" Requirement Is Met**

106.  "Injury arising out of" within the context of an insurance agreement has been broadly defined to mean "originating from," or "having its origin in."

107.  The C&D Letter alleged that end users utilized IPv4 addresses and an IPv6 address to allegedly commit infringement in 2018 that originated from the Google advertisement because:

 a.  **First,** the C&D Letter alleged that IPv4 addresses were utilized to commit infringement on February 16, 2018, March 6, 2018, and August 24, 2018. Some of these IPv4 addresses are associated with HE customers who signed up for HE's Port Availability and Internet Service Connection in 2015 in response to the Google advertisement;

 b.  **Second,** without the advertisement for HE's Port Availability or Internet Service Connection the customers would not have signed up for these "Internet [S]ervice[s]" as referenced in the C&D Letter;

 c.  **Third,** without the advertisement, the end users associated with the customers who utilized Port Availability and the Internet Service Connection could not have committed the alleged copyright infringement because without these services the copyright infringement the end users allegedly committed could not have occurred, HE, however, contests that it encouraged anybody to commit copyright infringement with the advertisement;

 d.  **Fourth,** the C&D Letter's reference to end users allegedly employing HE's "Internet [S]ervice" is broad and undefined and can be reasonably construed to include HE's Port Availability and Internet Service Connection.

108.   Thus, the C&D Letter alleges an "injury" that originates from or has its origin in HE's Google advertisement published during the 2015 Policy.

109.   The C&D Letter also alleged that an end user utilized an IPv6 address associated with an HE Customer/End-User to allegedly commit copyright infringement had its origin in the IPv6 Tunnel Broker webpage advertisement because:

    a. **First,** the C&D Letter alleges that an IPv6 address was utilized to commit the alleged infringement on September 19, 2018;

    b. **Second,** there is a reasonable inference from the C&D Letter that Claimants will assert customers that signed up during the 2015 Policy allegedly committed copyright infringement at a later date before the expiration of the Statute of Limitations through HE's IPv6 Tunnel Broker, for two reasons:

        i. **First**, the C&D Letter lists an IPv6 address associated with an HE customer that allegedly committed copyright infringement demonstrating IPv6 infringement can allegedly occur;

        ii. **Second**, Claimants have referenced "[t]housands" of alleged copyright infringement at five IP addresses—including the noted IPv6 address—listed in the C&D Letter, evidencing an inference that more alleged IP infringements, including the end users associated with HE IPv6 customers that signed up within the 2015 Policy and who are still customers, are forthcoming;

    c. **Third,** without the advertisement for HE's IPv6 Tunnel Broker HE customers and other non-associated end users would not have utilized this "Internet [S]ervice" as referenced in the C&D Letter. More critically, these potential users would have otherwise been unaware that the service was free;

    d. **Fourth,** without the advertisement the end users associated with customers who utilized the IPv6 Tunnel Broker could not have committed

the alleged infringement. This is because the HE customer or non-associated end user would not have wanted to switch to an IPv6 system without knowing first that it worked. The IPv6 Tunnel Broker allows for the testing of whether IPv4 system will work on an IPv6 system. HE, however, contends that it encouraged infringement with its advertisement;

e. **Fifth,** the C&D Letter alleges that the IPv6 address utilized HE's "Internet [S]ervice," which can be reasonably construed to include the service provided in the IPv6 Tunnel Broker.

110.   Thus, the C&D Letter alleges an "injury" that originates from or has its origin in HE's IPv6 Tunnel Broker webpage advertisement published during the 2015 Policy.

**The 2015 Policy's Requirement Of**

**"Damages Because Of" Requirement Is Met**

111.   "Damages because of" is not defined in the 2015 Policy. It means "damages" for "advertising injury" caused by "infringement in your advertisement."

112.   Copyright infringement is comprised of two elements ownership of a valid copyright and the copying of constituent elements of the work that are original.

113.   The C&D Letter alleges "damages because of" for the following reasons:

a. **First,** the C&D Letter explicitly states that it wants HE "to pay a portion of [Claimants] damages." These damages stem from the "Internet Service[s]" that HE provides to customers. These customers allegedly have IP addresses associated with that allegedly downloaded movies from websites by allegedly using HE's "Internet [S]ervice";

b. **Second,** the C&D Letter states that the Claimants are "the owners of the copyright motion pictures . . .";

c. **Third,** absent the advertisements HE customers would not have signed up for these "Internet [S]ervice[s]" and the alleged infringers could not have allegedly downloaded the movies. Without the alleged ability to

1    download movies there would be no "damages" in this case;

2    **d.  Fourth,** "Internet [S]ervice" is not defined by the C&D Letter and is

3    reasonably construed to include the services that HE advertised for in the

4    Google advertisement and the IPv6 Tunnel Broker webpage

5    advertisement.

