NEIL D. GREENSTEIN (SBN 123980)
TECHMARK
1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
Telephone (347) 514-7717
Facsimile: (408) 280-2250
Email: ndg@techmark.com

MARTIN R. GREENSTEIN (SBN 106789)
TECHMARK, A Law Corporation
4820 HARWOOD ROAD, SUITE 110
SAN JOSE, CA 95124
Telephone: (408) 266-4700
Facsimile: (408) 850-1955
Email: mrg@techmark.com

Attorneys for Plaintiff
HURRICANE ELECTRIC LLC

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HURRICANE ELECTRIC LLC,<br><br>        Plaintiff,<br>    v.<br><br>DALLAS BUYERS CLUB, LLC, a California LLC; DALLAS BUYERS CLUB, LLC, a Texas LLC; GLACIER FILMS 1, LLC; DOUBLE LIFE PRODUCTIONS, INC.; VOLTAGE PICTURES, LLC; ORION RELEASING, LLC; COOK PRODUCTIONS, LLC; WWE STUDIOS FINANCE CORP.; MON, LLC; TBV PRODUCTIONS, LLC; CELL FILM HOLDINGS, LLC; VENICE PI, LLC; SURVIVOR PRODUCTIONS, INC.; I AM WRATH PRODUCTION, INC.; POW NEVADA, LLC; HEADHUNTER, LLC; NICOLAS CHARTIER; CRAIG J. FLORES; AVI LERNER; VOLTAGE PRODUCTIONS, INC.; KILLING LINK DISTRIBUTION, LLC; MILLENIUM ENTERTAINMENT, LLC; and DOES 1-20, | CASE NO.<br><br>**COMPLAINT FOR COPYRIGHT MISUSE AND DECLARATORY JUDGMENT OF NO COPYRIGHT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

Defendants.

Plaintiff Hurricane Electric LLC ("Plaintiff" or "HE"), by counsel, for its Complaint against all of the defendants identified herein ("Defendants"), alleges on knowledge as to its own actions, and otherwise Plaintiff is informed and believes and thereon alleges, as follows:

## NATURE OF THE ACTION

1.      This is an action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, seeking a declaratory judgment that Plaintiff has not infringed any alleged copyright rights of Defendants (including any of Defendants' predecessors and/or successors in interest), directly, contributorily, or vicariously, and in the alternative, to the extent it is found that HE has infringed any such alleged rights, that HE is shielded from liability by Title II of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 512, also known as the "safe harbor" provisions of the Online Copyright Infringement Liability Limitation Act (OCILLA).

2.      This action arises from Defendants' counsel serving a subpoena on HE (listing one named Defendant but in the interest of all Defendants), to demand publicly-available information from HE, then improperly using that subpoena in extensive *ex parte* communications with HE to fish for additional information from HE. This led to all Defendants making ever-growing copyright infringement allegations and demands that HE must take action against alleged third-party copyright infringers unidentified to and unknown to HE and with which HE has no relationship and no direct control over, or face legal consequences.

3.      Defendants' cease and desist letters are demanding that upstream service providers like HE simply shut down entire Internet Service Providers (ISPs) that provide Internet access to thousands and sometimes tens of thousands of people, based solely on allegations of infringement by even a single unidentified end-user subscriber to an ISP. Defendants are thus putting HE in an impossible situation, all based on an improper and unlawful overextension of Defendants' alleged copyright rights. Defendants' letters and

demands directed to HE in the Northern District of California are abusive, tortious, are otherwise wrongful, and constitute copyright misuse.

4.     Accordingly, this is also an action for copyright misuse due to Defendants' unlawful scheme to secure an exclusive right or limited monopoly not granted by the Copyright Office pursuant to 17 U.S.C. § 102(b), which would be contrary to public policy to grant, by, *inter alia*, alleging that HE is a copyright infringer and demanding that HE take action against alleged third-party copyright infringers unidentified to and unknown to HE, and with which HE has no relationship and no direct control. Defendants' actions improperly extend their alleged copyrights to encompass HE's procedures, processes, systems, and methods of operation.

## THE PARTIES

### Plaintiff Hurricane Electric

5.     Plaintiff HE is a limited liability company organized and existing under the laws of the State of Nevada, with its principal place of business in Fremont, California.

6.     HE is a small privately-held company started in Silicon Valley by a start-up individual entrepreneur. HE has grown, in a niche upstream service provider market, to be a global provider of access to the backbone of the Internet, offering Internet Protocol version 4 (IPv4) and Internet Protocol version 6 (IPv6) Internet access, transit, tools, and network applications, as well as data center co-location services in San Jose, California, and in Fremont, California, where the company is based.

7.     HE operates a global IPv4 and IPv6 network and is considered the largest IPv6 backbone in the world as measured by the count of peering interconnections to other networks. Within its global network, HE is connected to over 200 major exchange points and exchanges traffic directly with more than 7,500 different networks. Employing a resilient fiber-optic topology, HE has no less than five redundant 100G paths crossing North America, five separate 100G paths between the U.S. and Europe, and 100G rings in Europe and Asia. Hurricane also has a ring around Africa, and a PoP in Australia.

8.   HE offers an IPv6 tunnel broker service, providing free connectivity to the IPv6 Internet via 6-in-4 IPv6 transition mechanisms. As of May 7, 2018, the company reported 97,067 provisioned tunnels spanning 197 countries via the IPv6 tunnel broker. HE provides an online IPv6 certification program to further education and compliance in IPv6 technology, with at least 15,382 individuals in 155 countries having reached the highest level of the IPv6 certification.

9.   In addition to its vast global network, HE owns and operates two data centers / co-location facilities in Fremont, California, including HE Fremont 2, its newest 200,000 square-foot facility. HE offers IPv4 and IPv6 transit solutions over the same connection. Connection speeds available include 100GE (100 gigabits/second), 40GE, 10GE, and gigabit ethernet.

10.   HE's primary business is as an upstream service provider (referred to in some contexts as an Online Service Provider and its business model for this service does not including "hosting" data on servers for customers accessible by third parties. HE, as an upstream service provider, does not have access to, or have control over, the content communicated through the Internet by its customers, which are account holders such as ISPs, or by its customers' customers, such as end-user subscribers to an ISP.

11.   As an upstream service provider, HE simply acts as a "highway" that passively provides its customers, and thus its customers' customers, with Internet access. HE Internet connections are business-to-business ("B2B") type connections and are most often sourced from data centers, and include customers such as the Government, including the U.S. Navy's Naval Research Labs which in turn provides service to thousands or tens of thousands of end-users, and ISPs that provide Internet service to thousands or tens of thousands of third-party subscribers over large geographic areas.

12.   While HE's B2B connections at data centers are competitive with certain aspects of major Internet providers like Cox, Comcast, Verizon, etc., HE does not have the connections to go the "last mile" to end-users, and end-users must utilize a service provider to connect to HE.

**Defendants**

13.    HE is informed and believes and based thereon alleges that multiple Defendants, many of which share the same addresses, managing agents, and/or agents for service, are copyright assertion entities in the business of generating income primarily from threats of infringement lawsuits against legitimate technology companies that have nothing to do with any alleged infringements by unnamed end-users of Internet connections.

14.    HE is informed and believes and based thereon alleges that some, if not all, of the Defendants are funded at least in part by litigation funding companies that have no previous interest in Defendants' lawsuits, but nonetheless finance Defendants' lawsuits with a view to sharing the financial recovery if the suit succeeds.

15.    Recent trends in the law have been against copyright assertion entities' use of the court system to wrest nuisance settlements from poor and unsophisticated Internet users who may have been baited into downloading media online in violation of copyright laws. While copyright assertion entities would typically bully individual alleged infringers *en masse* with threats of $150,000 statutory damages awards and attorney-fee-shifting penalties, courts, especially in the Ninth Circuit, have increasingly frustrated that business model by limiting damages awards in such cases to $750 with little or no attorney fee awards. HE is informed and believes and based thereon alleges that Defendants have been forced to adopt a new business model in view of these changes in the law, and are now targeting technology companies higher up the Internet food chain, like HE, who have nothing to do with any alleged infringements by unnamed end-users of Internet connections provided to third-parties by HE's customers (or by HE's customers' customers).

16.    Defendants' counsel claims to represent identified and unidentified owners of various identified and unidentified copyright-protected motion pictures allegedly infringed by HE, "including but not limited to" the present following-named Defendants, which HE is informed and believes and thereon alleges are as follows:

COMPLAINT FOR COPYRIGHT MISUSE AND DECLARATORY JUDGMENT OF
NO COPYRIGHT INFRINGEMENT

17. Dallas Buyers Club, LLC, which is organized under the laws of the state of California and has its principal place of business in the state of Texas.

18. Dallas Buyers Club, LLC, which is organized under the laws of the state of Texas and has its principal place of business in the state of Texas.

19. Glacier Films 1, LLC, which is organized under the laws of the state of Louisiana and has its principal place of business in the state Louisiana.

20. Double Life Productions, Inc., which is organized under the laws of the state of California and has its principal place of business in California.

21. Voltage Pictures, LLC, which is organized under the laws of the state of California and has its principal place of business in the state of California.

22. Orion Releasing, LLC, which is organized and existing under the laws of the state California and has its principal place of business in California.

23. Cook Productions, LLC, which is organized under the laws of the state of California and has its principal place of business in California.

24. WWE Studios Finance Corp., which is organized and existing under the laws of the state of Delaware and has its principal place of business in Connecticut.

25. Mon, LLC, which is organized and existing under the laws of the state of California and has its principal place of business in California.

26. TBV Productions, LLC, which is organized and existing under the laws of the state of California and has its principal place of business in California.

27. CELL Film Holdings, LLC, which is organized and existing under the laws of the state of Delaware and has its principal place of business in California.

28. Venice PI, LLC, which is organized and existing under the laws of the state of California and has its principal place of business in California.

29. Survivor Productions, Inc. which is organized under the laws of the state of California and has its principal place of business in California.

30. I am Wrath Production, Inc., which is organized and existing under the laws of the state of California and has its principal place of business in California.

COMPLAINT FOR COPYRIGHT MISUSE AND DECLARATORY JUDGMENT OF
NO COPYRIGHT INFRINGEMENT

31.     POW Nevada, LLC, which was organized under the laws of the state of Nevada and has its principal place of business in California but is now dissolved.

32.     Headhunter, LLC, which is organized and existing under the laws of the state of Delaware.

33.     Nicolas Chartier, who is the manager member of the dissolved POW Nevada, LLC, has a principal place of business in California, and is a resident of the state of California.

34.     Craig J. Flores is a resident of the state of California.

35.     Avi Lerner is a resident of the state of California.

36.     Voltage Productions, Inc. which is organized under the laws of the state of California and has its principal place of business in California.

37.     Killing Link Distribution, LLC, which is organized under the laws of the state of California and has its principal place of business in California.

38.     Millenium Entertainment, LLC, California, which is organized under the laws of the state of California and has its principal place of business in California.

39.     HE is informed and believes and thereon alleges that DOES 1-20 include presently-unidentified entities and/or individuals who claim an ownership interest in one or more of the copyrights at-issue, and/or who claim rights to proceeds from the alleged infringements of the copyrights at issue.  (the foregoing named entities and persons, along with the DOE defendants, are herein referred to as "Defendants").

## JURISDICTION

40.     This court has original jurisdiction over the subject matter of this action pursuant to the Copyright Act, 17 U.S.C. §§ 101 et seq., pursuant to 28 U.S.C. §§ 1331, 1332(a) and (c), 1338(a), and pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

### **Declaratory Judgment Jurisdiction**

41.     An actual case or controversy exists between the parties to this action.

42.     Defendants, by counsel, have repeatedly asserted in writing and over the

COMPLAINT FOR COPYRIGHT MISUSE AND DECLARATORY JUDGMENT OF
NO COPYRIGHT INFRINGEMENT

-7-

1  phone that HE has been and still is engaging in acts of copyright infringement, and have
2  repeatedly threatened to take legal action against HE (though Defendants' counsel has
3  not provided any specific, concrete indications that a suit by the Defendants is
4  imminent).

5      43.    Attached as Exhibits 1, 2, 3, and 4 are true and correct copies of
6  correspondence between counsel for the parties to this action.

7      44.    Defendants, by counsel, have repeatedly demanded in writing and over the
8  phone that HE immediately terminate the accounts of numerous third-parties over which
9  HE has no control, prospectively agree to take similar actions in the future whenever
10  Defendants' counsel sends future notices, and pay money damages well in excess of
11  $500,000.

12     45.    Defendants stated the damages are going up as time passes but that the
13  sooner money is paid along with an agreement to provide the name of the publicly
14  available (through WHOIS) customers of HE, the amount of HE's liability will then be
15  capped by agreement. Defendants undeniably recognize that HE cannot identify the
16  alleged infringers and does not have the ability to shut down service only to an alleged
17  infringer (without shutting down service to thousands or tens of thousands of innocent
18  end-users) but will agree to "go away" for a substantial payment with an agreement to
19  provide Defendants, in the future, with publicly available information.

20     46.    Defendants, by counsel, have also sought additional information from HE
21  so that additional undisclosed copyright assertion entities could be represented by
22  counsel and seek additional damages from HE.

23     47.    HE has refuted Defendants' allegations and repeatedly refused to comply
24  with Defendants' improper and impractical demands. Nonetheless, Defendants continue
25  to repeat their demands, creating a significant cloud of uncertainty over HE's business,
26  and causing HE to have a real and reasonable apprehension that it will eventually be
27  subject to suit.

28     48.    The circumstances show that there is a substantial controversy between HE

COMPLAINT FOR COPYRIGHT MISUSE AND DECLARATORY JUDGMENT OF
NO COPYRIGHT INFRINGEMENT

and Defendants, which have adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

**Personal Jurisdiction**

49.     Personal jurisdiction is proper in the Northern District of California over Defendants identified herein either as organized in this state (whether as a corporation, a limited liability company, a partnership, a joint venture, or an unincorporated association), or as having their principal place of business in this state, because this Court has general personal jurisdiction over those Defendants.

50.     Specific personal jurisdiction is proper in the Northern District of California over the non-resident Defendants, that is, Defendants identified herein neither as organized in this state nor as having their principal place of business in this state, because this Court has specific personal jurisdiction over those non-resident Defendants.

51.     First, the non-resident Defendants, through counsel, have purposefully directed their activities at, and consummated transactions with, HE in the Northern District of California, and performed acts by which Defendants purposefully availed themselves of the privilege of conducting activities in the Northern District of California, thereby invoking the benefits and protections of its laws, for example as described below:

(a)     On July 12, 2019 counsel for Defendants opened miscellaneous action number 1:19-mc-250 in the District of Hawaii entitled *In re Subpoena to Hurricane Electric, LLC*, for the purpose of issuing a subpoena to HE under 17 U.S.C. § 512(h) to force HE "to identify alleged infringer(s) of Owner's Copyright protected motion pictures." (hereafter collectively "the Subpoena").

(b)     Attached as Exhibit 8 is a true and correct copy of the Subpoena.

(c)     The information requested in the Subpoena was information publicly available via a WHOIS search online.

(d)     The Subpoena which was issued and based upon two letters, dated July 10, 2019 and July 12, 2019 regarding allegations of copyright infringement

by HE, was purportedly mailed to HE by counsel for Defendants.

(e)     Counsel for Defendants served the Subpoena on HE in the Northern District of California, namely on "Hurricane Electric LLC dba Hurricane Electric Internet Services Registered Agent: MIKE LEBER 760 Mission Court, Fremont, CA 94539." The Subpoena required HE to take action in the Northern District of California and to search its files in the Northern District of California and to produce documents, all subject to the enforcement powers and penalties of the U.S. District Court for the Northern District of California.

