JOSHUA M. DICKEY
Nevada Bar No. 6621
**BAILEY❖KENNEDY**
8984 Spanish Ridge Avenue
Las Vegas, Nevada 89148
Telephone: (702) 562-8820
Facsimile: (702) 562-8821
Email: jdickey@baileykennedy.com

NEIL D. GREENSTEIN
Virginia Bar No. 18555
**TECHMARK**
1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
Telephone (347) 514-7717
Facsimile: (408) 280-2250
Email: ndg@techmark.com
[Will Comply with LR IA 11-2 within 45 days]

*Attorneys for Plaintiff*
*HURRICANE ELECTRIC LLC*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| HURRICANE ELECTRIC LLC, | CASE NO. |
| Plaintiff, | **COMPLAINT FOR COPYRIGHT MISUSE AND DECLARATORY JUDGMENT OF NO COPYRIGHT INFRINGEMENT** |
| v. | |
| MILLENNIUM FUNDING, INC.; BODYGUARD PRODUCTIONS, INC.; UN4 PRODUCTIONS, INC.; HOMEFRONT PRODUCTIONS, INC.; MILLENNIUM MEDIA, INC.; CRIMINAL PRODUCTIONS, INC.; CLEAR SKIES NEVADA, LLC; HUNTER KILLER PRODUCTIONS, INC.; LHF PRODUCTIONS, INC.; RAMBO V PRODUCTIONS, INC.; FALLEN PRODUCTIONS, INC.; WICKED NEVADA, LLC; 211 PRODUCTIONS, INC.; FATHERS & DAUGHTERS NEVADA, LLC; VOLTAGE DEVELOPMENT NCCF, LLC; HB PRODUCTIONS, INC.; STATUS UPDATE, LLC; STOIC | **JURY TRIAL DEMANDED** |

PRODUCTIONS, INC.; COBBLER
NEVADA, LLC; SURVIVOR
PRODUCTIONS, INC.; TREVOR
SHORT; and, AVI LERNER,

Defendants.

Plaintiff Hurricane Electric LLC ("Plaintiff" or "HE"), by counsel, for its Complaint against all of the defendants identified herein ("Defendants"), alleges on knowledge as to its own actions, and otherwise Plaintiff is informed and believes and thereon alleges, as follows:

## **NATURE OF THE ACTION**

1.      This court has original jurisdiction over the subject matter of this action pursuant to the Copyright Act, 17 U.S.C. §§ 101 et seq., pursuant to 28 U.S.C. §§ 1331, 1332(a) and (c), 1338(a), and pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

2.      This is an action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, seeking a declaratory judgment that Plaintiff has not infringed any alleged copyright rights of Defendants (including any of Defendants' predecessors and/or successors in interest), directly, contributorily, or vicariously, and in the alternative, to the extent it is found that HE has infringed any such alleged rights, that HE is shielded from liability by Title II of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 512, also known as the "safe harbor" provisions of the Online Copyright Infringement Liability Limitation Act (OCILLA).

3.      This action arises from Defendants' counsel serving a subpoena on HE (in the interest of all Defendants), to demand publicly-available information from HE, then improperly using that subpoena in extensive *ex parte* communications with HE to fish for additional information from HE. This led to all Defendants making ever-growing copyright infringement allegations and demands that HE must take action against alleged third-party copyright infringers unidentified to and unknown to HE and with which HE has no relationship and no direct control over, or face legal consequences.

4.     Defendants' cease and desist letters are demanding that upstream service providers like HE simply shut down entire Internet Service Providers (ISPs) that provide Internet access to thousands and sometimes tens of thousands of people, based solely on allegations of infringement by even a single unidentified end-user subscriber to an ISP. Defendants are thus putting HE in an impossible situation, all based on an improper and unlawful overextension of Defendants' alleged copyright rights. Defendants' letters and demands directed to HE are abusive, tortious, are otherwise wrongful, and constitute copyright misuse.

5.     Accordingly, this is also an action for copyright misuse due to Defendants' unlawful scheme to secure an exclusive right or limited monopoly not granted by the Copyright Office pursuant to 17 U.S.C. § 102(b), which would be contrary to public policy to grant, by, *inter alia*, alleging that HE is a copyright infringer and demanding that HE take action against alleged third-party copyright infringers unidentified to and unknown to HE, and with which HE has no relationship and no direct control. Defendants' actions improperly extend their alleged copyrights to encompass HE's procedures, processes, systems, and methods of operation.

## THE PARTIES

### Plaintiff Hurricane Electric

6.     Plaintiff HE is a limited liability company organized and existing under the laws of the State of Nevada, with its principal place of business in Fremont, California.

7.     HE is a small privately-held company started in Silicon Valley by a start-up individual entrepreneur. HE has grown, in a niche upstream service provider market, to be a global provider of access to the backbone of the Internet, offering Internet Protocol version 4 (IPv4) and Internet Protocol version 6 (IPv6) Internet access, transit, tools, and network applications, as well as data center co-location services.

8.     HE operates a global IPv4 and IPv6 network and is considered the largest IPv6 backbone in the world as measured by the count of peering interconnections to other networks. Within its global network, HE is connected to over 200 major exchange

points and exchanges traffic directly with more than 7,500 different networks. Employing a resilient fiber-optic topology, HE has no less than five redundant 100G paths crossing North America, five separate 100G paths between the U.S. and Europe, and 100G rings in Europe and Asia. Hurricane also has a ring around Africa, and a PoP in Australia.

9.    HE offers an IPv6 tunnel broker service, providing free connectivity to the IPv6 Internet via 6-in-4 IPv6 transition mechanisms. As of May 7, 2018, the company reported 97,067 provisioned tunnels spanning 197 countries via the IPv6 tunnel broker. HE provides an online IPv6 certification program to further education and compliance in IPv6 technology, with at least 15,382 individuals in 155 countries having reached the highest level of the IPv6 certification.

10.    In addition to its vast global network, HE owns and operates two data centers / co-location facilities, including HE Fremont 2, its newest 200,000 square-foot facility. HE offers IPv4 and IPv6 transit solutions over the same connection. Connection speeds available include 100GE (100 gigabits/second), 40GE, 10GE, and gigabit ethernet.

11.    HE's primary business is as an upstream service provider (referred to in some contexts as an Online Service Provider ("OSP")) and its business model for this service does not include "hosting" data on servers for customers accessible by third parties.  HE, as an upstream service provider, does not have access to, or have control over, the content communicated through the Internet by its customers, which are account holders such as ISPs, or by its customers' customers, such as end-user subscribers to an ISP.

12.    As an upstream service provider, HE simply acts as a "highway" that passively provides its customers, and thus its customers' customers, with Internet access. HE Internet connections are business-to-business ("B2B") type connections and are most often sourced from data centers, and include customers such as the Government, including the U.S. Navy's Naval Research Labs which in turn provides service to

thousands or tens of thousands of end-users, and ISPs that provide Internet service to thousands or tens of thousands of third-party subscribers over large geographic areas.

13.    While HE's B2B connections at data centers are competitive with certain aspects of major Internet providers like Cox, Comcast, Verizon, etc., HE does not have the connections to go the "last mile" to end-users, and end-users must utilize a third-party service provider to connect to HE.

**Defendants**

14.    HE is informed and believes and based thereon alleges that multiple Defendants, many of which share the same addresses, managing agents, and/or agents for service, are copyright assertion entities in the business of generating income primarily from threats of infringement lawsuits against legitimate technology companies that have nothing to do with any alleged infringements by unnamed end-users of Internet connections.

15.    HE is informed and believes and based thereon alleges that some, if not all, of the Defendants are funded at least in part by litigation funding companies that have no previous interest in Defendants' lawsuits, but nonetheless finance Defendants' lawsuits with a view to sharing the financial recovery if the suit succeeds.

16.    Recent trends in the law have been against copyright assertion entities' use of the court system to wrest nuisance settlements from poor and unsophisticated Internet users who may have been baited into downloading media online in violation of copyright laws. While copyright assertion entities would typically bully individual alleged infringers *en masse* with threats of $150,000 statutory damages awards and attorney-fee-shifting penalties, courts, especially in the Ninth Circuit, have increasingly frustrated that business model by limiting damages awards in such cases to $750 with little or no attorney fee awards. HE is informed and believes and based thereon alleges that Defendants have been forced to adopt a new business model in view of these changes in the law, and are now targeting technology companies higher up the Internet food chain, like HE, who have nothing to do with any alleged infringements by unnamed end-users

of Internet connections provided to third-parties by HE's customers (or by HE's customers' customers).

17.    Defendants' counsel claims to represent identified and unidentified owners of various identified and unidentified copyright-protected motion pictures allegedly infringed by HE, "including but not limited to" the present following-named Defendants, which HE is informed and believes and thereon alleges are as follows:

18.    Millennium Funding, Inc., which is organized and existing under the laws of the state of Nevada and has its principal place of business in Nevada.

19.    Bodyguard Productions, Inc., which is organized and existing under the laws of the state of Nevada and has its principal place of business in Nevada.

20.    UN4 Productions, Inc., which is organized and existing under the laws of the state of Nevada and has its principal place of business in Nevada.

21.    Homefront Productions, Inc., which is organized under the laws of the state of Nevada and has its principal place of business in Nevada.

22.    Millennium Media, Inc., which is organized and existing under the laws of the state of Nevada and has its principal place of business in California.

23.    Criminal Productions, Inc., which is organized under the laws of the state of Nevada and has its principal place of business in Nevada.

24.    Clear Skies Nevada, LLC, which is organized under the laws of the state of Nevada and has its principal place of business in Nevada.

25.    Hunter Killer Productions, Inc., which is organized and existing under the laws of the state of Nevada and has its principal place of business in Nevada.

26.    LHF Productions, Inc., which is organized and existing under the laws of the state of Nevada and has its principal place of business in Nevada.

27.    Rambo V Productions, Inc., which is organized and existing under the laws of the state of Nevada and has its principal place of business in Nevada.

28.    Fallen Productions, Inc., which is organized and existing under the laws of the state of Nevada and has its principal place of business in Nevada.

29.     Wicked Nevada, LLC, which is organized and existing under the laws of the state of Nevada and has its principal place of business in Nevada.

30.     211 Productions, Inc., Nevada, which is organized and existing under the laws of the state of Nevada and has its principal place of business in Nevada.

31.     Fathers & Daughters Nevada, LLC, which is organized under the laws of the state of Nevada and has its principal place of business in Nevada.

32.     Voltage Development NCCF, LLC, organized and existing under the laws of the state of Nevada and has its principal place of business in California.

33.     HB Productions, Inc., organized and existing under the laws of the state of Nevada and has its principal place of business in Nevada.

34.     Status Update, LLC, organized and existing under the laws of the state of Nevada and has its principal place of business in California.

35.     Stoic Productions, Inc. organized and existing under the laws of the state of Nevada and has its principal place of business in Nevada.

36.     Cobbler Nevada, LLC, organized under the laws of the state of Nevada and has its principal place of business in California.

37.     Survivor Productions, Inc., organized under the laws of the state of Nevada and has its principal place of business in Nevada.

38.     Trevor Short who is a resident and domiciliary of Nevada.

39.     Avi Lerner who is a resident and domiciliary of Nevada.

## JURISDICTION

### Declaratory Judgment Jurisdiction

40.     An actual case or controversy exists between the parties to this action.

41.     Defendants, by counsel, have repeatedly asserted in writing and over the phone that HE has been and still is engaging in acts of copyright infringement, and have repeatedly threatened to take legal action against HE (though Defendants' counsel has not provided any specific, concrete indications that a suit by the Defendants is imminent).

42.    Attached as Exhibits 1, 2, 3, and 4 are true and correct copies of correspondence between counsel for the parties to this action.

43.    Defendants, by counsel, have repeatedly demanded in writing and over the phone that HE immediately terminate the accounts of numerous third-parties over which HE has no control, prospectively agree to take similar actions in the future whenever Defendants' counsel sends future notices, and pay money damages well in excess of $500,000.

44.    Defendants stated the damages are going up as time passes but that the sooner money is paid along with an agreement to provide the name of the publicly available (through WHOIS) customers of HE, the amount of HE's liability will then be capped by agreement. Defendants undeniably recognize that HE cannot identify the alleged infringers and does not have the ability to shut down service only to an alleged infringer (without shutting down service to thousands or tens of thousands of innocent end-users) but will agree to "go away" for a substantial payment with an agreement to provide Defendants, in the future, with publicly available information.

45.    Defendants, by counsel, have also sought additional information from HE so that additional undisclosed copyright assertion entities could be represented by counsel and seek additional damages from HE.

46.    HE has refuted Defendants' allegations and repeatedly refused to comply with Defendants' improper and impractical demands. Nonetheless, Defendants continue to repeat their demands, creating a significant cloud of uncertainty over HE's business, and causing HE to have a real and reasonable apprehension that it will eventually be subject to suit.

47.    The circumstances show that there is a substantial controversy between HE and Defendants, which have adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

**Personal Jurisdiction**

48.     Personal jurisdiction is proper in the District of Nevada over the Defendants identified herein, because they are either organized in this state (whether as a corporation, a limited liability company, a partnership, a joint venture, or an unincorporated association), and/or have their principal place of business in this state (or their domicile in this state, if an individual), such that this Court has general personal jurisdiction over those Defendants.

**VENUE**

49.     Venue is proper in this district under 28 U.S.C. § 1391(b) and (c).

**DETAILED JURISDICTIONAL ALLEGATIONS**

50.     On July 12, 2019, counsel for Defendants opened miscellaneous action number 1:19-mc-250 in the District of Hawaii entitled *In re Subpoena to Hurricane Electric, LLC*, for the purpose of issuing a subpoena to HE under 17 U.S.C. § 512(h) to force HE "to identify alleged infringer(s) of Owner's Copyright protected motion pictures." (hereafter collectively "the Subpoena").

51.     Attached as Exhibit 8 is a true and correct copy of the Subpoena

52.     The information requested in the Subpoena was information publicly available via a WHOIS search online.

53.     The Subpoena which was issued and based upon two letters, dated July 10, 2019 and July 12, 2019, regarding allegations of copyright infringement by HE, was purportedly mailed to HE by counsel for Defendants.

54.     Counsel for Defendants served the Subpoena on HE, namely on "Hurricane Electric LLC dba Hurricane Electric Internet Services Registered Agent: MIKE LEBER 760 Mission Court, Fremont, CA 94539". The Subpoena required HE to take action and to search its files and to produce documents, all subject to the enforcement powers and penalties of the court.

55.     Counsel for Defendants then improperly used the existence of the Subpoena to communicate extensively with HE, *ex parte*, such that the written communications

between counsel for Defendants and HE totaled forty-one (41) pages of documents. In these communications counsel for Defendants fished HE for information regarding other alleged infringements to assert against HE.

56.     When HE's unrepresented Director of Infrastructure explained to Defendants' counsel that HE has no technological way to identify the alleged infringer and that Defendants' counsel must go HE's customer – i.e., the ISP or the U.S. Naval Research Labs – Defendants' counsel responded by stating he was under no obligation to go to the ISPs or to the US Navy and that "the buck stops at HE."

57.     This is not the first time that counsel for Defendants, in representing one or more of the present Defendants, misused judicial process to search for new alleged copyright infringements. In District of Hawaii case number 19-cv-169-LEK-KJM, listed on some of Defendants' cease and desist letters (Exhibits 1, 2, 4), counsel for Defendants repeatedly misused judicial process by purporting to serve process on non-parties. In docket entry number 51, dated 10/28/2019 (a true and correct copy of which is attached hereto as Exhibit 5), the Hawaii Court stated:

> The Court is aware that Mr. * * *, as the plaintiffs' counsel, has engaged in the same conduct in at least two other cases: (1) *HB Prods., Inc. v. Doe, et al.*, Civil No. 19-00389 ACK-KJM; and (2) *Wicked Nev., LLC v. Doe, et al.*, Civil No. 19-00413 SOM-KJM. The Court cautions Mr. * * * that similar actions in the future will result in the Court striking the plaintiffs' filings.

58.     On or about March 19, 2020, counsel for Defendants sent to HE a cease-and-desist letter (Exhibit 1 hereto), alleging infringement by HE of copyrights allegedly owned by eight (8) different parties for which HE is now seeking declaratory judgment.

