1

**GAUNTLETT & ASSOCIATES**
David A. Gauntlett (SBN 96399)
James A. Lowe (SBN 214383)
18400 Von Karman, Suite 300
Irvine, California 92612
Telephone:    (949) 553-1010
Facsimile:     (949) 553-2050
jal@gauntlettlaw.com

2

3

4

5

Attorneys for Plaintiff
Hurricane Electric, LLC

6

7

8

9

10

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

11

12

13

14

15

16

17

18

19

20

| | |
|---|---|
| HURRICANE ELECTRIC, LLC, a Nevada limited liability company,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, an Illinois corporation,<br><br>　　　　　　Defendant. | Case No.: 3:20-cv-05840-CRB<br><br>Judge Charles R. Breyer<br><br>**NOTICE OF MOTION AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANT NATIONAL FIRE'S DUTY TO DEFEND**<br><br>Date:   November 13, 2020<br>Time:  10:00 a.m.<br>Ctrm:  6 |

21

22

23

24

25

26

　　　　**PLEASE TAKE NOTICE** that, pursuant to Fed. R. Civ. P. 56 and Civil Local Rules 56-1 and

7-2 of the United States District Court for the Northern District of California, at the United States

Courthouse, 17th Floor, Courtroom 6, 450 Golden Gate Avenue, San Francisco, California 94102,

Plaintiff Hurricane Electric, LLC ("HE") will move on November 13, 2020 at 10:00 a.m. or as soon

thereafter as possible for summary judgment on the grounds that Defendant and insurer National Fire

Insurance Company of Hartford, an Illinois Corporation ("NFI") failed to provide the defense required

27

28

to its insured, arising out of an underlying demand letter from Claimant as described in a declaratory relief action pursued before this court by *Hurricane Electric, LLC* v. *Dallas Buyers Club, LLC, et al.*, Case No. 4:20-CV-03813 in the United States District Court for the Northern District of California, herein after referred to as the "Declaratory Relief Action." [Greenstein Decl. ¶ 4]

Dated:  October 9, 2020

**GAUNTLETT & ASSOCIATES**

By:    /s/ David A. Gauntlett
          David A. Gauntlett
          James A. Lowe

Attorneys for Plaintiff,
Hurricane Electric, LLC

**TABLE OF CONTENTS**

Page

I. PRELIMINARY STATEMENT ................................................................... 1

    A. Summary of Argument ................................................................ 1

    B. NFI's Commercial General Liability Policy ........................................ 2

    C. NFI's Denial of Any Duty to Defend the C&D Letter Claims ...................... 3

    D. No Suit Need Be Filed Against HE Because a Mediation Occurred ................ 3

II. PERTINENT COVERAGE LAW PRINCIPLES SUPPORT IMPOSITION OF A
DEFENSE DUTY ON NFI ...................................................................... 4

    A. Defense Duty Exists Because of *Potential* Coverage Based on Facts, *Not
Labels* ......................................................................... 4

    B. A Factual Dispute About Whether an Offense Is Alleged *Establishes* the
Duty ........................................................................... 5

    C. A Five Part Test to Establish Potential Coverage Arises Under NFI's Policy
.................................................................................. 5

III. THE FIVE PART TEST TO ESTABLISH POTENTIAL COVERAGE IS MET ..... 5

    A. Element One Is Met: "Damages Because of" ...................................... 5

        1. Pertinent NFI 2015 Policy Language ....................................... 5

        2. "Damages because of" is Not Defined in the NFI 2015 Policy ............. 5

        3. The Policy Requires No Nexus Between Advertising and Damages
.............................................................................. 6

    B. Element Two Is Met: "Personal or Advertising Injury," i.e. "Injury
Arising Out Of" "Offense (g)" ................................................... 7

        1. Injury "Arising Out Of" As Used In The Definition Of
"Advertising Injury" Is Undefined In NFI's 2015 Policy ................... 7

        2. The C&D Letter Alleged That End Users Utilized IPv4 Addresses
And An IPv6 Address To Commit Infringement In 2018
Originating From The Google Advertisements .............................. 7

        3. The C&D Letter Contends That The HE Portal To The Internet
Created Copyright Infringement Exposure ................................ 8

    C. Element Three is Met: Copyright Infringement Under The 2015 Policy ....... 9

     **D.**     **Element Four Is Met: An "Advertisement"** ................................................**9**

          **1.**     **"Advertisement" Is Broadly Defined In NFI's Policy**........................**9**

          **2.**     **Under This Definition The IPv6 Tunnel Broker Webpage Constitutes An "Advertisement"** ............................................**9**

          **3.**     **HE's Internal Outreach Is An "Advertisement" Under California Case Law** ..............................................................**10**

     **E.**     **Element Five Is Met: "In Your 'Advertisement'"**.......................................**11**

          **1.**     **The C&D Letter's Demands for Damages "Originat[ed] From" HE's 2015 Advertisement of its IPv6 Tunnel Broker Service** ............**11**

          **2.**     **The Google Advertisement Highlighted HE's Unique Internet Accessibility Enhancement Features** ......................................**11**

          **3.**     **The IPv6 Tunnel Broker Advertisement For HE's "Internet Service" Implicated Potential Liability Under Offense (g)** .................**12**

**IV.**     **NO EXCLUSION RAISED IN THE ANSWER OF NFI BARS A DEFENSE** .........**12**

     **A.**     **The Intellectual Property Exclusion Contains an Exception for "Infringement of Copyright In Your 'Advertisement'" Applicable Here** .....**12**

     **B.**     **The "Limited Endorsement" Referenced Only in a Truncated Declaration Reference is No Bar To Coverage** ....................................................**13**

          **1.**     **NFI Curiously Asserts A Limited Endorsement That Is Not Present in NFI's 2015 Policy** ..........................................................**13**

          **2.**     **NFI's Failure To Advise HE of the Elimination of All "Advertising Injury" Coverage Renders Its "Limited Endorsement" Policy Language Unenforceable** ..................................................**14**

          **3.**     **Non Delivery Of The Limited Endorsement Means It Is Unenforceable** ..........................................................**14**

          **4.**     **NFI's "Limited Endorsement" That Fails To Inform HE Of The Purported Reduction In Coverage In A Renewal Policy Is Unenforceable** ..........................................................**15**

          **5.**     **The "Limited Endorsement" (Even if it Were Included in the 2015 Policy) Renders NFI's Express Coverage for "Advertising Injury" Illusory**..........................................................**16**

     **C.**     **HE Is Neither An Internet Service Provider ("ISP") Nor A Direct Access Link To An ISP So That The "ISP Exclusion" Is No Bar To A Defense** .......**19**

          **1.**     **The "ISP Exclusion"** ..........................................................**19**

2.   The Only Case to Address "Access" Under the ISP Exclusion, *Sony*, Found For The Insured On Less Compelling Grounds ...................... 20

3.   Mere Facilitation of an Interaction That Would Satisfy the Definitional Component of the Policy Does Not Satisfy the "Is Element".................................................................................................. 21

4.   As in *Sony*, HE Engaged in Business Unrelated to Internet Access ... 22

5.   The Analogous "Business of 'Publishing'" Exclusion Has Been Narrowly Construed by Courts  ............................................................. 24

V.   CONCLUSION.................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

State Cases

*Atl. Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017 (2002) .......................................... 6, 19

*Elliano v. Assurance Co. of Am.*, 3 Cal. App. 3d 446 (1970) ...................................... 14

*Fireman's Fund Ins. Cos. v. Atl. Richfield Co.*, 94 Cal. App. 4th 842 (2001) ............................ 16

*Hyundai Motor Am. v. Natl. Union Fire Ins. Co. of Pittsburgh, PA*, 600 F.3d 1092 (9th Cir. (Cal.) 2010) ........................................................................................ 4

*Marauez Knolls Prop. Owners Ass'n, Inc. v. Exec. Risk Indem., Inc.*, 153 Cal. App. 4th 228 (2007) ................................................................................ 18

*Mirpad, LLC v. Calif. Ins. Guar. Ass'n*, 132 Cal. App. 4th 1058 (2005) .......................... 5

*Safeco Ins. Co. v. Robert S.*, 26 Cal. 4th 758 (2001) ............................................ 16, 18, 25

*Sarchett v. Blue Shield of California*, 43 Cal. 3d 1 (1987) .................................... 15

*Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643 (2005) .................................... 4

*State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal. 3d 94 (1973) ................................ 7

