1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBERT C. CHRISTENSEN (SBN 151296)
CNA COVERAGE LITIGATION GROUP
Email:  robert.christensen@cna.com
555 12th Street, Suite 600
Oakland, CA  94607
Telephone:  510.645.2306
Facsimile:      510.645.2323

Attorneys for Defendant
NATIONAL FIRE INSURANCE COMPANY OF HARTFORD

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

HURRICANE ELECTRIC, INC.,

                  Plaintiff,

vs.

NATIONAL FIRE INSURANCE COMPANY
OF HARTFORD,

                  Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:20-cv-05840-CRB

(Related to 3:20-CV-3813-CRB)

**DEFENDANT NATIONAL FIRE
INSURANCE COMPANY OF
HARTFORD'S OPPOSITION TO MOTION
FOR PARTIAL SUMMARY JUDGMENT**

[Filed concurrently with Declaration of
 Corey Rider; Request for Judicial Notice and
Objections to Evidence]

Date:         November 13, 2020
Time:         10:00 a.m.
Courtroom:   6, 17th Floor –
               The Honorable Charles R. Breyer

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................... 2

    A.      The Cease-And-Desist Letters .................................................................2

    B.      Hurricane's Complaints ...........................................................................2

    C.      The NFIC Insurance Policy......................................................................4

    D.      Delivery of the Policy To Hurricane's Broker .........................................7

    E.      The Tenders and Responses ......................................................................8

    F.      The Simultaneously Filed Coverage Action and Amended Complaint in the
        Affirmative Action ...................................................................................8

III.    ARGUMENT ..................................................................................................... 10

    A.      Legal Standards......................................................................................10

        1.      Summary Judgment and the Duty to Defend ................................10

        2.      Policy Interpretation Under California Law .................................11

    B.      There is No Coverage Under the Policy ..................................................11

        1.      The PAI Endorsement In The Policy Delivered to Hurricane Bars
             Coverage .....................................................................................12

        2.      The Cease-and-Desist Letters and Affirmative Lawsuits Do Not
             Fall Within The Policy's Insuring Grant......................................14

        3.      The Intellectual Property Exclusion Bars Coverage .........................16

             a.      Hurricane Cannot Prove A Causal Connection Between The
                    Alleged Copyright Infringement And Its "Advertisement" .................17

        4.      The Insured In Internet-Type Business Exclusion Bars Coverage .................19

IV.     CONCLUSION ................................................................................................. 22

# TABLE OF AUTHORITIES

**Federal Cases**

*Ace American Insurance Company v. Dish Network, LLC*,
   173 F.Supp.3d 1128 (D. Colo. 2016) ...................................................................20

*American Employers Ins. Co. v. DeLorme Publishing*,
   39 F.Supp.2d 64 (D. Me. 1999)............................................................................20

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..............................................................................................10

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..............................................................................................10

*Chevron Corp. v. Pennzoil Co.*,
   974 F.2d 1156 (9th Cir. 1992) ..............................................................................10

*Corbis Corp., Inc. v. St. Paul Fire & Marine Ins. Co.*,
   125 Fed.Appx. 792, 2005 WL 481611 (9th Cir. 2005) ........................................20

*Dias v. Nationwide Life Ins. Co.*,
   700 F.Supp.2d 1204 (E.D. Cal. 2010) ..................................................................12

*Educational Impact v. Travelers Property Casualty Company of America*,
   2016 WL 7386139 (N.D. Cal., December 21, 2016) ............................................19

*Esparza v. Burlington Ins. Co.*,
   866 F.Supp.2d 1185 (E.D. Cal. 2011) ..................................................................12

*Hartford Cas. Ins. Co. v. EEE Business, Inc.*,
   2009 WL 3809817 (N.D. Cal., November 10, 2009) ......................................18, 19

*Icasiano v. Allstate Ins. Co.*,
   103 F.Supp.2d 1187 (N.D. Cal. 2000)..................................................................15

*Kingsley Management, Corp. v. Occidental Fire & Casualty Company of North
   Carolina*,
   441 F.Supp.3d 1016 (S.D. Cal. 2020) ..................................................................14

*Matsuo Yoshida v. Liberty Mut. Ins. Co.*,
   240 F.2d 824 (9th Cir. 1957)................................................................................12

*National American Ins. Co. of California v. Certain Underwriters at Lloyd's London*,
   93 F.3d 529 (9th Cir. 1996)..................................................................................13

*Simply Fresh Fruit, Inc. v. Continental Ins. Co.*,
   94 F.3d 1219 (9th Cir.1996).............................................................................18, 19

*Tarleton v. De Veuve*,
    113 F.2d 290 (9th Cir. 1940) ................................................................ 12

*Tradewind Products, Inc. v. Hartford Fire Ins. Co.*,
    314 Fed.Appx. 2, 2008 WL 2476695 (9th Cir. 2008) ............................ 19

*United States v. Diebold, Inc.*,
    369 U.S. 654 (1962) .............................................................................. 10

**State Cases**

*3250 Wilshire Blvd. Building v. Employers Ins. of Wausau*,
    39 Cal.App.4th 1277 (1995) ................................................................. 15

*AIU Ins. Co. v. Superior Court*,
    51 Cal.3d 807 (1990) ............................................................................ 21

*Aydin Corp. v. First State Ins. Co.*,
    18 Cal. 4th 1183 (1998) .................................................................. 10, 11

*Bank of the West v. Superior Court*,
    2 Cal. 4th 1254 (1992) ................................................................... 11, 18

*Buss v. Superior Court*,
    42 Cal.App.4th 1663 (1996) ................................................................. 20

*Cal-Farm Ins. Co. v. TAC Exterminators, Inc.*,
    172 Cal.App.3d 564 (1984) .................................................................. 13

*Certain Underwriters at Lloyd's of London v. Superior Court*,
    24 Cal. 4th 945 (2001) ................................................................... 12, 16

*Crane v. State Farm Fire & Casualty Co.*,
    5 Cal.3d 112 (1971) .............................................................................. 11

*Fagundes v. American Int'l Adjustment Co.*,
    2 Cal.App.4th 1310 (1992) ................................................................... 13

*Fireman's Fund Ins. Co. v. Sup.Ct.*,
    65 Cal.App.4th 1205 (1997) ................................................................. 15

*Forecast Homes, Inc. v. Steadfast Ins. Co.*,
    181 Cal.App.4th 1466 (2010) ............................................................... 13

*Foster-Gardner, Inc. v. National Union Fire Ins. Co.*,
    18 Cal. 4th 857 (1998) ................................................................... 14, 15

*Friedman Professional Management Co., Inc. v. Norcal Mut. Ins. Co.*,
    120 Cal.App.4th 17 (2004) ................................................................... 11

*Gunderson v. Fire Ins. Exch.*,
    37 Cal.App.4th 1106 (1995) ................................................................. 19

*Hameid v. National Fire Ins. of Hartford*,
    31 Cal. 4th 16 (2003) ........................................................................... 18

*Hartford Cas. Ins. Co. v. Swift Distribution, Inc.*,
　　59 Cal. 4th 277 (2014) ...............................................................................................10