6    114.  Thus, the "damages because of" requirement is met here since the

7    Claimants' C&D Letter is seeking monetary damages against HE that allegedly arise

8    form HE's advertisements. In other words, HE Customers/End-Users signed up

9    "Internet [S]ervice[s]," referenced in the C&D letter, "because of" HE's advertisements

10   which led to the Claimants' assertion for damages for the alleged infringement by end

11   users. HE, however, contests that its advertisements encouraged the alleged

12   infringement.

13                      **THE STATUTE OF LIMITATIONS IS**

14                      **TOLLED BY THE DISCOVERY RULE**

15   115.  Copyright infringement claims have a three-year statute of limitations that

16   is tolled by the "discovery rule." This means that any outstanding alleged copyright

17   infringement claims triggered by customers that signed up for IPv4 and IPv6 services

18   in response to HE advertisements during the 2015 Policy that Claimants have yet to

19   discover are still actionable.

20   116.  Given that Claimants asserted that the IP addresses associated with

21   multiple of HE's customers, who signed up during the 2015 Policy, have allegedly

22   committed copyright infringement at unknown dates, there has been no determination

23   in the HE Declaratory Relief Actions that determines when Claimants' alleged rights

24   accrue. Claimants' alleged rights could potentially accrue at any time, so there is no

25   basis to conclude that the statute of limitations has run for any claims otherwise

26   potentially covered by the 2015 Policy.

27   117.  HE cannot identify the individual end users using the allegedly infringing

28   IP addresses associated with the customers who signed up for the IPv4 services HE

1   offered and advertised during the 2015 Policy.

2       118.   HE cannot identify the individual end users using the allegedly infringing

3   IP addresses associated with the customers who signed up for the IPv6 services HE

4   offered and advertised during the 2015 Policy.

5       119.  Claimants are likely to make additional allegations of copyright

6   infringement against HE arising from alleged actions of end users associated with HE's

7   customers of HE's IPv4 and IPv6 "Internet [S]ervice[s]," as referred to in the C&D

8   Letter, who signed up for those services when they were offered and advertised by HE

9   during the 2015 Policy.

10   **HE IS ENTITLED TO REIMBURSEMENT FOR FEES INCURRED FOR**

11   **SERVICES "CONDUCTED AGAINST LIABILITY"**

12       120.  The HE Declaratory Relief Actions comprise legal activity undertaken by

13   HE in response to the claims for liability asserted in the C&D Letter against HE.

14       121.  California law requires NFI to reimburse HE's attorney fees incurred in

15   the pursuit of the HE Declaratory Relief Actions against Claimants, because the HE

16   Declaratory Relief Actions are defensive of the C&D Letter seeking monetary damages

17   and other relief against HE.

18       122.  The HE Declaratory Relief Actions also responded to Claimants' service

19   of a subpoena on HE listing only one of the Claimants. Claimants improperly used that

20   subpoena to secure extensive *ex parte* communications with HE.

21       123.  The information Claimants secured through the subpoena led the

22   Claimants to demand that HE take immediate action against third-party alleged

23   copyright infringers referenced in the C&D Letter, who were unidentified and/or

24   unknown to HE. Claimants' demands for money from HE were premised on HE's

25   alleged contributory copyright infringement via HE's advertisements to solicit users for

26   its "Internet [S]ervice[s]" as described in the C&D Letter.

27       124.  The Claimants' communications with HE that led HE to file the HE

28   Declaratory Relief Actions include the C&D Letter **[Ex. 3]**, a letter from Claimants'

counsel sent on May 1, 2020 [**Ex. 5**], a letter to Claimants' counsel from HE sent on May 15, 2020 misdated as being sent on June 15, 2020, a true and correct copy of which is attached as **Exhibit "14"**, and a letter from Claimants' counsel from May 20, 2020, a true and correct copy of which is attached as **Exhibit "15"**.

## CLAIMS

### First Claim

### Declaratory Relief Against NFI

125.   HE repeats and re-alleges the allegations in the above paragraphs 1 through 124 as if fully set forth herein.

126.   A valid contract existed between HE and NFI, namely the 2015 Policy.

127.   HE fully performed all of the obligations and conditions to be performed by it under the 2015 Policy, or has been excused from performing the same because of NFI's breach of its duty to defend the Claimants' monetary damages claims.

128.   By selling the 2015 Policy to HE, NFI agreed to provide HE with a defense for suit seeking damages for "personal and advertising injury" offense, as defined in the 2015 Policy.

129.   The Claimants' demands in the C&D Letter allege facts potentially implicating coverage under the 2015 Policy for "personal and advertising injury," offense (g) liability, thereby triggering NFI's obligation to settle and/or defend HE from those asserted claims.

130.   The Claimants' demand for damages required NFI to address, and if possible settle, the claim against HE articulated in the C&D Letter.