(f)     By serving the Subpoena on HE in the Northern District of California for production of documents, counsel for Defendants purposefully availed himself and his clients for whom he was acting of the privilege of conducting activities in the Northern District of California, thereby invoking the benefits and protections of its laws. For example, the Subpoena stated in part that "the serving party [Defendants by counsel] may move the court for the district where compliance is required [the Northern District of California] for an order compelling production or inspection."

(g)     Counsel for Defendants then improperly used the existence of the Subpoena to communicate extensively with HE in the Northern District of California, *ex parte*, such that the written communications between counsel for Defendants and HE totaled forty-one (41) pages of documents. In these communications counsel for Defendants fished HE for information regarding other alleged infringements to assert against HE.

(h)     When HE's unrepresented Director of Infrastructure explained to Defendants' counsel that HE has no technological way to identify the alleged infringer and that Defendants' counsel must go HE's customer – i.e., the ISP or the U.S. Naval Research Labs – Defendants' counsel responded by stating he was under no obligation to go to the ISPs or to the US Navy and that "the buck stops at HE."

(i)     This is not the first time that counsel for Defendants, in representing one or more of the present Defendants, misused judicial process to search for new alleged copyright infringements. In District of Hawaii case number 19-cv-169-LEK-KJM, listed on some of Defendants' cease and desist letters (Exhibits 1, 2, 3 and 4), counsel for Defendants repeatedly misused judicial process by purporting to serve process on non-parties. In docket entry number 51, dated 10/28/2019 (a true and correct copy of which is attached hereto as Exhibit 5), the Hawaii Court stated:

> The Court is aware that Mr. * * *, as the plaintiffs' counsel, has engaged in the same conduct in at least two other cases: (1) *HB Prods., Inc. v. Doe, et al.*, Civil No. 19-00389 ACK-KJM; and (2) *Wicked Nev., LLC v. Doe, et al.*, Civil No. 19-00413 SOM-KJM. The Court cautions Mr. * * * that similar actions in the future will result in the Court striking the plaintiffs' filings.

(j)     On or about March 19, 2020, counsel for Defendants sent to HE in the Northern District of California a cease-and-desist letter (Exhibit 1), alleging infringement by HE of copyrights allegedly owned by eight (8) different parties for which HE is now seeking declaratory judgment.

(k)     Counsel for HE responded on April 19, 2020 via email with a request that counsel for Defendants identify, among other things, the clients he represents.

(l)     On or about May 1, 2020, counsel for Defendants responded with a new cease and desist letter (Exhibit 2 hereto) to HE, by counsel, this time alleging infringement by HE of copyrights allegedly owned by thirty (30) different parties for which HE is now seeking declaratory judgment and identifying approximately 2,300 IP addresses where such infringements allegedly took place.

(m)     On or about May 15, 2020, counsel for HE responded to counsel for Defendants with a letter (Exhibit 3) hereto, inadvertently misdated June 15, 2020), explaining in detail why HE, as an Online Service Provider to ISP's, did not infringe, and that in the alternative, HE was protected by the Safe Harbor

provisions of the DMCA.

(n)     Notwithstanding HE's explanation of non-infringement and the impossibility of complying with Defendants' demands, on May 20, 2020 counsel for Defendants sent yet another cease and desist letter (Exhibit 4 hereto) to HE, by counsel, reiterating Defendants' position that HE is infringing their copyrights and indicating that as time went on, even "more of [his] clients' motion pictures are infringed."

52.     Second, the present claims arise directly out of and relate to the Defendants' activities described herein, all of which were directed to HE in the Northern District of California.

53.     Third, the exercise of jurisdiction over the non-resident Defendants in the Northern District of California to resolve these issues comports with fair play and substantial justice, because it is reasonable, for at least the following reasons:

(a)     The extent of Defendants' purposeful interjection into the Northern District of California, by counsel, is significant, and includes not only a cease and desist letter, but numerous unrelenting cease and desist letters directed into the Northern District of California over a period of nearly eleven (11) months, asserting ever-growing lists of alleged infringements, stemming from the Rule 45 Subpoena issued to HE in the Northern District of California subject to the penalties of the Northern District of California, which led to 41 pages of communications directly with HE in the Northern District of California, all of which led directly to the present Defendants' allegations of infringement against HE.

(b)     Defendants' cease and desist letters are demanding that upstream service providers like HE simply shut down entire service providers that provide Internet access to thousands or tens of thousands of people, based solely on allegations of infringement by even a single end-user subscriber to an ISP.

Defendants are refusing to contact the service providers providing service to end-users who can identify the potential infringer and instead are putting upstream service providers like HE in an impossible situation, all based on an improper and unlawful overextension of Defendants' alleged copyright rights. Defendants' cease and desist letters directed to HE in the Northern District of California are thus abusive, tortious, constitute copyright misuse, and are otherwise wrongful.

(c) The burden on the non-resident Defendants to defend the suit in the Northern District of California is minimal, for at least the reason that all of the Defendants are represented by the same counsel, and this case will be going forward with the California resident Defendants on the same legal and factual issues with or without the non-resident Defendants. Accordingly, it would actually be a substantially increased burden on the non-resident Defendants to make them pay to duplicate elsewhere the efforts that their counsel will already being making in this Court.

(d) Additionally, some or all of the non-resident Defendants from east of California are already litigating one or more copyright infringement cases in Hawaii, such as in Case Number: 19-cv-169-LEK-KJM (District of Hawaii), listed on some of Defendants' cease and desist letters (Exhibits 1, 2 & 4). Since Hawaii is far away and not the residence of any of the Defendants, but rather is the location of Defendants' counsel, this tends to indicate that the location of Defendants' counsel is actually the primary consideration for Defendants' preference in venue. Since Defendants' counsel will be present in this Court regardless to address the California-based Defendants, the burden on the non-resident Defendants to likewise defend the suit in the Northern District of California is minimal.

(e) Proceeding with this action against all Defendants presents no conflict with the sovereignty of any of the non-resident Defendants' states, because the issues here relate solely to federal copyright law, not local state law.

COMPLAINT FOR COPYRIGHT MISUSE AND DECLARATORY JUDGMENT OF NO COPYRIGHT INFRINGEMENT

-13-

(f)    California has a great interest in this dispute, because Defendants' arguments seek to upend the established business model surrounding providing access to the backbone of the Internet in and around Silicon Valley. Defendants are demanding that upstream service providers like HE simply shut down entire service providers that provide Internet access to thousands or tens of thousands of people, based solely on allegations of infringement by just a single end-user subscriber to an ISP. Decisions that could drastically affect Californians and California's tech industry should not be left to courts of other states.

(g)    Indeed, HE is physically located in San Jose and Fremont, California and its service is part of the Internet backbone. As explained in Wikipedia - https://en.wikipedia.org/wiki/Internet_backbone (a true and correct copy is attached as Exhibit 6):

The Internet backbone may be defined by the principal data routes between large, strategically interconnected computer networks and core routers of the Internet. These data routes are hosted by commercial, government, academic and other high-capacity network centers, the Internet exchange points and network access points, that exchange Internet traffic between the countries, continents, and across the oceans. Internet service providers, often Tier 1 networks, participate in Internet backbone traffic by privately negotiated interconnection agreements, primarily governed by the principle of settlement-free peering.

(h)    HE provides the bulk of its traffic through IXPs (Internet Exchange Points) -- thirteen (13) of which are in California.

(i)    Indeed, Defendants' counsel has already negotiated resolutions with some ISPs (not sourcing connections from HE) for large payments in exchange for withholding further action for infringement. Specifically, Defendants' counsel sued torrent site YTS in Hawaii. There, several of the same Defendants here were plaintiffs represented by the same counsel, and received a payment of over $1,000,000 (One Million Dollars). As stated in a TechWorm article -- https://www.techworm.net/2020/04/torrent-site-yts-piracy-lawsuit-online.html --

notwithstanding the settlement, there are still hundreds of pirated movies on that piratical site. (A true and correct screen-print of the web page https://www.techworm.net/2020/04/torrent-site-yts-piracy-lawsuit-online.html is attached hereto as Exhibit 7.)

(j)     Defendants do not actually care about stopping the ongoing infringements of their copyrights; they just want large immediate one-time payments from each service provider they can associate with the still-allegedly-infringing IP addresses.

(k)     The Northern District of California is the most efficient forum for judicial resolution of the dispute, because the vast majority of the present Defendants are Californians and/or have California connections, and HE, the technology at issue, pertinent documents and things, and likely experts all reside in the Northern District of California.

(l)     This forum is certainly important to HE's interest in convenient and effective relief, since HE, the technology at issue, pertinent documents and things, and likely experts all reside in the Northern District of California.

(m)     Finally, there is no alternative forum that would be more convenient for HE and the present Defendants as a whole, or better suited to decide the matter.

**VENUE**

54.     Venue is proper in this district under 28 U.S.C. § 1391(b) and (d).  As explained herein, a substantial part of the events or omissions giving rise to the present claims occurred in the Northern District of California. A substantial part of HE's property and systems that are the subject of the action is situated in the Northern District of California.  Also, at least for the reasons explained herein with respect to specific personal jurisdiction, the California resident Defendants' contacts, through counsel, would be sufficient to subject them to personal jurisdiction in the Northern District of California if it were a separate state.

**INTRADISTRICT ASSIGNMENT**

55.     This action is an Intellectual Property proceeding and is to be assigned on a district-wide basis as set forth in LR 3-2(c).

**GENERAL ALLEGATIONS**

56.     HE's primary business model is as an upstream service provider that provides its account-holder customers, such as ISPs, with access to the backbone of the Internet. HE does not have access to, or have control over, any content communicated through the Internet by its customers, also called account holders, or by its customers' customers, such as subscribers to a ISP account holder, or other end-users.

57.     HE provides a passive conduit to the backbone of the Internet, and does not engage in any volitional conduct with respect to any content that does or does not pass through its Internet connections including allegedly copyrighted material, such that HE is not the proximate cause of any copyright infringement alleged by Defendants.

58.     Defendants allege that one or more end-users to one or more account holders (including subscribers to ISPs) that obtain access to the backbone of the Internet from HE have committed copyright infringement by downloading copies of Defendants' copyrighted motion pictures using the Internet connections provided to those subscribers by those ISPs.

59.     There is no causal nexus between HE's conduct and the alleged copyright violations by end-user subscribers, who have no relationship with HE.

60.     HE's conduct in providing account holders such as ISPs with passive conduits to the backbone of the Internet is not the proximate cause of any alleged infringement by any end-user subscribers who are customers of the account holders.

61.     A depiction of the Internet transit can be found at: https://en.wikipedia.org/wiki/Internet_transit#/media/File:Internet_Connectivity_Distribution_&_Core.svg

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19  By User: Ludovic.ferre - Internet Connectivity Distribution & Core.svg, CC BY-SA 3.0,
20  https://commons.wikimedia.org/w/index.php?curid=10030716

21      62.    HE's business is largely at the IXP (yellow) level.  In order for an end-user
22  to be connected through HE at the IXP level, that end-user must have a service provider
23  who can connect to the IXP.  As shown in the diagram, this could be a Tier 2 ISP (light
24  blue) or a Tier 3 Network (purple or light green).

25      63.    HE has no control over how an ISP/service provider allocates connections
26  to end-users.  As examples, (a):  a service provider could break up a single version 4, IP
27  address to be used contemporaneously by tens of thousands of end-users, or (b) a service
28  provider may have hundreds (or more) of IP addresses and it can allocate the IP addresses

to customers on an as needed basis thereby allowing the service provider to have many more end-users than IP addresses. This is like "timesharing" where one unit can be used by many people at different times.

64. When a service provider divides up Internet service from a company like HE, HE has no technological way to determine the identity of the end-user. However, the service provider who controls the shared connection typically has logs and can identify each of its end-users based upon which IP address, the date and the time (just like a hotel can identify the person using a timeshare hotel suite on a given date but the property owner who does not have the records/logs cannot).

65. HE has no relationship with, nor control over, any end-user subscribers to the one or more ISPs and service providers that obtain access to the backbone of the Internet from HE.

66. HE has no control over any content communicated through the Internet by any end-user subscribers to the one or more ISPs and service providers that obtain access to the backbone of the Internet from HE.

67. HE has no control over any content communicated through the Internet by the one or more account holders, such as ISPs, that obtain access to the backbone of the Internet from HE.

68. As explained above, HE does not even have the ability to identify the end-user as the information required to do so is in the hands of the direct service providers, which are publicly identified and known to Defendants, but which Defendants have refused to contact or serve a subpoena under the DMCA.

69. The only way that HE could shut down a connection to the Internet of an alleged infringing end-user subscriber who accesses the Internet through an account holder such as an service provider that itself obtains access to the backbone of the Internet from HE, would be to shut down all access to the Internet to that ISP, service provider and/or account holder.

70. Shutting down all access to the Internet to an ISP or other account holder

would shut down not only a particular end-user subscriber's access to the Internet, but would also shut down the Internet access of all the other end-user subscribers who gain access to the Internet from that ISP or other account holder, which would typically mean shutting down Internet access for thousands or tens of thousands (perhaps hundreds of thousands if the account holder has multiple IP addresses) of innocent people across wide geographic regions. It is simply not appropriate to shut down an entire city, a school system, rural area with subscribers covering a 5-state region, or an airport internet provider at such airports as LAX because defendants do not want to bother contacting the ISP providing service from HE's backbone so that Defendants can obtain the information identifying the specific infringer. Yet that is exactly what Defendants are demanding HE do.

71. Illustrating the ridiculousness of Defendants' demands, HE's account holders include, for example, ISP's, and even the U.S. Navy's Naval Research Labs. Defendants know from publicly available records, and as set forth in communications from the undersigned counsel, that these ISPs include companies such as the reportedly leading Internet Service Provider in the Gilbert, Mesa, Queen Creek, San Tan Valley, Coolidge, Eloy, Casa Grande and Florence Arizona Area, the reportedly fourth largest fixed-wireless Internet Service Provider in the US servicing over 50,000 square miles in Iowa, Minnesota, Nebraska, South Dakota, and Wisconsin, ISPs providing service (sometimes the only service available) to major rural areas, ISPs providing service to school districts, and a highly regarded provider of wireless internet services at airports, buildings, stadiums, multifamily and student housing, and commercial real estate, as well as many other similar entities. Defendants are insisting that HE unilaterally shut down all access to the Internet for these account holders thereby shutting off tens of thousands of innocent end-users, for example, just to stop an individual end-user from allegedly improperly downloading movies. Such demands are inappropriate when all the Defendants need to do to ascertain the identity of the allegedly infringing end-user is to contact the ISP.

72.     Defendants' attempt to use an upstream provider like HE to stop alleged copyright infringement by far-removed downstream end-user subscribers of others' ISP services is analogous to Defendants' threatening an electric utility power company and arguing that it must shut off power to an entire city or region, because the power company is infringing Defendants' copyrights by providing electricity, since an end user could not download an unauthorized copy of a movie without electricity. The absurdity of this analogy highlights the outrageous overbreadth of Defendants' demands on HE.

73.     Defendants purport to have the IP addresses of HE's account holders where actual end-users are allegedly downloading the infringing movies but it is technologically impossible for HE to identify a specific end-user with an IP address as the records identifying the downloader are exclusively in the hands of the ISP.

74.     Nothing is stopping Defendants from directly pursuing the ISPs/service providers associated with the allegedly offending IP addresses and serving subpoenas for the identities of the end-users.

75.     Nothing is stopping Defendants from pursuing the individuals associated with the allegedly offending IP addresses by contacting HE's account holders/service providers, who, unlike HE, typically would have the logs to identify the individual end-user and the ability to shut down Internet access for that individual end-user without affecting Internet service to the tens of thousands of innocent users obtaining service from that service provider.