59.     Counsel for HE responded on April 19, 2020, via email with a request that counsel for Defendants identify, among other things, the clients he represents.

60.     On or about May 1, 2020, counsel for Defendants responded with a new cease and desist letter (Exhibit 2 hereto) to HE, by counsel, this time alleging infringement by HE of copyrights allegedly owned by thirty (30) different parties for

1    which HE is now seeking declaratory judgment and identifying approximately 2,300 IP

2    addresses where such infringements allegedly took place.

3        61.    On or about May 15, 2020, counsel for HE responded to counsel for

4    Defendants with a letter (Exhibit 3 hereto, inadvertently misdated June 15, 2020),

5    explaining in detail why HE, as an Online Service Provider to ISP's, did not infringe,

6    and that in the alternative, HE was protected by the Safe Harbor provisions of the

7    DMCA.

8        62.    Notwithstanding HE's explanation of non-infringement and the

9    impossibility of complying with Defendants' demands, on May 20, 2020, counsel for

10   Defendants sent yet another cease and desist letter (Exhibit 4 hereto) to HE, by counsel,

11   reiterating Defendants' position that HE is infringing their copyrights and indicating that

12   as time went on, even "more of [his] clients' motion pictures are infringed."

13       63.    The extent of Defendants' ongoing harassment of HE is significant, and

14   includes numerous unrelenting cease and desist letters directed to HE over a period of

15   nearly eleven (11) months, asserting ever-growing lists of alleged infringements,

16   stemming from the Rule 45 Subpoena issued to HE, which led to 41 pages of

17   communications directly with HE, all of which led directly to the present Defendants'

18   allegations of infringement against HE.

19       64.    Defendants' cease and desist letters are demanding that upstream service

20   providers like HE simply shut down entire service providers that provide Internet access

21   to thousands or tens of thousands of people, based solely on allegations of infringement

22   by even a single end-user subscriber to an ISP. Defendants are refusing to contact the

23   service providers providing service to end-users who can identify the potential infringer

24   and instead are putting upstream service providers like HE in an impossible situation, all

25   based on an improper and unlawful overextension of Defendants' alleged copyright

26   rights. Defendants' cease and desist letters directed to HE are thus abusive, tortious,

27   constitute copyright misuse, and are otherwise wrongful.

28

COMPLAINT FOR COPYRIGHT MISUSE AND DECLARATORY JUDGMENT OF
NO COPYRIGHT INFRINGEMENT

65.   Indeed, Defendants' counsel has already negotiated resolutions with some ISPs (not sourcing connections from HE) for large payments in exchange for withholding further action for infringement. Specifically, Defendants' counsel sued torrent site YTS in Hawaii. There, several of the same Defendants here were plaintiffs represented by the same counsel, and received a payment of over $1,000,000 (One Million Dollars). As stated in a TechWorm article -- https://www.techworm.net/2020/04/torrent-site-yts-piracy-lawsuit-online.html -- notwithstanding the settlement, there are still hundreds of pirated movies on that piratical site. (A true and correct screen-print of the web page https://www.techworm.net/2020/04/torrent-site-yts-piracy-lawsuit-online.html is attached hereto as Exhibit 7.)

66.   Defendants do not actually care about stopping the ongoing infringements of copyrights; they just want large immediate one-time payments from each service provider they can associate with the still-allegedly-infringing IP addresses.

67.   The present claims arise directly out of and relate to the Defendants' activities described herein.

## GENERAL ALLEGATIONS

68.   HE's primary business model is as an upstream service provider that provides its account-holder customers, such as ISPs, with access to the backbone of the Internet. HE does not have access to, or have control over, any content communicated through the Internet by its customers, also called account holders, or by its customers' customers, such as subscribers to an ISP account holder, or other end-users.

69.   HE provides a passive conduit to the backbone of the Internet, and does not engage in any volitional conduct with respect to any content that does or does not pass through its Internet connections including allegedly copyrighted material, such that HE is not the proximate cause of any copyright infringement alleged by Defendants.

70.   Defendants allege that one or more end-users to one or more account holders (including subscribers to ISPs) that obtain access to the backbone of the Internet

from HE have committed copyright infringement by downloading copies of Defendants' copyrighted motion pictures using the Internet connections provided to those subscribers by those ISPs.

71.    There is no causal nexus between HE's conduct and the alleged copyright violations by end-user subscribers, who have no relationship with HE.

72.    HE's conduct in providing account holders such as ISPs with passive conduits to the backbone of the Internet is not the proximate cause of any alleged infringement by any end-user subscribers who are customers of the account holders.

73.    Indeed, HE is physically located in San Jose and Fremont, California and its service is part of the Internet backbone. As explained in Wikipedia - https://en.wikipedia.org/wiki/Internet_backbone (a true and correct copy is attached as Exhibit 6):

> The Internet backbone may be defined by the principal data routes between large, strategically interconnected computer networks and core routers of the Internet. These data routes are hosted by commercial, government, academic and other high-capacity network centers, the Internet exchange points and network access points, that exchange Internet traffic between the countries, continents, and across the oceans. Internet service providers, often Tier 1 networks, participate in Internet backbone traffic by privately negotiated interconnection agreements, primarily governed by the principle of settlement-free peering.

74.    A depiction of the Internet transit can be found at: https://en.wikipedia.org/wiki/Internet_transit#/media/File:Internet_Connectivity_Distribution_&_Core.svg



By User: Ludovic.ferre - Internet Connectivity Distribution & Core.svg, CC BY-SA 3.0, https://commons.wikimedia.org/w/index.php?curid=10030716

75. HE's business is largely at the IXP (yellow) level. In order for an end-user to be connected through HE at the IXP level, that end-user must have a service provider who can connect to the IXP. As shown in the diagram, this could be a Tier 2 ISP (light blue) or a Tier 3 Network (purple or light green).

76. HE has no control over how an ISP/service provider allocates connections to end-users. As examples, (a): a service provider could break up a single version 4, IP address to be used contemporaneously by tens of thousands of end-users, or (b) a service provider may have hundreds (or more) of IP addresses and it can allocate the IP addresses to customers on an as needed basis thereby allowing the service provider to have many

1    more end-users than IP addresses.  This is like "timesharing" where one unit can be used
2    by many people at different times.

3        77.    When a service provider divides up internet service from a company like
4    HE, HE has no technological way to determine the identity of the end-user.  However,
5    the service provider who controls the shared connection typically has logs and can
6    identify each of its end-users based upon which IP address, the date and the time (just
7    like a hotel can identify the person using a timeshare hotel suite on a given date but the
8    property owner who does not have the records/logs cannot).

9        78.    HE has no relationship with, nor control over, any end-user subscribers to
10    the one or more ISPs and service providers that obtain access to the backbone of the
11    Internet from HE.

12        79.    HE has no control over any content communicated through the Internet by
13    any end-user subscribers to the one or more ISPs and service providers that obtain access
14    to the backbone of the Internet from HE.

15        80.    HE has no control over any content communicated through the Internet by
16    the one or more account holders, such as ISPs, that obtain access to the backbone of the
17    Internet from HE.

18        81.    As explained above, HE does not even have the ability to identify the end-
19    user as the information required to do so is in the hands of the direct service providers,
20    which are publicly identified and known to Defendants, but which Defendants have
21    refused to contact or serve a subpoena under the DMCA.

22        82.    The only way that HE could shut down a connection to the Internet of an
23    alleged infringing end-user subscriber who accesses the Internet through an account
24    holder such as an service provider that itself obtains access to the backbone of the
25    Internet from HE, would be to shut down all access to the Internet to that ISP, service
26    provider and/or account holder.

27        83.    Shutting down all access to the Internet to an ISP or other account holder
28    would shut down not only a particular end-user subscriber's access to the Internet, but

would also shut down the Internet access of all the other end-user subscribers who gain access to the Internet from that ISP or other account holder, which would typically mean shutting down Internet access for thousands or tens of thousands (perhaps hundreds of thousands if the account holder has multiple IP addresses) of innocent people across wide geographic regions. It is simply not appropriate to shut down an entire city, a school system, rural area with subscribers covering a 5-state region, or an airport internet provider at such airports as LAX because defendants do not want to bother contacting the ISP providing service from HE's backbone so that Defendants can obtain the information identifying the specific infringer. Yet that is exactly what Defendants are demanding HE do.

84. Illustrating the ridiculousness of Defendants' demands, HE's account holders include, for example, ISP's, and even the U.S. Navy's Naval Research Labs. Defendants know from publicly available records, and as set forth in communications from the undersigned counsel, that these ISPs include companies such as the reportedly leading Internet Service Provider in the Gilbert, Mesa, Queen Creek, San Tan Valley, Coolidge, Eloy, Casa Grande and Florence Arizona Area, the reportedly fourth largest fixed-wireless Internet Service Provider in the US servicing over 50,000 square miles in Iowa, Minnesota, Nebraska, South Dakota, and Wisconsin, ISPs providing service (sometimes the only service available) to major rural areas, ISPs providing service to school districts, and a highly regarded provider of wireless internet services at airports, buildings, stadiums, multifamily and student housing, and commercial real estate, as well as many other similar entities. Defendants are insisting that HE unilaterally shut down all access to the Internet for these account holders thereby shutting off tens of thousands of innocent end-users, for example, just to stop an individual end-user from allegedly improperly downloading movies. Such demands are inappropriate when all the Defendants need to do to ascertain the identity of the allegedly infringing end-user is to contact the ISP.

85.     Defendants' attempt to use an upstream provider like HE to stop alleged copyright infringement by far-removed downstream end-user subscribers of others' ISP services is analogous to Defendants' threatening an electric utility power company and arguing that it must shut off power to an entire city or region, because the power company is infringing Defendants' copyrights by providing electricity, since an end user could not download an unauthorized copy of a movie without electricity. The absurdity of this analogy highlights the outrageous overbreadth of Defendants' demands on HE.

86.     Defendants purport to have the IP addresses of HE's account holders where actual end-users are allegedly downloading the infringing movies but it is technologically impossible for HE to identify a specific end-user with an IP address as the records identifying the downloader are exclusively in the hands of the ISP.

87.     Nothing is stopping Defendants from directly pursuing the ISPs/service providers associated with the allegedly offending IP addresses and serving subpoenas for the identities of the end-users.

88.     Nothing is stopping Defendants from pursuing the individuals associated with the allegedly offending IP addresses by contacting HE's account holders/service providers, who, unlike HE, typically would have the logs to identify the individual end-user and the ability to shut down Internet access for that individual end-user without affecting internet service to the tens of thousands of innocent users obtaining service from that service provider.

89.     Notwithstanding Defendants' ability to effectively stop the alleged infringement by directly pursuing the users of the offending IP addresses, Defendants are instead pursuing HE, which has no relationship with, and no ability to control service to the allegedly offending end-user.

90.     HE is informed and believes and based thereon alleges that one or more Defendants do not own the copyrights in the allegedly infringed material that counsel for Defendants has indicated that Defendants own.

91.     HE is informed and believes and based thereon alleges that one or more Defendants are not validly existing legal entities and thus cannot own copyrights in the allegedly infringed material.

92.     Defendants allege that HE has directly, contributorily, and vicariously infringed Defendants' copyright rights.

93.     Defendants allege that HE continues to directly, contributorily and vicariously infringe Defendants' copyright rights.

94.     Defendants allege that HE's infringement of Defendants' copyright rights extends back to at least 2013, or earlier in that the statute of limitations for the alleged acts of HE does not start until the Defendants' learned of the alleged infringements.

95.     Defendants allege that HE's infringement of Defendants' copyright rights is continuing.

96.     Defendants' allegations of copyright infringement by HE are legally and factually baseless.

97.     HE's conduct has not and does not constitute direct copyright infringement, because HE's conduct does not violate any exclusive right granted to copyright holders under 17 U.S.C. § 106.

98.     HE has not had, and does not have, knowledge of an identifiable person or entity that has infringed any copyright owned by Defendants.

99.     Even if HE had or has actual knowledge that specific infringing material is available using its connection, there are no simple nor feasible measures that HE can take to prevent further damage to the copyrighted works.

100.    Even if HE had or has actual knowledge that specific infringing material is available using its connection, it would not be appropriate to shut down service to tens of thousands or hundreds of thousands of innocent end-users when Defendants could easily contact and/or issue a subpoena to the service provider who is HE's account holder, determine the identity of the alleged infringing end-user and have the service provider shut down only that alleged infringing end-user.

101.   HE has not and does not materially contribute to another's infringement of any copyright owned by Defendants.

102.   HE has not and does not provide its services, including providing ISPs and other account holders with access to the backbone of the Internet, with the object of promoting or advertising its use to infringe copyrights claimed by Defendants.

103.   HE has not and does not advertise, promote or express an intent to promote infringement, nor affirmatively take steps to foster the alleged copyright infringement.

104.   HE has not and does not induce another's infringement of any copyright owned by Defendants.

105.   HE's conduct has not and does not contributorily infringe any copyright owned by Defendants.

106.   HE has not had, and does not have, the right or ability to supervise the alleged infringement of any copyright owned by Defendants.

107.   The alleged infringement of any copyright owned by Defendants has not and does not constitute a draw for subscribers to HE's services.

108.   HE has not, and does not, engage in advertising or promoting of services for facilitating the alleged infringement of any copyright owned by Defendants.

109.   HE has not had, and does not have, a direct financial interest in the alleged infringement of any copyright owned by Defendants.

110.   HE has not and does not vicariously infringe any copyright owned by Defendants.

111.   HE's conduct has not and does not constitute vicarious copyright infringement.

112.   Not only is HE not an infringer of any copyright rights of Defendants, but Defendants have neither demonstrated nor alleged that any of HE's account holders have infringed any copyright rights of Defendants.

113.   Nonetheless, HE has adopted and reasonably implemented, and informs account holders of the HE's system or network of, a policy that provides for the

1    termination in appropriate circumstances of HE's account holders, if any, who are repeat

2    infringers. Indeed, Judge Fogel of the Northern District of California has in a written

3    opinion recognized Hurricane's policy to terminate infringers in appropriate

4    circumstances.

5        114.   HE has a notification system for copyright infringement allegations and a

6    procedure for dealing with DMCA-compliant notifications. HE does not actively prevent

7    copyright owners from collecting information needed to issue such notifications.

8        115.   Under appropriate circumstances, HE has or would terminate account

9    holders who repeatedly or blatantly infringe copyrights.

10       116.   Accordingly, even if HE were somehow found liable for some type of

11   copyright infringement, which is emphatically denied, HE, as an upstream service

12   provider which does not provide any intermediate or transient storage (as defined in

13   17 U.S.C. § 512(k)(1)(B)), would not have any liability to Defendants due to the safe

14   harbor limitation of liability under 17 U.S.C. § 512(i).

15       117.   Defendants have suffered no, and will not suffer any, legally cognizable

16   damages as a result of HE's conduct.

17       118.   Defendants are not entitled to any injunctive, monetary, or other relief from

18   HE.

19                            **FIRST CLAIM FOR RELIEF**

20        **(Declaratory Judgment of No Direct Copyright Infringement)**

21       119.   HE repeats and realleges the allegations contained in paragraphs 1 to 118

22   of this Complaint as if fully set forth herein.

23       120.   Defendants claim that HE's conduct directly violates at least one exclusive

24   right granted to Defendants as alleged copyright holders under 17 U.S.C. § 106.

25       121.   Under an ongoing threat of litigation, Defendants demand that HE

26   terminate the accounts of account holders and service providers for alleged violations of

27   end-users over which HE has no control, prospectively agree to take similar actions in

28

the future whenever Defendants' counsel sends future notices, and pay money damages well in excess of $500,000.

122. HE refutes Defendants' allegations of direct copyright infringement and refuses to comply with Defendants' improper and impractical demands.

123. Defendants' continued and repeated assertions of direct copyright infringement and related demands create a significant cloud of uncertainty over HE's business, and cause HE to have a real and reasonable apprehension that it will eventually be subject to suit.

124. The circumstances show that there is an actual, present, substantial, and justiciable controversy between HE and Defendants, which have adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

125. HE seeks a declaratory judgment that one or more Defendants do not own the copyrights in the allegedly infringed material that counsel for Defendants has indicated that Defendants own.

126. HE seeks a declaratory judgment that one or more Defendants are not validly existing legal entities and thus cannot own copyrights in the allegedly infringed material.