*Terra Nova Ins. Co. v. Fray-Witzer* 869 N.E.2d 565 (Mass. 2007) .............................. 16

*Wiliden v. Washington Nat'1 Ins. Co.*, 18 Cal. 3d 631 (1976) ................................ 17

*Zurich Am. Ins. v. Sony Corp. of Am.*, No. 651982/2011, 2014 N.Y. Misc. LEXIS 5141 (Sup. Ct. Feb. 21, 2014) ................................................................ 20, 22, 23

Federal Cases

*Allstate Ins. Co. v. Fibus*, 855 F.2d 660 (9th Cir. (Cal.) 1988) ................................ 18

*Am. Cas. Co. v. Continisio*, 819 F. Supp. 385 (D.N.J. 1993) .................................. 22

*American Employers' Insurance Co. v. DeLorme Publishing Co. Inc.*, 39 F.Supp.2d 64 (D. Maine, 1999) ............................................................ 24

*Benchmark Ins. Co. v. Dismon Corp.*, 2016 U.S. Dist. LEXIS 192404 (C.D. Cal. Aug. 9, 2016), No. CV 15-01539 TJH (FFMx) ................................................ 15

*Cont'l Ins. Co. v. Barratt Am.*. Case Number 94-0035-IEG (CGA), 1995 U.S. Dist. LEXIS 19016 (S.D. Cal. Sep. 29, 1995) .......................................... 14

*First Mercury Ins. Co. v. Sudderth*, 620 F. App'x 826 (11th Cir. 2015) ...................... 17

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942 (S.D. Cal. 2014) ................................................................ 20

*Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025 (9th Cir. (Cal.) 2008)..................................................................................................................... 19

*My Choice Software, Ltd. Liab. Co. v. Travelers Cas. Ins. Co. of Am.*, No. 19-56030, 2020 U.S. App. LEXIS 26328 (9th Cir. Aug. 19, 2020)............................. 13

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Mead Johnson & Co. LLC*, 735 F.3d 539 (7th Cir. 2013)........................................................................................... 21

*Princeton Express & Surplus Ins. Co. v. DM Ventures USA LLC*, 209 F. Supp. 3d 1252 (S.D. Fla. 2016) ............................................................................... 17, 18

*Saltarelli v. Bob Baker Grp. Med. Trust*, 35 F.3d 382 (9th Cir. (Cal.) 1994) .............................. 18

*State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am.* 343 F.3d 249 (4th Cir. 2003) .................................................................................................. 24

*State Farm Fire & Cas. Co. v. Franklin Ctr.* E.D.Va., No. 1:13-cv-957 AJT/TRJ (2014) U.S. Dist. LEXIS 47051 ...................................................................... 25

*W. Int'l Syndication Corp. v. Gulf Ins. Co.*, No. CV 04-2349-RGK (JWJx), 2004 U.S. Dist. LEXIS 17867 (C.D. Cal. Sep. 1, 2004) ......................................... 25

*West Trend, Inc. v. AMCO Ins. Co.*, CV 14-06872-RGK (PLAx), 2015 U.S. Dist. LEXIS 6807 (C.D. Cal. Jan. 9, 2015) .............................................................. 10

Dictionaries

*Merriam-Webster Dictionary* (2020) ............................................................................... 21

*Wolters Kluwer Bouvier Law Dictionary Desk Edition* (2012) .................................... 20

Treatises

*Insurance Claims* and *Disputes*: *Representation* of
*Insurance Companies* and Insureds, Allan Windt © 2007................................ 15, 16

Other Authorities

Washington, D.C. Department of Insurance, Securities and Banking, *Hiscox Insurance Company Inc.* ....................................................................................... 22

**HE'S MOTION FOR SUMMARY JUDGMENT
ON DEFENDANT NFI'S DUTY TO DEFEND
3:20-cv-05840-CRB**

## I.   PRELIMINARY STATEMENT

### A.   Summary of Argument

NFI defines personal and advertising injury as containing five elements: (1) Damages because of (2) **advertising injury** (injury 'arising out of' personal and advertising injury), sub defined to encompass element (g), which provides "infringing upon another's copyright…in your advertisement." It in turn requires (3) infringing upon another's copyright (5) in your (4) "advertisement[s]." [Gauntlett Decl. ¶ 6; Dkt. 1-6] Each of the five elements is potentially met by the C&D Letter, thereby triggering NFI's duty to defend HE.

The Declaratory Relief Action by Claimant which sought monetary damages responds to a March 19, 2020 cease and desist letter (the "C&D Letter"). It states:

> Thousands of infringements of my clients' motion pictures have occurred at the above [five] IP addresses. . . . . Remedies available to [Claimants] include: . . . Actual and statutory damages of up to $150,000/motion picture; and costs and attorney's fees. [Ng Decl. ¶ 7; Dkt. 1-3]

NFI's policy extends to coverage for damages because of "[p]ersonal and advertising injury" defined as (g) "Infringing upon another's copyright…in your "advertisement."" [Gauntlett Decl. ¶ 6; Dkt. 1-6] HE seeks summary judgment because: the factual allegations in the C&D Letter as clarified by the proposed claimants' counterclaim evidence violations of deceptive trade practice statues and assertions of false advertising claims, implicating a duty to defend under offense (g) of NFI's 2015 Policy.

The "copyright infringement" asserted in the C&D Letter and clarified by Claimants' proposed counterclaim is based on the C&D Letter's broad statement that

> [T]he Internet [S]ervice [HE] provides to its subscribers at IP addresses . . . . ha[s] [been used] repeatedly [by subscribers to] infringe[] the copyright in [Claimants'] motion pictures . . . . [Claimants] request that: (1) HE agree to immediate[ly] terminate all Internet [S]ervice to the subscribers at the above IP addresses; (2) HE agrees to take the appropriate action to terminate subscriber accounts in response to all further copyright notifications received from [Claimants'] agent; and (3) pay a portion of my clients' damages. [Ng Decl. ¶ 8; Dkt. 1-3]

No exclusion eliminates NFI's duty to defend, as the Affirmative Defenses addressing

exclusions for the first time in NFI's Answer require a defense:

**First**, the Sixth Affirmative Defense in (¶ 141) asserts an exception to the intellectual property exclusion directly implicated here for "infringement in your 'advertisement' of copyright."

**Second**, the Fourth and Fifth Affirmative Defenses address a "Limited Endorsement" (¶¶ 139-140) whose provisions were not included in the 2015 Policy issued to HE. [Dkt. 1-6] In any event, those provisions evidence that it cannot be enforced to bar coverage for "advertising injury" which HE's 2015 Policy purports to insure with $1,000,000 of coverage, and the "Limited Endorsement" does not explain that its redefinition of terms seeks to eliminate "advertising injury" coverage by sleight of hand without notice to HE. Rewriting this exclusion to bar any coverage for HE also renders its "Limited Endorsement" redundant.

**Third**, in its Seventh Affirmative Defense, (¶ 142) NFI narrowly construes its status based exclusion which is limited to "An Internet search…provider" that is not HE's business model. NFI does not explain how HE's outreach to vendors by advertising accessing the Internet place it within this exclusion addressed to the downstream ISP vendors who secure resource transact business with users on the Internet. NFI's construction of this exclusion would require a wholesale rewrite of its provisions under the guise of "interpretation." No court has countenanced in truncating the application of similar exclusions.

**B.    NFI's Commercial General Liability Policy**

NFI issued to HE the 2015 Policy. [Gauntlett Decl. ¶ 3; Dkt. 1-6] The 2015 Policy incorporates occurrence-based coverage per Form CG0001 4-13. The 2015 Policy provides a "Personal & Advertising Injury" limit of $1,000,000 and a "General Aggregate" limit of $2,000,000. [Gauntlett Decl. ¶ 5; Dkt. 1-6]

The 2015 Policy states in pertinent part:

> COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY
> 1. Insuring Agreement
> a. We will pay those sums that the Insured becomes legally obligated to pay as

damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the Insured against any suit seeking those damages. . . . .We may, at our discretion, investigate any offense and settle any claim or suit that may result. . . .

…

SECTION V – DEFINITIONS

1. Advertisement means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet . . . ; and

b. Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

…

14. . . . [A]dvertising injury means injury . . . arising out of one or more of the following offenses: . . .

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement."

…

18. Suit means a civil proceeding in which damages because . . . "advertising injury" to which this insurance applies are alleged. Suit includes: . . .