*James 3 Corp. v. Truck Ins. Exch.*,
　　91 Cal.App.4th 1093 (2001) .......................................................................................15

*Lebas Fashion Imps. of USA, Inc. v. ITT Hartford Ins. Grp.*,
　　50 Cal.App.4th 548 (1996) .........................................................................................11

*Lyons v. Fire Ins. Exchange*,
　　161 Cal. App. 4th 880 (2008) .....................................................................................10

*MacKinnon v. Truck Ins. Exch.*,
　　31 Cal.4th 635 (2003) .................................................................................................11

*Mez Industries Inc. v. Pacific National Ins. Co.*,
　　76 Cal.App.4th 856 (1999) .........................................................................................18

*National Ins. Underwriters v. Carter*,
　　17 Cal. 3d 380 (1976) .................................................................................................13

*Palmer v. Truck Ins. Exch.*,
　　21 Cal.4th 1109 (1999) ...............................................................................................11

*Ray v. Valley Forge Ins. Co.*,
　　77 Cal.App.4th 1039 (1999) .......................................................................................12

*Reserve Ins. Co. v. Pisciotta*,
　　30 Cal. 3d 800 (1982) .................................................................................................11

*Safeco Ins. Co. of America v. Parks*,
　　122 Cal.App.4th 779 (2004) .......................................................................................19

*San Diego Housing Com'n v. Industrial Indem. Co.*,
　　68 Cal.App.4th 526 (1998) .........................................................................................15

*Scottsdale Ins. Co. v. MV Transp.*,
　　36 Cal. 4th 643 (2005) ...............................................................................................10

*Searle v. Allstate Life Ins. Co.*,
　　38 Cal.3d 425 (1985) ...................................................................................................13

*Sprinkles v. Associated Indemnity Corp.*,
　　188 Cal.App.4th 69 (2010) .........................................................................................13

*Travelers Ins. Co. v. Lesher*,
　　187 Cal.App.3d 169 (1986) .........................................................................................20

*Ulta Salon, Cosmetics & Fragrance, Inc. v. Travelers Property Cas. Co. of America*,
　　197 Cal. App. 4th 424 (2011) .....................................................................................10

*Vernon v. Drexel Burnham & Co.*,
　　52 Cal.App.3d 706 (1975) .........................................................................................12

*Waller v. Truck Ins. Exchange*,
　　11 Cal. 4th 1 (1995) ..............................................................................................10, 21

*Ziman v. Fireman's Fund Ins. Co.*,
    73 Cal.App.4th 1382 (1999) ...........................................................................................18

**Statutes**

Cal. Civ. Code § 1626 ....................................................................................................... 12

Cal. Ins. Code, § 335 ......................................................................................................... 12

Fed. R. Civ. P. 56(a) .......................................................................................................... 10

**Rules**

Fed. R. App. P. 32.1 ........................................................................................................... 19

Ninth Circuit Rule 36-3 ..................................................................................................... 19

USDC Local Rule 3-4(e) (N.D. Cal.) ................................................................................ 19

# I.
# INTRODUCTION

Plaintiff Hurricane Electric, Inc. ("Hurricane") is an internet "tunnel broker," providing "upstream" internet service that allows access to the "backbone" of the Internet. In layperson's terms, Hurricane provides interconnections on the internet at high upload speeds. Hurricane received cease-and-desist letters demanding that Hurricane take action to stop certain IP addresses from uploading copyrighted movies and compensation for allegedly uploaded movies. Hurricane rightfully denies any wrong-doing, that it cannot plausibly comply with these demands and that it falls within the Safe Harbor of the Digital Millennium Copyright Act ("DMCA"). Hurricane filed complaints seeking a judicial declaration that it is not infringing on copyrights and that the third party copyright owners misuse or abuse their copyrights ("Affirmative Lawsuits").

National Fire Insurance Company of Hartford ("NFIC") issued a Commercial General Liability ("CGL") policy (the "Policy") to Hurricane for the period January 24, 2015 to January 24, 2016 (the "Policy"). NFIC properly declined coverage for the cease-and-desist letters on four grounds, any one of which is a complete bar to coverage requiring a denial of Hurricane's Motion for Partial Summary Judgment ("PMSJ"):

- The Policy delivered to Hurricane contains an endorsement that specifically excludes the purportedly applicable "personal and advertising injury" ("PAI") offense of "infringing on another's copyright . . . in your (Hurricane's) 'advertisement.'"

- The Policy's Insuring Agreement provides a duty to defend "suits" filed against Hurricane seeking damages because of "personal and advertising injury." The cease-and-desist letters and Affirmative Lawsuits do not trigger coverage. There is no backdoor to coverage by Hurricane agreeing to mediate its own lawsuits without NFIC's consent.

- Assuming Hurricane can rely on an incomplete copy of the Policy that omits the entire CGL portion of the Policy, including the CGL Coverage Form and PAI exclusion, the claimants' non-covered cease-and-desist letters do not (because they cannot) assert that Hurricane infringed on their copyrights "in your (Hurricane's) 'advertisement.'"

- The "Insureds In Media And Internet Type Businesses" exclusion applies to Hurricane's primary business of providing internet service, access or content.

NFIC submits that the Court does not need to step on the tortured path laid before it by Hurricane. Hurricane cannot submit half of the Policy and ask the Court to turn a blind eye to the PAI exclusion that plainly bars coverage. California law unequivocally holds that a CGL policy does not cover demand letters or an insured's affirmative lawsuits. Even assuming that the PAI exclusion did not exist and a CGL policy covered cease-and-desist letters, there is no alleged infringement of copyrighted materials in any of Hurricane's ads for its internet services. And Hurricane's primary form of business is to provide internet service, content or access. The Internet-Type Business exclusion operates as an additional, conclusive bar to coverage.

Hurricane cannot prove that there is a potential for coverage under the Policy as a matter of law. NFIC therefore respectfully requests that the Court deny Hurricane's PMSJ.

## II.
## STATEMENT OF FACTS

### A.     The Cease-And-Desist Letters

On March 19, 2020 counsel for certain third party claimants sent a "cease-and-desist" letter contending that the internet service provided by Hurricane allows unknown "subscribers" at certain IP addresses to download copyrighted movies. (Exh. 3 to the Complaint in this action, ECF 1-3; Ng Declaration in support of PMSJ, ECF 22-2.)[1] The letter demanded that Hurricane terminate all internet access to the subscribers at certain IP addresses and pay damages for infringement of the copyright owners' movies. (*Id.*, see also ECF 1-5.)

### B.     Hurricane's Complaints

On June 30, 2020 Hurricane filed complaints seeking a declaration that it is not liable for copyright infringement (direct, contributory or vicarious), and that it is protected by the Safe Harbor of the DMCA. (ECF 1-1 and 1-2.) Those complaints are styled *Hurricane Electric, LLC, v. Dallas Buyers Club, LLC, et al.*, U.S.D.C. Northern District of California Case No. 3:20-cv-03813 and *Hurricane Electric, LLC, v. Millennium Funding, Inc., et al.*, Case No. 2:20-cv-01034, U.S.D.C. District of Nevada (the "Affirmative Lawsuits"). (*Id.*)

---

[1] For ease of reference and to avoid repetition, NFIC will cite to the exhibits to the Complaint, ECF 1.