131.   The Claimants' demand for damages required NFI to reimburse HE for fees and costs HE expended to prosecute the HE Declaratory Relief Actions that were "conducted against liability" for the Claimants' C&D Letter demands.

132.   NFI has refused to reimburse HE for fees and costs HE expended to prosecute the HE Declaratory Relief Actions, despite HE's defensive role in the HE Declaratory Relief Actions "conducted against liability" for the Claimants' C&D Letter

1  demands.

2      133.   An actual bona fide controversy exists between HE, on the one hand, and

3  NFI, on the other that requires a judicial declaration by this Court of the party's rights

4  and duties regarding potential of coverage under the NFI policy, namely NFI's duty to

5  reimburse HE for the defensive HE Declaratory Relief Actions.

6      134.   HE has suffered, and absent action by this Court will continue to suffer,

7  legally cognizable damages as a result of NFI's improper and unjustified refusal to

8  reimburse HE for fees and costs HE expended to prosecute the HE Declaratory Relief

9  Actions.

10     135.   HE is entitled to injunctive, monetary, and other relief from NFI.

11                              **PRAYER FOR RELIEF**

12  **WHEREFORE**, HE prays for judgment against NFI as follows:

13  A. A judicial declaration that NFI had and has a duty under the 2015 policy NFI

14      issued to HE to defend HE against the Claimants' demands that are the subject

15      of the HE Declaratory Relief Actions;

16  B. A determination that the HE Declaratory Relief Actions were "conducted

17      against liability" by HE pursuant to the 2015 policy NFI issued to HE;

18  C. A judicial declaration that NFI's duty to defend HE, under the 2015 policy

19      NFI issued to HE, encompasses reimbursement of the fees and costs expended

20      by HE in pursuit of the HE Declaratory Relief Actions;

21  D. A determination and an award of general damages comprising reimbursement

22      by NFI for all fees and costs incurred by HE in connection with the HE

23      Declaratory Relief Actions;

24  / / /

25  / / /

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E.  An award of prejudgment interest accruing from the date of each invoice related to the HE Declaratory Relief Actions at the statutory rate of 10% per annum pursuant to applicable California law from the date of each invoice;

F.  An award of costs of suit; and

G.  Such other and further relief as this Court deems just and proper.


Dated: August 19, 2020                    **GAUNTLETT & ASSOCIATES**

/s/ David A. Gauntlett

David A. Gauntlett (SBN 96399)

info@gauntlettlaw.com

James A. Lowe (SBN 214383)

jal@gauntlettlaw.com

18400 Von Karman, Suite 300

Irvine, California 92612

Telephone: (949) 553-1010

Facsimile: (949) 553-2050

Attorneys for Plaintiff

HURRICANE ELECTRIC, LLC

1

## EXHIBITS TO COMPLAINT

2   **EXHIBIT "1"** – Declaratory Relief Action filed by HE styled *Hurricane Electric, LLC,*
3   *v. Dallas Buyers Club, LLC, et al.*, Case No. 4:20-cv-03813

4   **EXHIBIT "2"** – Declaratory Relief Action filed by HE styled *Hurricane Electric, LLC,*
5   *v. Millennium Funding, Inc., et al.*, Case No. 2:20-cv-01034

6   **EXHIBIT "3"** – Cease and Desist Letter from Claimants dated March 19, 2020

7   **EXHIBIT "4"** – 2300 IP List sent with Claimants' Reply Letter dated May 1, 2020

8   **EXHIBIT "5"** – Reply Letter from Claimants' Counsel dated May 1, 2020

9   **EXHIBIT "6"** – NFI's Commercial General Liability Policy No. C 5091119138 issued
10   by NFI for the period January 24, 2015 to January 24, 2016

11   **EXHIBIT "7"** – HE's Email Notice to NFI dated May 27, 2020

12   **EXHIBIT "8"** – NFI's Acknowledgement of HE's Notice dated June 4, 2020

13   **EXHIBIT "9"** – NFI's Denial of Coverage dated July 1, 2020

14   **EXHIBIT "10"** – Notice to NFI and NFI's Denial to Participate in HE and Claimants
15   Scheduled Mediation Proceeding

16   **EXHIBIT "11"** – The Northern District of California's Local Rules on Alternative
17   Dispute Resolution

18   **EXHIBIT "12"** – HE's Google Advertisement for Internet Service Connection
19   Services dated September 24, 2015

20   **EXHIBIT "13"** – Archive from Way Back Machine of HE's IPv6 Tunnel Broker
21   webpage Advertisement dated March 7, 2015

22   **EXHIBIT "14"** – Letter to Claimants' Counsel from HE sent May 15, 2020 but
23   misdated as being sent on June 15, 2020

24   **EXHIBIT "15"** – Letter from Claimants' Counsel to HE dated May 20, 2020

25

26

27

28