76.     Notwithstanding Defendants' ability to effectively stop the alleged infringement by directly pursuing the users of the offending IP addresses, Defendants are instead pursuing HE, which has no relationship with, and no ability to control service to the allegedly offending end-user.

77.     HE is informed and believes and based thereon alleges that one or more Defendants do not own the copyrights in the allegedly infringed material that counsel for Defendants has indicated that Defendants own.

78.     HE is informed and believes and based thereon alleges that one or more

Defendants are not validly existing legal entities and thus cannot own copyrights in the allegedly infringed material.

79. Defendants allege that HE has directly, contributorily, and vicariously infringed Defendants' copyright rights.

80. Defendants allege that HE continues to directly, contributorily and vicariously infringe Defendants' copyright rights.

81. Defendants allege that HE's infringement of Defendants' copyright rights extends back to at least 2013, or earlier in that the statute of limitations for the alleged acts of HE does not start until the Defendants' learned of the alleged infringements.

82. Defendants allege that HE's infringement of Defendants' copyright rights is continuing.

83. Defendants' allegations of copyright infringement by HE are legally and factually baseless.

84. HE's conduct has not and does not constitute direct copyright infringement, because HE's conduct does not violate any exclusive right granted to copyright holders under 17 U.S.C. § 106.

85. HE has not had, and does not have, knowledge of an identifiable person or entity that has infringed any copyright owned by Defendants.

86. Even if HE had or has actual knowledge that specific infringing material is available using its connection, there are no simple nor feasible measures that HE can take to prevent further damage to the copyrighted works.

87. Even if HE had or has actual knowledge that specific infringing material is available using its connection, it would not be appropriate to shut down service to tens of thousands or hundreds of thousands of innocent end-users when Defendants could easily contact and/or issue a subpoena to the service provider who is HE's account holder, determine the identity of the alleged infringing end-user and have the downstream service provider shut down only that alleged infringing end-user.

88. HE has not and does not materially contribute to another's infringement of

any copyright owned by Defendants.

89. HE has not and does not provide its services, including providing ISPs and other account holders with access to the backbone of the Internet, with the object of promoting or advertising its use to infringe copyrights claimed by Defendants.

90. HE has not and does not advertise, promote or express an intent to promote infringement, nor affirmatively take steps to foster the alleged copyright infringement.

91. HE has not and does not induce another's infringement of any copyright owned by Defendants.

92. HE's conduct has not and does not contributorily infringe any copyright owned by Defendants.

93. HE has not had, and does not have, the right or ability to supervise the alleged infringement of any copyright owned by Defendants.

94. The alleged infringement of any copyright owned by Defendants has not and does not constitute a draw for subscribers to HE's services.

95. HE has not, and does not, engage in advertising or promoting of services for facilitating the alleged infringement of any copyright owned by Defendants.

96. HE has not had, and does not have, a direct financial interest in the alleged infringement of any copyright owned by Defendants.

97. HE has not and does not vicariously infringe any copyright owned by Defendants.

98. HE's conduct has not and does not constitute vicarious copyright infringement.

99. Not only is HE not an infringer of any copyright rights of Defendants, but Defendants have neither demonstrated nor alleged that any of HE's account holders have infringed any copyright rights of Defendants.

100. Nonetheless, HE has adopted and reasonably implemented, and informs account holders of the HE's system or network of, a policy that provides for the termination in appropriate circumstances of HE's account holders, if any, who are repeat

infringers. Indeed, Judge Fogel of the Northern District of California has in a written opinion recognized Hurricane's policy to terminate infringers in appropriate circumstances.

101.  HE has a notification system for copyright infringement allegations and a procedure for dealing with DMCA-compliant notifications. HE does not actively prevent copyright owners from collecting information needed to issue such notifications.

102.  Under appropriate circumstances, HE has or would terminate account holders who repeatedly or blatantly infringe copyrights.

103.  Accordingly, even if HE were somehow found liable for some type of copyright infringement, which is emphatically denied, HE, as an upstream service provider which does not provide any intermediate or transient storage (as defined in 17 U.S.C. § 512(k)(1)(B)), would not have any liability to Defendants due to the safe harbor limitation of liability under 17 U.S.C. § 512(i).

104.  Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's conduct.

105.  Defendants are not entitled to any injunctive, monetary, or other relief from HE.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment of No Direct Copyright Infringement)

106.  HE repeats and realleges the allegations contained in paragraphs 1 to 105 of this Complaint as if fully set forth herein.

107.  Defendants claim that HE's conduct directly violates at least one exclusive right granted to Defendants as alleged copyright holders under 17 U.S.C. § 106.

108.  Under an ongoing threat of litigation, Defendants demand that HE terminate the accounts of account holders and service providers for alleged violations of end-users over which HE has no control, prospectively agree to take similar actions in the future whenever Defendants' counsel sends future notices, and pay money damages well in excess of $500,000.

109.  HE refutes Defendants' allegations of direct copyright infringement and refuses to comply with Defendants' improper and impractical demands.

110.  Defendants' continued and repeated assertions of direct copyright infringement and related demands create a significant cloud of uncertainty over HE's business, and cause HE to have a real and reasonable apprehension that it will eventually be subject to suit.

111.  The circumstances show that there is an actual, present, substantial, and justiciable controversy between HE and Defendants, which have adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

112.  HE seeks a declaratory judgment that one or more Defendants do not own the copyrights in the allegedly infringed material that counsel for Defendants has indicated that Defendants own.

113.  HE seeks a declaratory judgment that one or more Defendants are not validly existing legal entities and thus cannot own copyrights in the allegedly infringed material.

114.  HE seeks a declaratory judgment that HE provides a passive conduit to the backbone of the Internet, that HE engages in no volitional conduct with respect to any allegedly copyrighted material, and that HE is not the proximate cause of any copyright infringement alleged by Defendants.

115.  HE seeks declaratory judgment that HE's conduct has not and does not constitute direct copyright infringement, because HE's conduct does not violate any exclusive right granted to copyright holders under 17 U.S.C. § 106.

116.  HE seeks declaratory judgment that Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's conduct.

117.  HE seeks declaratory judgment that Defendants are not entitled to any injunctive, monetary, or other relief from HE.

/ / /

/ / /

COMPLAINT FOR COPYRIGHT MISUSE AND DECLARATORY JUDGMENT OF
NO COPYRIGHT INFRINGEMENT

**SECOND CLAIM FOR RELIEF**

**(Declaratory Judgment of No Contributory Copyright Infringement)**

118.   HE repeats and realleges the allegations contained in paragraphs 1 to 117 of this Complaint as if fully set forth herein.

119.   Defendants claim that HE's conduct constitutes contributory infringement of Defendants' alleged copyrights.

120.   Under an ongoing threat of litigation, Defendants demand that HE terminate the accounts of account holders and service providers over which HE has no control, prospectively agree to take similar actions in the future whenever Defendants' counsel sends future notices, and pay money damages well in excess of $500,000.

121.   HE refutes Defendants' allegations of contributory copyright infringement and refuses to comply with Defendants' improper and impractical demands.

122.   Defendants' continued and repeated assertions of contributory copyright infringement and related demands create a significant cloud of uncertainty over HE's business, and cause HE to have a real and reasonable apprehension that it will eventually be subject to suit.

123.   The circumstances show that there is an actual, present, substantial, and justiciable controversy between HE and Defendants, which have adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

124.   HE seeks a declaratory judgment that one or more Defendants do not own the copyrights in the allegedly infringed material that counsel for Defendants has indicated that Defendants own.

125.   HE seeks a declaratory judgment that one or more Defendants are not valid legal entities and thus cannot own copyrights in the allegedly infringed material.

126.   HE seeks a declaratory judgment that HE has not had, and does not have, knowledge of another's infringement of any copyright owned by Defendants.

127.   HE seeks a declaratory judgment that even if HE had or has actual knowledge that specific infringing material is available using its system, there are no

COMPLAINT FOR COPYRIGHT MISUSE AND DECLARATORY JUDGMENT OF
NO COPYRIGHT INFRINGEMENT

simple or feasible measures that HE can take to prevent further damage to the copyrighted works.

128. HE seeks a declaratory judgment that even if HE had or has actual knowledge that specific infringing material is available using its system, there are no reasonable or appropriate measures that HE can take to prevent further damage to the copyrighted works.

129. HE seeks a declaratory judgment that HE has not and does not materially contribute to another's infringement of any copyright owned by Defendants.

130. HE seeks a declaratory judgment that Defendants cannot prove that HE provides its services, including providing ISPs and other account holders with access to the backbone of the internet, with the object of advertising or promoting its use to infringe copyrights.

131. HE seeks a declaratory judgment that Defendants cannot prove that HE clearly expressed an intent to promote infringement or affirmatively took steps to foster copyright infringement.

132. HE seeks a declaratory judgment that HE provides a passive conduit to the backbone of the Internet, that HE engages in no volitional conduct with respect to any allegedly copyrighted material, and that HE is not the proximate cause of any copyright infringement alleged by Defendants.

133. HE seeks a declaratory judgment that HE has not and does not induce another's infringement of any copyright owned by Defendants.

134. HE seeks declaratory judgment that HE's conduct has not and does not constitute contributory copyright infringement.

135. HE seeks declaratory judgment that Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's conduct.

136. HE seeks declaratory judgment that Defendants are not entitled to any injunctive, monetary, or other relief from HE.

**THIRD CLAIM FOR RELIEF**

**(Declaratory Judgment of No Vicarious Copyright Infringement)**

137.   HE repeats and realleges the allegations contained in paragraphs 1 to 136 of this Complaint as if fully set forth herein.

138.   Defendants have suggested, and expressly not waived their argument that, HE's conduct constitutes vicarious infringement of Defendants' alleged copyrights.

139.   Under an ongoing threat of litigation, Defendants demand that HE terminate the accounts of account holders and service providers where end-users allegedly infringe Defendants' right, but over which HE has no control. Defendants demand that HE prospectively agree to take similar actions in the future whenever Defendants' counsel sends future notices, and pay money damages well in excess of $500,000.

140.   HE refutes Defendants' allegations of vicarious copyright infringement and refuses to comply with Defendants' improper and impractical demands.

141.   Defendants' assertions of vicarious copyright infringement and related demands create a significant cloud of uncertainty over HE's business, and cause HE to have a real and reasonable apprehension that it will eventually be subject to suit.

142.   The circumstances show that there is an actual, present, substantial, and justiciable controversy between HE and Defendants, which have adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

143.   HE seeks a declaratory judgment that one or more Defendants do not own the copyrights in the allegedly infringed material that counsel for Defendants has indicated that Defendants own.

144.   HE seeks a declaratory judgment that one or more Defendants are not valid legal entities and thus cannot own copyrights in the allegedly infringed material.

145.   HE seeks a declaratory judgment that HE has not had, and does not have, the right or ability to supervise the alleged infringement of any copyright owned by Defendants.

146.  HE seeks a declaratory judgment that the alleged infringement of any copyright owned by Defendants has not and does not constitute a draw for subscribers to HE's services.

147.  HE seeks a declaratory judgment that it has not, and does not, engage in advertising or promoting of services for facilitating the alleged infringement of any copyright owned by Defendants.

148.  HE seeks a declaratory judgment that HE has not had, and does not have, a direct financial interest in the alleged infringement of any copyright owned by Defendants.

149.  HE seeks a declaratory judgment that HE has not and does not vicariously infringe any copyright owned by Defendants.

150.  HE seeks declaratory judgment that HE's conduct has not and does not constitute vicarious copyright infringement.

151.  HE seeks declaratory judgment that Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's conduct.

152.  HE seeks declaratory judgment that Defendants are not entitled to any injunctive, monetary, or other relief from HE.

**FOURTH CLAIM FOR RELIEF**

**(In the Alternative, Declaratory Judgment that Safe Harbor Applies)**

153.  HE repeats and realleges the allegations contained in paragraphs 1 to 152 of this Complaint as if fully set forth herein.

154.  HE seeks a declaratory judgment that HE has adopted and reasonably implemented, and informs account holders of the HE's system or network of, a policy that provides for the termination in appropriate circumstances of HE's account holders who are repeat infringers.

155.  HE seeks a declaratory judgment that HE has a working notification system for copyright infringement allegations and a procedure for dealing with DMCA-compliant notifications. HE seeks a declaratory judgment that HE does not

COMPLAINT FOR COPYRIGHT MISUSE AND DECLARATORY JUDGMENT OF NO COPYRIGHT INFRINGEMENT

actively prevent copyright owners from collecting information needed to issue such notifications.

156.   HE seeks a declaratory judgment that under appropriate circumstances, HE has or would terminate account holders who repeatedly or blatantly infringe copyrights.

157.   Even if HE were somehow found liable for some type of copyright infringement, which is emphatically denied, HE seeks, in the alternative, a declaratory judgment that HE is an online service provider that does not provide any intermediate or transient storage as defined in 17 U.S.C. § 512(k)(1)(B), and that HE does not have any liability to Defendants due to the safe harbor limitation of liability under 17 U.S.C. § 512(i).

158.   HE seeks declaratory judgment that Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's conduct.

159.   HE seeks declaratory judgment that Defendants are not entitled to any injunctive, monetary, or other relief from HE.

## FIFTH CLAIM FOR RELIEF

### (Copyright Misuse)

160.   HE repeats and realleges the allegations contained in paragraphs 1 to 159 of this Complaint as if fully set forth herein.

161.   Defendants' cease and desist letters and related communications demand that HE, an upstream service provider of access to the backbone of the Internet to account holders like ISPs, simply shut down entire ISPs and other commercial and governmental account holders that provide Internet access to thousands or tens of thousands of innocent people, based solely on allegations of infringement by an individual end-user subscriber to the ISP or account holder. Defendants are thus putting HE in an impossible situation, all based on an improper and unlawful overextension of Defendants' alleged copyright rights. Defendants' letters and demands to HE are abusive, tortious, and otherwise wrongful.

162.   Defendants' unlawful scheme seeks to secure an exclusive right or limited

monopoly not granted by the Copyright Office pursuant to 17 U.S.C. § 102(b), which would be contrary to public policy to grant, by, inter alia, alleging that HE is a copyright infringer and demanding that HE take action against alleged third-party copyright infringers with which HE has no relationship and no direct control over. Defendants' actions improperly extend their alleged copyrights to encompass HE's procedures, processes, systems, and methods of operation, and thus constitute copyright misuse.

163.  Defendants' misuse of their alleged copyrights against HE renders them unenforceable against HE.

164.  Since Defendants' alleged copyrights are unenforceable against HE, HE's conduct has not and does not constitute infringement of exclusive rights, if any, granted to Defendants under 17 U.S.C. § 106 in connection with Defendants' alleged copyrights, neither directly, contributorily, vicariously, nor otherwise.

165.  Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's conduct.

166.  Defendants are not entitled to any injunctive, monetary, or other relief from HE.

### SIXTH CLAIM FOR RELIEF
### (Attorney Fees under 17 U.S.C. § 505)

167.  HE repeats and realleges the allegations contained in paragraphs 1 to 166 of this Complaint as if fully set forth herein.

168.  Defendants' allegations of copyright infringement and its demands against HE are frivolous and objectively unreasonable, and are not motivated by protecting their copyrights, which could be effectively protected by pursuing the actual alleged end-user infringers, or even the service providers that control the Internet access of the actual alleged infringers, but cannot be reasonably protected by attacking HE, which provides passive access to the backbone of the Internet to account holders such as ISPs. In these circumstances there is a need to award HE its costs including its attorney fees to deter copyright assertions entities like Defendants from abusing the system and frustrating the

legitimate purposes of the Copyright Act.