127. HE seeks a declaratory judgment that HE provides a passive conduit to the backbone of the Internet, that HE engages in no volitional conduct with respect to any allegedly copyrighted material, and that HE is not the proximate cause of any copyright infringement alleged by Defendants.

128. HE seeks declaratory judgment that HE's conduct has not and does not constitute direct copyright infringement, because HE's conduct does not violate any exclusive right granted to copyright holders under 17 U.S.C. § 106.

129. HE seeks declaratory judgment that Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's conduct.

130. HE seeks declaratory judgment that Defendants are not entitled to any injunctive, monetary, or other relief from HE.

## SECOND CLAIM FOR RELIEF

### (Declaratory Judgment of No Contributory Copyright Infringement)

131.   HE repeats and realleges the allegations contained in paragraphs 1 to 130 of this Complaint as if fully set forth herein.

132.   Defendants claim that HE's conduct constitutes contributory infringement of Defendants' alleged copyrights.

133.   Under an ongoing threat of litigation, Defendants demand that HE terminate the accounts of account holders and service providers over which HE has no control, prospectively agree to take similar actions in the future whenever Defendants' counsel sends future notices, and pay money damages well in excess of $500,000.

134.   HE refutes Defendants' allegations of contributory copyright infringement and refuses to comply with Defendants' improper and impractical demands.

135.   Defendants' continued and repeated assertions of contributory copyright infringement and related demands create a significant cloud of uncertainty over HE's business, and cause HE to have a real and reasonable apprehension that it will eventually be subject to suit.

136.   The circumstances show that there is an actual, present, substantial, and justiciable controversy between HE and Defendants, which have adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

137.   HE seeks a declaratory judgment that one or more Defendants do not own the copyrights in the allegedly infringed material that counsel for Defendants has indicated that Defendants own.

138.   HE seeks a declaratory judgment that one or more Defendants are not valid legal entities and thus cannot own copyrights in the allegedly infringed material.

139.   HE seeks a declaratory judgment that HE has not had, and does not have, knowledge of another's infringement of any copyright owned by Defendants.

140.   HE seeks a declaratory judgment that even if HE had or has actual knowledge that specific infringing material is available using its system, there are no

simple or feasible measures that HE can take to prevent further damage to the copyrighted works.

141. HE seeks a declaratory judgment that even if HE had or has actual knowledge that specific infringing material is available using its system, there are no reasonable or appropriate measures that HE can take to prevent further damage to the copyrighted works.

142. HE seeks a declaratory judgment that HE has not and does not materially contribute to another's infringement of any copyright owned by Defendants.

143. HE seeks a declaratory judgment that Defendants cannot prove that HE provides its services, including providing ISPs and other account holders with access to the backbone of the internet, with the object of advertising or promoting its use to infringe copyrights.

144. HE seeks a declaratory judgment that Defendants cannot prove that HE clearly expressed an intent to promote infringement or affirmatively took steps to foster copyright infringement.

145. HE seeks a declaratory judgment that HE provides a passive conduit to the backbone of the Internet, that HE engages in no volitional conduct with respect to any allegedly copyrighted material, and that HE is not the proximate cause of any copyright infringement alleged by Defendants.

146. HE seeks a declaratory judgment that HE has not and does not induce another's infringement of any copyright owned by Defendants.

147. HE seeks declaratory judgment that HE's conduct has not and does not constitute contributory copyright infringement.

148. HE seeks declaratory judgment that Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's conduct.

149. HE seeks declaratory judgment that Defendants are not entitled to any injunctive, monetary, or other relief from HE.

## THIRD CLAIM FOR RELIEF

### (Declaratory Judgment of No Vicarious Copyright Infringement)

150. HE repeats and realleges the allegations contained in paragraphs 1 to 149 of this Complaint as if fully set forth herein.

151. Defendants have suggested, and expressly not waived their argument that, HE's conduct constitutes vicarious infringement of Defendants' alleged copyrights.

152. Under an ongoing threat of litigation, Defendants demand that HE terminate the accounts of account holders and service providers where end-users allegedly infringe Defendants' right, but over which HE has no control. Defendants demand that HE prospectively agree to take similar actions in the future whenever Defendants' counsel sends future notices, and pay money damages well in excess of $500,000.

153. HE refutes Defendants' allegations of vicarious copyright infringement and refuses to comply with Defendants' improper and impractical demands.

154. Defendants' assertions of vicarious copyright infringement and related demands create a significant cloud of uncertainty over HE's business, and cause HE to have a real and reasonable apprehension that it will eventually be subject to suit.

155. The circumstances show that there is an actual, present, substantial, and justiciable controversy between HE and Defendants, which have adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

156. HE seeks a declaratory judgment that one or more Defendants do not own the copyrights in the allegedly infringed material that counsel for Defendants has indicated that Defendants own.

157. HE seeks a declaratory judgment that one or more Defendants are not valid legal entities and thus cannot own copyrights in the allegedly infringed material.

158. HE seeks a declaratory judgment that HE has not had, and does not have, the right or ability to supervise the alleged infringement of any copyright owned by Defendants.

159.   HE seeks a declaratory judgment that the alleged infringement of any copyright owned by Defendants has not and does not constitute a draw for subscribers to HE's services.

160.   HE seeks a declaratory judgment that it has not, and does not, engage in advertising or promoting of services for facilitating the alleged infringement of any copyright owned by Defendants.

161.   HE seeks a declaratory judgment that HE has not had, and does not have, a direct financial interest in the alleged infringement of any copyright owned by Defendants.

162.   HE seeks a declaratory judgment that HE has not and does not vicariously infringe any copyright owned by Defendants.

163.   HE seeks declaratory judgment that HE's conduct has not and does not constitute vicarious copyright infringement.

164.   HE seeks declaratory judgment that Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's conduct.

165.   HE seeks declaratory judgment that Defendants are not entitled to any injunctive, monetary, or other relief from HE.

## FOURTH CLAIM FOR RELIEF

### (In the Alternative, Declaratory Judgment that Safe Harbor Applies)

166.   HE repeats and realleges the allegations contained in paragraphs 1 to 165 of this Complaint as if fully set forth herein.

167.   HE seeks a declaratory judgment that HE has adopted and reasonably implemented, and informs account holders of the HE's system or network of, a policy that provides for the termination in appropriate circumstances of HE's account holders who are repeat infringers.

168.   HE seeks a declaratory judgment that HE has a working notification system for copyright infringement allegations and a procedure for dealing with DMCA-compliant notifications. HE seeks a declaratory judgment that HE does not

1    actively prevent copyright owners from collecting information needed to issue such
2    notifications.

3         169.   HE seeks a declaratory judgment that under appropriate circumstances, HE
4    has or would terminate account holders who repeatedly or blatantly infringe copyrights.

5         170.   Even if HE were somehow found liable for some type of copyright
6    infringement, which is emphatically denied, HE seeks, in the alternative, a declaratory
7    judgment that HE is an online service provider that does not provide any intermediate or
8    transient storage as defined in 17 U.S.C. § 512(k)(1)(B), and that HE does not have any
9    liability to Defendants due to the safe harbor limitation of liability under
10   17 U.S.C. § 512(i).

11        171.   HE seeks declaratory judgment that Defendants have suffered no, and will
12   not suffer any, legally cognizable damages as a result of HE's conduct.

13        172.   HE seeks declaratory judgment that Defendants are not entitled to any
14   injunctive, monetary, or other relief from HE.

15                              **FIFTH CLAIM FOR RELIEF**

16                                **(Copyright Misuse)**

17        173.   HE repeats and realleges the allegations contained in paragraphs 1 to 172
18   of this Complaint as if fully set forth herein.

19        174.   Defendants' cease and desist letters and related communications demand
20   that HE, an upstream service provider of access to the backbone of the Internet to account
21   holders like ISPs, simply shut down entire ISPs and other commercial and governmental
22   account holders that provide Internet access to thousands or tens of thousands of
23   innocent people, based solely on allegations of infringement by an individual end-user
24   subscriber to the ISP or account holder. Defendants are thus putting HE in an impossible
25   situation, all based on an improper and unlawful overextension of Defendants' alleged
26   copyright rights. Defendants' letters and demands to HE are abusive, tortious, and
27   otherwise wrongful.

28

175.   Defendants' unlawful scheme seeks to secure an exclusive right or limited monopoly not granted by the Copyright Office pursuant to 17 U.S.C. § 102(b), which would be contrary to public policy to grant, by, inter alia, alleging that HE is a copyright infringer and demanding that HE take action against alleged third-party copyright infringers with which HE has no relationship and no direct control over. Defendants' actions improperly extend their alleged copyrights to encompass HE's procedures, processes, systems, and methods of operation, and thus constitute copyright misuse.

176.   Defendants' misuse of their alleged copyrights against HE renders them unenforceable against HE.

177.   Since Defendants' alleged copyrights are unenforceable against HE, HE's conduct has not and does not constitute infringement of exclusive rights, if any, granted to Defendants under 17 U.S.C. § 106 in connection with Defendants' alleged copyrights, neither directly, contributorily, vicariously, nor otherwise.

178.   Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's conduct.

179.   Defendants are not entitled to any injunctive, monetary, or other relief from HE.

## SIXTH CLAIM FOR RELIEF

### (Attorney Fees under 17 U.S.C. § 505)

180.   HE repeats and realleges the allegations contained in paragraphs 1 to 179 of this Complaint as if fully set forth herein.

181.   Defendants' allegations of copyright infringement and its demands against HE are frivolous and objectively unreasonable, and are not motivated by protecting their copyrights, which could be effectively protected by pursuing the actual alleged end-user infringers, or even the service providers that control the internet access of the actual alleged infringers, but cannot be reasonably protected by attacking HE, which provides passive access to the backbone of the Internet to account holders such as ISPs. In these circumstances there is a need to award HE its costs including its attorney fees to deter

copyright assertions entities like Defendants from abusing the system and frustrating the legitimate purposes of the Copyright Act.

**WHEREFORE**, HE requests judgment against Defendant as follows:

With respect to the **FIRST CAUSE OF ACTION**, an order declaring that:

A.  HE has not and does not directly infringe any copyright rights of Defendants;

B.  Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's actions;

C.  Defendants are not entitled to any injunctive relief or damages against HE;

D.  HE is awarded its costs, expenses and attorneys' fees in this action; and

E.  Awarding such other further relief to which HE may be entitled as a matter of law or equity, as the Court deems just and proper.

With respect to the **SECOND CAUSE OF ACTION**, an order declaring that:

F.  HE has not and does not contributorily infringe any copyright rights of Defendants;

G.  Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's actions;

H.  Defendants are not entitled to any injunctive relief or damages against HE;

I.  HE is awarded its costs, expenses and attorneys' fees in this action; and

J.  Awarding such other further relief to which HE may be entitled as a matter of law or equity, as the Court deems just and proper.

With respect to the **THIRD CAUSE OF ACTION**, an order declaring that:

K.  HE has not and does not vicariously infringe any copyright rights of Defendants;

L.  Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's actions;

M.  Defendants are not entitled to any injunctive relief or damages against HE;

N.  HE is awarded its costs, expenses and attorneys' fees in this action; and

O.     Awarding such other further relief to which HE may be entitled as a matter of law or equity, as the Court deems just and proper.

With respect to the **FOURTH CAUSE OF ACTION**, in the alternative to the relief sought with respect to any or all of the first, second, and third causes of action, an order declaring that:

P.     HE is an online service provider that does not provide any intermediate or transient storage as defined in 17 U.S.C. § 512(k)(1)(B), and that HE does not have any liability to Defendants due to the safe harbor limitation of liability under 17 U.S.C. § 512(i);

Q.     Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's actions;

R.     Defendants are not entitled to any injunctive relief or damages against HE;

S.     HE is awarded its costs, expenses and attorneys' fees in this action; and

T.     Awarding such other further relief to which HE may be entitled as a matter of law or equity, as the Court deems just and proper.

With respect to the **FIFTH CAUSE OF ACTION**, an order declaring that:

U.     Defendants misused their alleged copyrights against HE, and thus rendered them unenforceable against HE;

V.     Defendants have suffered no, and will not suffer any, legally cognizable damages as a result of HE's actions;

W.     Defendants are not entitled to any injunctive relief or damages against HE;

X.     HE is awarded its costs, expenses and attorneys' fees in this action;

Y.     Awarding such other further relief to which HE may be entitled as a matter of law or equity, as the Court deems just and proper; and

Z.     Entry of an injunction ordering that Defendants, their officers, agents, members, and servants, and all persons acting in concert with them, including Defendants' counsel, be permanently restrained from alleging that HE is liable for alleged copyright infringement by downstream users of Internet access provided by HE,

and be permanently restrained from demanding that HE take action against any such alleged copyright infringements.

With respect to the **SIXTH CAUSE OF ACTION**:

AA.  An award to HE of its costs including its attorney fees incurred in connection with defending against Defendants' copyright infringement allegations, with interest; and

BB.  An award of such other and further relief as the Court deems just and proper.

DATED:  June 10, 2020.

BAILEY❖KENNEDY

By: */s/ Joshua M. Dickey*
JOSHUA M. DICKEY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148

In Association With:

NEIL D. GREENSTEIN
**TECHMARK**
1751 Pinnacle Drive
Suite 1000
Tysons, VA 22102

*Attorneys for Plaintiff*
*HURRICANE ELECTRIC LLC*

COMPLAINT FOR COPYRIGHT MISUSE AND DECLARATORY JUDGMENT OF
NO COPYRIGHT INFRINGEMENT

-30-

1

## JURY TRIAL DEMAND

2   Plaintiff, Hurricane Electric LLC, hereby requests a trial by jury on all issues

3 triable of right by a jury.

4    DATED: June 10, 2020.

5          BAILEY❖KENNEDY

6          By: */s/ Joshua M. Dickey*

7           JOSHUA M. DICKEY
            8984 SPANISH RIDGE AVENUE

8           LAS VEGAS, NEVADA 89148

9          In Association With:

10         NEIL D. GREENSTEIN
           **TECHMARK**

11         1751 Pinnacle Drive
           Suite 1000

12         Tysons, VA 22102

13         *Attorneys for Plaintiff*
          *HURRICANE ELECTRIC LLC*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR COPYRIGHT MISUSE AND DECLARATORY JUDGMENT OF
NO COPYRIGHT INFRINGEMENT

**INDEX OF EXHIBITS TO PLAINTIFF**
**HURICANE ELECTRIC LLC'S COMPLAINT**

| Exhibit No. | Document Description |
|---|---|
| 1 | March 19, 2020 cease and desist letter from Kerry S. Culpepper to Mike Leber, Agent for Hurricane Electric |
| 2 | May 1, 2020 cease and desist letter from Kerry S. Culpepper to Neil D. Greenstein |
| 3 | June 15, 2020 correspondence from Neil D. Greenstein to Kerry S. Culpepper |
| 4 | May 20, 2020 cease and desist letter from Kerry S. Culpepper to Neil D. Greenstein |
| 5 | Docket Report Entry Number 51 regarding District of Hawaii case number 19-cv-169-LEK-KJM |
| 6 | Wikipedia - https://en.wikipedia.org/wiki/Internet_backbone |
| 7 | Screen-print of the web page https://www.techworm.net/2020/04/torrent-site-yts-piracy-lawsuit-online.html |
| 8 | Subpoena to Hurricane Electric LLC dba Hurricane Electric Internet Services in the United States District Court for the District of Hawaii, Case No. MC 19-00250 JMS-RT |

# EXHIBIT 1

March 19, 2020 cease and desist letter
from Kerry S. Culpepper to Mike Leber,
Agent for Hurricane Electric


**Culpepper IP**

# CULPEPPER IP, LLLC

ATTORNEY AT LAW

75-170 HUALALAI ROAD, SUITE B204
KAILUA-KONA, HAWAII 96740

TEL: (808) 464-4047
FAX: (202) 204-5181

WWW.CULPEPPERIP.COM

KERRY S. CULPEPPER *

\* ADMITTED TO PRACTICE IN VIRGINIA, HAWAI'I
AND BEFORE THE USPTO

PATENTS, TRADEMARKS & COPYRIGHTS

Via E-mail<copyright@he.net>

March 19, 2020

Via Certified Mail
Mike Leber, Agent for Hurricane Electric
Hurricane Electric LLC
760 Mission Court
Fremont, CA 94539

Re: Cease and Desist of Direct Copyright Infringement, Contributory Copyright Infringement at
Hurricane Electric Subscriber IP addresses
My Reference and Case Number: 19-cv-169-LEK-KJM (District of Hawaii)

Dear Sir or Madam,

 As explained below, I am writing to you regarding the Internet service Hurricane Electric
("HE") provides to its subscribers at IP addresses including but not limited to those discussed
later in this letter ("subscribers"). My law firm represents the owners of the copyright protected
motion pictures including but not limited to as shown below.

| NO. | OWNER | MOTION PICTURE | Copyright Certificate Number |
|:---:|:---:|:---:|:---:|
| 1 | Millennium Funding, Inc. | *Mechanic: Resurrection* | PA1998057 |
| 2 | Bodyguard Productions, Inc. | *The Hitman's Bodyguard* | PAu3844508 |
| 3 | UN4 Productions, Inc. | *Boyka: Undisputed* | PA0002000772 |
| 4 | Hunter Killer Productions, Inc. | *Hunter Killer* | PA2136168 |
| 5 | LHF Productions, Inc. | *London Has Fallen* | PA1982831 |
| 6 | Rambo V Productions, Inc. | *Rambo V: Last Blood* | PA2202971 |

Page 2

| 7 | Fallen Productions, Inc. | *Angel Has Fallen* | PA2197434 |
| 8 | HB Productions, Inc. | *Hellboy* | PA2176664 |

On behalf of owners 1-5, my law firm filed a lawsuit here in Hawaii (1:19-cv-169) against operators of movie piracy websites under the name "YTS" for copyright infringement, contributory copyright infringement and intentional inducement.