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the Insured submits . . . . [Gauntlett Decl. ¶ 6; Dkt. 1-6]

### C.   NFI's Denial of Any Duty to Defend the C&D Letter Claims

On or about May 27, 2020, HE gave notice to NFI through CNA, the parent company of NFI, of the alleged copyright claims made against HE. [Greenstein Decl. ¶ 2; Dkt. 1-7] CNA functions as NFI's claim representative entity that interacts with insureds on behalf of NFI, through its insurance broker. [Greenstein Decl. ¶ 2] HE requested that NFI provide coverage for the claims. [Greenstein Decl. ¶¶ 2-4; Dkt. 1-8] NFI sent an acknowledgement notice email dated June 4, 2020. [Greenstein Decl. ¶ 3; Dkt. 1-8] By letter dated July 1, 2020, NFI acknowledged tender of the matter but denied HE coverage for the alleged claims of copyright infringement. In its denial letter, NFI denied coverage based on its stated view that NFI had no duty to defend or indemnify HE in the absence of a "suit." [Greenstein ¶ Decl. 4; Dkt. 1-9]

### D.   No Suit Need Be Filed Against HE Because a Mediation Occurred

HE submitted a demand for policy benefits in connection with a notice of mediation, but NFI did not agree to participate in mediation, which was scheduled for July 30, 2020. [Greenstein Decl. ¶

6; Dkt. 1-10] NFI also asserted in its denial letter that the HE Declaratory Relief Actions did not allege an "advertising injury" offense within the NFI policy period. [Greenstein Decl. ¶ 5; Dkt. 1-9] NFI failed to identify any facts to support its assertion that the HE Declaratory Relief Actions do not assert any claims for "advertising injury."

On July 30, 2020 HE and Claimants mediated the disputes addressed in the HE Declaratory Relief Actions. [Greenstein Decl. ¶ 6; Dkt. 1-10] A "mediation" is an "alternative dispute resolution" proceeding within the meaning of NFI's policy because per section "3-4. ADR Options" of the local rules on Alternative Dispute Resolution for the Northern District of California state that: "[t]he court sponsored ADR options . . . include: . . . 2. mediation." [Greenstein Decl. ¶ 9; Dkt. 1-11] NFI's representative, Catherine Gardner, was duly advised about the mediation on Friday July 24, 2020. [Dkt. 1-10] This event occurred one week prior to the mediation. NFI's agreement to allow the mediation to proceed to resolve these disputes was not a requirement to proceed. [Greenstein Decl. ¶ 6]

Moreover, in an email on July 28, 2020, NFI acknowledged the communications and declined to participate in the mediation. [Greenstein Decl. ¶ 6; Dkt. 1-10] Under the terms of the 2015 Policy, NFI cannot refuse to agree that a mediation proceeding after its declination of a defense does not satisfy the definition of an "alternative dispute resolution" within the suit provision of its policy. NFI has not revisited the potential for coverage in light of the fact that the suit requirement in its policy has now been met. [Greenstein Decl. ¶ 8]

## II.   PERTINENT COVERAGE LAW PRINCIPLES SUPPORT IMPOSITION OF A DEFENSE DUTY ON NFI

### A.   Defense Duty Exists Because of *Potential* Coverage Based on Facts, *Not Labels*

California law requires NFI's defense whenever there is a *mere potential* for coverage. *Hyundai Motor Am. v. Natl. Union Fire Ins. Co. of Pittsburgh, PA*, 600 F.3d 1092, 1097 (9th Cir. (Cal.) 2010) ("The obligation to defend can be excused only when the third party complaint can by **no conceivable theory** raise a single issue which could bring it within the policy coverage." (quotation omitted, emphasis added)). *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 654 (2005) ("[T]he

duty to defend [arises] where, **under the facts alleged, reasonably inferable, or otherwise known,** the complaint could fairly be amended to state a covered liability." (emphasis added)).

### B.   A Factual Dispute About Whether an Offense Is Alleged *Establishes* the Duty

As Judge Croskey held in *Mirpad, LLC v. Calif. Ins. Guar. Ass'n*, 132 Cal. App. 4th 1058, 1068 (2005), "If coverage depends on an unresolved dispute over a *factual* question, the very existence of that dispute would establish a possibility of coverage and thus a duty to defend." NFI cannot meet its heavy burden to prove the fact allegations do not implicate potential coverage "under any conceivable theory."

### C.   A Five Part Test to Establish Potential Coverage Arises Under NFI's Policy

The five elements derived by NFI's Policy are: (1) "As damages"; (2) "because of 'injury arising out of'"; (3) "(g) infringing upon another's copyright"; (5) "in your"; (4) "advertisement." [Dkt. 1-6]

## III.   THE FIVE PART TEST TO ESTABLISH POTENTIALCOVERAGE IS MET

### A.   Element One Is Met: "Damages Because of"

#### 1.   Pertinent NFI 2015 Policy Language

We will pay those sums that the Insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.

The 2015 Policy goes on to define "advertising injury" as:

14. . . [I]njury . . . arising out of . . . : . . .
g. Infringing upon another's copyright . . . in your "advertisement." [Dkt. 1-6]

#### 2.   "Damages because of" is Not Defined in the NFI 2015 Policy

"Damages because of" means "damages" for "advertising injury" caused by "infringement in your advertisement." Copyright infringement is comprised of two elements ownership of a valid copyright and the copying of constituent elements of the work that are original.  The C&D Letter alleges "damages because of" for the following reasons:

**First,** the C&D Letter explicitly states that it wants HE "to pay a portion of [Claimants] damages." These damages stem from the "Internet Service[s]" that HE provides to customers. These

customers allegedly have IP addresses associated with that allegedly downloaded movies from websites by allegedly using HE's "Internet [S]ervice"; [Dkt. 1-3]

**Second,** the C&D Letter states that the Claimants are "the owners of the copyright motion pictures . . ."; [Dkt. 1-3]

**Third,** absent the advertisements HE customers would not have signed up for these "Internet [S]ervice[s]" and the alleged infringers could not have allegedly downloaded the movies. Without the alleged ability to download movies there would be no "damages" in this case;

**Fourth,** "Internet [S]ervice" is not defined by the C&D Letter and is reasonably construed to include the services that HE advertised for in the Google advertisement and the IPv6 Tunnel Broker webpage advertisement; [Dkt. 1-3]

**Fifth**, the "damages because of" requirement is met here since the Claimants' C&D Letter is seeking monetary damages against HE that allegedly arise from HE's advertisements. In other words, HE Customers/End-Users signed up for "Internet [S]ervice[s]," referenced in the C&D letter, "because of" HE's advertisements. It led to the Claimants' assertion for damages for the alleged infringement by end users. [Ng Decl. ¶¶ 8; Dkt. 1-3] HE, however, contests that its advertisements encouraged the alleged infringement.

### 3.    The Policy Requires No Nexus Between Advertising and Damages

NFI's 2015 Policy is triggered by an offense, **not** injury or damages. As the court in *Atl. Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017, 1032 (2002) stated,

> [**Advertising injury**] . . . is a term of art that describes coverage for certain enumerated offenses that are spelled out in the policy. . . . Coverage . . . **is not determined by the nature of the damages sought** in the action against the insured, but by *the nature of the claims* . . . . '[**c**]**overage** ... **is triggered by the *offense*, not the injury or damage which a plaintiff suffers.**' (italics original, bold emphasis added).

Thus, NFI's 2015 Policy requires no causal connection between the offense and damages.  It only

requires a damage remedy for the claims potentially within the offense.