The Affirmative Lawsuits allege that Hurricane provides "access to the backbone of the Internet, offering Internet Protocol version 4 (IPv4) and Internet Protocol version 6 (IPv6) Internet access, transit, tools, and network applications, as well as data center co-location services in San Jose, California, and in Fremont, California, where the company is based." (ECF 1-1, p. 3, ¶ 6.)

Hurricane "is considered the largest IPv6 backbone in the world as measured by the count of peering interconnections to other networks."   (ECF 1-1, p. 3, ¶¶ 7-8.)   Hurricane explains the meaning of the "internet backbone" as follows:

> The Internet backbone may be defined by the principal data routes between large, strategically interconnected computer networks and core routers of the Internet. These data routes are hosted by commercial, government, academic and other high-capacity network centers, the Internet exchange points and network access points, that exchange Internet traffic between the countries, continents, and across the oceans. Internet service providers, often Tier 1 networks, participate in Internet backbone traffic by privately negotiated interconnection agreements, primarily governed by the principle of settlement-free peering.

(ECF 1-1, p. 14, ¶ 53(g).).   Hurricane has a global internet network. Hurricane uses fiber-optic topology to offer 100G upload speeds.  (ECF 1-1, p. 3, ¶¶ 7-8.)  "As an upstream service provider, H[urricane] simply acts as a 'highway' that passively provides its customers, and thus its customers' customers, with Internet access.  H[urricane] Internet connections are business-to-business ("B2B") type connections . . ."  (ECF 1-1, p. 4, ¶ 11.).  "While H[urricane]'s B2B connections at data centers are competitive with certain aspects of major Internet providers like Cox, Comcast, Verizon, etc., end-users must utilize a service provider to connect to H[urricane]."  (ECF 1-1, p. 4, ¶ 12.).  Stated differently, Hurricane is an Online Service Provider to ISP's.  (ECF 1-1, p. 11-12, ¶ 51(m).).   In layperson's terms, Hurricane provides business-to-business internet access or service that allows high speed uploads.

In or about July 2019, Hurricane began receiving cease and desist letters, demanding that Hurricane terminate the accounts of third-parties and pay money damages.  (ECF 1-1, p. 8, ¶ 45.). On or about May 15, 2020, counsel for Hurricane responded to the cease-and-desist letter, explaining in detail why Hurricane, as an Online Service Provider to ISP's, did not infringe, and that in the

1  alternative, Hurricane was protected by the Safe Harbor provisions of the DMCA.  (ECF 1-1, p. 11-

2  12, ¶ 51(m).  Hurricane contends that the underlying defendants' arguments seek to upend the

3  established business model providing access to the backbone of the Internet.  Underlying defendants'

4  demand that upstream service providers like Hurricane simply shut down entire service providers that

5  provide internet access to thousands or tens of thousands of people, based solely on allegations of

6  infringement by just a single end-user subscriber to an ISP.  (ECF 1-1, p. 14, ¶ 53(f).).

7

8   "Shutting down all access to the Internet to an ISP or other account holder
would shut down not only a particular end-user subscriber's access to the

9   Internet, but would also shut down the Internet access of all the other end-
user subscribers who gain access to the Internet from that ISP or other

10   account holder, which would typically mean shutting down Internet access
for thousands or tens of thousands (perhaps hundreds of thousands if the

11   account holder has multiple IP addresses) of innocent people across wide
geographic regions.

12

13  (ECF 1-1, pp. 18-19, ¶ 70.).

14      C.      **The NFIC Insurance Policy**

15      Hurricane seeks coverage under a CGL policy issued for the period January 24, 2015 to

16  January 24, 2016.  (Dkt. 1, p. 9, ¶ 45, *et seq.*)  The Complaint makes a lengthy argument as to why

17  the cease-and-desist letters fall within Coverage B, "Personal and Advertising Injury" of the Policy's

18  CGL Coverage Form.  The Declarations page of the NFIC policy attached to Complaint lists all

19  relevant forms, including the CGL Coverage Form and an "Exclusion – Personal and Advertising

20  Injury – Limited" Endorsement (the "PAI Endorsement").  (Dkt. 1-6 at pp. 9-10.)  However, the copy

21  of the NFIC Policy attached to the Complaint omits the CGL portion of the NFIC Policy, including

22  the CGL Coverage Form and the PAI Endorsement.  To complete the record, NFIC provided a

23  complete, certified copy of the Policy with its pending Motion for Judgment on the Pleadings, and

24  does so again here.  (Declaration of Corey Rider, Exh. B.)

25      The CGL Coverage Form in the Policy contains two insuring agreements, Coverage A and

26  Coverage B.  The Insuring Agreement for the relevant Coverage B, "Personal and Advertising Injury

27  Liability" provides:

28  / / /

1.      **Insuring Agreement**

    **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. . . .

        . . .

    **b.**    This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

(Rider Declaration, Exh. B, p. 89.)

The following definitions are relevant:

    **1.**    "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.

        For the purposes of this definition:

        a.    Notices that are published include material placed on the Internet or on similar electronic means of communication; and

        b.    Regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

    . . .

    **14.**    "Personal and advertising injury" means injury, including consequential "bodily injury," arising out of one or more of the following offenses:

        a.    False arrest, detention or imprisonment;

        b.    Malicious prosecution;

        c.    The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

       d.       Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

       e.       Oral or written publication, in any manner, of material that violates a person's right of privacy;

       f.       The use of another's advertising idea in your "advertisement"; or

       g.       Infringing upon another's copyright, trade dress or slogan in your "advertisement."

. . .

**18.**    "Suit" means a civil proceeding in which damages because of "bodily injury," "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

       a.       An arbitration proceeding in which such damages are claimed and to which the insured must submit or doss submit with our consent; or

       b.       Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

(Rider Declaration, Exh. B, pp. 96, 98-99.)

The CGL Coverage Form in the Policy contains the following exclusions:

    **i.**       **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement."

However, this exclusion does not apply to infringement, in your "advertisement," of copyright, trade dress or slogan.

    **j.**       **Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

       **(1)**       Advertising, broadcasting, publishing or telecasting;

       **(2)**       Designing or determining content of web sites for others; or

       **(3)**       An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

(Rider Declaration, Exh. B, p. 90.)

The PAI Endorsement in the Policy provides:

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART.**

1.    Section **V** - DEFINITIONS of the **COMMERCIAL GENERAL LIABILITY COVERAGE FORM** or coverage extension is amended to delete the definition of "personal and advertising injury" and replace it with the following:

"Personal and advertising injury" means injury, including consequential "bodily injury" arising out of one or more   of   the following offenses:

a.    False arrest, detention or imprisonment

b.    Malicious prosecution; or

c.    The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that the person occupies, committed by or on behalf of its owner, landlord or lessor.

(Rider Declaration, Exh. B, p. 115.)