**WHEREFORE**, HE requests judgment against Defendant as follows:

With respect to the **FIRST CAUSE OF ACTION**, an order declaring that:

A. HE has not and does not directly infringe any copyright rights of Defendants;

B. Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's actions;

C. Defendants are not entitled to any injunctive relief or damages against HE;

D. HE is awarded its costs, expenses and attorneys' fees in this action; and

E. Awarding such other further relief to which HE may be entitled as a matter of law or equity, as the Court deems just and proper.

With respect to the **SECOND CAUSE OF ACTION**, an order declaring that:

F. HE has not and does not contributorily infringe any copyright rights of Defendants;

G. Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's actions;

H. Defendants are not entitled to any injunctive relief or damages against HE;

I. HE is awarded its costs, expenses and attorneys' fees in this action; and

J. Awarding such other further relief to which HE may be entitled as a matter of law or equity, as the Court deems just and proper.

With respect to the **THIRD CAUSE OF ACTION**, an order declaring that:

K. HE has not and does not vicariously infringe any copyright rights of Defendants;

L. Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's actions;

M. Defendants are not entitled to any injunctive relief or damages against HE;

N. HE is awarded its costs, expenses and attorneys' fees in this action; and

O. Awarding such other further relief to which HE may be entitled as a matter

COMPLAINT FOR COPYRIGHT MISUSE AND DECLARATORY JUDGMENT OF NO COPYRIGHT INFRINGEMENT

of law or equity, as the Court deems just and proper.

With respect to the **FOURTH CAUSE OF ACTION**, in the alternative to the relief sought with respect to any or all of the first, second, and third causes of action, an order declaring that:

P.    HE is an online service provider that does not provide any intermediate or transient storage as defined in 17 U.S.C. § 512(k)(1)(B), and that HE does not have any liability to Defendants due to the safe harbor limitation of liability under 17 U.S.C. § 512(i);

Q.    Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's actions;

R.    Defendants are not entitled to any injunctive relief or damages against HE;

S.    HE is awarded its costs, expenses and attorneys' fees in this action; and

T.    Awarding such other further relief to which HE may be entitled as a matter of law or equity, as the Court deems just and proper.

With respect to the **FIFTH CAUSE OF ACTION**, an order declaring that:

U.    Defendants misused their alleged copyrights against HE, and thus rendered them unenforceable against HE;

V.    Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's actions;

W.    Defendants are not entitled to any injunctive relief or damages against HE;

X.    HE is awarded its costs, expenses and attorneys' fees in this action;

Y.    Awarding such other further relief to which HE may be entitled as a matter of law or equity, as the Court deems just and proper; and

Z.    Entry of an injunction ordering that Defendants, their officers, agents, members, and servants, and all persons acting in concert with them, including Defendants' counsel, be permanently restrained from alleging that HE is liable for alleged copyright infringement by downstream users of Internet access provided by HE, and be permanently restrained from demanding that HE take action against any such

alleged copyright infringements.

With respect to the **SIXTH CAUSE OF ACTION**:

AA.   An award to HE of its costs including its attorney fees incurred in connection with defending against Defendants' copyright infringement allegations, with interest; and

BB.   An award of such other and further relief as the Court deems just and proper.

DATED:  June 10, 2020

NEIL D. GREENSTEIN
MARTIN R. GREENSTEIN
TECHMARK

By:   /Neil D. Greenstein/
Attorneys for Plaintiff
HURRICANE ELECTRIC LLC

## JURY TRIAL DEMAND

Plaintiff, Hurricane Electric LLC, hereby requests a trial by jury on all issues triable of right by a jury

DATED:  June 10, 2020

NEIL D. GREENSTEIN
MARTIN R. GREENSTEIN
TECHMARK

By:   /Neil D. Greenstein/
Attorneys for Plaintiff
HURRICANE ELECTRIC LLC

COMPLAINT FOR COPYRIGHT MISUSE AND DECLARATORY JUDGMENT OF
NO COPYRIGHT INFRINGEMENT

EXHIBIT 1


**Culpepper IP**

<div align="center">

# CULPEPPER IP, LLLC

ATTORNEY AT LAW

75-170 HUALALAI ROAD, SUITE B204
KAILUA-KONA, HAWAII 96740

TEL: (808) 464-4047
FAX: (202) 204-5181

WWW.CULPEPPERIP.COM

PATENTS, TRADEMARKS & COPYRIGHTS

Via E-mail<copyright@he.net>

</div>

KERRY S. CULPEPPER *

\* ADMITTED TO PRACTICE IN VIRGINIA, HAWAI'I
AND BEFORE THE USPTO

March 19, 2020

Via Certified Mail
Mike Leber, Agent for Hurricane Electric
Hurricane Electric LLC
760 Mission Court
Fremont, CA 94539

Re: Cease and Desist of Direct Copyright Infringement, Contributory Copyright Infringement at
Hurricane Electric Subscriber IP addresses
My Reference and Case Number: 19-cv-169-LEK-KJM (District of Hawaii)

Dear Sir or Madam,

As explained below, I am writing to you regarding the Internet service Hurricane Electric
("HE") provides to its subscribers at IP addresses including but not limited to those discussed
later in this letter ("subscribers"). My law firm represents the owners of the copyright protected
motion pictures including but not limited to as shown below.

| NO. | OWNER | MOTION PICTURE | Copyright Certificate Number |
|:---:|:---:|:---:|:---:|
| 1 | Millennium Funding, Inc. | *Mechanic: Resurrection* | PA1998057 |
| 2 | Bodyguard Productions, Inc. | *The Hitman's Bodyguard* | PAu3844508 |
| 3 | UN4 Productions, Inc. | *Boyka: Undisputed* | PA0002000772 |
| 4 | Hunter Killer Productions, Inc. | *Hunter Killer* | PA2136168 |
| 5 | LHF Productions, Inc. | *London Has Fallen* | PA1982831 |
| 6 | Rambo V Productions, Inc. | *Rambo V: Last Blood* | PA2202971 |

Page 2

| 7 | Fallen Productions, Inc. | *Angel Has Fallen* | PA2197434 |
| 8 | HB Productions, Inc. | *Hellboy* | PA2176664 |

On behalf of owners 1-5, my law firm filed a lawsuit here in Hawaii (1:19-cv-169) against operators of movie piracy websites under the name "YTS" for copyright infringement, contributory copyright infringement and intentional inducement.

We have determined that your subscribers have repeatedly infringed the copyright in my clients' motion pictures via the YTS websites, among other means.

### *Prior Notices sent to HE by My Firm*

I sent first and second infringement notices per the Digital Millennium Copyright Action ("DMCA") to your agent on July 10, 2019 and July 12, 2019. (*See* Exhibits 1-2). The first notice concerned observed infringement of the motion picture *Hunter Killer* at the IP address 65.19.167.130 at timestamp 2018-10-19 09:16:51. The second DMCA notice concerned infringements of various motion pictures of my clients at the following dates and IP addresses:

| No. | IP address | Hit Date |
|---|---|---|
| 1 | 2001:470:b07e:0:d83a:a3ff:fe5e:ca | 2018-09-19 12:27:05.71563+00 |
| 2 | 216.218.222.14 | 2018-08-24 14:34:20.29611+00 |
| 3 | 216.218.222.12 | 2018-03-06 18:11:31.503688+00 |
| 4 | 65.19.167.130 | 2018-02-16 17:55:55.294389+00 |
| 5 | 216.218.222.14 | 2018-02-16 13:19:46.327169+00 |

Thousands of infringements of my clients' motion pictures have occurred at the above IP addresses.

### *Prior Notices sent to HE by Owners' Agent*

My clients' agent has sent over 290 infringement notices to HE regarding 136 IP addresses at copyright@he.net requesting that HE take action. One such exemplary notice is attached to this letter as Exhibit "3". It does not appear that HE terminated the subscriber's account (IP address 74.82.60.174) or took any meaningful action in response to these notices. In fact, infringement continues to occur at the '174 IP address as recently as 3/18/2020. Examples of the numbers of notices sent for certain IP addresses is shown below.

| IP | Notices Sent |
|---|---|
| 184.105.255.230 | 11 |
| 74.82.60.174 | 7 |
| 74.82.60.175 | 6 |

Page 3

| | |
|---|---|
| 72.52.87.188 | 6 |
| 74.82.60.74 | 5 |
| 72.52.87.94 | 5 |
| 74.82.60.91 | 5 |
| 72.52.87.78 | 5 |
| 72.52.87.91 | 4 |
| 74.82.60.191 | 4 |

The DMCA provides a safe harbor for qualified services providers from liability from copyright infringement. However, a requirement for safe harbor is that the service provider adopt and reasonably implement, and inform subscribers and account holders of the service provider's system or network of, a policy that provides for the *termination* in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers. *See* 17 USC 512(i)(1)(A). HE fails to qualify for a safe harbor because HE has not terminated the subscriber account despite the multiple notifications sent by my clients' agent.

Accordingly, my clients and I believe that HE is liable for these infringements of my clients' copyrights in violation of federal law under the Copyright Act, 17 USC §501. Remedies available to my clients include: An injunction against further infringement; Actual and statutory damages of up to $150,000/motion picture; and costs and attorney's fees.

Nonetheless, my clients would like to resolve this issue outside of litigation if possible. To do so, we request that: (1) HE agrees to immediate terminate all Internet service to the subscribers at the above IP addresses; (2) HE agrees to take the appropriate action to terminate subscriber accounts in response to all further copyright notifications received from my clients' agent; and (3) pay a portion of my clients' damages.

I look forward to receiving your affirmative response that you desire to fully comply with the above-stated requests by May 15, 2020 so that we can discuss this issue further. My clients would like to resolve this matter amicably but will consider any and all legal action necessary to protect their valuable intellectual property rights under federal and state law.

This letter is written without prejudice to the rights and remedies of our client, all of which are expressly reserved.

Sincerely,

Kerry S. Culpepper

kculpepper@culpepperip.com

Attachment: Exhibits 1-3



# CULPEPPER IP, LLLC

ATTORNEY AT LAW

75-170 HUALALAI ROAD, SUITE B204
KAILUA-KONA, HI 96740

TEL: (808) 464-4047
FAX: (202) 204-5181

WWW.CULPEPPERIP.COM

SPECIALIZING IN PATENTS, TRADEMARKS & COPYRIGHTS

KERRY S. CULPEPPER *

* ADMITTED TO PRACTICE IN VIRGINIA, HAWAI'I
  AND BEFORE THE USPTO

July 10, 2019

**VIA EMAIL < COPYRIGHT@HE.NET > AND FIRST CLASS MAIL**

Copyright Agent, Hurricane Electric Internet Services
Attn: Copyright Compliance
Hurricane Electric Internet Services
760 Mission Court
Fremont, CA 94539

Re: Copyright Claim of allegation of contributory copyright infringement on websites registered or affiliated with Hurricane Electric

Dear Sirs:

An electronic signature of the copyright owner, or a person authorized to act on behalf of the owner, of an exclusive copyright that has allegedly been infringed.

Kerry S. Culpepper authorized to act on behalf of owner Hunter Killer Productions, Inc.

/Kerry S. Culpepper/

State your contact information, including your TRUE NAME, street address, telephone number, and email address.

Kerry S. Culpepper, Esq.

Culpepper IP, LLLC

75-170 Hualalai Road

Suite B204

Kailua-Kona, Hawaii 96740

US Tel 1-808-464-4047

kculpepper@culpepperip.com

Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works on that site.

**Exhibit "1"**

Page 2

Infringement of the motion picture <u>Hunter Killer</u> is/was induced by (1) the content (promotional language of YTS); and/or (2) the link to download the torrent file of the motion pictures at the websites:

YTS.AM

<u>Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit Hurricane Electric to locate the material.</u>

(1) the content (promotional language of YTS); and/or (2) the link to download the motion picture at the websites:

YTS.AM

65.19.167.130 2018-10-19 09:16:51

Information reasonably sufficient to permit Hurricane Electric to contact the Complaining Party, such as an address, telephone number, and, if available, an electronic mail address at which the Complaining Party may be contacted.

Kerry S. Culpepper, Esq.

Culpepper IP, LLLC

75-170 Hualalai Road

Suite B204

Kailua-Kona, Hawaii 96740

US Tel 1-808-464-4047

<u>A statement that the Complaining Party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.</u>

I, have a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

<u>A statement that the information in the notification is accurate, and under penalty of perjury, that the Complaining Party is the owner, or is authorized to act on behalf of the owner, of an exclusive right that is allegedly infringed.</u>

Page 3

The information in the notification is accurate, and under penalty of perjury, I am authorized to act on behalf of the owner, Hunter Killer Productions, Inc. of an exclusive right that is allegedly infringed.

Sincerely,

/ksc/

Kerry S. Culpepper



**Culpepper IP**

# CULPEPPER IP, LLLC

ATTORNEY AT LAW

75-170 HUALALAI ROAD, SUITE B204
KAILUA-KONA, HI 96740

KERRY S. CULPEPPER *

TEL: (808) 464-4047
FAX: (202) 204-5181

\* ADMITTED TO PRACTICE IN VIRGINIA, HAWAI'I
AND BEFORE THE USPTO

WWW.CULPEPPERIP.COM

SPECIALIZING IN PATENTS, TRADEMARKS & COPYRIGHTS

July 12, 2019
**VIA FIRST CLASS MAIL**

Copyright Agent, Hurricane Electric Internet Services
Attn: Copyright Compliance
Hurricane Electric Internet Services
760 Mission Court
Fremont, CA 94539

> Re: Copyright Claim of allegation of contributory copyright infringement on
> websites registered or affiliated with Hurricane Electric

Dear Sirs:

<u>An electronic signature of the copyright owner, or a person authorized to act on behalf of
the owner, of an exclusive copyright that has allegedly been infringed.</u>

Kerry S. Culpepper authorized to act on behalf of owner Hunter Killer Productions, Inc.

/Kerry S. Culpepper/

<u>State your contact information, including your TRUE NAME, street address, telephone
number, and email address.</u>

Kerry S. Culpepper, Esq.

Culpepper IP, LLLC

75-170 Hualalai Road

Suite B204

Kailua-Kona, Hawaii 96740

US Tel 1-808-464-4047

kculpepper@culpepperip.com

<u>Identification of the copyrighted work claimed to have been infringed, or, if multiple
copyrighted works at a single online site are covered by a single notification, a representative
list of such works on that site.</u>

**Exhibit "2"**

Page 2

Infringement of the motion picture <u>Hunter Killer</u> is/was induced by (1) the content (promotional language of YTS); and/or (2) the link to download the torrent file of the motion pictures at the websites YTS.AM, YTS.AG and YTS.GG hosted and/or supported at following IP addresses at following times:

| No. | IP address | Hit Date | Infringing Website |
|---|---|---|---|
| 1 | 2001:470:b07e:0:d83a:a3ff:fe5e:ca | 2018-09-19 12:27:05.71563+00 | yts.ag |
| 2 | 216.218.222.14 | 2018-08-24 14:34:20.29611+00 | yts.am |
| 3 | 216.218.222.12 | 2018-03-06 18:11:31.503688+00 | yts.gg |
| 4 | 65.19.167.130 | 2018-02-16 17:55:55.294389+00 | yts.gg |
| 5 | 216.218.222.14 | 2018-02-16 13:19:46.327169+00 | yts.gg |

<u>Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit Hurricane Electric to locate the material.</u>

(1) the content (promotional language of YTS); and/or (2) the link to download the motion picture at the websites:

YTS.AM, YTS.AG and YTS.GG

Information reasonably sufficient to permit Hurricane Electric to contact the Complaining Party, such as an address, telephone number, and, if available, an electronic mail address at which the Complaining Party may be contacted.

Kerry S. Culpepper, Esq.