We have determined that your subscribers have repeatedly infringed the copyright in my clients' motion pictures via the YTS websites, among other means.

### *Prior Notices sent to HE by My Firm*

I sent first and second infringement notices per the Digital Millennium Copyright Action ("DMCA") to your agent on July 10, 2019 and July 12, 2019. (*See* Exhibits 1-2). The first notice concerned observed infringement of the motion picture *Hunter Killer* at the IP address 65.19.167.130 at timestamp 2018-10-19 09:16:51. The second DMCA notice concerned infringements of various motion pictures of my clients at the following dates and IP addresses:

| No. | IP address | Hit Date |
|---|---|---|
| 1 | 2001:470:b07e:0:d83a:a3ff:fe5e:ca | 2018-09-19 12:27:05.71563+00 |
| 2 | 216.218.222.14 | 2018-08-24 14:34:20.29611+00 |
| 3 | 216.218.222.12 | 2018-03-06 18:11:31.503688+00 |
| 4 | 65.19.167.130 | 2018-02-16 17:55:55.294389+00 |
| 5 | 216.218.222.14 | 2018-02-16 13:19:46.327169+00 |

Thousands of infringements of my clients' motion pictures have occurred at the above IP addresses.

### *Prior Notices sent to HE by Owners' Agent*

My clients' agent has sent over 290 infringement notices to HE regarding 136 IP addresses at copyright@he.net requesting that HE take action. One such exemplary notice is attached to this letter as Exhibit "3". It does not appear that HE terminated the subscriber's account (IP address 74.82.60.174) or took any meaningful action in response to these notices. In fact, infringement continues to occur at the '174 IP address as recently as 3/18/2020. Examples of the numbers of notices sent for certain IP addresses is shown below.

| IP | Notices Sent |
|---|---|
| 184.105.255.230 | 11 |
| 74.82.60.174 | 7 |
| 74.82.60.175 | 6 |

Page 3

| 72.52.87.188 | 6 |
|---|---|
| 74.82.60.74 | 5 |
| 72.52.87.94 | 5 |
| 74.82.60.91 | 5 |
| 72.52.87.78 | 5 |
| 72.52.87.91 | 4 |
| 74.82.60.191 | 4 |

The DMCA provides a safe harbor for qualified services providers from liability from copyright infringement. However, a requirement for safe harbor is that the service provider adopt and reasonably implement, and inform subscribers and account holders of the service provider's system or network of, a policy that provides for the *termination* in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers. *See* 17 USC 512(i)(1)(A). HE fails to qualify for a safe harbor because HE has not terminated the subscriber account despite the multiple notifications sent by my clients' agent.

Accordingly, my clients and I believe that HE is liable for these infringements of my clients' copyrights in violation of federal law under the Copyright Act, 17 USC §501. Remedies available to my clients include: An injunction against further infringement; Actual and statutory damages of up to $150,000/motion picture; and costs and attorney's fees.

Nonetheless, my clients would like to resolve this issue outside of litigation if possible. To do so, we request that: (1) HE agrees to immediate terminate all Internet service to the subscribers at the above IP addresses; (2) HE agrees to take the appropriate action to terminate subscriber accounts in response to all further copyright notifications received from my clients' agent; and (3) pay a portion of my clients' damages.

I look forward to receiving your affirmative response that you desire to fully comply with the above-stated requests by May 15, 2020 so that we can discuss this issue further. My clients would like to resolve this matter amicably but will consider any and all legal action necessary to protect their valuable intellectual property rights under federal and state law.

This letter is written without prejudice to the rights and remedies of our client, all of which are expressly reserved.

Sincerely,

Kerry S. Culpepper
kculpepper@culpepperip.com
Attachment: Exhibits 1-3


**Culpepper IP**

# CULPEPPER IP, LLLC

ATTORNEY AT LAW

75-170 HUALALAI ROAD, SUITE B204
KAILUA-KONA, HI 96740

KERRY S. CULPEPPER *

TEL: (808) 464-4047
FAX: (202) 204-5181

* ADMITTED TO PRACTICE IN VIRGINIA, HAWAI'I
AND BEFORE THE USPTO

WWW.CULPEPPERIP.COM

SPECIALIZING IN PATENTS, TRADEMARKS & COPYRIGHTS

July 10, 2019

**VIA EMAIL < COPYRIGHT@HE.NET > AND FIRST
CLASS MAIL**

Copyright Agent, Hurricane Electric Internet Services
Attn: Copyright Compliance
Hurricane Electric Internet Services
760 Mission Court
Fremont, CA 94539

Re: Copyright Claim of allegation of contributory copyright infringement on
websites registered or affiliated with Hurricane Electric

Dear Sirs:

An electronic signature of the copyright owner, or a person authorized to act on behalf of
the owner, of an exclusive copyright that has allegedly been infringed.

Kerry S. Culpepper authorized to act on behalf of owner Hunter Killer Productions, Inc.

/Kerry S. Culpepper/

State your contact information, including your TRUE NAME, street address, telephone
number, and email address.

Kerry S. Culpepper, Esq.

Culpepper IP, LLLC

75-170 Hualalai Road

Suite B204

Kailua-Kona, Hawaii 96740

US Tel 1-808-464-4047

kculpepper@culpepperip.com

Identification of the copyrighted work claimed to have been infringed, or, if multiple
copyrighted works at a single online site are covered by a single notification, a representative
list of such works on that site.

**Exhibit "1"**

Page 2

Infringement of the motion picture <u>Hunter Killer</u> is/was induced by (1) the content (promotional language of YTS); and/or (2) the link to download the torrent file of the motion pictures at the websites:

YTS.AM

<u>Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit Hurricane Electric to locate the material.</u>

(1) the content (promotional language of YTS); and/or (2) the link to download the motion picture at the websites:

YTS.AM

65.19.167.130 2018-10-19 09:16:51

Information reasonably sufficient to permit Hurricane Electric to contact the Complaining Party, such as an address, telephone number, and, if available, an electronic mail address at which the Complaining Party may be contacted.

Kerry S. Culpepper, Esq.

Culpepper IP, LLLC

75-170 Hualalai Road

Suite B204

Kailua-Kona, Hawaii 96740

US Tel 1-808-464-4047

<u>A statement that the Complaining Party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.</u>

I, have a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

<u>A statement that the information in the notification is accurate, and under penalty of perjury, that the Complaining Party is the owner, or is authorized to act on behalf of the owner, of an exclusive right that is allegedly infringed.</u>

Page 3

The information in the notification is accurate, and under penalty of perjury, I am authorized to act on behalf of the owner, Hunter Killer Productions, Inc. of an exclusive right that is allegedly infringed.

Sincerely,

/ksc/

Kerry S. Culpepper



**Culpepper IP**

# CULPEPPER IP, LLLC

ATTORNEY AT LAW

75-170 HUALALAI ROAD, SUITE B204
KAILUA-KONA, HI 96740

TEL: (808) 464-4047
FAX: (202) 204-5181

WWW.CULPEPPERIP.COM

SPECIALIZING IN PATENTS, TRADEMARKS & COPYRIGHTS

KERRY S. CULPEPPER *

* ADMITTED TO PRACTICE IN VIRGINIA, HAWAI'I
  AND BEFORE THE USPTO

July 12, 2019
**VIA FIRST CLASS MAIL**

Copyright Agent, Hurricane Electric Internet Services
Attn: Copyright Compliance
Hurricane Electric Internet Services
760 Mission Court
Fremont, CA 94539

> Re: Copyright Claim of allegation of contributory copyright infringement on
> websites registered or affiliated with Hurricane Electric

Dear Sirs:

An electronic signature of the copyright owner, or a person authorized to act on behalf of
the owner, of an exclusive copyright that has allegedly been infringed.

Kerry S. Culpepper authorized to act on behalf of owner Hunter Killer Productions, Inc.

/Kerry S. Culpepper/

State your contact information, including your TRUE NAME, street address, telephone
number, and email address.

Kerry S. Culpepper, Esq.

Culpepper IP, LLLC

75-170 Hualalai Road

Suite B204

Kailua-Kona, Hawaii 96740

US Tel 1-808-464-4047

kculpepper@culpepperip.com

Identification of the copyrighted work claimed to have been infringed, or, if multiple
copyrighted works at a single online site are covered by a single notification, a representative
list of such works on that site.

## Exhibit "2"

Page 2

Infringement of the motion picture <u>Hunter Killer</u> is/was induced by (1) the content (promotional language of YTS); and/or (2) the link to download the torrent file of the motion pictures at the websites YTS.AM, YTS.AG and YTS.GG hosted and/or supported at following IP addresses at following times:

| No. | IP address | Hit Date | Infringing Website |
|---|---|---|---|
| 1 | 2001:470:b07e:0:d83a:a3ff:fe5e:ca | 2018-09-19 12:27:05.71563+00 | yts.ag |
| 2 | 216.218.222.14 | 2018-08-24 14:34:20.29611+00 | yts.am |
| 3 | 216.218.222.12 | 2018-03-06 18:11:31.503688+00 | yts.gg |
| 4 | 65.19.167.130 | 2018-02-16 17:55:55.294389+00 | yts.gg |
| 5 | 216.218.222.14 | 2018-02-16 13:19:46.327169+00 | yts.gg |

<u>Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit Hurricane Electric to locate the material.</u>

(1) the content (promotional language of YTS); and/or (2) the link to download the motion picture at the websites:

YTS.AM, YTS.AG and YTS.GG .

Information reasonably sufficient to permit Hurricane Electric to contact the Complaining Party, such as an address, telephone number, and, if available, an electronic mail address at which the Complaining Party may be contacted.

Kerry S. Culpepper, Esq.

Culpepper IP, LLLC

75-170 Hualalai Road

Suite B204

Kailua-Kona, Hawaii 96740

US Tel 1-808-464-4047

<u>A statement that the Complaining Party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.</u>

Page 3

I, have a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

A statement that the information in the notification is accurate, and under penalty of perjury, that the Complaining Party is the owner, or is authorized to act on behalf of the owner, of an exclusive right that is allegedly infringed.

The information in the notification is accurate, and under penalty of perjury, I am authorized to act on behalf of the owner, Hunter Killer Productions, Inc. of an exclusive right that is allegedly infringed.

Sincerely,

/ksc/

Kerry S. Culpepper

| **From:** | notice@notices.copyrightmanagementservicesltd.com |
| **To:** | copyright@he.net |
| **Cc:** | ccbk@notices.copyrightmanagementservicesltd.com |
| **Subject:** | Notice of Claimed Infringement [Case No. 40559578682] |
| **Date:** | Friday, March 6, 2020 12:36:30 AM |

-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA256

Notice of Claimed Infringement

Notice ID: 40559578682
Notice Date: 2020-03-06 10:36:30

Dear Sir or Madam:

This message is sent on behalf of Fallen Productions, Inc..

Under penalty of perjury, I assert that Copyright Management Services, Ltd.  (CMS) is authorized to act on behalf of the owner of the exclusive copyrights that are alleged to be infringed herein.

Fallen Productions, Inc. owns the copyrights to the movie Angel Has Fallen. The unauthorized download and distribution of this file by your IP address constitutes copyright infringement.

Please see below details for the infringements:

Protocol: BITTORRENT
Infringed Work: Angel Has Fallen
Infringing FileName: Angel.Has.Fallen.2019.WEB-DL.x264-FGT
Infringing FileSize: 1236049106
Infringer's IP Address: 74.82.60.174
Infringer's Port: 54527
Initial Infringement Timestamp: 2020-02-08 16:00:25

And, you're also creating a security risk on your computers, devices and networks when you download unauthorized movies or allow others to do so from your Internet connection.

We respectfully ask that you stop infringing and redistributing Fallen Productions, Inc. copyright protected content, and take the proper steps to secure your Internet so that others do not infringe and redistribute our content as well.

We have a good faith belief that use of the copyrighted material detailed above is not authorized by the copyright owner, its agent, or the law.  In addition, we have a good faith subjective belief that the use does not constitute fair use. The information in this notice is accurate and we state, under penalty of perjury, that we are authorized to act on behalf of the owner of the copyright that is allegedly infringed. This letter is not a complete statement of Fallen Productions, Inc.'s rights in connection with this matter, and nothing contained herein constitutes an express or implied wavier of any rights or remedies of Fallen Productions, Inc. in connection with this matter, all of which are expressly reserved.

We appreciate your assistance and thank you for your cooperation in this matter.

Respectfully,

Catherine Hyde

**Exhibit "3"**

Copyright Management Services Ltd.
notice@notices.copyrightmanagementservicesltd.com
Address:
43 Berkeley Square
London W1J 5AP
United Kingdom

<?xml version="1.0" encoding="UTF-8"?>
<Infringement>
        <Case>
            <ID>40559578682</ID>
        </Case>
        <Complainant>
            <Entity>Fallen Productions, Inc.</Entity>
            <Contact>Catherine Hyde</Contact>
            <Address>43 Berkeley Square London W1J 5AP United Kingdom</Address>
            <Email>notice@notices.copyrightmanagementservicesltd.com</Email>

        </Complainant>
        <Service_Provider>
            <Entity>Hurricane Electric</Entity>
            <Address>907-651 Nootka Way, Port Moody, BC V3H 0A1, CA</Address>
            <Phone>+1-604-724-9612</Phone>
            <Email>copyright@he.net</Email>
        </Service_Provider>
        <Source>
            <TimeStamp>2020-02-08T16:00:25Z</TimeStamp>
            <IP_Address>74.82.60.174</IP_Address>
            <Port>54527</Port>
            <Type>BitTorrent</Type>
        </Source>
        <Content>
            <Item>
                <Title>Angel Has Fallen</Title>
                <FileName>Angel.Has.Fallen.2019.WEB-DL.x264-FGT</FileName>
                <FileSize>1236049106</FileSize>
                <Type>Movie</Type>
                <Hash Type="SHA1">DFCBE824F95FDE2C814953240BD598B7ADF8DB66</Hash>
            </Item>
        </Content>
</Infringement>
-----BEGIN PGP SIGNATURE-----

iQIIBAEBCAByBQJeYievaxxDYXRoZXJpbmUgSHlkZSAoQ29weXJpZ2h0IE1hbmFn
ZW1lbnQgU2VydmljZXMgTGltaXRlZCkgPG5vdGljZUBub3RpRpY2VzLmNvcHlyaWdo
dG1hbmFnZW1lbnRzZXJ2aWNlc2x0ZC5jb20+AAoJEPSJdnWuCmlX4acMAKz8utQd
9jY3KK04uvQ30apxgAkOq8kytbUSh4S4VZoxkGbpzzkG8OYE/NRybpBbbEK5s7+E
uoLUtZYtX1T3Ahgw4B7JL8B4qAWaKK4UGzXtO6Nz8mAdYuJKvTo9D/INgJr/pG9X
PlvXMo3OaLIWW7wyrdndwHkaG2NIayL04lmgzyBMqC0xEwiaYCPwT/FDb0el8gRd
ARHzgQgGf7h6l5U+1WAVDDFAvOaf8Y8lwJI7iGyd9BALrtvVVL96U1jidE2F8G40
eUOBcF8x5GSm/WdVAunWM7TGnfaUyWrCYfaIfttkQ8aY1khuKYH/a+h/6YfQTmCh
YYm7yt7pyQb6htolgFS5+MoivEVN3v3VRJYDvC+YqQ9DfozEPBWzgEF6o1cej0Tx
QuSfzoYuVC0VC/0LTU4op8TNUGoO62714CLIzhsWz8rBV+l3immvvlNRLCuCGPuY
x2ibPZFuVZCu78NEMUZ+BWN0UB2ePRuFrg0OpM/BFDrg2cZloI9BayGuVw==

=elxY
-----END PGP SIGNATURE-----

# EXHIBIT 2

May 1, 2020 cease and desist letter from
Kerry S. Culpepper to Neil D. Greenstein



# CULPEPPER IP, LLLC

ATTORNEY AT LAW

75-170 HUALALAI ROAD, SUITE B204
KAILUA-KONA, HAWAII 96740

TEL: (808) 464-4047
FAX: (202) 204-5181

WWW.CULPEPPERIP.COM

PATENTS, TRADEMARKS & COPYRIGHTS

KERRY S. CULPEPPER *

* ADMITTED TO PRACTICE IN VIRGINIA, HAWAI'I
AND BEFORE THE USPTO

Via E-mail Only<ndg@techmark.com>

May 1, 2020

Neil D. Greenstein

TechMark Greenstein Law, P.C.