**B.      Element Two Is Met: "Personal or Advertising Injury," i.e. "Injury Arising Out Of" "Offense (g)"**

**1.      Injury "Arising Out Of" As Used In The Definition Of "Advertising Injury" Is Undefined In NFI's 2015 Policy**

In California "arising out of" as used in an Insuring Agreement means almost any causal relationship. (*State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal. 3d 94, 100 (1973) ("Past California cases have established beyond contention that this language of "arising out of the use," *when utilized in a coverage or insuring clause of an insurance policy*, has broad and comprehensive application, and affords coverage for injuries bearing almost *any* causal relation[.]" (Original Emphasis.))). The C&D Letter alleges that HE's "Internet [S]ervice[s]" advertised in HE's Google advertisement were used by end-users of those services to commit the alleged copyright infringement. [Ng Decl. ¶ 8; Dkt. 1-3]

**2.      The C&D Letter Alleged That End Users Utilized IPv4 Addresses And An IPv6 Address To Commit Infringement In 2018 Originating From The Google Advertisements**

The C&D Letter alleged that IPv4 addresses were utilized to commit infringement on February 16, 2018, March 6, 2018, and August 24, 2018. [Dkt. 1-3] Some of these IPv4 addresses are associated with HE customers who signed up for HE's Backbone and IP Transit service in 2015 in response to the Google advertisement. [Ng Decl. ¶ 10] Without the advertisement for HE's Backbone and IP Transit service the customers would not have signed up for these "Internet [S]ervice[s]" as referenced in the C&D Letter, [Ng Decl. ¶ 8] nor could they have committed the alleged copyright infringement. Without these services, the copyright infringement the end users allegedly committed could not have occurred. HE, however, contests that it encouraged anybody to commit copyright infringement with the advertisement. The C&D Letter's reference to end users allegedly employing HE's "Internet [S]ervice" is broad and undefined and can be reasonably construed to include HE's Backbone and IP Transit service. [Ng Decl. ¶ 8; Dkt. 1-3] Thus, the C&D Letter alleges an "injury" that originates from

or has its origin in HE's Google advertisement published during the 2015 Policy.

### 3. The C&D Letter Contends That The HE Portal To The Internet Created Copyright Infringement Exposure

The C&D Letter alleges that an IPv6 address was utilized to commit the alleged infringement on September 19, 2018. [Dkt. 1-3] HE's Google advertisement for services during the 2015 Policy advertised services including:

> IP Transit For Your Network, Reach More Networks With Lower Latency. Price Matching. Turn up within 7 days. 24 x 7 NOC. Features: Port Availability, Flexible Billing, Rapid Turnaround Capability, Ability To Grow With You. [Ng Decl. ¶ 5; Dkt. 1-12]

A reasonable inference arises from the C&D Letter that Claimants will assert customers that signed up during the 2015 Policy allegedly committed copyright infringement at a later date before the expiration of the Statute of Limitations through HE's IPv6 Tunnel Broker because the C&D Letter lists an IPv6 address associated with an HE customer that allegedly committed copyright infringement demonstrating IPv6 infringement can allegedly occur. [Ng Decl. ¶ 7; Dkt. 1-3]

Without the advertisement for HE's IPv6 Tunnel Broker HE customers and other non-associated end users would not have utilized this "Internet [S]ervice" as referenced in the C&D Letter and would have been unaware that the service was free.

Claimants have referenced "[t]housands" of alleged copyright infringement at five IP addresses—including the noted IPv6 address—listed in the C&D Letter. [Ng Decl. ¶ 7; Dkt. 1-3] Without the advertisement, the end users associated with customers who utilized the IPv6 Tunnel Broker could not have committed the alleged infringement. No end user would switch to an IPv6 system without knowing first that it worked by facilitating IPv4 system access through an IPv6 system.

The C&D Letter alleges that the IPv6 address utilized HE's "Internet [S]ervice," which can be reasonably construed to include the service provided in the IPv6 Tunnel Broker. [Dkt. 1-3] HE's IPv4 and IPv6 customers gain access to HE's Backbone and IP Transit service, both referenced in the Google Advertisement. [Ng Decl. ¶ 5; Dkt. 1-12]

**C.     Element Three is Met: Copyright Infringement Under The 2015 Policy**

Copyright infringement has two essential elements. **First,** ownership of a valid copyright. **Second,** copying of constituent elements of the work that are original. Regarding the first element, the C&D Letter states the Claimants are "the owners of the copyright protected motion pictures . . ." [Ng Decl. ¶ 7; Dkt. 1-3] The first element is met. As to the second element, the C&D Letter alleges that IP addresses associated with HE's customers committed "[t]housands of infringements of [Claimants'] motion pictures[,]" and that IPv4 addresses and an IPv6 address utilized HE's "Internet [S]ervice," to access "movie piracy websites." [Ng Decl. ¶ 7; Dkt. 1-3] These allegations satisfy the second element of copyright infringement.

**D.     Element Four Is Met: An "Advertisement"**

**1.     "Advertisement" Is Broadly Defined In NFI's Policy**

The Policy provides:

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:
**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and
**b.** Regarding websites, only that part of a website that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement. [Dkt. 1-6]

**2.     Under This Definition The IPv6 Tunnel Broker Webpage Constitutes An "Advertisement"**

The IPv6 Tunnel Broker webpage is a "notice . . . broadcast . . . to a specific market segment," i.e. IPv4 developers, and experimenters.  [Ng Decl. ¶ 2; Dkt. 1-13] The IPv6 Tunnel Broker webpage is a "web site[] . . . that is about [HE's] goods, products, or services for the purpose of attracting customers or supporters . . . ." [Ng Decl. ¶ 2; Dkt. 1-13] The IPv6 Tunnel Broker is free to encourage developers and experimenters to be sure their devices, software, and webpages are compatible with IPv6. [Ng Decl. ¶ 3; Dkt. 1-13] This incentivizes these groups to switch from an IPv4 address to an IPv6 address from which HE would profit since it offers IPv6 connections. [Ng Decl. ¶ 3] The IPv6

Tunnel Broker webpage's entire purpose is to "attract[] customers" to switch from IPv4 to IPv6, for which HE is the world leader. [Ng Decl. ¶ 3] Thus, the IPv6 Tunnel Broker webpage constitutes an "advertisement" within the terms of the 2015 Policy.

During the 2015 Policy, and prior to the customers signing up for the IPv6 Tunnel Broker service in March, 2015, the IPv6 Tunnel Broker webpage stated:

> Welcome to the Hurricane Electric IPv6 Tunnel Broker! Our free tunnel broker service enables you to reach the IPv6 Internet by tunneling over existing IPv4 connections from your IPv6 enabled host or router to one of our IPv6 routers. To use this service you need to have an IPv6 capable host (IPv6 support is available for most platforms) or router which also has IPv4 (existing Internet) connectivity. Our tunnel service is oriented towards developers and experimenters that want a stable tunnel platform.
>
> Advantages of using our tunnel service over others include:
>
> Run by a Business ISP with 24 x 7 staff at multiple locations and an International backbone . . .
>
> Ability to get your own /48 prefix once your tunnel is up
>
> Ability to get a full view of the IPv6 BGP4+ routing table
>
> Ability to use your tunnel now after a simple registration process. (It takes less than a minute.)
>
> Ability to create your tunnel on geographically diverse tunnel-servers (Ashburn, Chicago, Dallas, Denver, Fremont, Kansas City, Los Angeles, Miami, New York, Palo Alto, Phoenix, San Jose, Seattle, Toronto, Winnipeg, Amsterdam, Berlin, Budapest, Frankfurt, London, Paris, Prague, Stockholm, Stockholm, Warsaw, Zurich, Hong Kong, Singapore, and Tokyo. [Ng Decl. ¶ 4; Dkt. 1-13]

The IPv6 Tunnel Broker webpage constitutes an "advertisement" within the 2015 policy. The IPv6 Tunnel Broker webpage is a "web site that is about [HE's] [Tunnel Broker] service for the purposes of attracting customers." [Ng Decl. ¶ 2; Dkt. 1-13]

### 3. HE's Internal Outreach Is An "Advertisement" Under California Case Law

In *West Trend, Inc. v. AMCO Ins. Co.,* CV 14-06872-RGK (PLAx), 2015 U.S. Dist. LEXIS 6807 (C.D. Cal. Jan. 9, 2015) a Central District court held that vague references to "marketing" were sufficient allegations of "advertising" explaining that:

[W]here a third party complaint is brought in federal court and subject to Federal Rule of Civil Procedure 8's simplified pleading standard, "a term as broad and multi-faceted as 'marketing' . . . must be understood to refer to activities that accord with the common use of 'advertising,'" at least "until there is a point in the [third party] proceeding at which the factual nature of [the third party's] allegation of injury resulting from 'market[ing]' is clarified 'with certainty' to exclude any issue relating to [the insured's] conduct in the course of advertising.…'[A]ny doubt as to whether the facts establish the existence of the defense duty must be resolved in the insured's favor.' [*Montrose Chemical Corp. v. Superior Court*, 6 Cal. 4th 287, 300 (1993) at 299-300] (*Id.* at *12-14)

Thus, for purposes of the present motion, HE has sufficiently demonstrated that the C&D Letter alleges promotion by HE constituting "advertisement."