**D.     Delivery of the Policy To Hurricane's Broker**

On January 16, 2015, NFIC provided a final renewal quote for the Policy to Hurricane's broker.  The quote lists the "following forms, endorsements and exclusions, which may not be deleted."  One of those forms is the PAI Endorsement. (Rider Declaration, Exh. A, p. 12.)  On or about January 24, 2015, NFIC delivered the complete copy of the Policy (including the PAI Endorsement) marked "Insured" to Hurricane's broker.  (Rider Declaration, Exh. B.)  NFIC delivered

a separate copy to the broker marked "Agent."  (ECF 1-6.) The Agent copy of the Policy contained the same form listing (or Declarations page) as the final renewal quote that includes the PAI Endorsement.  (ECF 1-6, at pdf p. 11.)  The Agent copy of the Policy did not contain the CGL portion of the Policy but attached premium rating information.  (*Id.*)

### E.   The Tenders and Responses

On or about June 3, 2020, NFIC received a May 27, 2020 letter from counsel for Hurricane tendering the cease-and-desist letters to Hurricane's insurers. (ECF 1-7.)  The cease-and-desist letters made no reference to Hurricane advertising its internet services.  (*Id.*)  NFIC declined coverage in a July 1, 2020 letter.  (ECF 1-9.)   As set forth more fully in the letter, the claim did not fall within the NFIC's policies' Insuring Agreement in the first instance.   The letter advised that the Policy contained the PAI Endorsement.  In addition, the claim would fall within the Policy's "Infringement Of Copyright, Patent, Trademark Or Trade Secret" and "Insureds In Media And Internet Type Businesses" exclusions.   In a July 28, 2020 email, NFIC declined to attend a mediation in the Affirmative Lawsuits. (ECF 1-10.)

### F.   The Simultaneously Filed Coverage Action and Amended Complaint in the Affirmative Action

On August 19, 2020, Hurricane filed this action seeking a judicial declaration that NFIC must pay for Hurricane's fees and costs in prosecuting its Affirmative Lawsuits.  The Complaint alleges that Hurricane advertised its "Internet Services" leading to copyright infringement, and this is sufficient to create a coverage potential for the Affirmative Lawsuits, or the mediation within those lawsuits, neither to which NFIC consented.  (ECF 1.)

Because the purported copyright owners never referenced or asserted copyright infringement in Hurricane's advertisements, Hurricane submits the following ad in support of its argument for coverage:

> IPv6 Tunnel Broker
>
> . . .
>
> Welcome to the Hurricane Electric 1Pv6 Tunnel Broker! Our free tunnel broker service enables you to reach the IPv6 Internet by tunneling over existing IPv4 connections from your IPv6 enabled host or router to one of

1

2

our IPv6 routers. To use this service you need to have an IPv6 capable host (IPv6 support is available for most platforms) or router which also has IPv4 (existing Internet) connectivity. Our tunnel service is oriented towards developers and experimenters that want a stable tunnel platform.

3

Advantages of using our tunnel service over others include:

4

5

• Run by a Business ISP with 24 x 7 staff at multiple locations and an International backbone (find out more about IPv6 transit at Hurricane Electric)

6

• Ability to get your own /48 prefix once your tunnel is up

7

Ability to get a full view of the IPv6 BGP4+ routing table

8

• Ability to use your tunnel now after a simple registration process. (It takes less than a minute.)

9

10

11

12

• Ability to create your tunnel on geographically diverse tunnel-servers (Ashburn, Chicago, Dallas, Denver, Fremont, Kansas City, Los Angeles, Miami, New Yor1<, Palo Alto, Phoenix, San Jose, Seattle, Toronto, Winnipeg, Amsterdam, Bertin, Budapest, Frankfurt, London, Paris, Prague, Stockholm, Stockholm, Warsaw, Zurich, Hong Kong, Singapore, and Tokyo) . . .

13

 (ECF 1-13)

14

Hurricane further relies on a Google ad:

15

100G IP Transit $6000/month - Global Internet Backbone

16

17

18

IP Transit For Your Network, Reach More Networks With Lower Latency. Price Matching. Turn up within 7 days. 24 x 7 NOC. Features: Port Availability, Flexible Billing, Rapid Turnaround Capability, Ability To Grow With You.

19

(ECF 1-12.)  The Complaint alleges that these ads were posted in 2015, and goes on to speculate that

20

the end-users could have committed the alleged copyright infringement in 2015 based on the three

21

year statute of limitations for copyright infringement.  (ECF 1, pp. 25-26.)

22

On the same day it filed the Complaint in this action, Hurricane filed an amended complaint in

23

the Affirmative Lawsuits.   (RJN, Exh. 1.)   The amended complaint makes the same factual

24

allegations referenced above and adds a section termed "Advertising."  (See RJN, Exh. 1, p. 3, *et*

25

*seq.*)  That section, lacking any foundation and with the apparent aim of triggering coverage, alleges

26

that the above-referenced Hurricane and Google ads did not encourage third parties to use its

27

"Internet Service Connection services" to commit copyright infringement.  (RJN, Exh. 1, pp. 25-28.)

28

/ / /

# III.
# ARGUMENT

## A.   Legal Standards

### 1.   Summary Judgment and the Duty to Defend

For Hurricane to prevail on its PMSJ, it would have to show "that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (holding that the moving party bears the initial burden of showing the absence of any genuine dispute over a material fact).  Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury.  *Celotex*, 477 U.S. at 327; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In adjudicating the PMSJ, this Court must view the facts and draw inferences in the manner most favorable to NFIC as the non-movant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992).

Under California law, a duty to defend is established only where the facts alleged or otherwise known to the insurer create a potential for covered liability, i.e., a judgment against the insured that the insurance company could be obligated to pay.  *Waller v. Truck Ins. Exchange*, 11 Cal. 4th 1, 19 (1995). Moreover, it is the alleged facts of the underlying complaint and not the labels assigned to them in the complaint that govern whether there is a potential for coverage.  *Hartford Cas. Ins. Co. v. Swift Distribution, Inc.*, 59 Cal. 4th 277, 287 (2014). "[I]f, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance." *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 654-55 (2005). "An insured cannot reasonably expect a defense of claims that are based on risks clearly not covered or conspicuously excluded under the policy." *Lyons v. Fire Ins. Exchange*, 161 Cal. App. 4th 880, 885 (2008).

Hurricane, as the party seeking coverage, has the burden of showing that the claims against it are within the scope of coverage provided by the Policy.  *Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1188 (1998).  Hurricane may not rely on mere speculation, including as to facts and claims that have not been asserted by the third party claimant, in meeting its burden. *Ulta Salon, Cosmetics & Fragrance, Inc. v. Travelers Property Cas. Co. of America*, 197 Cal. App. 4th 424, 434 (2011).

"The potentiality rule for the duty to defend is pegged to the possibility of actual indemnity coverage, not the mere existence of a plausible argument." *Friedman Professional Management Co., Inc. v. Norcal Mut. Ins. Co.*, 120 Cal.App.4th 17, 35 (2004). If Hurricane were to carry this burden, which it cannot, it would then be NFIC's burden to establish that the claims fall outside the grant of coverage, or are otherwise excluded. *Aydin*, 18 Cal.4th at 1183. Moreover, "it is settled that a potential for coverage cannot be based on an unresolved legal dispute concerning policy interpretation which is ultimately resolved in favor of the insurer."). *Lebas Fashion Imps. of USA, Inc. v. ITT Hartford Ins. Grp.*, 50 Cal.App.4th 548, 556 (1996).