Culpepper IP, LLLC

75-170 Hualalai Road

Suite B204

Kailua-Kona, Hawaii 96740

US Tel 1-808-464-4047

<u>A statement that the Complaining Party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.</u>

Page 3

I, have a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

<u>A statement that the information in the notification is accurate, and under penalty of perjury, that the Complaining Party is the owner, or is authorized to act on behalf of the owner, of an exclusive right that is allegedly infringed.</u>

The information in the notification is accurate, and under penalty of perjury, I am authorized to act on behalf of the owner, Hunter Killer Productions, Inc. of an exclusive right that is allegedly infringed.

Sincerely,

/ksc/

Kerry S. Culpepper

| From: | notice@notices.copyrightmanagementservicesltd.com |
|---|---|
| To: | copyright@he.net |
| Cc: | ccbk@notices.copyrightmanagementservicesltd.com |
| Subject: | Notice of Claimed Infringement [Case No. 40559578682] |
| Date: | Friday, March 6, 2020 12:36:30 AM |

-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA256

Notice of Claimed Infringement


Notice ID: 40559578682
Notice Date: 2020-03-06 10:36:30


Dear Sir or Madam:

This message is sent on behalf of Fallen Productions, Inc..

Under penalty of perjury, I assert that Copyright Management Services, Ltd.  (CMS) is authorized to act on behalf of the owner of the exclusive copyrights that are alleged to be infringed herein.

Fallen Productions, Inc. owns the copyrights to the movie Angel Has Fallen. The unauthorized download and distribution of this file by your IP address constitutes copyright infringement.

Please see below details for the infringements:

Protocol: BITTORRENT
Infringed Work: Angel Has Fallen
Infringing FileName: Angel.Has.Fallen.2019.WEB-DL.x264-FGT
Infringing FileSize: 1236049106
Infringer's IP Address: 74.82.60.174
Infringer's Port: 54527
Initial Infringement Timestamp: 2020-02-08 16:00:25

And, you're also creating a security risk on your computers, devices and networks when you download unauthorized movies or allow others to do so from your Internet connection.

We respectfully ask that you stop infringing and redistributing Fallen Productions, Inc. copyright protected content, and take the proper steps to secure your Internet so that others do not infringe and redistribute our content as well.

We have a good faith belief that use of the copyrighted material detailed above is not authorized by the copyright owner, its agent, or the law.  In addition, we have a good faith subjective belief that the use does not constitute fair use. The information in this notice is accurate and we state, under penalty of perjury, that we are authorized to act on behalf of the owner of the copyright that is allegedly infringed. This letter is not a complete statement of Fallen Productions, Inc.'s rights in connection with this matter, and nothing contained herein constitutes an express or implied wavier of any rights or remedies of Fallen Productions, Inc. in connection with this matter, all of which are expressly reserved.

We appreciate your assistance and thank you for your cooperation in this matter.

Respectfully,


Catherine Hyde


# Exhibit "3"

Copyright Management Services Ltd.
notice@notices.copyrightmanagementservicesltd.com
Address:
43 Berkeley Square
London W1J 5AP
United Kingdom

```
<?xml version="1.0" encoding="UTF-8"?>
<Infringement>
      <Case>
            <ID>40559578682</ID>
      </Case>
      <Complainant>
            <Entity>Fallen Productions, Inc.</Entity>
            <Contact>Catherine Hyde</Contact>
            <Address>43 Berkeley Square London W1J 5AP United Kingdom</Address>
            <Email>notice@notices.copyrightmanagementservicesltd.com</Email>

      </Complainant>
      <Service_Provider>
            <Entity>Hurricane Electric</Entity>
            <Address>907-651 Nootka Way, Port Moody, BC V3H 0A1, CA</Address>
            <Phone>+1-604-724-9612</Phone>
            <Email>copyright@he.net</Email>
      </Service_Provider>
      <Source>
            <TimeStamp>2020-02-08T16:00:25Z</TimeStamp>
            <IP_Address>74.82.60.174</IP_Address>
            <Port>54527</Port>
            <Type>BitTorrent</Type>
      </Source>
      <Content>
            <Item>
                  <Title>Angel Has Fallen</Title>
                  <FileName>Angel.Has.Fallen.2019.WEB-DL.x264-FGT</FileName>
                  <FileSize>1236049106</FileSize>
                  <Type>Movie</Type>
                  <Hash Type="SHA1">DFCBE824F95FDE2C814953240BD598B7ADF8DB66</Hash>
            </Item>
      </Content>
</Infringement>
```

-----BEGIN PGP SIGNATURE-----

iQIIBAEBCAByBQJeYievaxxDYXRoZXJpbmUgSHlkZSAoQ29weXJpZ2h0IE1hbmFFn
ZW1lbnQgU2VydmljZXMgTGltaXRlZCkgPG5vdGljZUBub3RpY2VzLmNvcHlyaWdo
dG1hbmFnZW1lbnRzZXJ2aWNlc2x0ZC5jb20+AAoJEPSJdnWuCmlX4acMAKz8utQd
9jY3KK04uvQ30apxgAkOq8kytbUSh4S4VZoxkGbpzzkG8OYE/NRybpBbbEK5s7+E
uoLUtZYtX1T3Ahgw4B7JL8B4qAWaKK4UGzXtO6Nz8mAdYuJKvTo9D/INgJr/pG9X
PlvXMo3OaLIWW7wyrdndwHkaG2NIayL04lmgzyBMqC0xEwiaYCPwT/FDb0el8gRd
ARHzgQgGf7h6l5U+1WAVDDFAvOaf8Y8lwJI7iGyd9BALrtvVVL96U1jidE2F8G40
eUOBcF8x5GSm/WdVAunWM7TGnfaUyWrCYfaIfttkQ8aY1khuKYH/a+h/6YfQTmCh
YYm7yt7pyQb6htolgFS5+MoivEVN3v3VRJYDvC+YqQ9DfozEPBWzgEF6o1cej0Tx
QuSfzoYuVC0VC/0LTU4op8TNUGoO62714CLIzhsWz8rBV+l3immvvlNRLCuCGPuY
x2ibPZFuVZCu78NEMUZ+BWN0UB2ePRuFrg0OpM/BFDrg2cZloI9BayGuVw==

=elxY
-----END PGP SIGNATURE-----

EXHIBIT 2



# CULPEPPER IP, LLLC

ATTORNEY AT LAW

75-170 HUALALAI ROAD, SUITE B204
KAILUA-KONA, HAWAII 96740

TEL: (808) 464-4047
FAX: (202) 204-5181

WWW.CULPEPPERIP.COM

PATENTS, TRADEMARKS & COPYRIGHTS

KERRY S. CULPEPPER *

* ADMITTED TO PRACTICE IN VIRGINIA, HAWAI'I
AND BEFORE THE USPTO

Via E-mail Only<ndg@techmark.com>

May 1, 2020

Neil D. Greenstein

TechMark Greenstein Law, P.C.

1751 Pinnacle Drive, Suite 1000

Tysons, VA 22102

Re:  Cease and Desist of Direct Copyright Infringement, Contributory Copyright Infringement at Hurricane Electric Subscriber IP addresses
My Reference and Case Number: 19-cv-169-LEK-KJM (District of Hawaii)

Dear Mr. Greenstein,

I am writing in reply to your email of 4/19/2020 in which you requested that I "…identify the clients [I] represent and the IP address on which [my] clients' rights have allegedly been infringed."

At least the following motion pictures of my clients were confirmed infringed at HE IP addresses as of March 18, 2020.

| NO. | OWNER | MOTION PICTURE |
|:---:|:---:|:---:|
| 1 | Millennium Funding, Inc. | *Mechanic: Resurrection* |
| 2 | Bodyguard Productions, Inc. | *The Hitman's Bodyguard* |
| 3 | UN4 Productions, Inc. | *Boyka: Undisputed IV* |
| 4 | Homefront Productions, Inc./ Millennium | *Homefront* |
| 5 | Dallas Buyers Club, LLC | *Dallas Buyers Club* |
| 6 | Glacier Films 1, LLC | *American Heist* |

Page 2

| 7 | Criminal Productions, Inc. | *Criminal* |
|---|---|---|
| 8 | Clear Skies Nevada, LLC/Voltage | *Good Kill* |
| 9 | Cook Productions, LLC | *Mr. Church* |
| 10 | WWE Studios Finance Corp | *Eliminators* |
| 11 | Hunter Killer Productions, Inc. | *Hunter Killer* |
| 12 | LHF Productions, Inc. | *London Has Fallen* |
| 13 | Rambo V Productions, Inc. | *Rambo V: Last Blood* |
| 14 | Fallen Productions, Inc. | *Angel Has Fallen* |
| 15 | Wicked Nevada, LLC | *Extremely Wicked Shockingly Evil and Vile* |
| 16 | MON, LLC/ Voltage | *Welcome Home* |
| 17 | 211 Productions, Inc./ Millennium | *211* |
| 18 | TBV Productions, LLC/Voltage | *I Feel Pretty* |
| 19 | CELL Film Holdings, LLC | *Cell* |
| 20 | Fathers & Daughters Nevada, LLC/Voltage | *Fathers and Daughters* |
| 21 | Venice PI, LLC | *Once Upon a Time in Venice* |
| 22 | I am Wrath Production, Inc. | *I Am Wrath* |
| 29 | HB Productions, Inc. | *Hellboy* |
| 31 | Headhunter, LLC | *A Family Man* |

Page 3

| 34 | POW Nevada, LLC/Voltage | *Revolt* |
| 35 | Status Update, LLC/Voltage | *Status Update* |
| 36 | Stoic Productions, Inc. /Millennium | *Acts of Vengeance* |
| 37 | Killing Link Distribution, LLC | *Kill Chain* |
| 38 | Cobbler Nevada, LLC/Voltage | *The Cobbler* |
| 39 | Survivor Productions, Inc. | *Survivor* |

I further reserve the right to supplement the above list.

I have attached an excel spreadsheet with all IP addresses at which my clients motion pictures have been infringed.

I look forward to hearing back from you by May 15, 2020 so that we can discuss this issue further.

This letter is written without prejudice to the rights and remedies of our client, all of which are expressly reserved.

Sincerely,

/ksc/

Kerry S. Culpepper

kculpepper@culpepperip.com

EXHIBIT 3

# TECHMARK

GREENSTEIN LAW, P.C.

TRADEMARK AND INTELLECTUAL PROPERTY LAW

TEL: (347) 514-7717

NEIL D. GREENSTEIN
ATTORNEY AT LAW
DIRECT TEL: (571) 206-4840
E-MAIL: ndg@techmark.com

June 15, 2020

TECHMARK®
1751 PINNACLE DRIVE
SUITE 1000
TYSONS, VA 22102

Kerry S. Culpepper, Esq.
Culpepper IP, LLLC
75-170 Hualalai Road, Suite B204
Kailua Kona, HI 96740

**Re: Allegations of Copyright Infringement against Hurricane Electric**

Dear Mr. Culpepper,

I write in response to your letter of March 19, 2020 ("March 19, 2020 Letter"), my email to you seeking additional information relating to your claims in the March 19, 2020 letter, and your subsequent letter of May 1, 2020 ("May 1, 2020 Letter") (together, March 19, 2020 Letter and May 1, 2020 Letter are hereinafter the "Letters").

First, I would point out that your March 19, 2020 Letter, and the subpoena[1] you obtained dated July 12, 2019, complained about alleged infringing activities on four (4) IP addresses. I called you to inform you of my representation of Hurricane Electric ("HE"), and you called me back on April 6, 2020. I confirmed to you my representation of HE and informed you that I learned you previously had communications with my client. As such, I asked you to forward me copies of all such communications. You subsequently uploaded 41 pages of documents purporting to be the total communications directly between you and my client.

After reviewing the documents that you uploaded, it appeared that you were not representing all of the clients mentioned in your March 19, 2020 letter. As such, I sent you an email on April 19, 2020 asking you to identify which clients you represented and the IP addresses on which such client's rights had allegedly been infringed.

---

[1] We believe the subpoena was not properly issued and Hurricane reserves all rights with respect to the validity and propriety of that subpoena.

You then responded on May 1, 2020 and instead of claiming to represent a subset of some 8 clients, you now claim to represent some 39 clients. In addition, you provided an attachment of some 2300+ IP addresses on which you claim infringement occurred. Notably, your letter failed to identify sufficient facts even to make out a prima facie case of infringement.

I provide below some information for you about HE relating to the overall and general nature of HE activities. While you presumably know these facts based upon your research and your calls with my client, I provide them to ensure there is no doubt about HE's activities. After this letter should any of your clients decide to continue this dispute, I insist that each of your clients' claims be segregated. We want to be sure to address each client's claims specifically, and confusion is inevitable if you are not clear which client is making each claim.

**Hurricane Electric is an Online Service Provider**

With respect to the activities that you complained of, HE is an Online Service Provider ("OSP") and does not "host," have access to or have control over the content provided by its customers/subscribers. HE simply acts as a "highway" and provides subscribers with internet access. HE internet connections are B2B-type connections and are most often to a data center, an ISP, the government[2], or a major business. Even though HE is a small company founded in Mr. Lieber's garage, it competes with the niche "B2B" online access side of Verizon, Comcast, AT&T. For example, as you know, HE provides network access to ISPs (Internet Service Providers) – who typically use that connection to provide service to hundreds or thousands of third-party subscribers.

Your letters prematurely jump into "safe harbors" under the DMCA, but you are well experienced in copyright law and you know that you must first show liability. It is only if there is liability that a safe harbor even becomes potentially relevant. It is simply wrong and indeed illogical for anyone to suggest that a company may have liability for an alleged failure to follow a safe harbor when no liability exists under the copyright (or other) law.

---

[2] As you know, some of the IP addresses in issue were provided to the U.S. Navy's Naval Research Labs. I find it interesting that you asked a federal district court for a subpoena relating to a potential claim against the US Navy, when you know that claims against the US Government MUST be brought in the US Federal Court of Claims and that the Federal District Courts do not have jurisdiction over such claims. That issue is, however, is for another day should any of your clients decide to proceed.

To address this logically, one must first analyze whether or not there is even potential liability by HE. Only if there is potential liability need one address whether there is "protection" from an otherwise potential liability under a safe harbor. Your letter seems to suggest that if a company does not fit into a safe harbor there is liability without regard to whether there is copyright infringement. While that would be a novel approach, such an approach is unsupported in the law.

**Hurricane Electric Has Not Infringed Any of Your Client's Copyrights**

Had you analyzed the law instead of making a conclusory assumption of liability, the only reasonable conclusion is that HE has no liability whether for direct, contributory, or vicarious copyright infringement.

"As a threshold question, a plaintiff who claims copyright infringement must show: (1) ownership of a valid copyright; and (2) that the defendant violated the copyright owner's exclusive rights under the Copyright Act." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004), *citing* 17 U.S.C. Section 501(a)(2003); *Ets-Hokin*, 225 F.3d at 1073. You have only provided to HE a chart of alleged copyrights (including the alleged owner, and motion picture title) and in your May 1, 2020 letter you have neither alleged that the copyrights are registered nor have you provided alleged copyright certificates. Nonetheless, even if one were to assume that the copyrights were registered and valid, infringement is still lacking.

### *Direct Copyright Infringement*

To prove a claim of direct copyright infringement, a plaintiff must show that he owns the copyright and that the defendant himself violated one or more of the plaintiff's exclusive rights under the Copyright Act. *Robertson*, 357 F.3d at 1076, *citing A & M Records v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). Your Letters never allege, nor could they, that HE directly infringed or violated any of your clients' rights under the Copyright Act. You have alleged, instead, simply that one or more of HE's subscribers have violated your clients' rights. Based on this, your Letters effectively admit that HE is not liable for any direct copyright infringement.