1751 Pinnacle Drive, Suite 1000

Tysons, VA 22102

Re:  Cease and Desist of Direct Copyright Infringement, Contributory Copyright Infringement at Hurricane Electric Subscriber IP addresses

My Reference and Case Number: 19-cv-169-LEK-KJM (District of Hawaii)

Dear Mr. Greenstein,

I am writing in reply to your email of 4/19/2020 in which you requested that I "…identify the clients [I] represent and the IP address on which [my] clients' rights have allegedly been infringed."

At least the following motion pictures of my clients were confirmed infringed at HE IP addresses as of March 18, 2020.

| NO. | OWNER | MOTION PICTURE |
|:---:|:---:|:---:|
| 1 | Millennium Funding, Inc. | *Mechanic: Resurrection* |
| 2 | Bodyguard Productions, Inc. | *The Hitman's Bodyguard* |
| 3 | UN4 Productions, Inc. | *Boyka: Undisputed IV* |
| 4 | Homefront Productions, Inc./ Millennium | *Homefront* |
| 5 | Dallas Buyers Club, LLC | *Dallas Buyers Club* |
| 6 | Glacier Films 1, LLC | *American Heist* |

Case 4:20-cv-05340-DMR Document 1-2 Filed 08/10/20 Page 48 of 89
Case 2:20-cv-01034R Document 1-3 Filed 06/10/20 Page 3 of 4

Page 2

| 7 | Criminal Productions, Inc. | *Criminal* |
|---|---|---|
| 8 | Clear Skies Nevada, LLC/Voltage | *Good Kill* |
| 9 | Cook Productions, LLC | *Mr. Church* |
| 10 | WWE Studios Finance Corp | *Eliminators* |
| 11 | Hunter Killer Productions, Inc. | *Hunter Killer* |
| 12 | LHF Productions, Inc. | *London Has Fallen* |
| 13 | Rambo V Productions, Inc. | *Rambo V: Last Blood* |
| 14 | Fallen Productions, Inc. | *Angel Has Fallen* |
| 15 | Wicked Nevada, LLC | *Extremely Wicked Shockingly Evil and Vile* |
| 16 | MON, LLC/ Voltage | *Welcome Home* |
| 17 | 211 Productions, Inc./ Millennium | *211* |
| 18 | TBV Productions, LLC/Voltage | *I Feel Pretty* |
| 19 | CELL Film Holdings, LLC | *Cell* |
| 20 | Fathers & Daughters Nevada, LLC/Voltage | *Fathers and Daughters* |
| 21 | Venice PI, LLC | *Once Upon a Time in Venice* |
| 22 | I am Wrath Production, Inc. | *I Am Wrath* |
| 29 | HB Productions, Inc. | *Hellboy* |
| 31 | Headhunter, LLC | *A Family Man* |

Case 4:20-cv-05640-DMR Document 1-2 Filed 08/19/20 Page 49 of 89
Case 2:20-cv-01034R Document 1-3 Filed 06/10/20 Page 4 of 4

Page 3

| 34 | POW Nevada, LLC/Voltage | *Revolt* |
| 35 | Status Update, LLC/Voltage | *Status Update* |
| 36 | Stoic Productions, Inc. /Millennium | *Acts of Vengeance* |
| 37 | Killing Link Distribution, LLC | *Kill Chain* |
| 38 | Cobbler Nevada, LLC/Voltage | *The Cobbler* |
| 39 | Survivor Productions, Inc. | *Survivor* |

I further reserve the right to supplement the above list.

I have attached an excel spreadsheet with all IP addresses at which my clients motion pictures have been infringed.

I look forward to hearing back from you by May 15, 2020 so that we can discuss this issue further.

This letter is written without prejudice to the rights and remedies of our client, all of which are expressly reserved.

Sincerely,

/ksc/
Kerry S. Culpepper
kculpepper@culpepperip.com

# EXHIBIT 3

June 15, 2020 correspondence from Neil
D. Greenstein to Kerry S. Culpepper

# TECHMARK

GREENSTEIN LAW, P.C.
## TRADEMARK AND INTELLECTUAL PROPERTY LAW
TEL: (347) 514-7717

NEIL D. GREENSTEIN
ATTORNEY AT LAW
DIRECT TEL: (571) 206-4840
E-MAIL: NDG@TECHMARK.COM

June 15, 2020

TECHMARK®
1751 PINNACLE DRIVE
SUITE 1000
TYSONS, VA  22102

Kerry S. Culpepper, Esq.
Culpepper IP, LLLC
75-170 Hualalai Road, Suite B204
Kailua Kona, HI 96740

**Re: Allegations of Copyright Infringement against Hurricane Electric**

Dear Mr. Culpepper,

I write in response to your letter of March 19, 2020 ("March 19, 2020 Letter"), my email to you seeking additional information relating to your claims in the March 19, 2020 letter, and your subsequent letter of May 1, 2020 ("May 1, 2020 Letter") (together, March 19, 2020 Letter and May 1, 2020 Letter are hereinafter the "Letters").

First, I would point out that your March 19, 2020 Letter, and the subpoena[1] you obtained dated July 12, 2019, complained about alleged infringing activities on four (4) IP addresses. I called you to inform you of my representation of Hurricane Electric ("HE"), and you called me back on April 6, 2020. I confirmed to you my representation of HE and informed you that I learned you previously had communications with my client. As such, I asked you to forward me copies of all such communications. You subsequently uploaded 41 pages of documents purporting to be the total communications directly between you and my client.

After reviewing the documents that you uploaded, it appeared that you were not representing all of the clients mentioned in your March 19, 2020 letter. As such, I sent you an email on April 19, 2020 asking you to identify which clients you represented and the IP addresses on which such client's rights had allegedly been infringed.

---

[1]  We believe the subpoena was not properly issued and Hurricane reserves all rights with respect to the validity and propriety of that subpoena.

You then responded on May 1, 2020 and instead of claiming to represent a subset of some 8 clients, you now claim to represent some 39 clients. In addition, you provided an attachment of some 2300+ IP addresses on which you claim infringement occurred. Notably, your letter failed to identify sufficient facts even to make out a prima facie case of infringement.

I provide below some information for you about HE relating to the overall and general nature of HE activities. While you presumably know these facts based upon your research and your calls with my client, I provide them to ensure there is no doubt about HE's activities. After this letter should any of your clients decide to continue this dispute, I insist that each of your clients' claims be segregated. We want to be sure to address each client's claims specifically, and confusion is inevitable if you are not clear which client is making each claim.

**Hurricane Electric is an Online Service Provider**

With respect to the activities that you complained of, HE is an Online Service Provider ("OSP") and does not "host," have access to or have control over the content provided by its customers/subscribers. HE simply acts as a "highway" and provides subscribers with internet access. HE internet connections are B2B-type connections and are most often to a data center, an ISP, the government[2], or a major business. Even though HE is a small company founded in Mr. Lieber's garage, it competes with the niche "B2B" online access side of Verizon, Comcast, AT&T. For example, as you know, HE provides network access to ISPs (Internet Service Providers) – who typically use that connection to provide service to hundreds or thousands of third-party subscribers.

Your letters prematurely jump into "safe harbors" under the DMCA, but you are well experienced in copyright law and you know that you must first show liability. It is only if there is liability that a safe harbor even becomes potentially relevant. It is simply wrong and indeed illogical for anyone to suggest that a company may have liability for an alleged failure to follow a safe harbor when no liability exists under the copyright (or other) law.

---

[2] As you know, some of the IP addresses in issue were provided to the U.S. Navy's Naval Research Labs. I find it interesting that you asked a federal district court for a subpoena relating to a potential claim against the US Navy, when you know that claims against the US Government MUST be brought in the US Federal Court of Claims and that the Federal District Courts do not have jurisdiction over such claims. That issue is, however, is for another day should any of your clients decide to proceed.

To address this logically, one must first analyze whether or not there is even potential liability by HE.  Only if there is potential liability need one address whether there is "protection" from an otherwise potential liability under a safe harbor.  Your letter seems to suggest that if a company does not fit into a safe harbor there is liability without regard to whether there is copyright infringement.  While that would be a novel approach, such an approach is unsupported in the law.

## Hurricane Electric Has Not Infringed Any of Your Client's Copyrights

Had you analyzed the law instead of making a conclusory assumption of liability, the only reasonable conclusion is that HE has no liability whether for direct, contributory, or vicarious copyright infringement.

"As a threshold question, a plaintiff who claims copyright infringement must show: (1) ownership of a valid copyright; and (2) that the defendant violated the copyright owner's exclusive rights under the Copyright Act." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004), *citing* 17 U.S.C. Section 501(a)(2003); *Ets-Hokin*, 225 F.3d at 1073.  You have only provided to HE a chart of alleged copyrights (including the alleged owner, and motion picture title) and in your May 1, 2020 letter you have neither alleged that the copyrights are registered nor have you provided alleged copyright certificates.  Nonetheless, even if one were to assume that the copyrights were registered and valid, infringement is still lacking.

### *Direct Copyright Infringement*

To prove a claim of direct copyright infringement, a plaintiff must show that he owns the copyright and that the defendant himself violated one or more of the plaintiff's exclusive rights under the Copyright Act.  *Robertson*, 357 F.3d at 1076, *citing A & M Records v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).  Your Letters never allege, nor could they, that HE directly infringed or violated any of your clients' rights under the Copyright Act.  You have alleged, instead, simply that one or more of HE's subscribers have violated your clients' rights.  Based on this, your Letters effectively admit that HE is not liable for any direct copyright infringement.

### *Contributory Copyright Infringement*

To prove a claim of contributory copyright infringement, a plaintiff must show that the defendant, with knowledge of the infringing activity, induced, caused or materially contributed to the infringing conduct of another. *See Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1162 (2d Cir. 1971). Your Letters similarly fail to establish that HE is guilty of contributory infringement.

The Second circuit is not alone in its analysis of contributory infringement. Indeed, the Ninth Circuit – of course, the circuit where you are located and where HE is located – has spoken loud and clear on the issue.  In a recent published precedential decision of which you are aware[3], *Cobbler Nevada, LLC v. Gonzales*, 901 F.3d. 1142 (9th Cir., 2018)(copy attached),  Cobbler Nevada didn't have the hubris to sue Comcast – in that case the ISP (a party one level closer to the alleged infringer than HE is in your allegations) -- but obtained records from Comcast that Gonzales was assigned the IP address in issue.  The District Court found no infringement liability against the subscriber, Gonzales, and the 9th circuit affirmed both the finding of no infringement and the award of attorneys' fees against Cobbler Nevada.  As to direct infringement, the 9th circuit stated:

> The only connection between Gonzales and the infringement was that he was the registered internet subscriber and that he was sent infringement notices. To establish a claim of copyright infringement, Cobbler Nevada "must show that [it] owns the copyright and that the defendant himself violated one or more of the plaintiff's exclusive rights under the Copyright Act." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004). Cobbler Nevada has not done so.

As to the claim of contributory infringement, the 9th circuit was similarly instructive and definitive.

> We have adopted the well-settled rule that "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1170 (9th Cir. 2007) (alteration in original)

---

[3] Your client is the party that not only lost but had to pay attorneys' fees.  Certainly, you became aware of this case, at the very least, as part of the normal vetting in taking on a representation of a client.

(quoting *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 914, 930 (2005)). Stated differently, "liability exists if the defendant engages in personal conduct that encourages or assists the infringement." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001) (internal quotation marks omitted). A claim for contributory infringement requires allegations that the defendant is "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) (brackets omitted) (quoting *Gershwin Publishing Corp. v. Columbia Artists Management*, 443 F.2d 1159, 1162 (2d Cir. 1971)). **Cobbler Nevada's contributory infringement claim is premised on a bare allegation that Gonzales failed to police his internet service. This perfunctory allegation, without more, does not sufficiently link Gonzales to the alleged infringement.** (emphasis added)

The 9th Circuit went on to state:

> We analyze contributory liability "in light of 'rules of fault-based liability derived from the common law,' and common law principles establish that intent may be imputed." *Id.* at 1170–71 (quoting *Grokster*, 545 U.S. 934–35).

> Turning to the first strand, Cobbler Nevada's complaint lacks any allegations that Gonzales "actively encourage[ed] (or induc[ed]) infringement through specific acts." *Id.* at 1170. Nothing in Cobbler Nevada's complaint alleges, or even suggests, that Gonzales actively induced or materially contributed to the infringement through "purposeful, culpable expression and conduct." *Grokster*, 545 U.S. at 937.

Just like Cobbler Nevada's claim in the *Gonzales* case, none of your clients (including Cobbler Nevada) have, nor could they have consistent with FRCP 11 in that HE is merely an online service provider of internet network access, made any allegations that HE "actively induced or materially contributed to the infringement through "purposeful, culpable expression and conduct."

The 9th Circuit continued –

Nor does the second strand implicate Gonzales. Providing internet access can hardly be said to be distributing a product or service that is not "capable of substantial" or "commercially significant noninfringing uses." *Sony*, 464 U.S. at 442.

HE is an online service provider which provides internet connections to major companies and government organizations. Your clients can not credibly suggest that the U.S. Navy doesn't have significant "noninfringing" use for an internet connection. Nor could your clients credibly suggest that an Internet Service Provider to which HE provides it online service doesn't have a significant "noninfringing" use.

Your clients, including Cobbler Nevada, know that their theories "both stray[s] from precedent and effectively create[s] an affirmative duty for private internet subscribers to actively monitor their internet service for infringement." In *Cobbler Nevada*, the 9th circuit noted that "[i]mposing such a duty would put at risk any purchaser of internet service who shares access with a family member or roommate, or who is not technologically savvy enough to secure the connection to block access by a frugal neighbor. This situation hardly seems to be one of "the circumstances in which it is just to hold one individual accountable for the actions of another."

In view of the clear ruling by the 9th Circuit, the egregiousness of your clients' allegations is further evident from the fact that HE is not the private internet subscriber and is not even the ISP. HE is an online service provider – who sells network connections to ISPs.

Absent facts from your clients that HE "actively induced or materially contributed to the infringement through "purposeful, culpable expression and conduct," I don't believe your clients will make it past a FRCP 12(b)(6) motion to dismiss. Indeed, in view of the Cobbler Nevada case, your clients will likely not only lose such a motion, but will likely have to pay HE's attorneys fees. In my view, there is also a significant risk of sanctions by the Court.

If you believe that HE has actively induced or materially contributed to the infringement through "purposeful, culpable expression and conduct," or is somehow infringing your clients' rights, you must provide me with those facts and theories. Again, this must be done on a client by client basis and should include all of the facts supporting a prima facie case including copyright registration certificates, and evidence in support of your clients' claims.