**E.     Element Five Is Met: "In Your 'Advertisement'"**

**1.     The C&D Letter's Demands for Damages "Originat[ed] From" HE's 2015 Advertisement of its IPv6 Tunnel Broker Service**

The "in your" requirement of the "in your 'advertisement'" provision in the 2015 Policy is met here, as well, because the advertised services on HE's website for the IPv6 Tunnel Broker include allowing HE's customers to offer newer and improved IP addresses to all of that customer's end users. [Ng Decl. ¶¶ 3-4; Dkt. 1-13] The end users can allegedly then utilize the new IPv6 setup to allegedly download and/or upload copyrighted movies at their new IPv6 addresses as alleged in the C&D Letter. [Ng Decl. ¶¶ 4-7; Dkt. 1-3]

**2.     The Google Advertisement Highlighted HE's Unique Internet Accessibility Enhancement Features**

Although Claimants' allegations appear to assert the IPv6 Tunnel Broker webpage advertisement may have encouraged the alleged infringement referenced in the C&D Letter, HE contends otherwise. HE's Google advertisement touted IP Transit, which allows HE's customers, including those with allegedly infringing IP addresses in the 2300 IP List and C&D Letter, to connect at a data center [Ng Decl. ¶ 5; Dkt. 1-12] so that the advertised Port Availability allegedly allowed the alleged copyright infringers to access the Internet and allegedly download and/or upload Claimants' copyrighted movies. [Ng Decl. ¶ 5]

The services advertised in HE's Google advertisement allegedly enticed HE's customers to sign up for the Internet Service Connection during the 2015 Policy, which later purportedly led to the alleged copyright infringement that Claimants assert in the C&D Letter. These infringements allegedly

1    occurred at some point thereafter within the three-year statute of limitations as tolled from the date of

2    discovery in 2018. For example, the C&D Letter states there was an alleged infringement of a movie

3    "at the IP address . . . at time stamp 2018-10-19 . . . ." [Ng Decl. ¶ 10; Dkt. 1-3]

4                    **3.    The IPv6 Tunnel Broker Advertisement For HE's "Internet Service"
                            Implicated Potential Liability Under Offense (g)**

5

6            The C&D Letter lists an IPv6 address associated with one of HE's Customers/End-Users that

7    allegedly committed copyright infringement by facilitating the IPv6 address's seamless utilization

8    through the IPv6 Tunnel Broker supplied by HE as is advertised in the IPv6 Tunnel Broker in 2015.

9    [Ng Decl. ¶¶ 4-7; Dkt. 1-13] It also states that "[t]housands of infringements of my client's motion

10   pictures have occurred at the above IP addresses," which includes an address for HE's IPv6 Tunnel

11   Broker service. [Ng Decl. ¶ 7; Dkt. 1-3]

12           There is a reasonable inference from the C&D Letter that Claimants will assert customers that

13   signed up during the 2015 Policy allegedly committed copyright infringement at a later date through

14   HE's IPv6 Tunnel Broker, an "Internet [S]ervice" as referred to in the C&D Letter, because: (1) the

15   C&D Letter lists an IPv6 address associated with an HE customer that allegedly committed copyright

16   infringement demonstrating IPv6 infringement can allegedly occur; (2) Claimants have referenced

17   "[t]housands" of alleged copyright infringement at five IP addresses—including the noted IPv6

18   address—listed in the C&D Letter; (3) this supports the inference that more alleged IP infringements,

19   including the end users associated with HE IPv6 customers that signed up within the 2015 Policy and

20   who are still customers, are forthcoming. [Ng Decl. ¶ 7; Dkt. 1-3]

21   **IV.    NO EXCLUSION RAISED IN THE ANSWER OF NFI BARS A DEFENSE**

22           **A.    The Intellectual Property Exclusion Contains an Exception for "Infringement of
                    Copyright In Your 'Advertisement'" Applicable Here**

23

24           As the Sixth Affirmative Defense (¶141) acknowledges, the Intellectual Property Exclusion

25   has an express exception thereto which states, "However, this exclusion does not apply to infringement

26   in your 'advertisement,' of copyright." That is precisely the sole basis asserted herein, "infringement

27   of copyright in your 'advertisement'." Because the infringement of copyright in HE's advertisement

28

is the intellectual property offense at issue in this case, and it is expressly excepted from the exclusion, the exclusion does not apply according to its own terms.

**B.    The "Limited Endorsement" Referenced Only in a Truncated Declaration Reference is No Bar To Coverage**

**1.    NFI Curiously Asserts A Limited Endorsement That Is Not Present in NFI's 2015 Policy**

Notably absent from the 2015 Policy is the "Personal and Advertising Injury Limitation Endorsement," (the "Limited Endorsement") referenced in ¶139 of the Fourth Affirmative Defense and again reasserted as a grounds for preclusion of coverage in the Fifth Affirmative Defense in ¶140. The Limited Endorsement as quoted in the Fourth Affirmative Defense provides,

> 1. Section V - DEFINITIONS of the COMMERCIAL GENERAL LIABILITY COVERAGE FORM or coverage extension is amended to delete the definition of "personal and advertising injury" and replace it with the following:
> "Personal and advertising injury" means injury, including consequential "bodily injury" arising out of one or more of the following offenses:
> a. False arrest, detention or imprisonment
> b. Malicious prosecution; or
> c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that the person occupies, committed by or on behalf of its owner, landlord or lessor. [Gauntlett Decl. ¶ 7]

NFI failed to address in its Answer the fact that the 2015 Policy, issued to HE in the form referenced in the Complaint, did not contain the "Limited Endorsement." [Dkt. 1-6] NFI's denial of the assertions by HE in ¶ 36 of its Complaint failed to directly contest that the 2015 Policy as attached to the Complaint as Exhibit "6" [Dkt. 1-6] was a true and correct copy of the 2015 Policy. NFI's Fourth Affirmative Defense in ¶ 139 of its Answer addressed a "Limited Endorsement" whose provisions were not incorporated in the 2015 Policy, without any explanation as to why NFI contended that they were part of the 2015 Policy issued to HE. The allegations in ¶ 36, when viewed in light of the absence of any attached "Limited Endorsement" to Exhibit "6" to the Complaint, revealed that the Fourth Affirmative Defense was deficient, as it was based on an assumption by NFI that that Policy form was in fact issued to HE. [Gauntlett Dec. ¶ 7]

As the Ninth Circuit recently explained in *My Choice Software, Ltd. Liab. Co. v. Travelers Cas. Ins. Co. of Am.*, No. 19-56030, 2020 U.S. App. LEXIS 26328 (9th Cir. Aug. 19, 2020)

"[E]xclusionary clauses are interpreted narrowly against the insurer." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648, 3 Cal. Rptr. 3d 228, 73 P.3d 1205 (2003) (quotations omitted); *see also Tower Ins. Co. v. Capurro Enters.*, No. C 11-03806, 2012 U.S. Dist. LEXIS 46443, 2012 WL 1109998, at *9-10 (N.D. Cal. Apr. 2, 2012) (rejecting argument that "arising out of" is always construed broadly, even in exclusionary clauses, and noting that the "broad coverage-narrow exclusion principle is well illustrated with respect to the phrase 'arising out of.') (*5)

2.    **NFI's Failure To Advise HE of the Elimination of All "Advertising Injury" Coverage Renders Its "Limited Endorsement" Policy Language Unenforceable**

In *Cont'l Ins. Co. v. Barratt Am.*, Case Number 94-0035-IEG (CGA), 1995 U.S. Dist. LEXIS 19016 (S.D. Cal. Sep. 29, 1995), the court clarified that the CNA's obligation to make evident any elimination of prior coverage or diminution of coverage previously available "The law 'requires notice of the specific reduction in coverage; a general admonition to read the policy for changes is insufficient.' *Davis v. United Services Auto. Ass'n*, 223 Cal. App. 3d 1322, 1332, 273 Cal. Rptr. 224 (1990)." (*Id.* *18) Critically, the court also stated "The elimination of a coverage granting provision upon renewal is a material alteration. *Davis,* 223 Cal. App. 3d at 1332" (*Id.* at *13) The *Davis* court also attacked a material change to coverage which was not clear in its purported actual effect. In *Barratt*, the court noted "Moreover, Continental's labelling of the renewal endorsement no. 13 as "Real & Personal CCC" was deliberately misleading and did not satisfy Continental's duty to notify Barratt of material changes to the policy." (*Id.* at *20)

Here, upon perusal of the actual policy language first referenced in the Answer by NFI, a CNA subsidiary, by the language of the endorsement substituting the former (a) through (g) with a redefinition to only encompass (a) through (c) necessarily eliminated utterly without any possible resurrection all "advertising injury" coverage. [Gauntlett Decl. ¶¶ 7-8] This, despite the fact that the Declarations Page and endorsement itself purportedly provide "advertising injury" coverage. [Gauntlett Decl. ¶¶ 5-7; Dkt. 1-6] Not so.