## 2. <u>Policy Interpretation Under California Law</u>

To interpret the meaning of the policy language, courts must first look at the written provisions of the policy. "If the policy language is clear and explicit, it governs.... When interpreting a policy provision, we must give its terms their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage." *Palmer v. Truck Ins. Exch.*, 21 Cal.4th 1109, 1115 (1999). Policy language must be interpreted as a reasonable lay person would read it, not as it might be analyzed by an attorney or insurance professional. *MacKinnon v. Truck Ins. Exch.*, 31 Cal.4th 635, 648 (2003); see also *Crane v. State Farm Fire & Casualty Co.*, 5 Cal.3d 112, 115 (1971). "Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." *Reserve Ins. Co. v. Pisciotta*, 30 Cal. 3d 800, 807 (1982). The language must be interpreted in the context of the policy as a whole, and in light of the circumstances of the case. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1265 (1992).

## B. <u>There is No Coverage Under the Policy</u>

The Policy's PAI Endorsement limits "personal and advertising injury" coverage to three offenses: False arrest, malicious prosecution and wrongful eviction. (Rider Dec., Exh. B, p. 115.) Plaintiff does not, because it cannot, allege that the Affirmative Lawsuits allege or implicate these three offenses. Moreover, neither the cease-and-desist letters nor Affirmative Lawsuits fall within the Policy's Insuring Agreement. Assuming Hurricane can overcome that insurmountable hurdle, the cease-and-desist letters asserted copyright infringement against an internet service or access provider. (Dkt. Nos. 1-1 and 1-3.) The Policy's Intellectual Property and Insured's Internet-Type Businesses

exclusions bar coverage.  (Rider Dec., Exh. B, p. 90.)  Pursuant to the plain terms of the Policy, compared to the cease-and-desist letters, there is no potential for coverage under the Policy.  *Certain Underwriters at Lloyd's of London v. Superior Court*, 24 Cal. 4th 945, 958 (2001).

### 1.   The PAI Endorsement In The Policy Delivered to Hurricane Bars Coverage

NFIC provided a final quote for the Policy that listed the PAI Endorsement.  (Rider Dec.) NFIC thereafter delivered the complete Policy to Hurricane's broker including the PAI Endorsement, along with another copy reflecting the inclusion of the PAI Endorsement that included premium rating information.  (*Id.*)  The mailing of an insurance policy to insured's broker, who procured insurance, constitutes delivery to insured.  *Tarleton v. De Veuve*, 113 F.2d 290, 295 (9th Cir. 1940).  "A contract in writing takes effect upon its delivery to the party in whose favor it is made, or to his agent."  Cal. Civ. Code § 1626.  An insured is bound by the terms of the insurance policy where the policy is delivered to and retained by the insured.  *Matsuo Yoshida v. Liberty Mut. Ins. Co.*, 240 F.2d 824, 828 (9th Cir. 1957).

NFIC's delivery of the Policy binds Hurricane to the terms of the Policy.  Hurricane is generally under a duty to read the Policy, and will be charged with constructive knowledge of policy provisions which are plain, clear, and conspicuous.  *Dias v. Nationwide Life Ins. Co.*, 700 F.Supp.2d 1204, 1216 (E.D. Cal. 2010); see also *Ray v. Valley Forge Ins. Co.*, 77 Cal.App.4th 1039 (1999), citing Cal. Ins. Code, § 335 (parties to an insurance contract are bound to know all the material perils contemplated by it). As explained in *Esparza v. Burlington Ins. Co.*, 866 F.Supp.2d 1185, 1202-03 (E.D. Cal. 2011), the insurer does not owe an obligation to bring attention to a policy containing an amendment in a CGL policy to the insured's attention.  Instead, the insureds had duty to read their policy, in which the amendment was clear and conspicuous.  *Id.*  The failure to read the written contract before accepting is not a defense.  See also *Vernon v. Drexel Burnham & Co.*, 52 Cal.App.3d 706, 714 (1975) (failure to read the terms of a contract is not a meritorious defense to enforcement of an unread term).

Under California law, the insured has the burden of proving both the existence of the insurance contract, and its material terms. *National American Ins. Co. of California v. Certain*

*Underwriters at Lloyd's London*, 93 F.3d 529, 534 (9th Cir. 1996), citing *Searle v. Allstate Life Ins. Co.*, 38 Cal.3d 425, 438 (1985).  Here, Hurricane attempts to prove the existence of a partial policy that does not even contain the CGL Coverage Form of the Policy that it relies upon in its Complaint and this summary judgment motion.  Hurricane's broker had a complete copy of the Policy, as well as advance notice of the forms it would contain, including the PAI Endorsement.  (Rider Dec.)  NFIC has proven the existence and delivery of the complete Policy, and Hurricane cannot prove the reverse.

The PAI Endorsement was more than sufficiently "clear and conspicuous" under California law.  (PMSJ, pp. 15-17.)  Whether an exclusion or limitation is "conspicuous, plain and clear" is a question of law.  *Sprinkles v. Associated Indemnity Corp.*, 188 Cal.App.4th 69, 77-78 (2010).  An exclusion is clear and conspicuous when it is set-off by endorsement with a bold-faced heading in capital letters.  *National Ins. Underwriters v. Carter*, 17 Cal. 3d 380, 384-385 (1976) (exclusion clear and conspicuous); *Cal-Farm Ins. Co. v. TAC Exterminators, Inc.*, 172 Cal.App.3d 564, 578 (1984) (exclusion clauses do not fail merely because of the density of verbiage).  The exclusionary language of the PAI endorsement is listed on the Declarations page as a separate endorsement entitled "EXCLUSION – PERSONAL AND ADVERTISING INJURY LIMITED."  (Exh. B to Rider Dec., p. 12.)  The heading of the PAI Endorsement is in bold, capital letters and provides that it deletes "personal and advertising injury" offenses with the exception of offenses (a)-(c).  (Exh. B to Rider Dec., p. 115.)

Nor does the PAI Endorsement make coverage "illusory."  (PMSJ, pp. 16-18.)  A policy provision may not be considered illusory when it merely limits the amount of protection afforded. *Fagundes v. American Int'l Adjustment Co.*, 2 Cal.App.4th 1310, 1317 (1992) (underinsured motorist coverage was not illusory merely because there was no coverage available when the UIM coverage limit equaled limits of underinsured motorist's policy); *Forecast Homes, Inc. v. Steadfast Ins. Co.*, 181 Cal.App.4th 1466, 1483-1484 (2010) (self-insured retention did render coverage illusory where the satisfaction of the retention was not within insurer's control or discretion).

NFIC delivered the complete Policy to Hurricane's broker.  (Rider Dec.)  Moreover, NFIC sent a proposal to the broker in advance of delivery which listed the PAI Endorsement.  (*Id.*)  The PAI Endorsement is clear, plain and conspicuous.  There is nothing "curious" about NFIC relying on

the complete copy of the Policy provided to the insured for this opposition and its motion for judgment on the pleadings.  (PMSJ, p. 13.)  Hurricane is bound by the Policy issued to it, which contains the PAI Endorsement.