### *Contributory Copyright Infringement*

To prove a claim of contributory copyright infringement, a plaintiff must show that the defendant, with knowledge of the infringing activity, induced, caused or materially contributed to the infringing conduct of another. *See Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir. 1971). Your Letters similarly fail to establish that HE is guilty of contributory infringement.

The Second circuit is not alone in its analysis of contributory infringement. Indeed, the Ninth Circuit – of course, the circuit where you are located and where HE is located – has spoken loud and clear on the issue. In a recent published precedential decision of which you are aware[3], *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d. 1142 (9th Cir., 2018)(copy attached), Cobbler Nevada didn't have the hubris to sue Comcast – in that case the ISP (a party one level closer to the alleged infringer than HE is in your allegations) -- but obtained records from Comcast that Gonzales was assigned the IP address in issue. The District Court found no infringement liability against the subscriber, Gonzales, and the 9th circuit affirmed both the finding of no infringement and the award of attorneys' fees against Cobbler Nevada. As to direct infringement, the 9th circuit stated:

> The only connection between Gonzales and the infringement was that he was the registered internet subscriber and that he was sent infringement notices. To establish a claim of copyright infringement, Cobbler Nevada "must show that [it] owns the copyright and that the defendant himself violated one or more of the plaintiff's exclusive rights under the Copyright Act." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004). Cobbler Nevada has not done so.

As to the claim of contributory infringement, the 9th circuit was similarly instructive and definitive.

> We have adopted the well-settled rule that "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1170 (9th Cir 2007) (alteration in original)

---

[3] Your client is the party that not only lost but had to pay attorneys' fees. Certainly, you became aware of this case, at the very least, as part of the normal vetting in taking on a representation of a client.

4

(quoting *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 914, 930 (2005)). Stated differently, "liability exists if the defendant engages in personal conduct that encourages or assists the infringement." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001) (internal quotation marks omitted). A claim for contributory infringement requires allegations that the defendant is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) (brackets omitted) (quoting *Gershwin Publishing Corp. v. Columbia Artists Management*, 443 F.2d 1159, 1162 (2d Cir. 1971)). **Cobbler Nevada's contributory infringement claim is premised on a bare allegation that Gonzales failed to police his internet service. This perfunctory allegation, without more, does not sufficiently link Gonzales to the alleged infringement.** (emphasis added)

The 9th Circuit went on to state:

> We analyze contributory liability "in light of 'rules of fault-based liability derived from the common law,' and common law principles establish that intent may be imputed." *Id.* at 1170–71 (quoting *Grokster*, 545 U.S. 934–35).

> Turning to the first strand, Cobbler Nevada's complaint lacks any allegations that Gonzales "actively encourage[ed] (or induc[ed]) infringement through specific acts." *Id.* at 1170. Nothing in Cobbler Nevada's complaint alleges, or even suggests, that Gonzales actively induced or materially contributed to the infringement through "purposeful, culpable expression and conduct." *Grokster*, 545 U.S. at 937.

Just like Cobbler Nevada's claim in the *Gonzales* case, none of your clients (including Cobbler Nevada) have, nor could they have consistent with FRCP 11 in that HE is merely an online service provider of internet network access, made any allegations that HE "actively induced or materially contributed to the infringement through "purposeful, culpable expression and conduct."

The 9th Circuit continued –

Nor does the second strand implicate Gonzales. Providing internet access can hardly be said to be distributing a product or service that is not "capable of substantial" or "commercially significant noninfringing uses." *Sony*, 464 U.S. at 442.

HE is an online service provider which provides internet connections to major companies and government organizations. Your clients can not credibly suggest that the U.S. Navy doesn't have significant "noninfringing" use for an internet connection. Nor could your clients credibly suggest that an Internet Service Provider to which HE provides it online service doesn't have a significant "noninfringing" use.

Your clients, including Cobbler Nevada, know that their theories "both stray[s] from precedent and effectively create[s] an affirmative duty for private internet subscribers to actively monitor their internet service for infringement." In *Cobbler Nevada*, the 9th circuit noted that "[i]mposing such a duty would put at risk any purchaser of internet service who shares access with a family member or roommate, or who is not technologically savvy enough to secure the connection to block access by a frugal neighbor. This situation hardly seems to be one of "the circumstances in which it is just to hold one individual accountable for the actions of another."

In view of the clear ruling by the 9th Circuit, the egregiousness of your clients' allegations is further evident from the fact that HE is not the private internet subscriber and is not even the ISP. HE is an online service provider – who sells network connections to ISPs.

Absent facts from your clients that HE "actively induced or materially contributed to the infringement through "purposeful, culpable expression and conduct," I don't believe your clients will make it past a FRCP 12(b)(6) motion to dismiss. Indeed, in view of the Cobbler Nevada case, your clients will likely not only lose such a motion, but will likely have to pay HE's attorneys fees. In my view, there is also a significant risk of sanctions by the Court.

If you believe that HE has actively induced or materially contributed to the infringement through "purposeful, culpable expression and conduct," or is somehow infringing your clients' rights, you must provide me with those facts and theories. Again, this must be done on a client by client basis and should include all of the facts supporting a prima facie case including copyright registration certificates, and evidence in support of your clients' claims.

Simply put, we don't believe that HE has engaged in contributory copyright infringement.

### Vicarious Copyright Infringement

To prove a claim of vicarious copyright infringement, a plaintiff must show that the defendant enjoys or enjoyed a direct financial benefit from another's infringing activity and has the right and ability to supervise the infringing activity. *See Robertson*, 357 F.3d at 1076, *citing Napster, Inc.,* 239 F.3d at 1022 (citing *Gershwin Publ'g Corp.,* 443 F.2d at 1162); *Fonovisa, Inc., v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996); 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* Section 12.04[A][1] (perm.ed., rev.vol.2003). HE has no ability to supervise or control any relevant content and has no hand in the making or distribution of such content. HE has no direct financial interest in any of the purchasers of the internet connections and gets no financial benefit from any alleged infringing activity by a user. Moreover, HE is an OSP providing only an internet network connection and has no control over, the content itself. HE's customers or HE's customer's customers, or even HE's customer's customer's customers are the users of the internet network connection. Thus, HE cannot be vicariously liable for the alleged copyright infringement.

### Even if Hurricane Electric Was Somehow Liable for Copyright Infringement – Which is Emphatically Denied – HE is protected by the DMCA Safe Harbor

As established above, HE is not liable for any sort of copyright infringement. Without any infringement, the *threshold* has not been met and no safe harbor discussion is necessary. Nonetheless, for completeness, even if HE were somehow liable for some type of copyright infringement, which is emphatically denied, HE, as an online service provider which does not provide any intermediate or transient storage (as defined in 17 U.S.C. § 512(k)(1)(B), would not have any liability due to the safe harbor limitation of liability under 17 U.S.C. § 512(i).

### Hurricane Electric Is Not Subject to Jurisdiction in Hawaii

Jurisdiction over HE in Hawaii has not been, and cannot be, established. HE is located, headquartered and operates from Fremont, California. California is HE's principal place of business. Indeed, HE does not even have a place of business in Hawaii.

7

**HE Has No Interest in This Matter**

As a practical matter, HE has no interest, financial or otherwise, in your clients' disputes with alleged infringers who may have improperly downloaded movies. As such, HE promptly provided you with information, including names and addresses, of the subscribers who leased the internet connections. That gave your clients all of the information they needed to take appropriate action against the alleged infringers.

**Conclusion**

I understand from my client – which I trust must have been a miscommunication – that you took the position that your clients were not obligated to go after the actual infringers or to seek the actual infringers' identities from the ISPs which purchase internet connections from HE. That statement would be facially erroneous, as discussed above, as the cases discussed above make it clear that your clients have the burden of proof and cannot prove infringement merely by relying upon the fact that HE is an online service provider of an internet network connection.

If you have facts supporting a *prima facie* case against HE, I am open to receiving those facts. Again, that must be on a client by client basis as we will keep meticulous records for a later attorney fee petition.

Finally, if you would like to discuss this matter, I am available by telephone this month, and, travel restrictions due to COVID-19 permitting, I will be in Kona next month where we can meet in-person after I complete my arrival quarantine/isolation.

Absent a further response from you by June 15, 2020, we will consider this matter closed.

Sincerely yours,

Neil D. Greenstein

8

EXHIBIT 4



# CULPEPPER IP, LLLC

ATTORNEY AT LAW

75-170 HUALALAI ROAD, SUITE B204
KAILUA-KONA, HAWAII 96740

TEL: (808) 464-4047
FAX: (202) 204-5181

WWW.CULPEPPERIP.COM

PATENTS, TRADEMARKS & COPYRIGHTS

Via E-mail<copyright@he.net>

KERRY S. CULPEPPER *

* ADMITTED TO PRACTICE IN VIRGINIA, HAWAI'I
AND BEFORE THE USPTO

May 20, 2020

Via First Class Mail
Neil D. Greenstein
TechMark
1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102

Re:  Cease and Desist of Direct Copyright Infringement, Contributory Copyright Infringement at
Hurricane Electric Subscriber IP addresses
My Reference and Case Number: 19-cv-169-LEK-KJM (District of Hawaii)

Dear Mr. Greenstein,

I am writing in reply to your reply letter of May 15, 2020 (but incorrectly dated June 15, 2020).  As you most likely expect, I disagree with all your legal conclusions and factual assertions.  HE account holders directly infringed and continue to infringe my clients' exclusive rights of at least reproductions and distribution.  HE contributes to these infringements by continuing to provide Internet service to these account holders despite the Infringement Notices ("Notices") sent to HE by my clients' agents.

In the outset, I would like to point out that in your email of April 19, 2020 you stated, "Please identify the clients you represent and the IP address on which your clients' rights have allegedly been infringed. We can then address those claims…"  That is exactly what I provided to you.  However, in your reply letter you stated that my letter "…failed to identify sufficient facts even to make out a prima facie case of infringement.".   You did not request that I send the data files, notices, or other evidence of infringements by HE account holders.  I sent to you exactly what you requested – the IP addresses, client names and their motion pictures.

**The Evidence of Direct Infringement of HE account holders**

My clients' agent Maverick Eye ("MEU") identifies IP addresses on peer-to-peer networks distributing my clients' motion pictures by monitoring resources that broadcast IP

addresses sharing the motion pictures. In many cases, MEU can monitor these IP addresses at various stages of downloading and confirm whether the user at the IP address possesses 100% of the infringing file copy. MEU performs a data exchange with each IP address to confirm actual distribution of the infringing file copy of the motion picture. The Notices are then sent to ISPs such as HE based upon the evidence of actual distribution. Thus, the evidence obtained by the MEU will establish a *prima facie* case of a direct infringement and distribution of my clients' exclusive right to distribute and reproduce their motion pictures. This is the same type of circumstantial evidence of direct infringement that the Western District of Texas found acceptable in *Grande* and the Eastern District of Virginia found acceptable in *Cox I* and *II*.

Finally, each of Notices includes the illicit file names of the motion picture shared by the account holder. For example, in the two exemplary notices I sent in the first letter the file names are: Hellboy (2019) [BluRay] [1080p] [YTS.LT] (obtained from YTS.LT) and Hellboy.2019.1080p.KORSUB.HDRip.x264.AAC2.0-STUTTERSHIT (obtained from RARBG.TO). The file names are also circumstantial evidence that they are illegitimate copies made from the same HE IP address and thus a direct infringement of my clients' exclusive right of reproduction in their motion pictures.

You argue that Ninth Circuit decision in *Cobbler Nevada* prevents me from establishing the direct infringements of the account holders unless I point out the specific end user responsible. I find it amusing that you seek to compare your client HE – described by you as an OSP that provides B2B-type connections to account holders across the United States and competes with Verizon, Comcast and AT&T– to the adult day care center operator Defendant in *Cobbler Nevada* that provided WiFi service to its adult residents. The differences are so stark that it is hard to take the comparison even seriously. The adult day care center Defendant in *Cobbler Nevada* did not have accountholders to terminate in response to Notices. When the Plaintiff ISP Grande Communications Networks, LLC ("Grande") attempted to make this same argument in the Western District of Texas it was completely rejected just in a footnote. *See UMG Recordings, Inc., et al. v. Grande Communications Networks, LLC,* 1:17-CV-365-DAE, Doc. #268, pg. 40 ("*Grande*"). This argument was also rejected by the Eastern District of Virginia in *Sony Music Entertainment et al v. Cox Communications, Inc. et al*, 1:18-cv-00950-LO-JFA, Doc. #586, pgs. 22-24 ("*Cox II*").

## The Evidence of Contributory Infringement

Without conceding that the Ninth Circuit is the relevant law, in the Ninth Circuit, generally one infringes contributorily by intentionally inducing or encouraging direct infringement. Some decisions require knowledge. However, under any standard of contributory infringement HE is liable because HE had *actual* knowledge of direct infringements from the numerous Notices my clients' agent sent to you. Even when HE ignored many of these Notices,

Page 3

HE's willful blindness in these circumstances also satisfies the knowledge requirement. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011).

HE encourages or materially contributes to the account holders' direct infringements by providing the facilities and means for the account holders' to continue their infringements – namely the Internet service. Along this line, I found it interesting that you would challenge that HE has directly or contributed to copyright infringements while conceding that HE acts as a "…"highway" and provided subscribers with internet access"… and operates a "data center". Even if transmissions of infringing material are performed by the end user, HE performs "…the transmission, routing, provision of connections, or storage of the infringing material" by the HE data center and/or routers and servers that makeup his "highway". These are the activities that an OSP performs to, for example, transport data packets from the account holder to the next destination. This very concern that these activities would render all OSPs liable for direct and contributory infringement is one of the reasons that the DMCA was passed by Congress. That is why it is important for an OSP to comply with the provisions of the DMCA such as in 17 USC 512(i)(1)(A) to keep its safe harbor. However, not only has HE failed to comply with this provision by not taking meaningful actions in response to the Notices from my clients' agents, it is apparent that HE did not even forward many of these notices to their account holders. Nonetheless, HE had knowledge of its account holders' infringing activity by the notices my clients' agents sent to HE but still continued to provide normal data transmission operations to provide the "highway" so the infringements continued. Accordingly, HE encouraged and/or materially contributed to the copyright infringements. HE could have taken the simplest measure to terminate the customer account and stop further infringement – namely terminating the account but the profits from these infringing accounts were simply to delicious for HE to pass up.

Besides HE's liability for contributing to the direct infringements of its account holders, arguably HE is also liable for its own direct infringements of my clients' motion pictures. Particularly, when HE routed the data packets of the infringing material from its account holders to destinations, HE likely copied and temporarily stored copies of the materials during the normal transmission, routing, and provision of connections. Ordinarily, HE would probably not be liable because of lack of volitional conduct. However, because HE had actual knowledge of the infringing activity, yet continued to provide service for the account holders, a Court may decide that HE has sufficient volitional conduct to be liable for direct infringement.

**Vicarious Liability**

I have not made assertions regarding whether HE is liable under vicarious copyright infringement. However, I note that the District Court of Colorado rejected arguments similar to yours made by the Defendant in *Warner Records Inc. v. Charter Communications, Inc.*, 1:19-cv-

00874-RBJ-MEH, Doc. #157. Particularly, the District Court determined that the Plaintiffs'
allegations that Defendants' failure to stop or take other action in response to notices of
infringement is a draw to current and prospective subscribers was sufficient for the "direct
financial benefit requirement" and that Charter's ability to terminate those users about whom it is
notified was sufficient for the "right and ability to supervise the infringing activity". Id. at pgs.
10-12. Your arguments were also rejected in *Cox II*.