Simply put, we don't believe that HE has engaged in contributory copyright infringement.

### *Vicarious Copyright Infringement*

To prove a claim of vicarious copyright infringement, a plaintiff must show that the defendant enjoys or enjoyed a direct financial benefit from another's infringing activity and has the right and ability to supervise the infringing activity. *See Robertson*, 357 F.3d at 1076, *citing Napster, Inc.,* 239 F.3d at 1022 (citing *Gershwin Publ'g Corp.,* 443 F.2d at 1162); *Fonovisa, Inc., v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996); 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* Section 12.04[A][1] (perm.ed., rev.vol.2003). HE has no ability to supervise or control any relevant content and has no hand in the making or distribution of such content. HE has no direct financial interest in any of the purchasers of the internet connections and gets no financial benefit from any alleged infringing activity by a user. Moreover, HE is an OSP providing only an internet network connection and has no control over, the content itself. HE's customers or HE's customer's customers, or even HE's customer's customer's customers are the users of the internet network connection. Thus, HE cannot be vicariously liable for the alleged copyright infringement.

### Even if Hurricane Electric Was Somehow Liable for Copyright Infringement – Which is Emphatically Denied – HE is protected by the DMCA Safe Harbor

As established above, HE is not liable for any sort of copyright infringement. Without any infringement, the *threshold* has not been met and no safe harbor discussion is necessary. Nonetheless, for completeness, even if HE were somehow liable for some type of copyright infringement, which is emphatically denied, HE, as an online service provider which does not provide any intermediate or transient storage (as defined in 17 U.S.C. § 512(k)(1)(B), would not have any liability due to the safe harbor limitation of liability under 17 U.S.C. § 512(i).

### Hurricane Electric Is Not Subject to Jurisdiction in Hawaii

Jurisdiction over HE in Hawaii has not been, and cannot be, established. HE is located, headquartered and operates from Fremont, California. California is HE's principal place of business. Indeed, HE does not even have a place of business in Hawaii.

7

**HE Has No Interest in This Matter**

As a practical matter, HE has no interest, financial or otherwise, in your clients' disputes with alleged infringers who may have improperly downloaded movies.  As such, HE promptly provided you with information, including names and addresses, of the subscribers who leased the internet connections.  That gave your clients all of the information they needed to take appropriate action against the alleged infringers.

**Conclusion**

I understand from my client – which I trust must have been a miscommunication – that you took the position that your clients were not obligated to go after the actual infringers or to seek the actual infringers' identities from the ISPs which purchase internet connections from HE.  That statement would be facially erroneous, as discussed above, as the cases discussed above make it clear that your clients have the burden of proof and cannot prove infringement merely by relying upon the fact that HE is an online service provider of an internet network connection.

If you have facts supporting a *prima facie* case against HE, I am open to receiving those facts.  Again, that must be on a client by client basis as we will keep meticulous records for a later attorney fee petition.

Finally, if you would like to discuss this matter, I am available by telephone this month, and, travel restrictions due to COVID-19 permitting, I will be in Kona next month where we can meet in-person after I complete my arrival quarantine/isolation.

Absent a further response from you by June 15, 2020, we will consider this matter closed.

Sincerely yours,

Neil D. Greenstein

8

# EXHIBIT 4

May 20, 2020 cease and desist letter
from Kerry S. Culpepper to
Neil D. Greenstein


**Culpepper IP**

# CULPEPPER IP, LLLC

ATTORNEY AT LAW

75-170 HUALALAI ROAD, SUITE B204
KAILUA-KONA, HAWAII 96740

TEL: (808) 464-4047
FAX: (202) 204-5181

WWW.CULPEPPERIP.COM

PATENTS, TRADEMARKS & COPYRIGHTS

Via E-mail<copyright@he.net>

KERRY S. CULPEPPER *

* ADMITTED TO PRACTICE IN VIRGINIA, HAWAI'I
AND BEFORE THE USPTO

May 20, 2020

Via First Class Mail
Neil D. Greenstein
TechMark
1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102

Re: Cease and Desist of Direct Copyright Infringement, Contributory Copyright Infringement at
Hurricane Electric Subscriber IP addresses
My Reference and Case Number: 19-cv-169-LEK-KJM (District of Hawaii)

Dear Mr. Greenstein,

  I am writing in reply to your reply letter of May 15, 2020 (but incorrectly dated June 15,
2020). As you most likely expect, I disagree with all your legal conclusions and factual
assertions. HE account holders directly infringed and continue to infringe my clients' exclusive
rights of at least reproductions and distribution. HE contributes to these infringements by
continuing to provide Internet service to these account holders despite the Infringement Notices
("Notices") sent to HE by my clients' agents.

  In the outset, I would like to point out that in your email of April 19, 2020 you stated,
"Please identify the clients you represent and the IP address on which your clients' rights have
allegedly been infringed. We can then address those claims…" That is exactly what I provided
to you. However, in your reply letter you stated that my letter "…failed to identify sufficient
facts even to make out a prima facie case of infringement.". You did not request that I send the
data files, notices, or other evidence of infringements by HE account holders. I sent to you
exactly what you requested – the IP addresses, client names and their motion pictures.

**The Evidence of Direct Infringement of HE account holders**

  My clients' agent Maverick Eye ("MEU") identifies IP addresses on peer-to-peer
networks distributing my clients' motion pictures by monitoring resources that broadcast IP

Case 4:20-cv-05840-DMR Document 1-5 Filed 08/19/20 Page 61 of 89
Case 2:20-cv-01034R Document 1-5 Filed 06/10/20 Page 61 of 89

Page 2

addresses sharing the motion pictures. In many cases, MEU can monitor these IP addresses at various stages of downloading and confirm whether the user at the IP address possesses 100% of the infringing file copy. MEU performs a data exchange with each IP address to confirm actual distribution of the infringing file copy of the motion picture. The Notices are then sent to ISPs such as HE based upon the evidence of actual distribution. Thus, the evidence obtained by the MEU will establish a *prima facie* case of a direct infringement and distribution of my clients' exclusive right to distribute and reproduce their motion pictures. This is the same type of circumstantial evidence of direct infringement that the Western District of Texas found acceptable in *Grande* and the Eastern District of Virginia found acceptable in *Cox I* and *II*.

Finally, each of Notices includes the illicit file names of the motion picture shared by the account holder. For example, in the two exemplary notices I sent in the first letter the file names are: Hellboy (2019) [BluRay] [1080p] [YTS.LT] (obtained from YTS.LT) and Hellboy.2019.1080p.KORSUB.HDRip.x264.AAC2.0-STUTTERSHIT (obtained from RARBG.TO). The file names are also circumstantial evidence that they are illegitimate copies made from the same HE IP address and thus a direct infringement of my clients' exclusive right of reproduction in their motion pictures.

You argue that Ninth Circuit decision in *Cobbler Nevada* prevents me from establishing the direct infringements of the account holders unless I point out the specific end user responsible. I find it amusing that you seek to compare your client HE – described by you as an OSP that provides B2B-type connections to account holders across the United States and competes with Verizon, Comcast and AT&T– to the adult day care center operator Defendant in *Cobbler Nevada* that provided WiFi service to its adult residents. The differences are so stark that it is hard to take the comparison even seriously. The adult day care center Defendant in *Cobbler Nevada* did not have accountholders to terminate in response to Notices. When the Plaintiff ISP Grande Communications Networks, LLC ("Grande") attempted to make this same argument in the Western District of Texas it was completely rejected just in a footnote. *See UMG Recordings, Inc., et al. v. Grande Communications Networks, LLC,* 1:17-CV-365-DAE, Doc. #268, pg. 40 ("*Grande*"). This argument was also rejected by the Eastern District of Virginia in *Sony Music Entertainment et al v. Cox Communications, Inc. et al*, 1:18-cv-00950-LO-JFA, Doc. #586, pgs. 22-24 (*"Cox II"*).

**The Evidence of Contributory Infringement**

Without conceding that the Ninth Circuit is the relevant law, in the Ninth Circuit, generally one infringes contributorily by intentionally inducing or encouraging direct infringement. Some decisions require knowledge. However, under any standard of contributory infringement HE is liable because HE had *actual* knowledge of direct infringements from the numerous Notices my clients' agent sent to you. Even when HE ignored many of these Notices,

Case 4:20-cv-05840-DMR Document 15-2 Filed 08/18/20 Page 62 of 89
Case 2:20-cv-01034R Document 1-5 Filed 08/10/20 Page 4 of 6

Page 3

HE's willful blindness in these circumstances also satisfies the knowledge requirement. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011).

HE encourages or materially contributes to the account holders' direct infringements by providing the facilities and means for the account holders' to continue their infringements – namely the Internet service. Along this line, I found it interesting that you would challenge that HE has directly or contributed to copyright infringements while conceding that HE acts as a "…"highway" and provided subscribers with internet access"… and operates a "data center". Even if transmissions of infringing material are performed by the end user, HE performs "…the transmission, routing, provision of connections, or storage of the infringing material" by the HE data center and/or routers and servers that makeup his "highway". These are the activities that an OSP performs to, for example, transport data packets from the account holder to the next destination. This very concern that these activities would render all OSPs liable for direct and contributory infringement is one of the reasons that the DMCA was passed by Congress. That is why it is important for an OSP to comply with the provisions of the DMCA such as in 17 USC 512(i)(1)(A) to keep its safe harbor. However, not only has HE failed to comply with this provision by not taking meaningful actions in response to the Notices from my clients' agents, it is apparent that HE did not even forward many of these notices to their account holders. Nonetheless, HE had knowledge of its account holders' infringing activity by the notices my clients' agents sent to HE but still continued to provide normal data transmission operations to provide the "highway" so the infringements continued. Accordingly, HE encouraged and/or materially contributed to the copyright infringements. HE could have taken the simplest measure to terminate the customer account and stop further infringement – namely terminating the account but the profits from these infringing accounts were simply to delicious for HE to pass up.

Besides HE's liability for contributing to the direct infringements of its account holders, arguably HE is also liable for its own direct infringements of my clients' motion pictures. Particularly, when HE routed the data packets of the infringing material from its account holders to destinations, HE likely copied and temporarily stored copies of the materials during the normal transmission, routing, and provision of connections. Ordinarily, HE would probably not be liable because of lack of volitional conduct. However, because HE had actual knowledge of the infringing activity, yet continued to provide service for the account holders, a Court may decide that HE has sufficient volitional conduct to be liable for direct infringement.

**Vicarious Liability**

I have not made assertions regarding whether HE is liable under vicarious copyright infringement. However, I note that the District Court of Colorado rejected arguments similar to yours made by the Defendant in *Warner Records Inc. v. Charter Communications, Inc.*, 1:19-cv-

Case 4:20-cv-05640-DMR  Document 1-2  Filed 08/10/20  Page 63 of 89
Case 2:20-cv-01034R  Document 1-5  Filed 06/10/20  Page 5 of 6

Page 4

00874-RBJ-MEH, Doc. #157.  Particularly, the District Court determined that the Plaintiffs' allegations that Defendants' failure to stop or take other action in response to notices of infringement is a draw to current and prospective subscribers was sufficient for the "direct financial benefit requirement" and that Charter's ability to terminate those users about whom it is notified was sufficient for the "right and ability to supervise the infringing activity".  Id. at pgs. 10-12.  Your arguments were also rejected in *Cox II*.

## The Recent ISP Cases

It is not surprising that you do not mention any of the recent ISP copyright infringement cases such as *Grande*, *Cox I* and *II* and *Warner Bros. Records, Inc. v. Charter*.  None of these cases support your position.  In the contrary, in *Sony* the Eastern District of Virginia rejected Cox's argument that it was not responsible for the infringements of business customers who had numerous downstream users – the same argument you are attempting to make.  The Central District of California rejected an attempt by Cloudflare to make a similar argument in *ALS Scan, Inc. v. CloudFlare, Inc.* and concluded that CloudFlare could be liable under a material contribution theory because CloudFlare could take the simple measures of terminating the customer account to stop further infringement.

> The simple answer as to whether Cloudflare could have done something simple to stop the infringement is "yes": Cloudflare can, but does not, end its business relationship with websites that it knows (or arguably knows) are serial infringers.

ALS Scan, Inc. v. CloudFlare, Inc., No. CV 16-5051-GW(AFMX), 2017 WL 1520444, (C.D. Cal. Feb. 16, 2017).   HE could do the same here.

## HE has no safe harbor

As argued previously, HE has no safe harbor because it failed to take meaningful actions against its account holders let alone termination in response to the multiple notices.  You stated that "…HE, as an online service provider which does not provide any intermediate or transient storage…would not have any liability…"  Please explain to me how HE performs its data routing services to provide a "highway" to the content provided to its customers/subscribers without temporarily storing, copying, and forwarding the data packets.  It is telling that you spend only one paragraph in your reply letter arguing that HE has a safe harbor.

## Jurisdiction

I never argued that jurisdiction of HE in Hawaii is appropriate.  However, it should be noted that when the HE subscribers sent copies of my clients' motion pictures (in the 19cv169 case) to the Hawaii Defendants, HE purposefully directed electronic activity into this District. Particularly, since HE acted as a "highway" as you state, HE *knew* the destination of these data packets, namely to IP addresses in Hawaii.  Further, many of my clients' claims for copyright infringement arise from this activity.  Moreover, the HE infringing account holders appear to be

Case 4:20-cv-05840-DMR Document 1-2 Filed 08/19/20 Page 64 of 89
Case 2:20-cv-01034-R Document 1-5 Filed 06/10/20 Page 6 of 6

Page 5

dispersed across the United States – some in the same districts as the Courts in *Grande, Cox I* and *Cox II*. The purposeful direction test will likely support jurisdiction in the forums where the infringement occurred as well.

**Conclusion**

I sincerely hope that HE reconsiders its position after reviewing the above points and agrees to our three requests (terminate the account; agree to take appropriate action on further notices; pay a portion of the damages). Please consider the vast damage that is being done to my clients by these HE customers. To give a concrete example, in my previous letter I pointed out that the clients' agent had sent multiple notices regarding infringements for the account of IP address 72.52.87.188 ("188"). Nonetheless, since the date of that previous letter MEU has captured nearly 50 more instances of copyright protected content being illegally shared from the 188 address. For example, MEU captures the motion picture *The Rest of Us* of our client Sugar Shack Productions Ontario, Inc. being shared at the 188 address on 2020-04-28 06:06:38 UTC and the motion picture *The Hurricane Heist* of our client Screen Media Ventures, LLC being shared multiple times from 2020-03-26 20:19:10 to 2020-03-27 00:36:54 UTC at the 188 address. None of these infringements would have happened if HE had terminated this account after my previous letter. You may notice that these two clients and motion pictures were not included in the previous list. The problem is that the longer HE fails to terminate the accounts of repeat infringers such as the 188 address that have become piracy cesspools, more of my clients' motion pictures are infringed.

I respectfully request a reply to my letter by June 15, 2020. This letter is written without prejudice to the rights and remedies of my clients, all of which are expressly reserved.

Sincerely,
/ksc/
Kerry S. Culpepper
kculpepper@culpepperip.com

# EXHIBIT 5

Docket Report Entry Number 51
regarding District of Hawaii case number
19-cv-169-LEK-KJM

CM/ECF V6.3.2 **LIVE**                                      https://ecf.hid.uscourts.gov/cgi-bin/DktRpt.pl?353570655963932-L_1_0-1

Case 4:20-cv-05840-DMR Document 1-2 Filed 08/19/20 Page 66 of 89
Case 2:20-cv-01034-R Document 1-6 Filed 06/10/20 Page 2 of 5

AO121,CLOSED

# U.S. District Court
## District of Hawaii (Hawaii)
## CIVIL DOCKET FOR CASE #: 1:19-cv-00169-LEK-KJM

| | |
|---|---|
| Venice PI, LLC, et al v. Doe 1, et al | Date Filed: 04/04/2019 |
| Assigned to: JUDGE LESLIE E. KOBAYASHI | Date Terminated: 04/22/2020 |
| Referred to: MAGISTRATE JUDGE KENNETH J. MANSFIELD | Jury Demand: Plaintiff |
| | Nature of Suit: 820 Copyright |
| Cause: 17:101 Copyright Infringement | Jurisdiction: Federal Question |

**Plaintiff**

**Venice PI, LLC**  represented by  **Kerry S. Culpepper**
75-170 Hualalai Road
Suite B204
Kailua Kona, HI 96740
808-464-4047
Fax: 202-204-5181
Email: kculpepper@culpepperip.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MON, LLC**  represented by  **Kerry S. Culpepper**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Millennium Funding, Inc**  represented by  **Kerry S. Culpepper**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bodyguard Productions, Inc.**  represented by  **Kerry S. Culpepper**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TBV Productions, LLC**  represented by  **Kerry S. Culpepper**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**UN4 Productions, Inc.**  represented by  **Kerry S. Culpepper**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

CM/ECF V6.3.2 **LIVE**                                    https://ecf.hid.uscourts.gov/cgi-bin/DktRpt.pl?353570655963932-L_1_0-1

Case 4:20-cv-05840-DMR Document 1-6 Filed 08/19/20 Page 67 of 89
Case 2:20-cv-01034R Document 1-6 Filed 06/10/20 Page 3 of 5

**Hunter Killer Productions, Inc.**                represented by **Kerry S. Culpepper**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*


V.