3.    **Non Delivery Of The Limited Endorsement Means It Is Unenforceable**

An insurer is estopped from asserting a contractual limitation if the insurer does not provide the insured with a copy of the portion of the policy containing the contractual limitation. *Elliano v. Assurance Co. of Am.*, 3 Cal. App. 3d 446, 450 (1970). So, NFI's failure to deliver the "Limited

Endorsement" means it cannot be applied to bar potential coverage.

Not only was the "Limited Endorsement" not provided to HE, but the issuance of the 2015 Policy itself post-dated the operative coverage claim for which a defense was sought herein. [Heppes Decl. ¶¶ 3-5]

While the Declarations Page need not reference the specific "advertising injury" effect of the "Limited Endorsement," the failure to accompany that Declarations Page with its actual policy language cannot be cured. [Dkt. 1-6] Consistent with this, *Benchmark Ins. Co. v. Dismon Corp.*, 2016 U.S. Dist. LEXIS 192404 (C.D. Cal. Aug. 9, 2016), No. CV 15-01539 TJH (FFMx) at *2, citing *Sarchett v. Blue Shield of California*, 43 Cal. 3d 1, 15 (1987), noted, "it is axiomatic that a condition precedent to an insured's duty to read an insurance policy is the insurer's duty to deliver a copy of the policy to the insured." Implicit in that logic is the view that a particular endorsement (especially one purporting to limit coverage, such as the "Limited Endorsement"), must be physically provided to an insured in order for its provisions to bind that insured.

### 4.   NFI's "Limited Endorsement" That Fails To Inform HE Of The Purported Reduction In Coverage In A Renewal Policy Is Unenforceable

"Most courts have held that the insurance company is bound by the terms of the earlier policy if the renewal policy was issued without calling the insured's attention to the reduction in policy coverage." Section 6:9 p. 6-139.  *Insurance Claims* and *Disputes*: *Representation of Insurance Companies* and Insureds, Allan Windt © 2007 ("Windt")

Indeed, that is precisely what occurred here. [Heppes Decl. ¶ 5]

California law has clarified that merely instructing an insured to read a new policy will not suffice. This is doubly the case where the only descriptor regarding the new "Limited Endorsement" was the Declaration Page reference, but not the actual policy language itself. As *Fields v. Blue Shield of Cal.*, 163 Cal. App. 3d 570, 583 (4th Dist. 1985) emphasized,

The rule is and should be: Deletions or exclusions from a renewal group policy should be communicated and explained to the subscriber by a plain, clear and conspicuous writing. The prominent and express listing of certain specific changes whether grants or exclusions coupled with the omission of very specific exclusion of coverage, can only mislead the subscriber. Reduction of benefits, to be effective, cannot be placed in an inconspicuous place under the heading "Supplemental Benefits."

The rationale for this is solid:

> The purpose behind the rule is that when an insured already owns a policy issued by a particular insurer, the insured can, absent notice from the insurer to the contrary, justifiably assume that the renewal of the same policy by that insurer provides the same coverage. It is for that reason that the rule that an insured is obligated to read his or her policy—and bound by the terms of the policy—does not control. (© Windt, 6:9 p. 6140)

> [W]e cannot read into the policy what [the insurer] has omitted. To do so would violate the fundamental principle that in interpreting contracts, including insurance contracts, courts are not to insert what has been omitted. *Safeco Ins. Co. v. Robert S.*, 26 Cal. 4th 758, 764 (2001)

Indeed, NFI seeks to, in effect, add words of limitation under the guise of policy construction by interpreting the "Limited Endorsement" as if it expressly acknowledged that all "advertising injury" coverage was eliminated, despite its promise elsewhere in the 2015 Policy and in the Declarations Page to HE that it would be provided. [Dkt. 1-6]

Criticizing precisely such a tactic, the Supreme Judicial Court of Massachusetts in *Terra Nova Ins. Co. v. Fray-Witzer* 869 N.E.2d 565, 574 (Mass. 2007) found an analogous problematic exclusion unenforceable:

> In effect, the insurers argue that the policy's definition of injury should be read to say "[o]ral or written publication of material, *the content of which* violates a person's right of privacy." But…courts should "consider whether clearer draftsmanship by the insurer 'would have put the matter beyond reasonable question.'"

NFI's failure to expressly clarify that it intended to eliminate all "advertising injury" coverage and offer only a limited version of "personal injury" coverage after the "Limited Endorsement" was in place means that it cannot enforce this endorsement. As the court explained in *Fireman's Fund Ins. Cos. v. Atl. Richfield Co.*, 94 Cal. App. 4th 842, 852 (2001)

> [A]n insurance company's failure to use available language to exclude certain types of liability gives rise to the inference that the parties intended not to so limit coverage.

An express description of the specific offenses eliminated by NFI and a proper description of the 2015 Policy's "personal and advertising injury" "Limited Endorsement" would be the minimum requirement to advise HE of the purported impact of the "Limited Endorsement."

### 5. The "Limited Endorsement" (Even if it Were Included in the 2015 Policy) Renders NFI's Express Coverage for "Advertising Injury" Illusory

Addressing the precise policy provision at issue here, the "Limited Endorsement," a district court addressing a matter of first impression held the same Limited Endorsement illusory because the

"policy provisions, limitations, or exclusions completely contradict the insuring provisions." *Princeton Express & Surplus Ins. Co. v. DM Ventures USA LLC*, 209 F. Supp. 3d 1252, 1258 (S.D. Fla. 2016). Florida, like California, follows a rule on illusory coverage that renders the limitations or exclusions unenforceable when they completely contradict insuring provisions. *Princeton Id.* at *1259. As *First Mercury Ins. Co. v. Sudderth*, 620 F. App'x 826, 830 (11th Cir. 2015) observed, "Coverage in one part of an insurance policy is illusory when an exclusion in another part completely nullifies the coverage. . . . Exclusions that make coverage illusory are ineffectual." (*Id.*) Citing salient Eleventh Circuit authority in *Hooters of Augusta, Inc. v. Am. Glob. Ins. Co.*, 157 F. App'x 201, 209 (11th Cir. 2005) it noted that courts determine a view that "[w]hen an endorsement is entered at the same moment as the policy it accompanies, rather than at a later time, and the endorsement purports to obliterate coverage, as opposed to merely clarifying, narrowing, or modifying the terms of coverage, we believe the approach more consistent with Georgia law is to read the endorsement and the terms of the policy as being coequal and thus to enforce the provision that grants coverage."

The substitution by redefinition of the terms (a) – (c) for (a) – (g) surreptitiously eliminated all "advertising injury" coverage, thereby essentially doing what is prohibited. Distinguishing case law that addresses distinct fact scenarios concluded that

> the Exclusion here essentially eliminates all advertising injury coverage. Because the policies provide that they cover advertising injury, and then the Exclusion provides that advertising injury is excluded, the provisions are completely contradicted. The Exclusion does not carve out a particular type of advertising injury…but, instead, excludes all advertising injury. Giving effect to the Exclusion would make the advertising injury coverage illusory, which is prohibited by Florida law. (*Id.* at *1260)

As under Florida law applied in *Princeton*, California law prohibits giving effect to policy language that would render coverage illusory. *See Wilden v. Washington Nat'l Ins. Co.*, 18 Cal. 3d 631, 638 (1976) ("[W]hen the strict enforcement of a provision of an insurance policy will result in unreasonable and unjust forfeitures or an absurd result, the courts will refuse to enforce the strict meaning of the language of the policy."). Following the precedent of *Princeton* in California is appropriate as an insurer must "conspicuously notify [the insured] of a reduction in coverage[.]" *Allstate Ins. Co. v. Fibus*, 855 F.2d 660, 663 (9th Cir. (Cal.) 1988).