Under California law, an insurer may select the risks it will insure and those it will not, and a clear exclusion will be respected. *Kingsley Management, Corp. v. Occidental Fire & Casualty Company of North Carolina*, 441 F.Supp.3d 1016 (S.D. Cal. 2020)  The PAI Endorsement, by its plain terms, limits personal and advertising injury coverage to three offenses, false arrest, malicious prosecution and wrongful eviction, none of which are implicated by the cease-and desist letters or the Affirmative Lawsuits.  (Exh. B to Rider Dec., p. 115.)  The PAI Endorsement does not render coverage, which is limited but still available, illusory.

## 2.   The Cease-and-Desist Letters and Affirmative Lawsuits Do Not Fall Within The Policy's Insuring Grant

The Policy's Insuring Agreement provides that NFIC "will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend   the insured against any "suit" seeking damages for "personal and          advertising injury" to which   this insurance does not apply." (Exh. A, p. 89.)  The term "suit" is defined as:

> [A] civil proceeding in which damages because of . . . "personal and advertising injury" to which this insurance applies are alleged.   "Suit" includes:
>
> a.   An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or
>
> b.   Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

(Rider Dec., Exh. B, pp. 96, 98-99.)

A pre-lawsuit demand is not a "suit."  In *Foster-Gardner, Inc. v. National Union Fire Ins. Co.*, 18 Cal. 4th 857, 863 (1998), the term "suit" is interpreted to mean a civil action commenced by filing a complaint in court.  Anything short of this is a "claim."  *Id.* (rejecting cases under which certain pre-lawsuit proceedings were treated as "functional equivalent" of "suit"; see also *Fireman's*

*Fund Ins. Co. v. Sup.Ct.*, 65 Cal.App.4th 1205, 1214 (1997).

The standard CGL policy, like the Policy here, treats "claim" and "suit" separately, indicating the insurer has different rights and obligations with respect to "suits" and "claims." *Foster-Gardner, Inc.*, 18 Cal. 4th at 886. The result is that an insurer does not owe a duty to defend "claims" that have not yet become suits. Rather, it has discretionary authority to investigate and settle "as it deems expedient." *Id.* at 887; *Icasiano v. Allstate Ins. Co.*, 103 F.Supp.2d 1187, 1190 (N.D. Cal. 2000) (applying Calif. law) (no duty to investigate accident prior to tender of third party lawsuit).

As explained by the court in *San Diego Housing Com'n v. Industrial Indem. Co.*, 68 Cal.App.4th 526 (1998), the standard liability policy requires an insurer to defend a "suit," but gives it discretion to investigate and settle a "claim:"

> "As explained in *Foster–Gardner, Inc.*, 18 Cal.4th 857, standard liability policies require an insurer to defend a "suit," but give it discretion to investigate and settle a "claim." . . . There the court stated the rule that "a 'suit' is a court proceeding initiated by the filing of a complaint" . . . for purposes of analyzing a duty to defend. The court stated a preference for a "'bright-line rule that, by clearly delineating the scope of risk, reduces the need for future litigation. . . . [¶]  In *Foster–Gardner*, the Supreme Court contrasted the policy term "suit" to the policy term "claim" (also called a precomplaint notice at page 879), relying on the Court of Appeal opinion in *Fireman's Fund Ins. Co. v. Superior Court* (1997) 65 Cal.App.4th 1205, 1216, as follows: "'*A "claim" can be any number of things, none of which rise to the formal level of a suit—it may be a demand for payment communicated in a letter, or a document filed to protect an injured party's right to sue a governmental entity, or the document used to initiate a wide variety of administrative proceedings.... While a claim may ultimately ripen into a suit, "claim" and "suit" are not synonymous.*'" *Foster–Gardner,* 18 Cal.4th at 879.

*Id.* at 540-41.   (Emphasis added.); see also, *3250 Wilshire Blvd. Building v. Employers Ins. of Wausau*, 39 Cal.App.4th 1277, 1280 (1995) (matters raised only by way of answer have no potential to result in a judgment against the insured for "damages" covered by liability insurance); *James 3 Corp. v. Truck Ins. Exch.*, 91 Cal.App.4th 1093, 1104-1105 (2001) (a liability insurer is generally not obligated to fund and prosecute cross-complaints even if they are factually intertwined with the action against its insured).

The cease-and-desist letter is a "claim."   NFIC owed no obligation to defend against that

1   claim under the plain language of the Insuring Agreement and California law.  Nor is there is a "suit"

2   seeking damages against Hurricane.  NFIC owes no obligation to defend with respect to the cease-

3   and-desist letter or to pay Hurricane to prosecute its Affirmative Lawsuits.

4         Apparently  acknowledging  well-established  California  law,  Hurricane  makes  a  novel

5   argument that it can backdoor its way into coverage by filing a lawsuit and then agreeing to a

6   mediation without NFIC's consent.  This argument directly contravenes the language of the Policy.

7   The Policy defines the term "suit" to include "[a]ny other alternative dispute resolution proceeding in

8   which such damages are claimed and to which the insured submits *with our consent*."  (Emphasis

9   added.)  Hurricane offers no support for the argument that it can end-run the Insuring Agreement and

10   the definition of a "suit" by prosecuting its claims and then agreeing to mediate the case *without*

11   NFIC's consent.  This situation is plainly contemplated by the Policy's language and cannot be used

12   to invoke coverage that does not exist.[2]

13               **3.**        **The Intellectual Property Exclusion Bars Coverage**

14         The Court does not need to participate in Hurricane's "five part test" to determine coverage.

15   If the Court opts to participate in Hurricane's reasoning, Hurricane fails parts three through five.

16   (PMSJ, pp. 5-12.)  The  Intellectual  Property  exclusion  excludes  coverage  for  "personal  and

17   advertising  injury"  arising  out  of  copyright  infringement.  (Exh. B to Rider Dec., p. 90.)  This

18   exclusion  precludes  coverage  for  the  claims  of  copyright  infringement  made  by  the  third  party

19   claimants; and the claims made in the cease-and-desist letters do not fall within the exclusion's

20   limited exception for "infringement, in your 'advertisement,' of copyright . . ."  (Exh. B to Rider

21   Dec., pp. 90, 96.)

22         The  Intellectual  Property  exclusion  bars  coverage  for  "[p]ersonal  and  advertising  injury"

23   arising out of the infringement of copyright, . . ."  (Exh. B to Rider Dec., p. 90.)  The Intellectual

24   Property  exclusion  provides  an  exception  limited  to  "*infringement,  in  your  'advertisement,'  of*

25

26   [2]    The Complaint's Prayer seeks a judicial determination that NFIC must provide a "defense against
     liability." (ECF 1, p. 28.)  Hurricane's reply may ask the Court to weed through various unpublished case
27   law and ask the court to make new law that an insurer must pay fees and costs for any claim that may, or
     may not, ripen into a lawsuit.  The court does not need to undertake this exercise.  The policy language
28   should be applied as written. *Certain Underwriters at Lloyd's of London*, 24 Cal.4th at 958.