## The Recent ISP Cases

It is not surprising that you do not mention any of the recent ISP copyright infringement
cases such as *Grande*, *Cox I* and *II* and *Warner Bros. Records, Inc. v. Charter*. None of these
cases support your position. In the contrary, in *Sony* the Eastern District of Virginia <u>rejected</u>
Cox's argument that it was not responsible for the infringements of business customers who had
numerous downstream users – the same argument you are attempting to make. The Central
District of California rejected an attempt by Cloudflare to make a similar argument in *ALS Scan,
Inc. v. CloudFlare, Inc.* and concluded that CloudFlare could be liable under a material
contribution theory because CloudFlare could take the simple measures of terminating the
customer account to stop further infringement.

> The simple answer as to whether Cloudflare could have done something simple to stop the infringement is "yes":
> Cloudflare can, but does not, end its business relationship with websites that it knows (or arguably knows) are serial
> infringers.

ALS Scan, Inc. v. CloudFlare, Inc., No. CV 16-5051-GW(AFMX), 2017 WL 1520444, (C.D.
Cal. Feb. 16, 2017). <u>HE could do the same here.</u>

## HE has no safe harbor

As argued previously, HE has no safe harbor because it failed to take meaningful actions
against its account holders let alone termination in response to the multiple notices. You stated
that "…HE, as an online service provider which does not provide any intermediate or transient
storage…would not have any liability…" <u>Please explain to me how HE performs its data routing
services to provide a "highway" to the content provided to its customers/subscribers without
temporarily storing, copying, and forwarding the data packets</u>. It is telling that you spend only
one paragraph in your reply letter arguing that HE has a safe harbor.

## Jurisdiction

I never argued that jurisdiction of HE in Hawaii is appropriate. However, it should be
noted that when the HE subscribers sent copies of my clients' motion pictures (in the 19cv169
case) to the Hawaii Defendants, HE purposefully directed electronic activity into this District.
Particularly, since HE acted as a "highway" as you state, HE *knew* the destination of these data
packets, namely to IP addresses in Hawaii. Further, many of my clients' claims for copyright
infringement arise from this activity. Moreover, the HE infringing account holders appear to be

dispersed across the United States – some in the same districts as the Courts in *Grande, Cox I* and *Cox II*. The purposeful direction test will likely support jurisdiction in the forums where the infringement occurred as well.

**Conclusion**

I sincerely hope that HE reconsiders its position after reviewing the above points and agrees to our three requests (terminate the account; agree to take appropriate action on further notices; pay a portion of the damages). Please consider the vast damage that is being done to my clients by these HE customers. To give a concrete example, in my previous letter I pointed out that the clients' agent had sent multiple notices regarding infringements for the account of IP address 72.52.87.188 ("188"). Nonetheless, since the date of that previous letter MEU has captured nearly 50 more instances of copyright protected content being illegally shared from the 188 address. For example, MEU captures the motion picture *The Rest of Us* of our client Sugar Shack Productions Ontario, Inc. being shared at the 188 address on 2020-04-28 06:06:38 UTC and the motion picture *The Hurricane Heist* of our client Screen Media Ventures, LLC being shared multiple times from 2020-03-26 20:19:10 to 2020-03-27 00:36:54 UTC at the 188 address. None of these infringements would have happened if HE had terminated this account after my previous letter. You may notice that these two clients and motion pictures were not included in the previous list. The problem is that the longer HE fails to terminate the accounts of repeat infringers such as the 188 address that have become piracy cesspools, more of my clients' motion pictures are infringed.

I respectfully request a reply to my letter by June 15, 2020. This letter is written without prejudice to the rights and remedies of my clients, all of which are expressly reserved.

Sincerely,

/ksc/

Kerry S. Culpepper

kculpepper@culpepperip.com

EXHIBIT 5

# U.S. District Court
## District of Hawaii (Hawaii)
## CIVIL DOCKET FOR CASE #: 1:19-cv-00169-LEK-KJM

| | |
|---|---|
| Venice PI, LLC, et al v. Doe 1, et al | Date Filed: 04/04/2019 |
| Assigned to: JUDGE LESLIE E. KOBAYASHI | Date Terminated: 04/22/2020 |
| Referred to: MAGISTRATE JUDGE KENNETH J. MANSFIELD | Jury Demand: Plaintiff |
| | Nature of Suit: 820 Copyright |
| Cause: 17:101 Copyright Infringement | Jurisdiction: Federal Question |

**Plaintiff**

**Venice PI, LLC**                represented by    **Kerry S. Culpepper**
                                                    75-170 Hualalai Road
                                                    Suite B204
                                                    Kailua Kona, HI 96740
                                                    808-464-4047
                                                    Fax: 202-204-5181
                                                    Email: kculpepper@culpepperip.com
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**MON, LLC**                     represented by    **Kerry S. Culpepper**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Millennium Funding, Inc**      represented by    **Kerry S. Culpepper**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bodyguard Productions, Inc.**  represented by    **Kerry S. Culpepper**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**TBV Productions, LLC**         represented by    **Kerry S. Culpepper**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**UN4 Productions, Inc.**        represented by    **Kerry S. Culpepper**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Hunter Killer Productions, Inc.**            represented by  **Kerry S. Culpepper**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*


V.

<u>**Defendant**</u>

**Doe 1**
*TERMINATED: 11/07/2019*
*doing business as*
YIFY
*TERMINATED: 11/07/2019*


<u>**Defendant**</u>

**Doe 2**
*TERMINATED: 11/07/2019*
*doing business as*
YTS
*TERMINATED: 11/07/2019*


<u>**Defendant**</u>

**Michael Nolasco**
*TERMINATED: 05/09/2019*


<u>**Defendant**</u>

**Brent Baldwin**
*TERMINATED: 05/23/2019*


<u>**Defendant**</u>

**Doe 3**
*Cullen Coughlan*
*TERMINATED: 06/12/2019*


<u>**Defendant**</u>

**Does 4-10**
*TERMINATED: 11/07/2019*


<u>**Defendant**</u>

**Techmodo Limited**
*TERMINATED: 04/14/2020*


<u>**Defendant**</u>

**Senthil Vijay Segaran**
*TERMINATED: 04/14/2020*


<u>**Defendant**</u>

**NGUYEN DINH Manh**
*TERMINATED: 04/22/2020*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/28/2019 | 51 | EO: Plaintiffs filed this action against Doe 2 dba YTS ("Doe Defendant YTS"), among others. *See* ECF No. 1. Plaintiffs' counsel, Kerry S. Culpepper, Esq., subsequently submitted a proposed summons for Doe Defendant YTS, which he directed to:<br><br><div align="center">Doe 2 - Techmodo LTD<br>Mr. Senthil Vijay Segaran<br>40 BLOOMSBURY WAY<br>LOWER GROUND FLOOR<br>LONDON UNITED KINGDOM WC1A 2SE</div><br>ECF No. 17 at 1.<br><br>Mr. Culpepper subsequently filed two Proofs of Service purporting to evidence service of process upon Doe Defendant YTS through Techmodo Limited and Senthil Vijay Segaran. *See* ECF Nos. 42, 43. Techmodo Limited and Mr. Segaran, however, are not named in the Complaint, and thus they are not defendants in this case.<br><br>Federal Rule of Civil Procedure 4(a)(1)(B) requires that a summons "be directed to the defendant[.]" As a practical matter, it is impossible to serve a summons and complaint on an anonymous defendant. The Ninth Circuit therefore disfavors the use of doe defendants, *see Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980), and Plaintiffs' tactics highlight the problems with proceeding with doe defendants.<br><br>It is improper for Plaintiffs to attempt to effect service on a person or entity Plaintiffs believe to be a doe defendant without properly amending their complaint to identify the doe defendant by name. It is equally improper for Mr. Culpepper to direct summonses to persons and/or entities who are not named defendants in an action.<br><br>Based on the foregoing, the Court finds that Plaintiffs and Mr. Culpepper improperly served the Complaint on Techmodo Limited and Mr. Segaran. The Court thus STRIKES the 42 and 43 Proofs of Service as to these non-parties. If Plaintiffs name Techmodo Limited and/or Mr. Segaran in a subsequent amended pleading, Plaintiffs will need to effect service of process in accordance with Federal Rule of Civil Procedure 4.<br><br>The Court is aware that Mr. Culpepper, as the plaintiffs' counsel, has engaged in the same conduct in at least two other cases: (1) *HB Prods., Inc. v. Doe, et al.*, Civil No. 19-00389 ACK-KJM; and (2) *Wicked Nev., LLC v. Doe, et al.*, Civil No. 19-00413 SOM-KJM. The Court cautions Mr. Culpepper that similar actions in the future will result in the Court striking the plaintiffs' filings. (MAGISTRATE JUDGE KENNETH J. MANSFIELD) (mansfield2) (Entered: 10/28/2019) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/09/2020 19:20:35 | | |
| **PACER Login:** TechMarkGLPC:2557109:0 | **Client Code:** Hurricane | |

| Description: | Docket Report | Search Criteria: | 1:19-cv-00169-LEK-KJM Starting with document: 51 Ending with document: 51 |
|---|---|---|---|
| Billable Pages: | 3 | Cost: | 0.30 |

# EXHIBIT 6

**WIKIPEDIA**

# Internet backbone

The **Internet backbone** may be defined by the principal data routes between large, strategically interconnected computer networks and core routers of the Internet. These data routes are hosted by commercial, government, academic and other high-capacity network centers, the Internet exchange points and network access points, that exchange Internet traffic between the countries, continents, and across the oceans. Internet service providers, often Tier 1 networks, participate in Internet backbone traffic by privately negotiated interconnection agreements, primarily governed by the principle of settlement-free peering.

The Internet, and consequently its backbone networks, do not rely on central control or coordinating facilities, nor do they implement any global network policies. The resilience of the Internet results from its principal architectural features, most notably the idea of placing as few network state and control functions as possible in the network elements and instead relying on the endpoints of communication to handle most of the processing to ensure data integrity, reliability, and authentication. In addition, the high degree of redundancy of today's network links and sophisticated real-time routing protocols provide alternate paths of communications for load balancing and congestion avoidance.



Each line is drawn between two nodes, representing two IP addresses. This is a small look at the backbone of the Internet.

The largest providers, known as Tier 1 providers, have such comprehensive networks that they do not purchase transit agreements from other providers.[1] As of 2019, there are six Tier 1 providers in the telecommunications industry: CenturyLink (Level 3), Telia Carrier, NTT, GTT, Tata Communications, and Telecom Italia.[2]

## Contents

**Infrastructure**

**History**

**Modern backbone**

**Economy of the backbone**
    Peering agreements
    Regulation
    Transit agreements

**Regional backbone**
    Egypt
    Europe

Caucasus
Japan
China

**See also**

**Further reading**

**References**

**External links**

# Infrastructure

The Internet backbone consists of many networks owned by numerous companies. Optical fiber trunk lines consists of many fiber cables bundled to increase capacity, or bandwidth. Fiber-optic communication remains the medium of choice for Internet backbone providers for several reasons. Fiber-optics allow for fast data speeds and large bandwidth, they suffer relatively little attenuation, allowing them to cover long distances with few repeaters, and they are also immune to crosstalk and other forms of electromagnetic interference which plague electrical transmission.[3] The real-time routing protocols and redundancy built into the backbone is also able to reroute



Routing of prominent undersea cables that serve as the physical infrastructure of the Internet.

traffic in case of a failure.[4] The data rates of backbone lines have increased over time. In 1998,[5] all of the United States' backbone networks had utilized the slowest data rate of 45 Mbit/s. However, technological improvements allowed for 41 percent of backbones to have data rates of 2,488 Mbit/s or faster by the mid 2000s.[6]

# History

The first packet-switched computer networks, the NPL network and the ARPANET were interconnected in 1973 via University College London.[7] The ARPANET used a backbone of routers called Interface Message Processors. Other packet-switched computer networks proliferated starting in the 1970s, eventually adopting TCP/IP protocols, or being replaced by newer networks. The National Science Foundation created the National Science Foundation Network (NSFNET) in 1986 by funding six networking sites using 56 kbit/s interconnecting links, with peering to the ARPANET. In 1987, this new network was upgraded to 1.5 Mbit/s T1 links for thirteen sites. These sites included regional networks that in turn connected over 170 other networks. IBM, MCI and Merit upgraded the backbone to 45 Mbit/s bandwidth (T3) in 1991.[8] The combination of the ARPANET and NSFNET became known as the Internet. Within a few years, the dominance of the NSFNet backbone led to the decommissioning of the redundant ARPANET infrastructure in 1990.

In the early days of the Internet, backbone providers exchanged their traffic at government-sponsored network access points (NAPs), until the government privatized the Internet, and transferred the NAPs to commercial providers.[1]

# Modern backbone

Because of the overlap and synergy between long-distance telephone networks and backbone networks, the largest long-distance voice carriers such as AT&T Inc., MCI (acquired in 2006 by Verizon), Sprint, and CenturyLink also own some of the largest Internet backbone networks. These backbone providers sell their services to Internet service providers (ISPs).[1]

Each ISP has its own contingency network and is equipped with an outsourced backup. These networks are intertwined and crisscrossed to create a redundant network. Many companies operate their own backbones which are all interconnected at various Internet exchange points (IXPs) around the world.[9] In order for data to navigate this web, it is necessary to have backbone routers—routers powerful enough to handle information—on the Internet backbone and are capable of directing data to other routers in order to send it to its final destination. Without them, information would be lost.[10]

# Economy of the backbone

## Peering agreements

Backbone providers of roughly equivalent market share regularly create agreements called peering agreements, which allow the use of another's network to hand off traffic where it is ultimately delivered. Usually they do not charge each other for this, as the companies get revenue from their customers regardless.[1][11]

## Regulation

Antitrust authorities have acted to ensure that no provider grows large enough to dominate the backbone market. In the United States, the Federal Communications Commission has decided not to monitor the competitive aspects of the Internet backbone interconnection relationships as long as the market continues to function well.[1]

## Transit agreements

Backbone providers of unequal market share usually create agreements called transit agreements, and usually contain some type of monetary agreement.[1][11]

# Regional backbone

## Egypt

The government of Egypt shut down the four major ISPs on January 27, 2011 at approximately 5:20 p.m. EST.[12] Evidently the networks had not been physically interrupted, as the Internet transit traffic through Egypt was unaffected. Instead, the government shut down the Border Gateway Protocol (BGP) sessions announcing local routes. BGP is responsible for routing traffic between

ISPs.[13]

Only one of Egypt's ISPs was allowed to continue operations. The ISP Noor Group provided connectivity only to Egypt's stock exchange as well as some government ministries.[12] Other ISPs started to offer free dial-up Internet access in other countries.[14]

## Europe

Europe is a major contributor to the growth of the international backbone as well as a contributor to the growth of Internet bandwidth. In 2003, Europe was credited with 82 percent of the world's international cross-border bandwidth.[15] The company Level 3 Communications began to launch a line of dedicated Internet access and virtual private network services in 2011, giving large companies direct access to the tier 3 backbone. Connecting companies directly to the backbone will provide enterprises faster Internet service which meets a large market demand.[16]

## Caucasus

Certain countries around the Caucasus have very simple backbone networks; for example, in 2011, a woman in Georgia pierced a fiber backbone line with a shovel and left the neighboring country of Armenia without Internet access for 12 hours. The country has since made major developments to the fiber backbone infrastructure, but progress is slow due to lack of government funding.[17]

## Japan

Japan's Internet backbone needs to be very efficient due to high demand for the Internet and technology in general. Japan had over 86 million Internet users in 2009, and was projected to climb to nearly 91 million Internet users by 2015. Since Japan has a demand for fiber to the home, Japan is looking into tapping a fiber-optic backbone line of Nippon Telegraph and Telephone (NTT), a domestic backbone carrier, in order to deliver this service at cheaper prices.[18]

## China

In some instances the companies that own certain sections of the Internet backbone's physical infrastructure depend on competition in order to keep the Internet market profitable. This can be seen most prominently in China. Since China Telecom and China Unicom have acted as the sole Internet service providers to China for some time, smaller companies cannot compete with them in negotiating the interconnection settlement prices that keep the Internet market profitable in China. This imposition of discriminatory pricing by the large companies then results in market inefficiencies and stagnation, and ultimately effects the efficiency of the Internet backbone networks that service the nation.[19]

# See also

- Default-free zone
- Internet2

- Mbone
- Network service provider
- Root name server
- Packet switching
- Trunking

# Further reading

- Greenstein, Shane. 2020. "The Basic Economics of Internet Infrastructure. (https://www.aeaweb.org/articles?id=10.1257/jep.34.2.192)" *Journal of Economic Perspectives*, 34 (2): 192-214. DOI: 10.1257/jep.34.2.192

# References

1. Jonathan E. Nuechterlein; Philip J. Weiser. *Digital Crossroads* (https://archive.org/details/digitalcrossroad00jona).