<u>**Defendant**</u>

**Doe 1**
*TERMINATED: 11/07/2019*
*doing business as*
YIFY
*TERMINATED: 11/07/2019*

<u>**Defendant**</u>

**Doe 2**
*TERMINATED: 11/07/2019*
*doing business as*
YTS
*TERMINATED: 11/07/2019*

<u>**Defendant**</u>

**Michael Nolasco**
*TERMINATED: 05/09/2019*

<u>**Defendant**</u>

**Brent Baldwin**
*TERMINATED: 05/23/2019*

<u>**Defendant**</u>

**Doe 3**
*Cullen Coughlan*
*TERMINATED: 06/12/2019*

<u>**Defendant**</u>

**Does 4-10**
*TERMINATED: 11/07/2019*

<u>**Defendant**</u>

**Techmodo Limited**
*TERMINATED: 04/14/2020*

<u>**Defendant**</u>

**Senthil Vijay Segaran**
*TERMINATED: 04/14/2020*

<u>**Defendant**</u>

**NGUYEN DINH Manh**
*TERMINATED: 04/22/2020*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/28/2019 | 51 | EO: Plaintiffs filed this action against Doe 2 dba YTS ("Doe Defendant YTS"), among others. *See* ECF No. 1. Plaintiffs' counsel, Kerry S. Culpepper, Esq., subsequently submitted a proposed summons for Doe Defendant YTS, which he directed to:<br><br>Doe 2 - Techmodo LTD<br>Mr. Senthil Vijay Segaran<br>40 BLOOMSBURY WAY<br>LOWER GROUND FLOOR<br>LONDON UNITED KINGDOM WCIA 2SE<br><br>ECF No. 17 at 1.<br><br>Mr. Culpepper subsequently filed two Proofs of Service purporting to evidence service of process upon Doe Defendant YTS through Techmodo Limited and Senthil Vijay Segaran. *See* ECF Nos. 42, 43. Techmodo Limited and Mr. Segaran, however, are not named in the Complaint, and thus they are not defendants in this case.<br><br>Federal Rule of Civil Procedure 4(a)(1)(B) requires that a summons "be directed to the defendant[.]" As a practical matter, it is impossible to serve a summons and complaint on an anonymous defendant. The Ninth Circuit therefore disfavors the use of doe defendants, *see Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980), and Plaintiffs' tactics highlight the problems with proceeding with doe defendants.<br><br>It is improper for Plaintiffs to attempt to effect service on a person or entity Plaintiffs believe to be a doe defendant without properly amending their complaint to identify the doe defendant by name. It is equally improper for Mr. Culpepper to direct summonses to persons and/or entities who are not named defendants in an action.<br><br>Based on the foregoing, the Court finds that Plaintiffs and Mr. Culpepper improperly served the Complaint on Techmodo Limited and Mr. Segaran. The Court thus STRIKES the 42 and 43 Proofs of Service as to these non-parties. If Plaintiffs name Techmodo Limited and/or Mr. Segaran in a subsequent amended pleading, Plaintiffs will need to effect service of process in accordance with Federal Rule of Civil Procedure 4.<br><br>The Court is aware that Mr. Culpepper, as the plaintiffs' counsel, has engaged in the same conduct in at least two other cases: (1) *HB Prods., Inc. v. Doe, et al.*, Civil No. 19-00389 ACK-KJM; and (2) *Wicked Nev., LLC v. Doe, et al.*, Civil No. 19-00413 SOM-KJM. The Court cautions Mr. Culpepper that similar actions in the future will result in the Court striking the plaintiffs' filings. (MAGISTRATE JUDGE KENNETH J. MANSFIELD) (mansfield2) (Entered: 10/28/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/09/2020 19:20:35 | | | |
| **PACER Login:** | TechMarkGLPC:2557109:0 | **Client Code:** | Hurricane |

CM/ECF V6.3.2 **LIVE**                                          https://ecf.hid.uscourts.gov/cgi-bin/DktRpt.pl?353570655963932-L_1_0-1

Case 4:20-cv-05240-DMR Document 1-2 Filed 08/19/20 Page 69 of 89
Case 2:20-cv-01054R Document 1-6 Filed 06/10/20 Page 6 of 5

| Description: | Docket Report | Search Criteria: | 1:19-cv-00169-LEK-KJM Starting with document: 51 Ending with document: 51 |
|---|---|---|---|
| Billable Pages: | 3 | Cost: | 0.30 |

# EXHIBIT 6

Wikipedia - https://en.wikipedia.org/wiki
/Internet_backbone

# WIKIPEDIA

# Internet backbone

The **Internet backbone** may be defined by the principal data routes between large, strategically interconnected computer networks and core routers of the Internet. These data routes are hosted by commercial, government, academic and other high-capacity network centers, the Internet exchange points and network access points, that exchange Internet traffic between the countries, continents, and across the oceans. Internet service providers, often Tier 1 networks, participate in Internet backbone traffic by privately negotiated interconnection agreements, primarily governed by the principle of settlement-free peering.

The Internet, and consequently its backbone networks, do not rely on central control or coordinating facilities, nor do they implement any global network policies. The resilience of the Internet results from its principal architectural features, most notably the idea of placing as few network state and control functions as possible in the network elements and instead relying on the endpoints of communication to handle most of



Each line is drawn between two nodes, representing two IP addresses. This is a small look at the backbone of the Internet.

the processing to ensure data integrity, reliability, and authentication. In addition, the high degree of redundancy of today's network links and sophisticated real-time routing protocols provide alternate paths of communications for load balancing and congestion avoidance.

The largest providers, known as Tier 1 providers, have such comprehensive networks that they do not purchase transit agreements from other providers.[1] As of 2019, there are six Tier 1 providers in the telecommunications industry: CenturyLink (Level 3), Telia Carrier, NTT, GTT, Tata Communications, and Telecom Italia.[2]

## Contents

**Infrastructure**

**History**

**Modern backbone**

**Economy of the backbone**
    Peering agreements
    Regulation
    Transit agreements

**Regional backbone**
    Egypt
    Europe

Internet backbone - Wikipedia                                    https://en.wikipedia.org/wiki/Internet_backbone

Case 4:20-cv-05640-DMR   Document 1-2   Filed 08/19/20   Page 72 of 89
Case 2:20-cv-01034R   Document 1-7-2   Filed 06/10/20   Page 73 of 7

Caucasus

Japan

China

**See also**

**Further reading**

**References**

**External links**

# Infrastructure

The Internet backbone consists of many networks owned by numerous companies. Optical fiber trunk lines consists of many fiber cables bundled to increase capacity, or bandwidth. Fiber-optic communication remains the medium of choice for Internet backbone providers for several reasons. Fiber-optics allow for fast data speeds and large bandwidth, they suffer relatively little attenuation, allowing them to cover long distances with few repeaters, and they are also immune to crosstalk and other forms of electromagnetic interference which plague electrical transmission.[3] The real-time routing protocols and redundancy built into the backbone is also able to reroute



Routing of prominent undersea cables that serve as the physical infrastructure of the Internet.

traffic in case of a failure.[4] The data rates of backbone lines have increased over time. In 1998,[5] all of the United States' backbone networks had utilized the slowest data rate of 45 Mbit/s. However, technological improvements allowed for 41 percent of backbones to have data rates of 2,488 Mbit/s or faster by the mid 2000s.[6]

# History

The first packet-switched computer networks, the NPL network and the ARPANET were interconnected in 1973 via University College London.[7] The ARPANET used a backbone of routers called Interface Message Processors. Other packet-switched computer networks proliferated starting in the 1970s, eventually adopting TCP/IP protocols, or being replaced by newer networks. The National Science Foundation created the National Science Foundation Network (NSFNET) in 1986 by funding six networking sites using 56 kbit/s interconnecting links, with peering to the ARPANET. In 1987, this new network was upgraded to 1.5 Mbit/s T1 links for thirteen sites. These sites included regional networks that in turn connected over 170 other networks. IBM, MCI and Merit upgraded the backbone to 45 Mbit/s bandwidth (T3) in 1991.[8] The combination of the ARPANET and NSFNET became known as the Internet. Within a few years, the dominance of the NSFNet backbone led to the decommissioning of the redundant ARPANET infrastructure in 1990.

In the early days of the Internet, backbone providers exchanged their traffic at government-sponsored network access points (NAPs), until the government privatized the Internet, and transferred the NAPs to commercial providers.[1]

Internet backbone - Wikipedia                                                                                          https://en.wikipedia.org/wiki/Internet_backbone

Case 4:20-cv-05640-DMR   Document 1-2   Filed 08/19/20   Page 73 of 89
Case 2:20-cv-01034R   Document 1-7-2   Filed 06/10/20   Page 4 of 3

# Modern backbone

Because of the overlap and synergy between long-distance telephone networks and backbone networks, the largest long-distance voice carriers such as AT&T Inc., MCI (acquired in 2006 by Verizon), Sprint, and CenturyLink also own some of the largest Internet backbone networks. These backbone providers sell their services to Internet service providers (ISPs).[1]

Each ISP has its own contingency network and is equipped with an outsourced backup. These networks are intertwined and crisscrossed to create a redundant network. Many companies operate their own backbones which are all interconnected at various Internet exchange points (IXPs) around the world.[9] In order for data to navigate this web, it is necessary to have backbone routers—routers powerful enough to handle information—on the Internet backbone and are capable of directing data to other routers in order to send it to its final destination. Without them, information would be lost.[10]

# Economy of the backbone

## Peering agreements

Backbone providers of roughly equivalent market share regularly create agreements called peering agreements, which allow the use of another's network to hand off traffic where it is ultimately delivered. Usually they do not charge each other for this, as the companies get revenue from their customers regardless.[1][11]

## Regulation

Antitrust authorities have acted to ensure that no provider grows large enough to dominate the backbone market. In the United States, the Federal Communications Commission has decided not to monitor the competitive aspects of the Internet backbone interconnection relationships as long as the market continues to function well.[1]

## Transit agreements

Backbone providers of unequal market share usually create agreements called transit agreements, and usually contain some type of monetary agreement.[1][11]

# Regional backbone

## Egypt

The government of Egypt shut down the four major ISPs on January 27, 2011 at approximately 5:20 p.m. EST.[12] Evidently the networks had not been physically interrupted, as the Internet transit traffic through Egypt was unaffected. Instead, the government shut down the Border Gateway Protocol (BGP) sessions announcing local routes. BGP is responsible for routing traffic between

Internet backbone - Wikipedia

https://en.wikipedia.org/wiki/Internet_backbone

Case 4:20-cv-05640-DMR Document 1-2 Filed 08/19/20 Page 74 of 7
Case 2:20-cv-01034-DMR Document 1-2 Filed 06/10/20 Page 6 of 7

ISPs.[13]

Only one of Egypt's ISPs was allowed to continue operations. The ISP Noor Group provided connectivity only to Egypt's stock exchange as well as some government ministries.[12] Other ISPs started to offer free dial-up Internet access in other countries.[14]

## Europe

Europe is a major contributor to the growth of the international backbone as well as a contributor to the growth of Internet bandwidth. In 2003, Europe was credited with 82 percent of the world's international cross-border bandwidth.[15] The company Level 3 Communications began to launch a line of dedicated Internet access and virtual private network services in 2011, giving large companies direct access to the tier 3 backbone. Connecting companies directly to the backbone will provide enterprises faster Internet service which meets a large market demand.[16]

## Caucasus

Certain countries around the Caucasus have very simple backbone networks; for example, in 2011, a woman in Georgia pierced a fiber backbone line with a shovel and left the neighboring country of Armenia without Internet access for 12 hours. The country has since made major developments to the fiber backbone infrastructure, but progress is slow due to lack of government funding.[17]

## Japan

Japan's Internet backbone needs to be very efficient due to high demand for the Internet and technology in general. Japan had over 86 million Internet users in 2009, and was projected to climb to nearly 91 million Internet users by 2015. Since Japan has a demand for fiber to the home, Japan is looking into tapping a fiber-optic backbone line of Nippon Telegraph and Telephone (NTT), a domestic backbone carrier, in order to deliver this service at cheaper prices.[18]

## China

In some instances the companies that own certain sections of the Internet backbone's physical infrastructure depend on competition in order to keep the Internet market profitable. This can be seen most prominently in China. Since China Telecom and China Unicom have acted as the sole Internet service providers to China for some time, smaller companies cannot compete with them in negotiating the interconnection settlement prices that keep the Internet market profitable in China. This imposition of discriminatory pricing by the large companies then results in market inefficiencies and stagnation, and ultimately effects the efficiency of the Internet backbone networks that service the nation.[19]

# See also

- Default-free zone
- Internet2

- Mbone
- Network service provider
- Root name server
- Packet switching
- Trunking

# Further reading

- Greenstein, Shane. 2020. "The Basic Economics of Internet Infrastructure. (https://www.aeaweb.org/articles?id=10.1257/jep.34.2.192)" *Journal of Economic Perspectives*, 34 (2): 192-214. DOI: 10.1257/jep.34.2.192

# References

1. Jonathan E. Nuechterlein; Philip J. Weiser. *Digital Crossroads (https://archive.org/details/digitalcrossroad00jona)*.
2. Zmijewski, Earl (2017). "A Baker's Dozen, 2016 Edition" (https://dyn.com/blog/a-bakers-dozen-2016-edition/). *Dyn Research IP Transit Intelligence Global Rankings*.
3. E. Williams, Edem; Eyo, Essien (2011-12-19). "Building a Cost Effective Network for E-learning in Developing Countries" (https://dx.doi.org/10.5539/cis.v4n1p53). *Computer and Information Science*. **4** (1). doi:10.5539/cis.v4n1p53 (https://doi.org/10.5539%2Fcis.v4n1p53). ISSN 1913-8997 (https://www.worldcat.org/issn/1913-8997).
4. Nuechterlein, Jonathan E., author. *Digital crossroads : telecommunications law and policy in the internet age* (http://worldcat.org/oclc/827115552). ISBN 978-0-262-51960-1. OCLC 827115552 (https://www.worldcat.org/oclc/827115552).
5. Kesan, Jay P.; Shah, Rajiv C. (2002). "Shaping Code" (https://dx.doi.org/10.2139/ssrn.328920). *SSRN Electronic Journal*. doi:10.2139/ssrn.328920 (https://doi.org/10.2139%2Fssrn.328920). ISSN 1556-5068 (https://www.worldcat.org/issn/1556-5068).
6. Malecki, Edward J. (October 2002). "The Economic Geography of the Internet's Infrastructure" (https://dx.doi.org/10.2307/4140796). *Economic Geography*. **78** (4): 399. doi:10.2307/4140796 (https://doi.org/10.2307%2F4140796). ISSN 0013-0095 (https://www.worldcat.org/issn/0013-0095).
7. Kirstein, P.T. (1999). "Early experiences with the Arpanet and Internet in the United Kingdom" (https://pdfs.semanticscholar.org/4773/f19792f9fce8eacba72e5f8c2a021414e52d.pdf) (PDF). *IEEE Annals of the History of Computing*. **21** (1): 38–44. doi:10.1109/85.759368 (https://doi.org/10.1109%2F85.759368). ISSN 1934-1547 (https://www.worldcat.org/issn/1934-1547).
8. Kende, M. (2000). "The Digital Handshake: Connecting Internet Backbones". *Journal of Communications Law & Policy*. **11**: 1–45.
9. Tyson, J. "How Internet Infrastructure Works" (http://computer.howstuffworks.com/internet/basics/internet-infrastructure4.htm). Archived (https://web.archive.org/web/20110614002356/http://computer.howstuffworks.com/internet/basics/internet-infrastructure4.htm) from the original on 14 June 2011. Retrieved 9 February 2011.
10. Badasyan, N.; Chakrabarti, S. (2005). "Private peering, transit and traffic diversion". *Netnomics : Economic Research and Electronic Networking*. **7** (2): 115. doi:10.1007/s11066-006-9007-x (https://doi.org/10.1007%2Fs11066-006-9007-x).