Here, NFI has taken what appears in the coverage section as a policy that "provides coverage for advertising injury" and transformed that in an endorsement into an "exclusion" that "deletes coverage for advertising injury." *Princeton*, 209 F. Supp. 3d at 1258. No "reasonable" policyholder can be expected to understand that the Limited Endorsement operates to take away all the coverage for "advertising injury" expressly granted elsewhere in the Policy, the reading on which NFI relies. NFI's apparent placement, in a separate Endorsement, of language that would purportedly eviscerate all coverage for "advertising injury" otherwise granted in the main Form, [Dkt. 1-6] violates the requirement that provisions limiting coverage must be "conspicuous, plain, and clear" for reasons explained in *Saltarelli v. Bob Baker Grp. Med. Trust*, 35 F.3d 382, 386 (9th Cir. (Cal.) 1994):

> [A]n insurer wishing to avoid liability on a policy purporting to give general or comprehensive coverage must make exclusionary clauses conspicuous, plain, and clear, placing them in such a fashion as to make obvious their relationship to other policy terms, and must bring such provisions to the attention of the insured.

Because the Limited Endorsement lacks this "conspicuous, plain, and clear" presentation, its ambiguity must be construed in favor of coverage to include all coverage for offense (a)-(g) including the coverage for offense (g) pertinent here.

Without an express reference to the purportedly eviscerated "advertising injury" coverage, it would be improper to deprive the insured of the coverage benefits which a straightforward reading of the Business Liability coverage form's "personal and advertising injury" coverage would lead a reasonable policyholder to presume existed. An exclusion, or as here pertinent, endorsement cannot render the coverage of an insurance policy illusory.

A number of California cases are in accord with *Princeton*'s logic. *See Safeco Ins. Co. v. Robert S.*, 26 Cal. 4th 758, 765 (2001) (Under *Safeco*, a broad interpretation of the "illegal act" exclusion would violate this rule impermissibly, rendering the promised coverage illusory, and therefore cannot be accepted.); *Marquez Knolls Prop. Owners Ass'n, Inc. v. Exec. Risk Indem., Inc.*, 153 Cal. App. 4th 228, 233 (2007) (An exclusion regarding "the design, construction, renovation or rehabilitation of any building, structure or other improvement on any real property" could not be extended to preclude

coverage for any improvement made by a third party as it would result in a policy that is almost entirely illusory" (Id. at 514); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1032-1033 (9th Cir. (Cal.) 2008) (Expansive and distorted interpretation of an exclusion regarding entertainment deemed illusory and thus not enforceable. Narrow construction of FELE is requisite, since as construed by the insurer, it would eviscerate coverage for Manzarek and DTI's marketing of a line of t-shirts or electric guitars with *The Doors* logo or Morrison's likeness on them, which should be subject to advertising injury coverage.)

### C. HE Is Neither An Internet Service Provider ("ISP") Nor A Direct Access Link To An ISP So That The "ISP Exclusion" Is No Bar To A Defense

#### 1. The "ISP Exclusion"

NFI's Seventh Affirmative Defense (¶142) asserts that this exclusion applies because HE's "business is; . . . (3) An Internet search, access, content or service provider." No facts are asserted in connection with this conclusory reference to this provision in the 2015 Policy. Nor is any explanation offered as to how the business model of HE can be deemed to be one that solely falls within the scope of this exclusion. [Gauntlett Decl. ¶ 10] The Declaratory Relief Complaint's allegations acknowledge only that HE is a portal provider that provides access to OSPs, who in turn, on occasion, allow customers to access ISPs. [Dkt. 1-1]

This later inter-relation occurs many layers downstream from HE's operational activities. [Ng Decl. ¶ 5] This linkage cannot be considered a direct Internet search so as to render HE an Internet service provider. To determine a contextually appropriate meaning of the term "access" in the phrase "Internet search access content or service provider," all tertiary forms of access volitionally chosen by a portal user must be eschewed. NFI's coverage analysis cannot rely on the supposition that a particular user may have gained access to an ISP and through it streaming movies like those identified by the Claimant. This limited status based construction also runs counter to the insurer's "burden of proving, through conclusive evidence, that the exclusion applies in all possible worlds." *Atl. Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017, 1039 (2002).

2.      **The Only Case to Address "Access" Under the ISP Exclusion,** *Sony*, **Found For The Insured On Less Compelling Grounds**

At the Motion for Summary Judgment hearing in *Sony*, the court addresses the precise exclusionary provision that is also listed in NFI's policy regarding "business is . . . internet search, access, content, or service provider". *Zurich Am. Ins. v. Sony Corp. of Am.*, No. 651982/2011, 2014 N.Y. Misc. LEXIS 5141 (Sup. Ct. Feb. 21, 2014) (The "*Sony* Action" or "*Sony*")

The *Sony* Action determined the salient facts in an earlier federal court action were germane to its analysis. The *Sony* court explained that the plain language of the exclusion was very clear on its face and that the exclusion was only applicable to businesses that were internet search, access, content, or service providers. The trial judge explained,

> This is how The Federal Court describes what Sony does. Sony develops and markets the PlayStation portable hand-held devices, PSP, and the PlayStation 3 console PSP, collectively, consoles and all consoles. Both consoles allow users to play games, connect to the internet and access Qriocity – Q-R-I-O-C-I-T-Y. (*Id.* at. *12).

> [B]efore establishing a PSN Qriocity and/or SOC account plaintiffs and other consumers are required to enter into terms of identifying users with Sony and agree to Sony's privacy policy as part of this registration process. (*Id.* at *13)

> It sounds like they do more than being an internet search, or access, or content or service provider. They are sort of a hybrid. They do a lot of things…[T]his policy doesn't…go on and say, and 'any other hybrid type of situation'. (*Id.* at *13)

The state trial court looked to a prior decision by a federal court, *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 1001 (S.D. Cal. 2014). It involved the underlying action that purportedly created liability for which the coverage action sought benefits, and noted:

> Plaintiffs allege Sony violated the NHCPA by misrepresenting the adequacy of Sony's network security and by representing that PS3s, PSPs, and Sony Online Services had specific security characteristics, uses and benefits, when Sony knew they did not.

The term "is" means "[t]he present of 'to be', at the time or at all times. Is, the third person, present tense of 'to be,' stands for the state of affairs at a given time" (*Is* Definition, *Wolters Kluwer Bouvier Law Dictionary Desk Edition* (2012)*, LexisNexis

https://advance.lexis.com/api/permalink/52bed925-62f2-4aa8-9e80-a6e0cd2d4be5/?context=1000516 ). Additionally, the term "access" means "freedom or ability to

obtain or make use of something". (*Access* Definition, *Merriam-Webster Dictionary* (2020) https://www.merriam-webster.com/dictionary/access ).

So understood, "is" and "access" would not encompass mere positioning of a party to ultimately have an advantageous interaction such that one could in a broader and loose sense of the term promote facilitation. This cannot be the meaning of that term in light of other cases addressing the analogous "publishing exclusion" that have rigorously defined its limited scope. By analogy, in *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Mead Johnson & Co. LLC,* 735 F.3d 539, 547 (7th Cir. 2013), Judge Posner criticized the over broad construction of a causal nexus element in the language "arising out of" which rejected the argument that National Union's policy covered any tortious injury that could be traced to product disparagement and damages for any injury "arising out of" disparaging material. This was too tenuous a connection because:

> Mead Johnson's brief attenuates "arising out of" by equating it to "flowing from,"…Such a chain of equations can't be taken literally…Usually the next step of attenuation of causality beyond proximate cause is "but for" cause, as in but for the evolution of man from ape PBM's infant formula would not have been invented and so could not have been disparaged. Legal liability rarely reaches back to the first, a very early, link of a causal chain.

### 3.   Mere Facilitation of an Interaction That Would Satisfy the Definitional Component of the Policy Does Not Satisfy the "Is Element"

The "business is . . . an Internet search, access, content or service provider" provision cannot be deemed implicated by the very remote inter relationship as depicted on the internet transit image of ¶ 61 on p. 17 of the "Declaratory Relief Action," Case No. 3:20-cv-05840 [Ng Decl. ¶ 12; Dkt. 1-1] To do so would ignore the interconnections necessary to turn the portal admission ticket secured by a user into a direct access pathway to an ultimate tertiary party such as an ISP. [Ng Decl. ¶¶ 12-13] It is of no moment that the advertising injury coverage is implicated because advertising is linked as the terms "arising out of" have a broad connective language element that is entirely distinct from the "business is…an" element at issue here.

These activities are revealed by the Declaratory Relief Action herein. [Ng Decl. ¶ 12; Dkt. 1-1] HE is, at most, a tertiary provider. HE's business is at the IXP level, meaning its subscribers, or end-users, must have a service provider who can connect to the IXP. [Ng Decl. ¶ 5] This type of

connection was also pertinent in *Sony*, where the court stated that while Sony does provide "internet access", it is not a business that provides the type of "pure access" that would make the exclusion enforceable under its narrow interpretation. (*Id*.)  Additionally, the *Sony* court asserted that even though Sony does in a sense service provide, it only does so in a sense because "it allows people who pay up to play games on their Play Stations. So that is sort of a hybrid". (*Id*.)