*copyright*, . . ." (Emphasis added.) (*Id.*) When read in conjunction with the definition of "advertisement," this exception states that Intellectual Property exclusion "does not apply to *infringement, in your* [*notice that is broadcast* or published to the *general public or specific market segments about your* goods, products or *services* for the purpose of attracting customers or supporters] of *copyright* . . ." (Emphasis added.) (Exh. B to Rider Dec., pp. 90, 96.)

The Policy plainly excludes copyright infringement. Assuming the PAI Endorsement can be ignored and the Policy requires a defense to claims (not "suits"), the cease-and-desist letters' claim for copyright infringement falls squarely in the Intellectual Property exclusion. The exception only applies to "infringement, *in your 'advertisement,*' of copyright . . ." (Emphasis added.) The only reasonable interpretation of this language is that the insured must infringe on a plaintiff's copyright by using copyrighted materials in the insured's advertisement. The advertising must be the source of the infringement. Such infringement would include the use of copyrighted advertising materials, graphics or other visual works in an advertisement. Indeed, this is the only reasonable interpretation when reading the Policy provisions in context. Copyright infringement is excluded from coverage. Advertising injury coverage, however, will be provided when the insured's advertisements infringe on another's copyright, trade dress or slogan, i.e., forms of visual intellectual property that may be infringed upon by the insured's advertising.

The (non-covered) cease-and-desist letters and Affirmative Lawsuits do not allege copyright infringement in Hurricane's ads for internet services. Under the basic rules of interpretation, the cease-and-desist letters and Affirmative Lawsuits do not fall within the definition of "personal and advertising injury" and there is no potential for coverage as a matter law.

a. **Hurricane Cannot Prove A Causal Connection Between The Alleged Copyright Infringement And Its "Advertisement"**

NFIC submits that the Court does not need to delve further into this issue under the facts of this case. However, NFIC further notes that for a court to find a covered "advertising injury" it must find that: (1) There is a causal connection between allegations in the third party complaint and the insured's advertising activities; and (2) the allegations in the third party complaint fit into one of the enumerated offenses in the commercial general liability policy that could be considered advertising

1   injuries.  *Bank of the West*, 2 Cal.4th at 1273–1274; *Mez Industries Inc. v. Pacific National Ins. Co.*,

2   76 Cal.App.4th 856, 865 (1999).  "[A]ny of the policy's enumerated advertising injuries must be

3   *caused* by [the insured's] advertising."  *Simply Fresh Fruit, Inc. v. Continental Ins. Co.*, 94 F.3d

4   1219, 1221 (9th Cir.1996) (emphasis in original).  That is, "the advertising activities must cause the

5   injury - not merely expose it."  *Id.* at 1223; see also *Hameid v. National Fire Ins. of Hartford*, 31 Cal.

6   4th 16, 22 (2003) (in order for the insured to have a reasonable expectation of coverage for

7   "advertising injury" "he must show that: (1) he was engaged in 'advertising' during the policy period

8   when the alleged 'advertising injury' occurred; (2) [plaintiff's] allegations created a potential for

9   liability under one of the covered offenses . . .; and (3) a causal connection existed between the

10  alleged injury and the 'advertising.'").

11          No court has ever held that a non-covered cease-and-desist letter or the insured's own

12  complaint can allege a claim that constitutes copyright infringement in the insured's own

13  advertisement.  Even assuming such a scenario could exist, to qualify as advertising injury, a causal

14  nexus must exist between the injury and the advertising offense itself.  *Bank of the West*, 2 Cal.4th at

15  1277.  A causal connection does not exist unless the insured directly violated the law through its

16  advertising activities.  *Mez Industries, Inc*., 76 Cal.App.4th 856, 867 and *Simply Fresh Fruit, Inc.*, 94

17  F.3d at 1221 (9th Cir.1996).  Without a causation requirement, advertising injury liability coverage

18  would extend far beyond the insured's reasonable expectations because it then "would encompass

19  most claims related to the insured's business."  *Bank of the West*, 2 Cal.4th at pp. 1276-1277. A case

20  of advertising injury based on copyright infringement of software, art, or music, the material must be

21  physically manifested in an advertisement or transmitted in an advertising message.  *Ziman v.

22  Fireman's Fund Ins. Co.*, 73 Cal.App.4th 1382, 1389 (1999).

23          For example, in *Hartford Cas. Ins. Co. v. EEE Business, Inc.*, 2009 WL 3809817 (N.D. Cal.,

24  November 10, 2009), Microsoft alleged that that EEE infringed on Microsoft's software copyrights

25  by importing and selling the software in the United States when it was only licensed for sale abroad

26  and to educational institutions.  The judgment and the complaint upon which it was entered did not

27  relate to any content in advertising or injury caused therefrom.  The court therefore ruled that there

28  was no duty to indemnify for a judgment against the insured for copyright infringement where the

1   plaintiff did not allege infringement of the copyright in advertising activities.  *Id.* at *6; see also

2   *Educational Impact v. Travelers Property Casualty Company of America*, 2016 WL 7386139 (N.D.

3   Cal., December 21, 2016) (the insured's alleged copyright infringement through the sale of

4   counterfeit software did fall within the exception to the intellectual property exclusion for infringing

5   on another's copyright in the insured's advertisements).[3]

6        The causal connection requirement is not met where an advertisement merely exposes an

7   underlying injury.  *Simply Fresh Fruit, Inc.*, 94 F.3d at 1223.  The advertisements at issue here, for

8   internet services, do not even expose copyright infringement let alone allege copyright infringement

9   in an advertisement.  The cease-and-desist letters and Affirmative Lawsuits do not fall within the

10  Policy's Insuring Agreement.  Even if they did, Hurricane offers no facts to support an exception for

11  the use of copyright in Hurricane's advertisements for its internet services.[4]

12       Because there is no claim that Hurricane used movie titles or other copyrighted materials in

13  the advertisements, there is no causal connection between infringement and injury.  Thus, there is no

14  potential for coverage under the Policy for the copyright infringement asserted by the third party

15  claimants, or the insured's own Affirmative Lawsuits.

16       **4.      The Insured In Internet-Type Business Exclusion Bars Coverage**

17       The Insured's In Internet-Type Business exclusion bars "personal and advertising injury"

18  coverage, with the exception of three relevant offenses, where the "'personal and advertising injury'

19  committed by an insured whose business is: . . . [a]n Internet search, access, content or service

20  provider."  (Exh. B to Rider Dec., p. 90.)

21

22  [3] *Tradewind Products, Inc. v. Hartford Fire Ins. Co.*, 314 Fed.Appx. 2, 2008 WL 2476695 (9th Cir. 2008) is inapposite.  In *Tradewinds*, the complaint repeatedly used the term "advertising" in broad terms that

23  encompassed ongoing use of copyrighted materials in online and other advertising.   NFIC further notes that depublished California Court of Appeal decisions and unpublished federal court decisions prior to

24  2007 are not citable as authority.  Local Rule 3-4(e); Ninth Circuit Rule 36-3; Fed. R. App. P. 32.1.