2. Zmijewski, Earl (2017). "A Baker's Dozen, 2016 Edition" (https://dyn.com/blog/a-bakers-dozen-2016-edition/). *Dyn Research IP Transit Intelligence Global Rankings*.

3. E. Williams, Edem; Eyo, Essien (2011-12-19). "Building a Cost Effective Network for E-learning in Developing Countries" (https://dx.doi.org/10.5539/cis.v4n1p53). *Computer and Information Science*. **4** (1). doi:10.5539/cis.v4n1p53 (https://doi.org/10.5539%2Fcis.v4n1p53). ISSN 1913-8997 (https://www.worldcat.org/issn/1913-8997).

4. Nuechterlein, Jonathan E., author. *Digital crossroads : telecommunications law and policy in the internet age* (http://worldcat.org/oclc/827115552). ISBN 978-0-262-51960-1. OCLC 827115552 (https://www.worldcat.org/oclc/827115552).

5. Kesan, Jay P.; Shah, Rajiv C. (2002). "Shaping Code" (https://dx.doi.org/10.2139/ssrn.328920). *SSRN Electronic Journal*. doi:10.2139/ssrn.328920 (https://doi.org/10.2139%2Fssrn.328920). ISSN 1556-5068 (https://www.worldcat.org/issn/1556-5068).

6. Malecki, Edward J. (October 2002). "The Economic Geography of the Internet's Infrastructure" (https://dx.doi.org/10.2307/4140796). *Economic Geography*. **78** (4): 399. doi:10.2307/4140796 (https://doi.org/10.2307%2F4140796). ISSN 0013-0095 (https://www.worldcat.org/issn/0013-0095).

7. Kirstein, P.T. (1999). "Early experiences with the Arpanet and Internet in the United Kingdom" (https://pdfs.semanticscholar.org/4773/f19792f9fce8eacba72e5f8c2a021414e52d.pdf) (PDF). *IEEE Annals of the History of Computing*. **21** (1): 38–44. doi:10.1109/85.759368 (https://doi.org/10.1109%2F85.759368). ISSN 1934-1547 (https://www.worldcat.org/issn/1934-1547).

8. Kende, M. (2000). "The Digital Handshake: Connecting Internet Backbones". *Journal of Communications Law & Policy*. **11**: 1–45.

9. Tyson, J. "How Internet Infrastructure Works" (http://computer.howstuffworks.com/internet/basics/internet-infrastructure4.htm). Archived (https://web.archive.org/web/20110614002356/http://computer.howstuffworks.com/internet/basics/internet-infrastructure4.htm) from the original on 14 June 2011. Retrieved 9 February 2011.

10. Badasyan, N.; Chakrabarti, S. (2005). "Private peering, transit and traffic diversion". *Netnomics : Economic Research and Electronic Networking*. **7** (2): 115. doi:10.1007/s11066-006-9007-x (https://doi.org/10.1007%2Fs11066-006-9007-x).

11. "Internet Backbone" (http://www.tech-faq.com/internet-backbone.html). Topbits Website. Archived (https://web.archive.org/web/20110716200149/http://www.tech-faq.com/internet-backbone.html) from the original on 16 July 2011. Retrieved 9 February 2011.

12. Singel, Ryan (28 January 2011). "Egypt Shut Down Its Net With a Series of Phone Calls" (https://www.wired.com/threatlevel/2011/01/egypt-isp-shutdown/). *Wired.* Archived (https://web.archive.org/web/20110501183804/http://www.wired.com/threatlevel/2011/01/egypt-isp-shutdown) from the original on 1 May 2011. Retrieved 30 April 2011.

13. Van Beijnum, Iljitsch. "How Egypt did (and your government could) shut down the Internet" (https://arstechnica.com/tech-policy/news/2011/01/how-egypt-or-how-your-government-could-shut-down-the-internet.ars). *Ars Technica.* Archived (https://web.archive.org/web/20110426155523/http://arstechnica.com/tech-policy/news/2011/01/how-egypt-or-how-your-government-could-shut-down-the-internet.ars) from the original on 26 April 2011. Retrieved 30 April 2011.

14. Murphy, Kevin. "DNS not to blame for Egypt blackout" (http://domainincite.com/dns-not-to-blame-for-egypt-blackout/). Domain Incite. Archived (https://web.archive.org/web/20110404013457/http://domainincite.com/dns-not-to-blame-for-egypt-blackout/) from the original on 4 April 2011. Retrieved 30 April 2011.

15. "Global Internet backbone back up to speed for 2003 after dramatic slow down in 2002". *TechTrends.* **47** (5): 47. 2003.

16. "Europe - Level 3 launches DIA, VPN service portfolios in Europe". *Europe Intelligence Wire.* 28 January 2011.

17. Lomsadze, Giorgi (8 April 2011). "A Shovel Cuts Off Armenia's Internet" (https://www.wsj.com/articles/SB10001424052748704630004576249013084603344). *The Wall Street Journal.* Archived (https://web.archive.org/web/20141225063937/http://www.wsj.com/articles/SB10001424052748704630004576249013084603344) from the original on 25 December 2014. Retrieved 16 April 2011.

18. "Japan telecommunications report - Q2 2011". *Japan Telecommunications Report* (1). 2011.

19. Li, Meijuan; Zhu, Yajie (2018). "Research on the problems of interconnection settlement in China's Internet backbone network" (https://www.sciencedirect.com/science/article/pii/S1877050918305738?via%3Dihub). *Procedia Computer Science.* **131**: 153–157 – via Elsevier Science Direct.

# External links

- About Level 3 (http://www.level3.com/en/about-us/)
- Russ Haynal's ISP Page (http://navigators.com/isp.html)
- US Internet backbone maps (https://web.archive.org/web/20060411203358/http://www.nthelp.com/maps.htm)
- Automatically generated backbone map of the Internet (http://www.opte.org/maps/)
- IPv6 Backbone Network Topology (https://web.archive.org/web/20181028124233/http://ipv6.nlsde.buaa.edu.cn/)

Retrieved from "https://en.wikipedia.org/w/index.php?title=Internet_backbone&oldid=955389099"

**This page was last edited on 7 May 2020, at 14:50 (UTC).**

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

EXHIBIT 7

# Torrent Site YTS To Pay Million Dollars In Piracy Settlements But Remain Online

By **Kavvitaa S Iyer** - April 25, 2020



[YTS](#), one of the most popular and largest visited [torrent site](#) on the Internet, has 'settled' yet another piracy lawsuit by agreeing to a consent judgment totaling $1,050,000 in damages, reports [TorrentFreak](#).

The lawsuit against YTS has been filed by a group of seven related movie companies which includes Venice PI LLC, MON LLC, Millennium Funding Inc., Bodyguard Productions Inc., TBV Productions LLC, UN4 Productions Inc., and Hunter Killer Productions Inc.

Usually, when copyright holders file a lawsuit against pirate sites, their main mission is to shut them down permanently; however, some of those cases go into prolonged legal battles.

However, in the case of YTS, the torrent website has been allowed to stay online as long as it paid damages to the seven movie companies and ensured that their films were not listed at the torrent site.

This settlement method previously became public when Kerry Culpepper, an attorney from Hawaii, who works for Millennium Films, Voltage Pictures, and several of its daughter companies struck a deal between YTS and other movie companies.

According to the consent judgment signed at the Hawaii federal court a few days ago, YTS operator and an associated business have agreed to pay $150,000 to each company, which amounts to a total of $1,050,000 in damages.

The consent judgment lists a person named Senthil Vijay Segaran and the company Techmodo as the YTS operators. Segaran is the same person who in the past had agreed to remove several torrents linking to Millenium and Voltage Films' movies from YTS.

Besides paying over $1 million in piracy damages, the judgment also prevents YTS's operator from distributing and/or promoting torrent files related to the seven movie companies.

> *Also Read- Best Free Movie Download Websites*

While YTS has removed the relevant movie torrents from the site, it continues to operate online as usual.

Nothing seems to have changed, as YTS still has hundreds of other pirated movies listed online. However, the site's users continue to remain at risk of being sued although no new lawsuits have been filed in recent weeks.

Here is a copy of the consent judgment, signed by the YTS operator and the seven movie companies.

EXHIBIT 8

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Hawaii

| | |
|---|---|
| In re Subpoena to Hurricane Electric LLC | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   MC 19-00250 JMS-RT |
| | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:         Hurricane Electric LLC dba Hurricane Electric Internet Services
            Registered Agent: MIKE LEBER 760 Mission Court, Fremont, CA 94539

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Documents sufficient to show the name, address, telephone number, email address and payment records from the customer(s) associated with IP addresses shown in Exhibit "3"
for hosting/supporting movie piracy website YTS

| Place: Kerry S. Culpepper (kculpepper@culpepperip.com) <br> 75-170 Hualalai Road, St B204 <br> Kailua Kona, HI 96740 | Date and Time: <br><br> 08/02/2019 0:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached — Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   July 12, 2019

SUE BEITIA, CLERK

*CLERK OF COURT*

/S/ SUE BEITIA, CLERK by EA, Deputy Clerk   OR                                         

*Signature of Clerk or Deputy Clerk*                      *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Hunter Killer Productions, Inc. _____ , who issues or requests this subpoena, are:

Kerry Culpepper, 75-170 Hualalai Rd, #B204, Kailua-Kona, HI 96740; T 808-464-4047; kculpepper@culpepperip.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

| No. | IP address | Hit Date | Infringing Website |
|-----|-----------|----------|-------------------|
| 1 | 2001:470:b07e:0:d83a:a3ff:fe5e:ca | 2018-09-19 12:27:05.71563+00 | yts.ag |
| 2 | 216.218.222.14 | 2018-08-24 14:34:20.29611+00 | yts.am |
| 3 | 216.218.222.12 | 2018-03-06 18:11:31.503688+00 | yts.gg |
| 4 | 65.19.167.130 | 2018-02-16 17:55:55.294389+00 | yts.gg |
| 5 | 216.218.222.14 | 2018-02-16 13:19:46.327169+00 | yts.gg |
| 6 | 65.19.167.130 | 2018-10-19 09:16:51.052958+00 | yts.am |

**Exhibit "3"**

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❑  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
**(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
**(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
**(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
**(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
**(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

JS-CAND 44 (Rev. 07/19)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Hurricane Electric LLC

**DEFENDANTS**

See attached list.

**(b)** County of Residence of First Listed Plaintiff    Alameda County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys

Neil D. Greenstein, TechMark, 1751 Pinnacle Drive,
Suite 1000, Tysons, VA 22012  (also see attached)

Attorneys *(If Known)*   Kerry Culpepper, Esq.
Culpepper IP, LLLC, 75-170 Hualalai Road, # B204 Kailua-Kona, Hawaii
96740; (808) 464-4047

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 | U.S. Government Plaintiff |
| ☐ 2 | U.S. Government Defendant |
| ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                   *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | ☒ 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 470 Racketeer Influenced & Corrupt Organizations |
| | 350 Motor Vehicle | 371 Truth in Lending | 790 Other Labor Litigation | **SOCIAL SECURITY** | 480 Consumer Credit |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 485 Telephone Consumer Protection Act |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | **IMMIGRATION** | 862 Black Lung (923) | 490 Cable/Sat TV |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 864 SSID Title XVI | 890 Other Statutory Actions |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | 865 RSI (405(g)) | 891 Agricultural Acts |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation–Transfer | ☐ 8 Multidistrict Litigation–Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
17 USC section 101, et seq.

Brief description of cause:
Copyright Declaratory Judgment action.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, Fed. R. Civ. P.

**DEMAND $** 0.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes    ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE                                      DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

*(Place an "X" in One Box Only)*    ☐ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE    ☐ EUREKA-MCKINLEYVILLE

DATE   06/10/2020        SIGNATURE OF ATTORNEY OF RECORD        /Neil D. Greenstein/

Hurricane Electric LLC v. Dallas Buyers Club, LLC et al.

Additional Counsel for Plaintiff

Martin R. Greenstein (SBN 106789)
TECHMARK, A Law Corporation
4820 HARWOOD ROAD, SUITE 110
SAN JOSE, CA 95124
Telephone: (408) 266-4700
Facsimile: (408) 850-1955
Email: mrg@techmark.com

HURRICANE ELECTRIC LLC V. DALLAS BUYERS CLUB, LLC

List of Defendants


DALLAS BUYERS CLUB, LLC, a California LLC
2170 Buckthorne Place
The Woodlands, TX 77380


DALLAS BUYERS CLUB, LLC, a Texas LLC
2170 Buckthorne Place
The Woodlands, TX 77380


GLACIER FILMS 1, LLC
327 S. Rampart St.
New Orleans, LA 70112


DOUBLE LIFE PRODUCTIONS, INC.
6423 Wilshire Blvd.
Los Angeles, CA 90048


VOLTAGE PICTURES, LLC
116 N. Robertson Blvd.
Los Angeles, CA 90048


ORION RELEASING, LLC
254 N. Beverly Drive
Beverly Hills, CA 90210


COOK PRODUCTIONS, LLC
844 Seward St., 1st Floor
Los Angeles, CA 90038

WWE STUDIOS FINANCE CORP.
1241 E. Main St.
Stamford, CT 06902

MON, LLC
215 ½ Arnaz Drive
Beverly Hills, CA 90211

TBV PRODUCTIONS, LLC
116 N. Robertson Blvd., Ste. 200
Los Angeles, CA 90048

CELL FILM HOLDINGS, LLC
8383 Wilshire Blvd., Ste. 310
Beverly Hills, CA 90211

VENICE PI, LLC
116 N. Robertson Blvd., Ste. 200
Los Angeles, CA 90048

SURVIVOR PRODUCTIONS, INC.
318 N. Carson St., #208
Carson City, NV 89701

I AM WRATH PRODUCTION, INC.
1901 Ave of the Stars, Suite 1050
Los Angeles, CA 90067

POW NEVADA, LLC
116 N. Robertson Blvd., Ste. 200
Los Angeles, CA 90048

HEADHUNTER, LLC
500 N. Rainbow Blvd.
Ste. 300A
Los Angeles, CA 90048

NICOLAS CHARTIER
6360 Deep Dell Pl.
Los Angeles, CA  90068

CRAIG J. FLORES
6426 Deep Dell 1
Los Angeles, CA 90068

AVI LERNER
1017 Maybrook Drive
Beverly Hills, CA 90210

VOLTAGE PRODUCTIONS, INC.
3025 W. Olympic Blvd.
Santa Monica, CA 90404

KILLING LINK DISTRIBUTION, LLC
9190 Olympic Blvd., Suite 400
Beverly Hills, CA 90212

MILLENIUM ENTERTAINMENT, LLC
6349 Palomar Oaks Center
Carlsbad, CA 92009

and

DOES 1-20
Unknown Addresses