11. "Internet Backbone" (http://www.tech-faq.com/internet-backbone.html). Topbits Website. Archived (https://web.archive.org/web/20110716200149/http://www.tech-faq.com/internet-backbone.html) from the original on 16 July 2011. Retrieved 9 February 2011.

12. Singel, Ryan (28 January 2011). "Egypt Shut Down Its Net With a Series of Phone Calls" (https://www.wired.com/threatlevel/2011/01/egypt-isp-shutdown/). *Wired*. Archived (https://web.archive.org/web/20110501183804/http://www.wired.com/threatlevel/2011/01/egypt-isp-shutdown) from the original on 1 May 2011. Retrieved 30 April 2011.

13. Van Beijnum, Iljitsch. "How Egypt did (and your government could) shut down the Internet" (https://arstechnica.com/tech-policy/news/2011/01/how-egypt-or-how-your-government-could-shut-down-the-internet.ars). *Ars Technica*. Archived (https://web.archive.org/web/20110426155523/http://arstechnica.com/tech-policy/news/2011/01/how-egypt-or-how-your-government-could-shut-down-the-internet.ars) from the original on 26 April 2011. Retrieved 30 April 2011.

14. Murphy, Kevin. "DNS not to blame for Egypt blackout" (http://domainincite.com/dns-not-to-blame-for-egypt-blackout/). Domain Incite. Archived (https://web.archive.org/web/20110404013457/http://domainincite.com/dns-not-to-blame-for-egypt-blackout/) from the original on 4 April 2011. Retrieved 30 April 2011.

15. "Global Internet backbone back up to speed for 2003 after dramatic slow down in 2002". *TechTrends*. **47** (5): 47. 2003.

16. "Europe - Level 3 launches DIA, VPN service portfolios in Europe". *Europe Intelligence Wire*. 28 January 2011.

17. Lomsadze, Giorgi (8 April 2011). "A Shovel Cuts Off Armenia's Internet" (https://www.wsj.com/articles/SB10001424052748704630004576249013084603344). *The Wall Street Journal*. Archived (https://web.archive.org/web/20141225063937/http://www.wsj.com/articles/SB10001424052748704630004576249013084603344) from the original on 25 December 2014. Retrieved 16 April 2011.

18. "Japan telecommunications report - Q2 2011". *Japan Telecommunications Report* (1). 2011.

19. Li, Meijuan; Zhu, Yajie (2018). "Research on the problems of interconnection settlement in China's Internet backbone network" (https://www.sciencedirect.com/science/article/pii/S1877050918305738?via%3Dihub). *Procedia Computer Science*. **131**: 153–157 – via Elsevier Science Direct.

# External links

- About Level 3 (http://www.level3.com/en/about-us/)
- Russ Haynal's ISP Page (http://navigators.com/isp.html)
- US Internet backbone maps (https://web.archive.org/web/20060411203358/http://www.nthelp.com/maps.htm)
- Automatically generated backbone map of the Internet (http://www.opte.org/maps/)
- IPv6 Backbone Network Topology (https://web.archive.org/web/20181028124233/http://ipv6.nlsde.buaa.edu.cn/)

Retrieved from "https://en.wikipedia.org/w/index.php?title=Internet_backbone&oldid=955389099"

This page was last edited on 7 May 2020, at 14:50 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

# EXHIBIT 7

Screen-print of the web page
https://www.techworm.net/2020/04/torre
nt-site-yts-piracy-lawsuit-online.html

# Torrent Site YTS To Pay Million Dollars In Piracy Settlements But Remain Online

By **Kavvitaa S Iyer** - April 25, 2020



**YTS**, one of the most popular and largest visited torrent site on the Internet, has 'settled' yet another piracy lawsuit by agreeing to a consent judgment totaling $1,050,000 in damages, reports TorrentFreak.

The lawsuit against YTS has been filed by a group of seven related movie companies which includes Venice PI LLC, MON LLC, Millennium Funding Inc., Bodyguard Productions Inc., TBV Productions LLC, UN4 Productions Inc., and Hunter Killer Productions Inc.

Usually, when copyright holders file a lawsuit against pirate sites, their main mission is to shut them down permanently; however, some of those cases go into prolonged legal battles.

However, in the case of YTS, the torrent website has been allowed to stay online as long as it paid damages to the seven movie companies and ensured that their films were not listed at the torrent site.

5/27/2020
Case 4:20-cv-05240-DMR Document 1-3 Filed 08/10/20 Page 79 of 89
Case 2:20-cv-01634-RDP Document 1-3 Filed 08/10/20 Page 3 of 4

This settlement method previously became public when Kerry Culpepper, an attorney from Hawaii, who works for Millennium Films, Voltage Pictures, and several of its daughter companies struck a deal between YTS and other movie companies.

According to the consent judgment signed at the Hawaii federal court a few days ago, YTS operator and an associated business have agreed to pay $150,000 to each company, which amounts to a total of $1,050,000 in damages.

The consent judgment lists a person named Senthil Vijay Segaran and the company Techmodo as the YTS operators. Segaran is the same person who in the past had agreed to remove several torrents linking to Millenium and Voltage Films' movies from YTS.

Besides paying over $1 million in piracy damages, the judgment also prevents YTS's operator from distributing and/or promoting torrent files related to the seven movie companies.

> **Also Read-** *Best Free Movie Download Websites*

While YTS has removed the relevant movie torrents from the site, it continues to operate online as usual.

Nothing seems to have changed, as YTS still has hundreds of other pirated movies listed online. However, the site's users continue to remain at risk of being sued although no new lawsuits have been filed in recent weeks.

Here is a copy of the consent judgment, signed by the YTS operator and the seven movie companies.

Case 2:20-cv-61054 Document 1-3 Filed 06/10/20 Page 4 of 4

# EXHIBIT 8

Subpoena to Hurricane Electric LLC
dba Hurricane Electric Internet Services
in the United States District Court
for the District of Hawaii,
Case No. MC 19-00250 JMS-RT

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Hawaii

| | |
|---|---|
| In re Subpoena to Hurricane Electric LLC | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No. MC 19-00250 JMS-RT |
| | ) |
| | ) |
| _Defendant_ | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:       Hurricane Electric LLC dba Hurricane Electric Internet Services
          Registered Agent: MIKE LEBER 760 Mission Court, Fremont, CA 94539

_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Documents sufficient to show the name, address, telephone number, email address and payment records from the customer(s) associated with IP addresses shown in Exhibit "3"
for hosting/supporting movie piracy website YTS

| Place: Kerry S. Culpepper (kculpepper@culpepperip.com) 75-170 Hualalai Road, St B204 Kailua Kona, HI 96740 | Date and Time: 08/02/2019 0:00 am |
|---|---|

❑ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

        The following provisions of Fed. R. Civ. P. 45 are attached    Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: July 12, 2019        SUE BEITIA, CLERK

_CLERK OF COURT_

/S/ SUE BEITIA, CLERK by EA, Deputy Clerk  OR

_____        _____
_Signature of Clerk or Deputy Clerk_                    _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ _____
Hunter Killer Productions, Inc. _____ , who issues or requests this subpoena, are:

Kerry Culpepper, 75-170 Hualalai Rd, #B204, Kailua-Kona, HI 96740; T 808-464-4047; kculpepper@culpepperip.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

| No. | IP address | Hit Date | Infringing Website |
|---|---|---|---|
| 1 | 2001:470:b07e:0:d83a:a3ff:fe5e:ca | 2018-09-19 12:27:05.71563+00 | yts.ag |
| 2 | 216.218.222.14 | 2018-08-24 14:34:20.29611+00 | yts.am |
| 3 | 216.218.222.12 | 2018-03-06 18:11:31.503688+00 | yts.gg |
| 4 | 65.19.167.130 | 2018-02-16 17:55:55.294389+00 | yts.gg |
| 5 | 216.218.222.14 | 2018-02-16 13:19:46.327169+00 | yts.gg |
| 6 | 65.19.167.130 | 2018-10-19 09:16:51.052958+00 | yts.am |

**Exhibit "3"**

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                        *Server's signature*

                                _____
                                        *Printed name and title*

                                _____
                                        *Server's address*

Additional information regarding attempted service, etc.:

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2) For Other Discovery.** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2) Command to Produce Materials or Permit Inspection.**
   **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3) Quashing or Modifying a Subpoena.**
   **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
   **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
   **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
   **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2) Claiming Privilege or Protection.**
   **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

HURRICANE ELECTRIC LLC

**(b)** County of Residence of First Listed Plaintiff   Alameda
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Joshua M. Dickey, Esq., BAILEY KENNEDY, 8984 Spanish Ridge Avenue, Las Vegas, NV 89148; (702) 562-8820 / Neil D. Greenstein, Esq., TECHMARK, 1751 Pinnacle Drive, Suite 1000, Tysons, VA 22102 (347) 514-7717

## DEFENDANTS

MILLENNIUM FUNDING, INC.; BODYGUARD PRODUCTIONS, INC.; UN4 PRODUCTIONS, INC., et al.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Kerry S. Culpepper, Esq., Culpepper IP, LLC, 75-170 Hualalai Road Suite B204, Kailua-Kona, Hawaii 96740

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
     Plaintiff

☒ 3   Federal Question
     *(U.S. Government Not a Party)*

☐ 2   U.S. Government
     Defendant

☐ 4   Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*               *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product |    Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |    Liability | ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander |    Pharmaceutical Personal Injury | | ☒ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' |    Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) |    Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 340 Marine |    Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |    Injury | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - Medical Malpractice | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original Proceeding    ☐ 2   Removed from State Court    ☐ 3   Remanded from Appellate Court    ☐ 4   Reinstated or Reopened    ☐ 5   Transferred from Another District *(specify)*    ☐ 6   Multidistrict Litigation - Transfer    ☐ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
17 U.S.C. §§ 101 et seq.
Brief description of cause:
Copyright Declaratory Judgment Action

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
0.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE                      DOCKET NUMBER

DATE
06/10/2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #       AMOUNT       APPLYING IFP       JUDGE       MAG. JUDGE

**Karen Rodman**

| | |
|---|---|
| **From:** | cmecf@nvd.uscourts.gov |
| **Sent:** | Wednesday, June 10, 2020 5:17 PM |
| **To:** | cmecfhelpdesk@nvd.uscourts.gov |
| **Subject:** | Activity in Case 2:20-cv-01034 Hurricane Electric LLC v. Millennium Funding, Inc. et al Complaint |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### United States District Court

### District of Nevada

### Notice of Electronic Filing

The following transaction was entered by Dickey, Joshua on 6/10/2020 at 5:17 PM PDT and filed on 6/10/2020

| | |
|---|---|
| **Case Name:** | Hurricane Electric LLC v. Millennium Funding, Inc. et al |
| **Case Number:** | 2:20-cv-01034 |
| **Filer:** | Hurricane Electric LLC |
| **Document Number:** | 1 |

**Docket Text:**
**COMPLAINT against All Defendants (Filing fee $400 receipt number 0978-6038323) by Hurricane Electric LLC. Proof of service due by 9/8/2020. (Attachments: # (1) Index of Exhibits, # (2) Exhibit 1, # (3) Exhibit 2, # (4) Exhibit 3, # (5) Exhibit 4, # (6) Exhibit 5, # (7) Exhibit 6, # (8) Exhibit 7, # (9) Exhibit 8, # (10) Civil Cover Sheet) (Dickey, Joshua)**

**NOTICE of Certificate of Interested Parties requirement: Under Local Rule 7.1-1, a party must immediately file its disclosure statement with its first appearance, pleading, petition, motion, response, or other request addressed to the court.**

**2:20-cv-01034 Notice has been electronically mailed to:**

Joshua M Dickey     jdickey@baileykennedy.com, bkfederaldownloads@baileykennedy.com, krodman@baileykennedy.com, smurnane@baileykennedy.com

**2:20-cv-01034 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

 **Document description:**Main Document
**Original filename:**n/a

**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1101333072 [Date=6/10/2020] [FileNumber=9788222-0
] [47c139750a1cd363f389d7dba2cf4d9e474e5f871d58922a3fd26e66357afa9aed8
4a99bb03e555c961c0d2aabd52d792626fd502837dba6bc4308587ba23a63]]
**Document description:**Index of Exhibits
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1101333072 [Date=6/10/2020] [FileNumber=9788222-1
] [8681dccae4f31399bf9fa2d6139960ed2331bd344d41095a67c4a435a69862a01d3
1e1761ff614442aefda58e7dade423f2a0af980d3a6857f79d15df3242bbf]]
**Document description:**Exhibit 1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1101333072 [Date=6/10/2020] [FileNumber=9788222-2
] [72ed23e64f8caed5a21b20655a8886f426d2d12f85d6f4a0697207ed44f08ab62a3
d2027fabecf946a441678661e66cdff78cb76617f7e19b2d7d589e24507b9]]
**Document description:**Exhibit 2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1101333072 [Date=6/10/2020] [FileNumber=9788222-3
] [885abff7b43984810a1313fccf07476ab6ea4fecfec6f0b243074321a2262a06e03
43af21aee2904632caa56ebd187f79fae8be48192bd9bf2e5669ab6dcf4e2]]
**Document description:**Exhibit 3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1101333072 [Date=6/10/2020] [FileNumber=9788222-4
] [e3fa500ea479ec8187f1389e264ac14bd9c8a509ac67cc7c3db530fe9027a12819f
aa1f2b3466a1d9ccca00bbf4b50b1a5a6d6834135b003fc34c1c5247fe2c3]]
**Document description:**Exhibit 4
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1101333072 [Date=6/10/2020] [FileNumber=9788222-5
] [1234e3bf1931a698aeef8c5e8e56f807068a7f0bc2fc837f6c7551d337339e17cf5
4e139a66795b4df0495e2ab4cb298f325793f55fcfdc205fa2eb0f975d874]]
**Document description:**Exhibit 5
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1101333072 [Date=6/10/2020] [FileNumber=9788222-6
] [4af40cf343b08ea9e450ebb70809629c5d9374ea9c5eb62648d5d13e0a8bf4e110e
7001925eb638c9c699b765bd9fa6f766cebaf79f7fd1a277ff4ec3babdf2b]]
**Document description:**Exhibit 6
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1101333072 [Date=6/10/2020] [FileNumber=9788222-7
] [57fbea7b4051e8c5d6cfdd16512384e3eb1e60d54f398e0b725b896a04d7391a2d4
13bfaff8c8db16152c9e0867fefde3c64798cdab67100de77106f2ae50bf5]]
**Document description:**Exhibit 7
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1101333072 [Date=6/10/2020] [FileNumber=9788222-8
] [4f2fe7fe6fd12bdc1c93392b66f43b356ade168299ac628c1bdaad59abe007bfe54
b72d314c01e1b713a24965e15eca09bb9b4978ed00fd509cd0c1f57cdff72]]
**Document description:**Exhibit 8
**Original filename:**n/a

2

**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1101333072 [Date=6/10/2020] [FileNumber=9788222-9
] [427322a38378fdadbb15ed300eb220e979b93c8decef4ecebe60581c355c3f1bca1
5348cd9babc5e9d28396f93d5c93f459121777736261a9e47d30c511a593f]]
**Document description:**Civil Cover Sheet
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1101333072 [Date=6/10/2020] [FileNumber=9788222-1
0] [9fc95e0869c015bf2102b73af9e2fb9a2ab88d2e554c683656f777abae55e630cb
7ea83bb8a5359eb0e4c87d30c64d1e9164953c23381b21aa07864eaa3399fd]]