Hiscox, a Media Cyber Liability insurer, in one of its standard policy provisions addressing such coverage offers the following definition:

**On-line access providers** means companies through whom you:

A.  access information made available by third parties; or

B.  make information available to third parties,
via a computer or other electronic system.
(Washington, D.C. Department of Insurance, Securities and Banking, *Hiscox Insurance Company Inc.* "Business interruption coverage part" ETE P4203 CW (11/14) Page 11/13)

That Hiscox used this more focused definition is evidence that a broader definition, like that NFI used, is ambiguous. *Am. Cas. Co. v. Continisio*, 819 F. Supp. 385, 398 (D.N.J. 1993) "Evidence of subsequent changes in contract language is relevant to whether the language at issue is ambiguous." Had NFI adopted a similarly more focused definition following the "business…is" section of the 2015 Policy, rather than assuming the aspect of HE's business that created the asserted exposure for copyright infringement as the only business activity, then NFI's assertion of a Seventh Affirmative Defense based on the purported applicability of the ISP exclusion would be intelligible.

But it is not applicable here because CNA elected to draw a far narrower definition of ISP business identified, and HE engaged in a multitude of activities as did Sony. For the same reasons the court held the insurer's coverage argument overbroad there, that is the case here as well.

### 4.     As in *Sony*, HE Engaged in Business Unrelated to Internet Access

The *Sony* Action identified Sony's unique non Internet access business activities:

Sony develops and markets PlayStation consoles … allows users to play games … connect to the internet and access [other third party services]…They do a lot of things. (*Id*. *12-13)

While the court does admit that Sony certainly provides services related to the broad language of the policy exclusion, its "business" encompassed a far broader range of services so that the "business

1   is…a" component of the exclusion could not be satisfied. As in *Sony*, HE's business includes the

2   delivery of various services and **only** one of those services is wholly dedicated to activity that would

3   fall within the 2015 Policy's ISP Exclusion if its "access" conduit were direct to the Internet, which

4   it is not. Critically, there, as here, the multitude of activities beyond those identified with the Internet

5   Portal are like the multifaceted activities that necessarily fall outside of the "business is…" exclusion

6   addressed by the *Sony* coverage analysis (*Id.* at *11-16).

7       HE provides its customers a safe harbor in which it adopts, reasonably implements, and

8   informs its customers of a service provider's system or network of, a policy that provides for the

9   termination in appropriate circumstances of subscribers and account holders of the service provider's

10  system or network who are repeat infringers. HE offers colocation, providing physical space similar

11  to a storage facility with air conditioning and a power source. Its clients can, and do, use this space

12  independent of Internet connection or access. [Ng Decl. ¶ 14]

13      HE also provides rooftop space for clients to install dishes and antennas. Among HE's clients

14  who use this service include those that offer television service. [Ng Decl. ¶ 15] HE's business of

15  offering physical facilities and rooftop space to clients who, themselves, provide services wholly

16  distinct from Internet access, falls outside of the ISP exclusion. HE provides IP transport, which is

17  the moving of data from one point to another, all within one network. This service could be used, for

18  example, to allow a business to back up its data in a data center. As the data stays within one

19  network, at no point in this process is it on the open Internet. [Ng Decl. ¶ 16]

20      HE offers web hosting, which is the providing of storage space for clients' websites. Web

21  hosts are distinct from ISPs in that web hosts simply store websites' data on servers, while ISPs

22  provide users with Internet access to reach those servers. [Ng Decl. ¶ 17] HE provides a DNS

23  service, which simply translates website domain names to their corresponding numerical IP

24  addresses. The DNS service itself neither conducts searches on the Internet nor provides Internet

25  access. [Ng Decl. ¶ 18] Thus, NFI's contention that HE "is . . . an Internet search, access, content or

26  service provider" relies on an overbroad construction of "is," because HE provides a wide range of

27  services distinct from those of an ISP.

28

5.     **The Analogous "Business of 'Publishing'" Exclusion Has Been Narrowly Construed by Courts**

NFI's 2015 Policy has a "status" exclusion for "'[p]ersonal and advertising injury' committed by an insured whose business is: (1) Advertising, broadcasting, *publishing* or telecasting . . . ." (emphasis added). [Dkt. 1-6] Although not directly applicable, case law construing this "status" exclusion is instructive.

In *American Employers' Insurance Co. v. DeLorme Publishing Co. Inc.*, 39 F.Supp.2d 64 (D. Maine, 1999), the court interpreted the status based exclusion for "…publishing" to mean "insureds whose primary, essential, chief or principal business is publishing." (*Id.* at 81) DeLorme asked the court to make a distinction between "in the publishing business" and "whose business is publishing," thus to find coverage for DeLorme because publishing was not DeLorme's sole business. (*Id.* at 80) It reasoned that it would not make sense to read the exclusion to apply to insureds whose business, only in part, is one of the four areas because most businesses are involved in multiple areas of practice and reading the exclusion in that manner would render the exclusion inapplicable because no insureds would qualify. (*Id.*)

> [T]he language of the exclusion makes it clear that it does not apply to insureds who are 'in the business of ... publishing' only in part. The phrasing 'insureds whose business is ...' clearly contemplates that the insured is more than just, in part, engaged in one of the four listed activities. An ordinary person would not reasonably conclude that the exclusion applies if one of a company's ancillary activities is in one of the four listed areas.  (*Id.* at 81.)

The *DeLorme* court draws a clear line that the exclusion does not apply when the advertising is only a part of the business of the insured and a reasonable person would still interpret the insured's principal business to be something else.

It agreed with DeLorme that "[m]ost, if not all, businesses are engaged in multiple areas of business even if they primarily practice in one area." [*DeLorme Publishing Co. Inc.*, 39 F.Supp.2d 64, 81 (D. Maine, 1999).] This means that the insured could be a manufacturing company which uses advertising to sell its products. To make the exclusion broad enough to include anyone who advertises would make the exclusion inapplicable. *State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am.* 343 F.3d 249, 260 (4th Cir. 2003) (holding that the insurer was not excused from its obligation to defend the insured because it's "business of advertising" exclusion only applied to insureds whose

primary, essential, chief or principal business was advertising); *State Farm Fire & Cas. Co. v. Franklin Ctr.* E.D.Va., No. 1:13-cv-957 AJT/TRJ (2014) U.S. Dist. LEXIS 47051 at *19-23 (holding that reduced coverage was not appropriate because the insurer's exclusion did not clearly apply to the insured because the exclusion's language did not make clear what in fact, constituted an "insured whose business is publishing"). *Safeco Ins. Co. v. Robert S.* 26 Cal.4th 758, 766 (2001) (stating that by placing ambiguous language, the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language).

The "Publisher's Liability" exclusion does not apply to situations where the insured is promoting his own business. (*Id.*) It was undisputed that the broadcast facsimile promoted Group C's own business, thus the publisher's exclusion did not bar coverage. (*Id.*) This case reinforces the proposition that the publishers, broadcasters, and advertisers exclusion does not apply where the insured is advertising simply to promote its principal or primary business. *W. Int'l Syndication Corp. v. Gulf Ins. Co.*, No. CV 04-2349-RGK (JWJx), 2004 U.S. Dist. LEXIS 17867 (C.D. Cal. Sep. 1, 2004) at *23, analyzed a similar "entertainment" status exclusion. It also concluded that there was no applicable exclusion because Western was neither a ""broadcaster" nor a "telecaster,"" as it did not transmit programs to the public.  Nor was there evidence that its business was that of a motion picture or television production company that necessarily addressed broadcasting or telecasting.

## V.    CONCLUSION

The Court should grant HE's Motion for Partial Summary Judgment recognizing NFI's duty to defend the C&D Letter's claims for damages by reimbursing fees incurred in its defensive prosecution of the Declaratory Relief Action, as well as paying all pre-judgment interest at the 10% *per annum* legal rate from the date of each invoice.

Dated:  October 9, 2020

**GAUNTLETT & ASSOCIATES**

By:    /s/ David A. Gauntlett
          David A. Gauntlett
          James A. Lowe

Attorneys for Plaintiff,
Hurricane Electric, LLC