25  [4] In an effort to bring the claim within the Policy's effective date, Hurricane speculates that certain IP addresses existed in 2015 and that those IP addresses could have downloaded copyrighted movies in 2015

26  based on the three year statute of limitations for copyright infringement.  In addition to the fact the cease-and-desist letters are not covered and the underlying lawsuit was filed by Hurricane, speculation by the

27  insured about ways in which a pleading (here its own complaint . . .) might be amended to state potentially covered claims does not create a potential for coverage. *Gunderson v. Fire Ins. Exch.*, 37

28  Cal.App.4th 1106, 1114 (1995); *Safeco Ins. Co. of America v. Parks*, 122 Cal.App.4th 779, 794 (2004).

The jurisdictions addressing this exclusion have held that the exclusion applies to an insured "principally engaged" in the business of providing media or internet-type services.  Courts apply the plain language of the exclusion, i.e., it applies even where the alleged enumerated offense does not "arise out of" the insured's internet-type services.  *American Employers Ins. Co. v. DeLorme Publishing*, 39 F.Supp.2d 64 (D. Me. 1999) (upholding exclusion even where advertising or publishing was not insured's sole business, and even where alleged trademark infringement did not arise out of publishing activities). See also *Travelers Ins. Co. v. Lesher*, 187 Cal.App.3d 169, 181 (1986) rev'd in part on other grounds, *Buss v. Superior Court*, 42 Cal.App.4th 1663 (1996) (applying the exclusion even though the underlying claim did not arise out of insured's publishing activities); *Ace American Insurance Company v. Dish Network, LLC,* 173 F.Supp.3d 1128 (D. Colo. 2016) (applying similar business of broadcasting, telecasting exclusion even though alleged TCPA violations did not arise out of insured's broadcasting or telecasting activities); see also *Corbis Corp., Inc. v. St. Paul Fire & Marine Ins. Co.*, 125 Fed.Appx. 792, 2005 WL 481611 (9th Cir. 2005) (third party allegations arose from "publishing activity" by insured).

Hurricane provides "internet access, transit, tools, and network applications, . . ." (ECF 1-1, p. 3, ¶ 6.)  Hurricane "is considered the largest IPv6 backbone in the world . . ." (ECF 1-1, p. 3, ¶¶ 7-8.) "The Internet backbone [is] . . . principal data routes between large, strategically interconnected computer networks and core routers of the Internet. . . . Internet service providers, often Tier 1 networks, participate in Internet backbone traffic by privately negotiated interconnection agreements, primarily governed by the principle of settlement-free peering. (ECF 1-1, p. 14, ¶ 53(g).)  Hurricane has a global internet network,". . . us[ing] fiber-optic topology to offer 100G upload speeds.  (ECF 1-1, p. 3, ¶¶ 7-8.)  "As an upstream service provider, H[urricane] simply acts as a 'highway' that passively provides its customers, and thus its customers' customers, with Internet access.  H[urricane] Internet connections are business-to-business ("B2B") type connections . . ."  (ECF 1-1, p. 4, ¶ 11.) Hurricane is an Online Service Provider to ISP's.  (ECF 1-1, p. 11-12, ¶ 51(m).)   In short, Hurricane provides business-to-business internet access or service that allows high speed uploads.

The ads on which Hurricane (unsuccessfully) relies to contend that the third party claimants assert copyright infringement state that Hurricane is "tunnel broker service" enabling users to reach

the IPv6 Internet.  (ECF 1-13.) The Google ad states that Hurricane provides "100G IP Transit. . .  –  [to the] Global Internet Backbone."  (ECF 1-12.)

There is no reasonable dispute that Hurricane is an internet "access, content or service provider."  Hurricane attempts to muddy this conclusion by stating that its service requires an ISP to provide an IP address, and that it provides web-hosting, storage and translates website domain names to numerical IP addresses.[5]  (PMSJ, p. 19; ECF 22, Ng Dec.)  Hurricane's attempt to explain away its business model on the grounds it is not an ISP like Google is unavailing.  Hurricane's  argument that "[t]o determine a contextually appropriate meaning of the term 'access' in the phrase 'Internet search access content or service provider,' all tertiary forms of access volitionally chosen by a portal user must be eschewed," is untrue, both practically and in theory.  (ECF 21, p. 19, lines 19-21.)  Hurricane provides access to the "backbone" of the internet, connecting users across internet networks.  This is an internet service that provides access to exchange information over the internet.  Hurricane's attempt to parse terms and tenses, reference language from an irrelevant cyber-technology insurance policy and equate Hurricane's high speed internet service to a Sony Play Station cannot create coverage that does not exist under the plain terms of the Policy.  (ECF 21, pp. 19-25.)

Moreover, Hurricane providing web-hosting, storage and translation of website domain names to numerical IP addresses are all internet services that are part-and-parcel of the internet-type business in which it is "principally engaged."  (Ng Dec., ECF 22-2.)  Stated differently, these add-on services allow Hurricane to offer a turn-key solution for accessing its internet services.

In determining the intent of the Insured in Internet-Type Business exclusion, "[t]he rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the  meaning a layperson would ordinarily attach to it."  *Waller*, 11 Cal. 4th at 18. Courts consider the clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage. *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 822 (1990).  The Insured in

---

[5] "A web hosting service is a type of Internet hosting service that allows individuals and organizations to make their website accessible via the World Wide Web." https://en.wikipedia.org/wiki/Web_hosting_service

National Fire Ins. Co. of Hartford's Opposition to Motion for Partial Summary Judgment

Internet-Type Business exclusion is broadly worded and unambiguous.   The exclusion bars coverage based its plain terms as applied to the Hurricane's business model.

## IV.
## CONCLUSION

There is no coverage for this claim under the PAI Endorsement.  The cease-and-desist letters and Hurricane's affirmative complaints do not fall within the scope of the Policy's Insuring Agreement in any event.  Even assuming the Court is willing to make new law requiring a liability insurer to defend "claims" not "suits" or the prosecution of an insured's own action and chooses to ignore the PAI Endorsement, any claims for copyright infringement fall within the Policy's Intellectual Property exclusion.   That exclusion precludes coverage for "[p]ersonal and advertising injury" arising out of the infringement of copyright, . . ."   There can be no reasonable dispute that cease-and-desist letters assert infringement of copyright.  The exception for copyright infringement in Hurricane's "advertisement" is facially implausible based on the ads for Hurricane's internet service that provides access to the backbone of the internet.  Lastly, the Insured's in Media and Internet-Type Business exclusion applies to Hurricane, an internet service or access provider.

Based on the foregoing, Hurricane has not met its burden of proving a potential for "personal advertising injury" coverage for the cease-and-desist letters or the Affirmative Lawsuits.  NFIC respectfully submits that Hurricane's PMSJ must be denied.


Respectfully submitted,

Dated:  October 27, 2020          CNA COVERAGE LITIGATION GROUP


By:    /s/      *Robert Christensen*                      
      ROBERT CHRISTENSEN
      Attorneys for Defendant NATIONAL FIRE
      INSURANCE COMPANY OF HARTFORD