1   **GAUNTLETT & ASSOCIATES**
    David A. Gauntlett (SBN 96399)
2   James A. Lowe (SBN 214383)
    18400 Von Karman, Suite 300
3   Irvine, California 92612
    Telephone:     (949) 553-1010
4   Facsimile:     (949) 553-2050
    jal@gauntlettlaw.com
5
    Attorneys for Plaintiff
6   Hurricane Electric, LLC

7

8                    **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10                    **SAN FRANCISCO DIVISION**

11

12  HURRICANE ELECTRIC, LLC, a Nevada      )   Case No.: 3:20-cv-05840-CRB
    limited liability company,             )
13                                         )   Judge Charles R. Breyer
                                           )
14              Plaintiff,                 )
        vs.                                )   **REPLY TO DEFENDANT NATIONAL**
15                                         )   **FIRE INSURANCE COMPANY'S**
    NATIONAL FIRE INSURANCE COMPANY        )   **OPPOSITION TO HURRICANE**
16  OF HARTFORD, an Illinois corporation,  )   **ELECTRIC'S MOTION FOR PARTIAL**
                                           )   **SUMMARY JUDGMENT**
17              Defendant.                 )
                                           )
18                                         )   Date:   November 13, 2020
                                           )   Time:   10:00 a.m.
19                                         )   Ctrm:   6
                                           )
20  _____)

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

I.      HE IS ENTITLED TO A DEFENSE ...................................................... 1

3

4
II.     NFI HAS NOT OVERCOME HE'S EVIDENCE THAT THE "LIMITED
        ENDORSEMENT" WAS NOT DELIVERED. .......................................... 2

5
        A.      NFI Has Not Produced Competent Evidence That The "Limited
                Endorsement" Was Included With 2015 Policy Delivered To HE. ............... 3

6

7
        B.      NFI's Cases Do Not Address Its Failure To Deliver The "Limited
                Endorsement" ................................................................................ 5

8
        C.      NFI Does Not Dispute That The 2015 Policy Promised "Advertising Injury"
                Coverage. ....................................................................................... 6

9

10
        D.      NFI Fails To Address Its Failure To Inform HE That The 2015 Policy
                Restricted Coverage Available Under The Previous Years' Policy. ............... 7

11
                1.      NFI Failed To Inform HE That The Limited Endorsement Purports
                        To Eliminate Coverage That Was Available Under Its Previous
                        Year's Policy. ........................................................................ 7

12

13
                2.      NFI's Cited Cases Are Readily Distinguishable. ..................... 8

14
                3.      The Surreptitious Elimination Of All "Advertising Injury" Coverage
                        Is Precisely The Diminution In Coverage Courts Protect Against. ....... 9

15

16
        E.      By Failing To Address HE's Arguments, NFI Has Conceded That Delivery
                Is Required For The Limited Endorsement To Be Enforceable .................. 10

17
III.    THE LIMITED ENDORSEMENT IS NOT ENFORCEABLE. ................. 11

18
        A.      The Limited Endorsement Is Inconsistent With The Expanded AI/PI
                Endorsement Contemporaneously Issued ............................................. 11

19

20
        B.      The Contemporaneously-Issued Expanded AI/PI Endorsement Cannot Be
                Reconciled With The Limited Endorsement's Coverage Restriction. ........... 12

21
IV.     THE MEDIATION WAS A "SUIT," SO THAT ELEMENT IS MET ...... 12

22
        A.      NFI's Cases Interpreting "Suit" Are Readily Distinguishable ................ 13

23
        B.      An Insurer Cannot Require Consent Where It Has Denied A Defense And
                Not Rejected The Insured's Right To Pursue ADR Thereafter ................. 14

24

25
        C.      The Mediation Which NFI Declined To Attend Was A "Suit" Within The
                Plain Meaning Of NFI's Policy. ....................................................... 15

26
                1.      NFI Acknowledges That It Denied A Defense To Its Insured, HE, On
                        July 1, 2020 (ECF 1-9) On A Variety Of Grounds. ....................... 15

27

28

i

2. Case Law Supports The Duty To Facilitate Settlement To Secure Case Resolution. ......................................................................... 15

3. NFI Does Not Explain Any Legal Issue Arising Out Of The Filing Of An "Amended Complaint" In The Affirmative Action. ...................... 16

4. The Aforementioned Out-Of-State "Consent" Cases Regarding ADR Follow The Policy's Plain Language ......................................... 16

5. NFI Never Asserted That HE Could Not Go Forward With The Mediation, Nor Did NFI Contest HE's Ability To Contend That The Mediation Would Meet The Requirements For A "Suit." ................ 16

V. NO EXCLUSIONS ASSERTED BY NFI APPLY .......................................... 17

 A. The "Intellectual Property" Exclusion Is No Bar To A Defense .................... 17

  1. The Pertinent Policy Language Is Satisfied. .......................................... 17

  2. NFI's Reliance On Cases Interpreting Broader Causal Nexus Policy Language In Earlier ISO Policy Forms Is Of No Moment ................. 18

 B. HE's "Advertisement" Created A Causal Nexus To Alleged Copyright Infringement Liability Due To Promotion Of Internet Backbone Connectivity. ............................................................................................... 20

 C. NFI's Reliance Upon The Exclusion For Insureds Whose Business Is As An "Internet Search, Access, Content Or Service Provider" Is Misplaced. ......... 21

  1. The "Business Is" Predicate To The Isp Exclusion Is Narrowly Construed. .................................................................................... 21

  2. The *Sony Corp.* Case Is Directly On Point. ......................................... 22

  3. NFI Relies On Out-Of-State Decisions That Are Inconsistent With More Recent Decisions. ............................................................... 23

  4. The Exclusion's Application To A Business That "Is" An Internet Service Or Access Provider Necessarily Limits Its Ambit. ................ 24

  5. No Evidence Limits HE's Business To Providing Internet Access. .... 24

VI. CONCLUSION .................................................................................................. 25

1

2

**TABLE OF AUTHORITIES**

**Federal Cases**

*Ace American Ins. Co. v. Dish Network, LLC*,
 173 F.3d 1128 (D. Colo. 2016) ...................................................................................23

*AMCO Ins. Co. v. Lauren-Spencer, Inc.*,
 500 F.Supp.2d 721 (S.D. Ohio 2007).........................................................................19

*American Employers Ins. Co. v. DeLorme Publishing*,
 39 F.Supp.2d 64 (D. Me. 1999)...................................................................................23

*Benabou v. Cheo*,
 No. 2:19-cv-04619-R-SS, 2019 U.S. Dist. LEXIS 227872, 2019 WL 8017819
 (C.D. Cal. December 17, 2019)....................................................................................11

*Benchmark Ins. Co. v. Dismon Corp.*,
 2016 U.S. Dist. LEXIS 192404 (C.D. Cal. Aug. 9, 2016), No. CV 15-01539 TJH ....10

*Century 21, Inc. v. Diamond State Ins. Co.*,
 442 F.3d 79 (2d Cir. (NY) 2006) .................................................................................20

*Columbus Farmers Market, LLC, v. Farm Family Casualty Ins. Co.*,
 2006 WL 3761987 (D. N.J., Dec. 21, 2006) ...............................................................20

*Corbis Corp. v. St. Paul Fire & Marine Ins. Co.*,
 125 F. App'x 792 (9th Cir. 2005).................................................................................23

*Dias v. Nationwide Life Ins. Co.*,
 700 F.Supp.2d 1204 (E.D. Cal. 2010) .......................................................................8, 9

*Educ. Impact v. Travelers Prop. Cas. Co. of Am.*, No. 15-cv-04510-EMC, 2016 U.S.
 Dist. LEXIS 176799 , 2016 WL 7386139 (N.D. Cal. Dec. 21, 2016............................18

*Esparza v. Burlington Ins. Co.*,
 866 F.Supp.2d 1185 (E.D. Cal. 2011) .......................................................................9, 10

*Hall v. Mrtg. Investors Grp.*,No. 2:11-CV-00952-JAM-GGH, 2011 U.S. Dist. LEXIS
 105999 (E.D. Cal. Sep. 16, 2011) ...............................................................................11

*Hartford Cas. Ins. Co. v. EEE Bus. Inc.*, No. C 09-01888 JSW, 2009 U.S. Dist. LEXIS
 104994, 2009 WL 3809817 (N.D. Cal. Nov. 10, 2009).................................................18

*Hooters of Augusta, Inc. v. Am. Glob. Ins. Co.*,
 157 F. App'x 201 (11th Cir. 2005)................................................................................7

*Icasiano v. Allstate ins. Co.*,
 103 F. Supp. 2d 1187 (N.D. Cal. 2000) ......................................................................13

*Interface, Inc. v. Standard Fire Is. Co.*,
    2000 U.S. Dist. LEXIS 14019 (N.D. Ga., Aug. 15, 2000) ..................................................20

*Kingsley Management Corp. v. Occidental Fire & Casualty Co. of North Carolina*,
    441 F.Supp.3d 1016 (S.D. Cal. 2020) ..................................................7

*Lexington Ins. Co. v. MGA Entm't, Inc.*,
    961 F. Supp. 2d 536 (S.D.N.Y. 2013) ..................................................17

*Mid-Continental Casualty Co. v. Kipp Flores Architects, LLC*,
    602 F. App'x 985 (5th Cir. (Tex.) 2015) ..................................................21

*Princeton Express & Surplus Ins. Co. v. DM Ventures USA LLC*,
    209 F. Supp 3d 1252 (S.D. Fla. 2016) ..................................................2, 7

*R.C. Bigelow v. Liberty Mutual Ins. Co.*
    287 F.3d 242 (2d. Cir. 2002) ..................................................19

*Simply Fresh Fruit, Inc. v. Continental Ins. Co*,
    94 F.3d 1219 (122) (9th Cir. 1996) ..................................................18

*St. Surfing, Ltd. Liab. Co. v. Great Am. E&S Ins. Co.*,
    776 F.3d 603 (9th Cir. (Cal.) 2014) ..................................................2, 17

*Tarleton v. De Veuve*,
    113 F.2d 290 (9th Cir. 1940) ..................................................5, 6

*Wiseman-Hughes Enters. v. Harleysville Lake States Ins. Co.*,
    2009 U.S. Dist. LEXIS 29797 (N.D. Ill. Apr. 8, 2009) ..................................................14

*Yoshida v. Liberty Mut. Ins. Co.*,
    240 F.2d 824 (9th Cir. 1957) ..................................................6

**State Cases**

*3250 Wilshire Blvd. Building v. Employers Ins. of Wausau*,
    39 Cal. App. 4th 1277 (1995) ..................................................13

*Acuity v. Bagadia*,
    750 N.W.2d 817 (Wis. 2008) ..................................................19

*AIU Ins. Co. v. Superior Court*,
    51 Cal. 3d 807 (1990) ..................................................23

*American Cyanamid Co. v. American Home Assurance Co.*
    30 Cal.App.4th 969 (1994) ..................................................13

*Atl. Mut. Ins. Co. v. J. Lamb, Inc.*,
    100 Cal.App.4th 1017 (2002) ..................................................18, 19

*Bank of the West v. Superior Court,*
    2 Cal.4th 1254 (1992) .................................................................................18

*Essex Ins. Co. v. Heck,*
    186 Cal.App.4th 1513 (2010) ......................................................................17

*Fagundes v. American Int'l Adjustment Co.,*
    2 Cal.App.4th 1310 (1992) ...........................................................................7

*Fields v. Blue Shield of Cal.,*
    163 Cal.App.3d 570 (1985) ...........................................................................8

*Fireman's Fund Ins. Co. v. Sup. Ct.,*
    65 Cal. App. 4th 1205 (1997) ......................................................................13

*Foster-Gardner, Inc. v. National Union Fire Ins. Co.,*
    18 Cal. 4th 857 (1998) ................................................................................13

*Hameid v. National Fire Ins. Co. of Hartford,*
    31 Cal.4th 16 (2003) ...................................................................................18

*Hartford Cas. Ins. Co. v. Swift Distribution, Inc.,*
    59 Cal.4th 277 (2014) .................................................................................24

*Isaacson v. Cal. Ins. Guarantee Ass'n,*
    44 Cal.3d 775 (1988) ..................................................................................16

*James 3 Corp. v. Truck Ins. Exch.,*
    91 Cal. App. 4th 1093 (2001) ......................................................................13

*King v. Cont'l Western Ins. Co.,*
    123 S.W.3d 259 (Mo. App. 2003) ...............................................................20

*MacKinnon v. Truck Insurance Exchange,*
    31 Cal. 4th 635 (2001) ................................................................................11

*Melssen v. Auto-Owners Ins. Co.,*
    285 P.3d 328 (Colo. 2012) ..........................................................................15

*Ray v. Valley Forge Ins. Co.,*
    77 Cal.App.4th 1039 (1999) .......................................................................8, 9

*Safeco Ins. Co. v. Roberts,*
    26 Cal. 4th 758 (2001) ............................................................................14, 25

*San Diego Housing Com'n v. Industrial Indem. Co.,*
    68 Cal. App. 4th 526 (1998) ........................................................................13

*Steven v. Fidelity & Casualty Co.*,
  58 Cal. 2d 862 (1962)..........................................................................................23

*United States Fire Ins. Co.  v. Button Transp., Inc*, A108419, 2006 Cal. App. Unpub.
  LEXIS 3472, 2006 WL 1085782 (Apr. 26, 2006) .........................................15

*Vernon v. Drexel Burnham & Co.*,
  52 Cal.App.3d 706 (1975)...................................................................................8, 9

*Waller v. Truck Ins. Exch., Inc.*,
  11 Cal. 4th 1 (1995)..................................................................................17, 23, 24

*Zurich Am. Ins. v. Sony Corp of Am.*,
  2014 N.Y. Misc. LEXIS 5141 (Sup. Ct. Feb. 21, 2014) ........................... *passim*

**State Statutes**

Cal. Bus. & Prof. Code § 17200.........................................................................18

**Rules**

F.R.E. 602............................................................................................................3

**Other Authorities**

David A. Gauntlett, *Insurance Coverage of Intellectual Property Assets*, §§ 16.06 B,
  2014 Supp............................................................................................................18

David A. Gauntlett, Recent Developments in Intellectual Property Law, 37 TORT &
  INS. L.J. 543, 550 (Winter 2002)......................................................................21

*New Appleman on Insurance Law*, § 30.01 (4)(a)(ii)(b)(3) .................................18

**HE'S REPLY TO DEF. NFI'S OPP. TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.    HE IS ENTITLED TO A DEFENSE

National Fire Insurance Company of Hartford ("NFI") misleadingly characterizes Hurricane Electric Inc. ("HE") as a direct connector to the internet despite HE's careful explanation that one of its activities, among many, is serving as a "tunnel broker" to the internet backbone "providing distant, upstream access to the backbone of the internet, but not direct connections to internet services which permit uploading of movies."  [DKT 28, p. 7:18-22, Declaration of Danny Ng. ("Ng Decl.").] As NFI concedes, "Hurricane rightfully denies any wrongdoing."  [DKT 32, p. 2:6-7.]  No infringement of the asserted copyrights, or misuse of abuse of copyrights charged by the C & D Letter can be imagined, in light of the impact of the Digital Millennium Copyright Act ("DMCA").

Nonetheless, even false, frivolous, or groundless claims against the policyholder must be defended.  Indeed, that is the whole point of insurance liability coverage.  It protects parties wrongfully accused of conduct that falls within the potential scope of coverage.  Otherwise, liability insurance would be a mere risk transference mechanism.  NFI's declination of coverage for the March 19, 2020 cease and desist letter ("C & D Letter"), and the defensive Declaratory Relief Action, including that pending but stayed by this Court, is based on its wrongful denial of potential coverage for the asserted claims therein.

HE is entitled to a defense for five (5) distinct reasons:

**First**, HE's insurance broker, James Heppes, forwarded to HE the 2015 Policy he received from NFI, which is "Exhibit 6" to the Complaint.  [Heppes Declaration, ¶ 4.]  The "Exclusion-Personal and Advertising Injury-Limited" Endorsement ("Limited Endorsement") was not delivered to HE.  According to the Second Rider declaration in support of the Opposition, the Limited Endorsement purports to redefine coverage to only include coverages (a) through (c).

A distinct new endorsement was also included with the version of the Policy that NFI contends was delivered.  NFI describes that endorsement, first referenced in the Second Rider Declaration as part of Exhibit 3 (the certified 2015 Policy, which it claims was given to HE), as "Expanded Personal and Advertising Limited Endorsement 6300950A" ("Expanded AI/PI Endorsement").  The actual language of the Expanded AI/PI endorsement was never delivered, as was true of the Limited

1   Endorsement.

2       The Expanded AI/PI endorsement, if considered, notified HE of a purported *expansion* of

3   "personal and advertising injury" coverage by adding offense (h) to include discrimination and

4   humiliation coverage in addition to offenses (a) through (g).  Thus, even if the Limited Endorsement

5   was delivered to HE (it was not), NFI did not call attention to this limitation in coverage.  Instead, the

6   only notice given to HE was that personal and advertising injury coverage had been *expanded*.

7       **Second**, even if the Limited Endorsement is deemed enforceable despite not being delivered to

8   HE or notifying HE by a Notice of  Change of Coverage that the "Personal and Advertising Injury"

9   coverage previously in force was dramatically reduced without a reduction in annual premiums, NFI

10  fails to distinguish the only case to address the (a) through (c) redefinition, which held it created illusory

11  coverage.  *Princeton Express & Surplus Ins. Co. v. DM Ventures USA LLC*, 209 F. Supp 3d 1252, 1250

12  (S.D. Fla. 2016).

13      **Third**, express coverage in NFI's definition of a "suit" extends to mediation in subparagraph

14  (b), as here, following a denial of a defense.  As HE provided notice to NFI of the mediation in which

15  NFI declined to participate, NFI cannot now object to HE's contention that HE satisfied the definition

16  of "suit" in its policy.

17      **Fourth**, the requirement under offense (g) that copyright infringement occur in "your

18  advertisement" is satisfied for the same reasons the court held it satisfied in a Ninth Circuit case, *St.

19  Surfing, Ltd. Liab. Co. v. Great Am. E&S Ins. Co.*, 776 F.3d 603, 611 (9th Cir. (Cal.) 2014), which held

20  that conduct of a related entity directing customers to an insured is advertising—a case which NFI

21  neither discusses nor distinguishes.

22      **Fifth,** NFI also ignores

23      *Zurich Am. Ins. v. Sony Corp of Am.,* 2014 N.Y. Misc. LEXIS 5141 at *12-13 (Sup. Ct. Feb.

24  21, 2014) case, the only court to analyze the "ISP" exclusion, concluding that a defense obligation arose

25  in analyzing claims out of "access to" the Sony PlayStation.

26  **II.    NFI HAS NOT OVERCOME HE'S EVIDENCE THAT THE "LIMITED
        ENDORSEMENT" WAS NOT DELIVERED.**

27

28

**HE'S REPLY TO DEF. NFI'S OPP. TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

1

      **A.**     **NFI Has Not Produced Competent Evidence That The "Limited Endorsement" Was Included With 2015 Policy Delivered To HE.**

2

NFI seeks to avoid defending its insured by asserting a limited endorsement that was never

3

delivered to the insured.  This is wrong, for at least five (5) reasons.

4

**First**, HE's evidence establishes that the NFI Policy delivered to it in 2015 did not contain the

5

endorsement which NFI argues severely reduces the insurer's coverage obligations.  NFI's argument

6

requires it to establish that the Policy actually delivered to HE contained the Limited Endorsement. NFI

7

filed on October 27, 2020 a Declaration Of Corey Rider In Support Of National Fire Insurance Company

8

Of Hartford's Opposition To Motion For Partial Summary Judgment [ECF 29] with Exhibits A and B

9

[ECF 29-1 and 29-2] which Mr. Rider purports to authenticate (collectively, the "Second Rider

10

Declaration").  Exhibit "B" to the Second Rider Declaration purports to be a copy of the policy issued

11

to HE in 2015.  It includes a one-page endorsement entitled "Exclusion-Personal and Advertising Injury

12

Limited" which is the basis of NFI's opposition to HE's MPSJ.  [Second Rider Decl. ¶ 6, Ex. "B", p.

13

115.]

14

Mr. Rider's Second Declaration attempts to establish that Exhibit "B," a version of the 2015

15

Policy containing the Limited Endorsement, was "sent to Hurricane's broker," James Heppes.  But Mr.

16

Heppes has testified that the NFI policy he received and delivered to HE did *not* contain the "Exclusion-

17

Personal and Advertising Injury Limited" endorsement upon which NFI now wants to rely.  *See*

18

Declaration of James Heppes [ECF 23] and its **Exhibit "6"** [ECF 24].  NFI's problem in challenging

19

HE's evidence is that the Second Rider Declaration is incompetent evidence and cannot authenticate its

20

Exhibit B.

21

**Second**, the Second Rider Declaration and exhibits are inadmissible under Civil L.R. 7-5(b).

22

They violate F.R.E. 602 (lack of personal knowledge), 802 (hearsay), 901 (failure to authenticate

23

documents), and 902 (documents are not self-authenticating).

24

Mr. Rider only testifies that he is "a vice-president, commercial officer for the CNA service

25

mark underwriting companies…"  The sole purpose of his Second Declaration is to authenticate Exhibit

26

A, asserted to be a "proposal" for insurance sent to HE's broker on January 16, 2015, and Exhibit B,

27

28

**HE'S REPLY TO DEF. NFI'S OPP. TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

asserted to be a "true and correct certified copy of policy number 509119138 issued for the period January 24, 2015 to January 24, 2016 to Hurricane… and sent to Hurricane's broker on January 15, 2015."  Mr. Rider, however, does not testify to any fact that would allow him, based on his personal knowledge, to determine what was issued at any time to HE, or what was sent to anyone in 2015, or whether Exhibit B is a true and correct certified copy of any particular policy.  Mr. Rider provides only unsupported conclusions and his declaration is not competent to authenticate the exhibits.

**Third**, Mr. Rider did not himself "issue" or "send" anything to anyone.  He did not "deliver" anything.  There is no evidence about NFI's "process" for "issuing" a policy, or how it is done, or by whom.  There is no evidence about any NFI "process" for "issuing" or "delivering" a policy, or "certifying" or "sending" anything.  Aside from his title, Mr. Rider does not testify how he is "familiar with the underwriting process and systems for the issuance of the insurance policies and the delivery of policies." He does not explain anything about any "process and systems."  Mr. Rider does not testify to any fact that would put him in a position to know anything about the documents he purports to authenticate.  As a company officer, it is unlikely that Mr. Rider personally creates, handles, maintains, sends, or delivers the documents he seeks to authenticate or even that he supervises people who do.

**Fourth**, Mr. Rider is not a custodian of records and does not testify about any records maintained by NFI.  He does not explain where his exhibits came from or how they were created or maintained.  Mr. Rider does not even testify as to whether or how he can recognize the documents attached to his declaration, or that he even examined Exhibits "A" and "B."  If he did examine the exhibits, Mr. Rider does not explain what he or anyone compared them to in order to determine if they were copies of anything.  He does not even testify that NFI maintains full policy copies.

Mr. Rider apparently assumes that certain things normally happen and he appears to be guessing about what happened where he works during issuance and delivery of the particular policy sold to HE.  Mr. Rider testifies to no personal knowledge of what actually happened with the issuance, assembly, delivery, and maintenance of the documents he is asked to authenticate.  There is no evidence that Mr. Rider knows what happened to particular documents nearly six years ago.  Since insurance policies are assembled from numerous forms, it is understandable that one or more forms may have been omitted

**HE'S REPLY TO DEF. NFI'S OPP. TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

1   when assembling the Policy actually delivered to HE.  There is no testimony about quality control

2   procedures in the assembly of policies.  Mr. Rider cannot know what happened with this form.

3        **Fifth**, Mr. Rider does not testify to any personal knowledge about the contents of any policy, let

4   alone Exhibit B.  Mr. Rider does not testify about his job (other than his title) or what a commercial

5   officer is or does for the various companies he references, or when he did it.  He does not testify about

6   how he claims to know what is in Exhibit B, or when it was issued, or to whom it was issued, or even

7   if it was ever "issued."  Mr. Rider does not explain what it means to "issue" and deliver a policy.

8        Nor does Mr. Rider explain what a "certified" copy of anything might be, including what

9   "certification" means, or how the certification process is performed and by whom.  Mr. Rider's

10  Declaration contains only lawyers' conclusory boilerplate phrases with no content or meaning.  Mr.

11  Rider does not testify to any facts that would put him in a position to authenticate any exhibit.

12       All that the Second Rider Declaration purports to do is authenticate a final review quote provided

13  to the broker referencing the "Limited Endorsement' by policy number, but not including the actual

14  policy language.  As this was the first occasion that NFI had offered or required a Limited Endorsement

15  as part of the policy, it was incumbent upon it to call attention to its specific distinct language varying

16  the coverage provided for "personal injury and advertising injury" in force up to that point in time.

17       **B.    NFI's Cases Do Not Address Its Failure To Deliver The "Limited Endorsement"**

18       NFI does not cite to any legal authority for enforcing an exclusion based on an endorsement that

19  was not delivered to an insured or its agent.  Indeed, the cases cited by NFI only reinforce the rule that

20  delivery is required.

21       NFI cites *Tarleton v. De Veuve*, 113 F.2d 290, 295 (9th Cir. 1940) and Civil Code section 1626

22  for the proposition that mailing a policy to an insured's broker constitutes delivery to the insured.  (Dkt.

23  32, p. 12:9-10.)  Yet that is not an issue in this case.  HE does not argue that delivery to its broker does

24  not constitute delivery to the insured.  Rather, HE's broker has confirmed that the 2015 Policy he

25  received from NFI did not include the Limited Endorsement.  (Dkt. 23, Declaration of James Heppes

26  ("Heppes Decl."), ¶¶ 3-5.)  Thus, the Limited Endorsement was never delivered to HE.

27       In *Tarleton*, the issue was whether a broker's attempted cancellation of a fire policy for failure

28

1    to pay the premium, without notice to the insured property owner, was effective.  113 F.2d at 294.  The

2    court ruled in favor of the insured, finding the policy went into effect upon its delivery to the insured's

3    broker, with notice to the insured.  *Id.* at 297.  However, the cancellation was not effective because

4    neither the broker nor the insurer had provided notice of cancelation to the insured.  *Id.* at 299.

5         NFI also cites *Yoshida v. Liberty Mut. Ins. Co.*, 240 F.2d 824, 828 (9th Cir. 1957) for the

6    proposition that an insured is bound by the terms of an insurance policy "where the policy is delivered

7    to and retained by the insured."  [Dkt. 32, p. 12:13-14.]  In *Yoshida,* the insured was issued a non-

8    owner's automobile policy excluding coverage for autos owned by the insured, because his application

9    stated he did not own any vehicles.  *Id.* at 828. While the main issue in the case was whether the insured

10   owned the vehicle at issue, the court also rejected the insured's argument that he did not read the policy.

11   *Id.* at 828-829.  Again, *Yoshida* is inapposite, as the case did not involve an insurer failing to deliver the

12   policy provision at issue.  Moreover, unlike this case, *Yoshida* did not involve an endorsement added to

13   a renewal policy that purported to eliminate coverage contained in earlier policies and referenced in the

14   renewal policy.

15        **C.    NFI Does Not Dispute That The 2015 Policy Promised "Advertising Injury"
16               Coverage.**

17        In addition to its failure to acknowledge that the Limited Endorsement to the 2015 policy

18   (even if delivered to HE) cannot be enforced because NFI failed to inform HE of the change from the

19   previous year's policy, NFI also ignores that, if the Limited Endorsement is enforced, NFI will have

20   promised illusory coverage.  The Declarations page and the policy itself promised "advertising injury"

21   coverage.  Yet the Limiting Endorsement essentially eliminated such coverage by redefining the

22   coverage obligation to include only clauses (a) through (c), rather than (a) through (g).  The missing

23   clauses—(d) through (g)—are the only clauses that provide "advertising injury" coverage.  NFI cannot

24   promise "advertising injury" coverage, then surreptitiously remove that coverage with a "Limited

25   Endorsement" without making the limitation of coverage conspicuous, plain and clear.  NFI did not do

26   so.

As noted in the opening Memorandum,

When an endorsement is entered at the same moment as the policy it accompanies, rather than at a later time, and the endorsement purports to obliterate coverage, as opposed to merely clarifying, narrowing, or modifying the terms of coverage, we believe the approach more consistent with Georgia law is to read the endorsement and the terms of the policy as being coequal and thus to enforce the provision that grants coverage.

*Hooters of Augusta, Inc. v. Am. Glob. Ins. Co.*, 157 F. App'x 201, 209 (11th Cir. 2005).  Where, as here, "the Exclusion … essentially eliminates all advertising injury coverage," yet the policy purports to grant advertising injury coverage, "the provisions are completely contradicted" and the policy, not the exclusion, applies.  *Princeton Express & Surplus Ins. Co. v. DM Ventures USA LLC*, 209 F. Supp. 3d 1252, 1260 (S.D. Fla. 2016).

*Fagundes v. American Int'l Adjustment Co.*, 2 Cal.App.4th 1310, 1317 (1992) is not to the contrary.  There, the plaintiff claimed that underinsured motorist coverage was illusory simply because its limits were the same as those of the party against whom the plaintiff had a claim.  In other words, there was no coverage available when the underinsured motorist liability limit matched the liability limit of the underinsured motorist.  All that *Fagundes* stands for is that coverage is not illusory when it matches what the policy described.  Here, by contrast, the policy stated that it provided "advertising injury" coverage, but an endorsement deleted that coverage.  Nor does *Kingsley Management Corp. v. Occidental Fire & Casualty Co. of North Carolina*, 441 F.Supp.3d 1016, 1024 (S.D. Cal. 2020) add anything to NFI's argument.  That case, in this context, stands for nothing more than the unexceptional principle that "a clear exclusion will be respected."  The AI/PI Exclusion here was *not* clear, because it was contradicted by another portion of the policy.

      **D.**    **NFI Fails To Address Its Failure To Inform HE That The 2015 Policy Restricted Coverage Available Under The Previous Years' Policy.**

             **1.**    **NFI Failed To Inform HE That The Limited Endorsement Purports To Eliminate Coverage That Was Available Under Its Previous Year's Policy.**

As noted in the opening Memorandum:

"Most courts have held that the insurance company is bound by the terms of the earlier policy if the renewal policy was issued without calling the insured's attention to the reduction in

7

1   policy coverage." Section 6:9 p. 6-139. Insurance Claims and Disputes: Representation of
    Insurance Companies and Insureds, Allan Windt © 2007 ("Windt").

2   Here, NFI has made no showing that it called HE's attention to the fact that the Limited

3   Endorsement issued in 2015 had the effect of limiting coverage that had been available in previous

4   years' policies.  Again, "[d]eletions or exclusions from a renewal group policy should be

5   communicated and explained to the subscriber by a plain, clear and conspicuous writing." *Fields v.*

6   *Blue Shield of Cal.*, 163 Cal.App.3d 570, 583 (1985).

7   It was not enough for NFI to note on the declarations page that there was new "Limited

8   Endorsement," rather, NFI was obliged to call HE's attention to the fact that this new limited

9   endorsement essentially eliminated the advertising injury coverage HE had had for years.  An express

10  description of the specific offenses eliminated by the Limited Endorsement, and a proper description

11  of the 2015 Policy's "personal and advertising injury" coverage would be necessary if NFI intended to

12  change coverage from previous years.

13              **2.      NFI's Cited Cases Are Readily Distinguishable.**

14  *Dias v. Nationwide Life Ins. Co.,* 700 F.Supp.2d 1204, 1216 (E.D. Cal. 2010), *Ray v. Valley*

15  *Forge Ins. Co.,* 77 Cal.App.4th 1039 (1999) (citing Cal. Ins. Code § 335) and *Vernon v. Drexel Burnham*

16  *& Co.,* 52 Cal.App.3d 706, 714 (1975) are inapplicable.  NFI cites these cases for the proposition that

17  Hurricane was "generally under a duty to read the Policy" and will be charged with constructive

18  knowledge of policy provisions "which are plain, clear and unambiguous," as well as knowledge of

19  "material perils contemplated by" the Policy.  (Dkt. 32, p. 12:15-20, 24-26.)  These cases have no

20  application here.

21  *Dias* addressed a single cause of action for fraud brought against a life insurance company by

22  an insured who alleged he was fraudulently promised his whole life insurance policy "investment"

23  would earn enough to self-fund the premiums after two annual payments. 700 F.Supp.2d at 1207-1208,

24  1213.  The insurer sought summary judgment on the ground that the insured had a duty to read the

25  policy, among other grounds. *Id.* at 1216-1217.  But the court rejected the insurer's argument because

26  the fraud allegations were not inconsistent with the policy's express provisions. *Id.* at 1218.

27

28
                                                8

1        In *Ray,* the insured roofing consultant, sued by a homeowners' association for giving bad advice

2 about re-roofing materials, tendered defense to his commercial general liability ("CGL") carrier, which

3 refused because the policy did not cover professional malpractice and the complaint did not allege a

4 covered occurrence or accident.  77 Cal.App.4th at 1042-1043.  In opposition to the insurer's summary

5 judgment motion, the insured alleged the insurer had a duty to advise him that CGL policies do not

6 provide errors and omissions coverage.  *Id.* at 1049.  The court rejected the insured's argument, finding

7 insureds are bound to know the material perils contemplated by the types of policies they purchase.  *Id.*

8        Neither *Dias* nor *Ray* involved any of the issues present in this case. Unlike here, the insureds

9 in those cases did not allege that the insurer failed to deliver the endorsement with the limiting language

10 upon which it relied to deny coverage.  The cases also did not involve renewal policies or the issue of

11 whether an insurer has a duty to give notice and clearly inform its insured of a renewal policy's material

12 reduction in coverage.

13        *Vernon* is also inapposite, as it does not involve an insurance policy or a contract provision that

14 was not delivered to the party challenging the provision.  Instead, a party therein sought to avoid an

15 arbitration provision in an agreement he had signed on the grounds that he did not read the agreement

16 before signing it.  52 Cal.App.3d at 714.

17               **3.**      **The Surreptitious Elimination Of All "Advertising Injury" Coverage Is**

18                              **Precisely The Diminution In Coverage Courts Protect Against.**

19      *Esparza v. Burlington Ins. Co.,* 866 F.Supp.2d 1185, 1202 (E.D. Cal. 2011) is also

20 distinguishable.  In that case, the insurer denied coverage under a CGL policy for a contractual

21 indemnity claim brought by the insured's customer, for a wrongful death action brought against the

22 customer for allegedly causing the death of an employee of the insured.  *Id.* at 1190-1191. The court

23 found the insurer properly denied coverage based on a "Contractual Liability Amendment" endorsement

24 to the policy that removed an exception to the policy's employer's liability exclusion for "insured

25 contracts" and also excepted from the "insured contract' definition any contracts indemnifying another

26 person or organization for injuries caused by their sole negligence.  *Id.* at 1202-1203.  NFI cites *Esparza*

27 for the position that an insured has a duty to read its policy and an insurer does not owe any obligation

28

**HE'S REPLY TO DEF. NFI'S OPP. TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

to bring attention to a clear and conspicuous policy amendment.  (Dkt. 32, p. 12:20-23.)

*Esparza* is not germane for several reasons.

**First**, like all the other cases cited by NFI, *Esparza* does not involve the enforceability of an endorsement that an insurer failed to deliver to its insured.

**Second**, the policy at issue in *Esparza* was not a renewal policy issued by the same insurance group with a new endorsement removing material coverage without notice to the insured.  Instead, the insured in *Esparza* argued that the Contractual Liability Amendment made changes from "basic and standard" language typically found in CGL policies.  *Id.* at 1203.

**Third**, unlike here, the insured did not argue that the Amendment was ambiguous and the Amendment at issue was not inherently ambiguous, as here, where the Limited Endorsement completely removes "advertising injury" coverage from an insuring agreement for "personal and advertising injury."

**Fourth**, an amendment removing an exception to a broad employer's liability exclusion and removing one type of indemnity agreement (those indemnifying sole negligence) from the definition of "insured contract" is not as drastic and material as an endorsement deleting more than half of the "personal and advertising injury" offenses, including all "advertising injury" coverage.

### E.    By Failing To Address HE's Arguments, NFI Has Conceded That Delivery Is Required For The Limited Endorsement To Be Enforceable

In its opening brief, HE argued that the "Limited Endorsement" cannot be applied to bar coverage if it was not delivered to HE or its agent, citing *Elliano v. Assurance Co. of Am.*, 3 Cal. App. 3d 446, 450 (1970) and *Benchmark Ins. Co. v. Dismon Corp.*, 2016 U.S. Dist. LEXIS 192404 (C.D. Cal. Aug. 9, 2016), No. CV 15-01539 TJH (FFMx) at *2. [DKT. 21, pp. 14:24-15:13.] NFI's opposition fails to discuss either of these cases, nor does it cite any contrary authority for enforcing a policy endorsement that was only listed in a Declarations page but never delivered to the insured.  Rather, all of the cases cited by NFI involve enforcement of policy provisions that were indisputably delivered to the insured.

Instead of challenging HE's legal position, NFI simply presents incompetent conclusory

**HE'S REPLY TO DEF. NFI'S OPP. TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

evidence to argue that the Limited Endorsement was delivered to HE's broker.  By failing to address the cases cited by HE and failing to offer any argument to challenge HE's position, NFI has conceded that the Limited Endorsement is not enforceable if the undisputed evidence shows it was never delivered to HE.  *Benabou v. Cheo,* No. 2:19-cv-04619-R-SS, 2019 U.S. Dist. LEXIS 227872, 2019 WL 8017819, *9-10 (C.D. Cal. December 17, 2019); *Hall v. Mrtg. Investors Grp.,* No. 2:11-CV-00952-JAM-GGH, 2011 U.S. Dist. LEXIS 105999, 2011 WL 4374995, *5 (E.D. Cal. 2011).

## III.   THE LIMITED ENDORSEMENT IS NOT ENFORCEABLE.

### A.   The Limited Endorsement Is Inconsistent With The Expanded AI/PI Endorsement Contemporaneously Issued.

Assuming the delivery of the 2015 Policy in the form NFI claims it was issued [Rider Decl. Ex. 6], the Expanded AI/PI Endorsement creates thorny issues of coverage for NFI.  Where, as here, endorsements are arguably inconsistent, the ambiguity arising from that inconsistency must be interpreted against the insurer.  Ambiguity arises from the contemporary inclusion of the Expanded AP/PI Endorsement, so that the evisceration of coverage under paragraphs (d) through (g) purportedly accomplished by the Limited Endorsement must be reconciled with the Expanded AI/PI Endorsement.  Otherwise it would render the reference to (h) as a sequenced next in order offense following (d) through (g) superfluous.  Any other policy construction would be inconsistent with the reasonable expectations of the policyholder.  HE would anticipate that where (h) is added to (a) through (g), a different endorsement that purported to eliminate (d) through (g) could not be part of the same policy.

As *MacKinnon v. Truck Insurance Exchange*, 31 Cal. 4th 635, 648 (2001) states:
> an insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear.  As we have declared time and again any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect.  Thus, the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language.  The exclusionary clause must be *conspicuous, plain and clear.*

(Internal quotation marks and citations omitted, emphasis in original.)  The only reasonable interpretation in such a context is that offenses (d) through (g) remain in force. To the extent NFI contests this view, its argument is but another construction of its policy language that cannot supplant that of HE where NFI cannot establish that it is "the only reasonable construction." *Id.* at 655.

1

**B.      The Contemporaneously-Issued Expanded AI/PI Endorsement Cannot Be Reconciled With The Limited Endorsement's Coverage Restriction.**

2

3       A contemporaneous endorsement purportedly issued by NFI but not received by HE or its

4  insurance broker, G-144294-GG (ed. 12/06 110/113), entitled TECHNOLOGY GENERAL

   LIABILITY EXTENSION ENDORSEMENT Section 9 notes the following:

5

6       "EXPANDED PERSONAL AND ADVERTISING INJURY A the following is added to
        Section V-DEFINITION the definition of "personal and advertising injury (h) discrimination or
7       humiliation that results in injury to the feelings or reputation of a natural person."

8       There are (3) distinguishable features of the Expanded AI/PI Endorsement.

9       **First**, it purports to call the policyholder's attention to all new "personal and advertising injury"

10 endorsements.

11      **Two**, it focuses on Technology General Liability which the 2015 Policy purported to specially

12 address.

13      **Third**, it described itself as an *extension* endorsement, i.e. expanding, enhancing, and creating

14 greater coverage not previously available.  While that might have been the case as to the addition of

   subheading h or offense (h), addressing discrimination or humiliation, NFI did not take the occasion to

15 inform HE that it was also offering as a subsequent endorsement the Limited Endorsement, which

16 purported to eliminate coverage for (d) through (g), thereby rendering of no moment the next labeled

17 offense, (h).

18      **Fourth,** the same Expanded AI/PI Endorsement noted elsewhere that only endorsements that

19 "exclude all personal and advertising injury" would supersede the Technology General Liability

20 Extension Endorsement.  [2d Rider Decl. Exhibit 5 at p. 111.]:

21
        "D.  This provision [expanded personal and advertising injury coverage] does not apply if
22      Section 1—Coverage for Personal and Advertising Liability is excluded either by the provisions
        of the Coverage Part or by Endorsement"
23

24      NFI does not contend that any endorsement, including the Limited Endorsement, had that effect

25 here.  The Expanded AI/PI Endorsement had an expansive impact on "personal and advertising injury."

   Therefore, it is not covered by that aspect of the Expanded AI/PI Endorsement.

26

27      **IV.     THE MEDIATION WAS A "SUIT," SO THAT ELEMENT IS MET.**

28

**HE'S REPLY TO DEF. NFI'S OPP. TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

1

### A.    NFI's Cases Interpreting "Suit" Are Readily Distinguishable

2          NFI's cites cases that do not rely on policy language that, as here, broadly defined the term "suit"

3    to encompass alternative dispute resolution ("ADR"), including subsection (b).  In claiming that cease-

4    and-desist letters and affirmative lawsuits do not fall within the 2015 Policy insuring grant, NFI

5    completely ignores subsection "b" of its ADR definition of "suit." The 2015 Policy states that:

6                 "Suit" includes: . . .

7                 b.     Any other alternative dispute resolution proceeding in which such
                  damages are claimed and to which the insured submits with our consent.
8                 [Dkt. 32, § I.B.2.]

9          It matters not, therefore, whether or not a pre-suit lawsuit demand has been held not to be a

10   "suit," as that is not a legal issue germane to this case.  NFI's citations to cases where the policy did not

11   define the word "suit" are inapposite.  *Foster-Gardner, Inc. v. National Union Fire Ins. Co.*, 18 Cal. 4th

12   857, 863-64, 878 (1998) (no ADR activity nor definition of "suit" to include any form of ADR).

13   *Fireman's Fund Ins. Co. v. Sup. Ct.*, 65 Cal. App. 4th 1205, 1222 (1997) (conceding "ordinary meaning

14   of 'suit' is broad enough to cover alternative dispute resolution proceedings" even though policy did

15   not define "suit" to include any ADR provision).  The same is true of *Icasiano v. Allstate ins. Co.*, 103

16   F. Supp. 2d 1187, 1190 (N.D. Cal. 2000), *San Diego Housing Com'n v. Industrial Indem. Co.*, 68 Cal.

17   App. 4th 526 (1998), *3250 Wilshire Blvd. Building v. Employers Ins. of Wausau*, 39 Cal. App. 4th 1277,

18   1280 (1995), and *James 3 Corp. v. Truck Ins. Exch.*, 91 Cal. App. 4th 1093, 1104-05 (2001).

19         NFI argues that "[a] pre-lawsuit demand is not a 'suit'."  [Dkt. 32, p. 14.]  Implicit in this

20   argument is the unarticulated presumption that pre-lawsuit activity can never fall within the scope of

21   coverage.  This, despite express language in the 2015 Policy standing for the contrary proposition, since

22   ADR often proceeds a lawsuit.  As a thoughtful early decision states: "The foregoing general rule

23   concerning the trigger of coverage of an occurrence policy is not applicable when the policy language

24   differs from the language construed [in earlier cases]."  *American Cyanamid Co. v. American Home*

25   *Assurance Co.* 30 Cal.App.4th 969, 980 (1994).  There, the court was concerned that insurers not ignore

26   the policy language issued in order to further some vague policy concerns that were not included in the

27   policy.

28

**HE'S REPLY TO DEF. NFI'S OPP. TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    Simply put, there is no extracontractual limitation on coverage for pre-suit activities implied in

2    law.  Rather, courts look to the language of the policy and interpret it and apply it as written.  To reach

3    a contrary result would add words of limitation to the policy under the guise of construction.  As the

4    California Supreme Court has explained, "[w]e cannot read into the policy what [the insurer] has

5    omitted. To do so would violate the fundamental principle that in interpreting contracts, including

6    insurance contracts, courts are not to insert what has been omitted." *Safeco Ins. Co. v. Roberts*, 26 Cal.

7    4th 758, 764 (2001).

8    **B.     An Insurer Cannot Require Consent Where It Has Denied A Defense And Not
             Rejected The Insured's Right To Pursue ADR Thereafter**

9

10   Although no California case has directly addressed the issue of "consent" with regard to whether

11   ADR satisfied the same broad definition of a "suit" as here, out of state cases offer persuasive authority.

12   They reveal that activity the denying insurer cannot foreclose coverage before a lawsuit where the

13   insurer did not contest its insured's ability to mediate the case after it refused to defend that lawsuit.

14   Analyzing a "suit" definition that mirrors the 2015 Policy, the court in *Wiseman-Hughes Enters.*

15   *v. Harleysville Lake States Ins. Co.*, 2009 U.S. Dist. LEXIS 29797, *11-12 (N.D. Ill. Apr. 8, 2009) noted

16   that the policy language for "'suit' is clearly defined to include both a civil proceeding in which damages

17   are alleged, or "alternative dispute resolution (*such as mediation*)" (emphasis added).   Summary

18   judgment was refused to the insurer because it was on notice of the mediation but had declined to attend.

19   *Id.* at *12.  Nor did the insurer contest the insured's participation or advise it in advance that any

20   settlement secured would not be enforceable against it, exactly as occurred in this case.  *Id.* at *8-9. [*See*

21   Declaration of Neil Greenstein ("Greenstein Decl."), ¶¶6-8.]  In *Wiseman-Hughes*, the insurer's silence

22   in response to notification of, and requests to participate in, a mediation between the insured and

23   claimants, did not entitle the insurer to summary judgment.  *Id.*  Here as well NFI cannot win on its

24   motion because it has no undisputed evidence that NFI advised HE that it would not consent to the

25   mediation.  [Greenstein Decl., ¶¶ 6-8.]

26   Where the insurer did not consent to the insured's involvement in an ADR process under an

27

28

14

indistinguishable policy, the court in *Melssen v. Auto-Owners Ins. Co*., 285 P.3d 328 (Colo. 2012) nonetheless held that the insureds did not need the insurer's consent to submit to an ADR proceeding because *the insurer had already denied coverage*. *Id.* at 336.  It reasoned that for "insurance coverage under the policy, consent may also be deemed implied or an insurer may waive a consent requirement in a policy."  *Id.* at 335 (citing *Raitz v. State Farm Mut. Auto. Ins. Co.*, 960 P.2d 1179, 1186 (Colo. 1998)).

### C.     The Mediation Which NFI Declined To Attend Was A "Suit" Within The Plain Meaning Of NFI's Policy.

#### 1.     NFI Acknowledges That It Denied A Defense To Its Insured, HE, On July 1, 2020 (ECF 1-9) On A Variety Of Grounds.

Not the least of the grounds on which NFI denied a defense was that, at that time, there was not a "suit" against" its policyholder HE.  NFI also concedes that, on July 28, 2020, it declined to attend a mediation orchestrated through the affirmative declaratory relief actions.  Prior to that mediation, HE clarified that the mediation presented NFI with an opportunity to address defensive claims responsive to the Cease and Desist Letter, but NFI repeatedly declined HE's request that it defend or, as a separate provision in NFI's policy requires, participate in "settlement."

#### 2.     Case Law Supports The Duty To Facilitate Settlement To Secure Case Resolution.

It is of no moment that there was a simultaneously-filed coverage action and an amended complaint in the affirmative action before the lawsuits ensued. *United States Fire Ins. Co.  v. Button Transp., Inc*, A108419, 2006 Cal. App. Unpub. LEXIS 3472 at *33, 2006 WL 1085782 at *10 (Apr. 26, 2006) ("[t]hus, the implied covenant of good faith and fair dealing requires an insurer to settle a covered claim rather than simply wait to see if a lawsuit is filed and to pay a judgment, if settlement is necessary to protect the interest of the insured"). Indeed, NFI's failure to acknowledge that the definition of "suit" in its policy encompasses a mediation, or to acknowledge any duty to settle a claim which could mature into a direct lawsuit against its insured, is inconsistent with its duties of good faith and fair dealing to HE as well as its duty to defend HE.

3.      **NFI Does Not Explain Any Legal Issue Arising Out Of The Filing Of An "Amended Complaint" In The Affirmative Action.**

The amended complaint was based on the same factual allegations as referenced above and adds a section termed "advertising" referencing "Hurricane and Google Ads." *See*, RJN Ex. 1, p. 3 *et seq*. NFI contended that such advertisements do not meet requirements for "infringement of copyright in your 'advertisement'" and for that reason it elected to not participate in the mediation.  As NFI contends the C & D Letter does not qualify as a covered claim, it does not matter when the amendment occurred. Moreover, the mediation NFI declined to attend post-dated the amendment.  All these facts were known to NFI at the time it failed to participate in the mediation.

4.      **The Aforementioned Out-Of-State "Consent" Cases Regarding ADR Follow The Policy's Plain Language**

The cases do not allow substituting more limiting language for that in subsection (b) of NFI's definition of "suit."  Otherwise, mediation after a denial of coverage cannot be attacked for lack of consent.  These cases are in accord with those decisions that have determined that "voluntary payments" by the insured cannot eliminate an insurer's obligation to pay a settlement entered into after the insurer denied defense because the insurer did not consent to that settlement.  *Isaacson v. Cal. Ins. Guarantee Ass'n*, 44 Cal.3d 775, 791 (1988) (wrongful failure to provide coverage or defend a claim is a breach of contract, "the insured is entitled to make a reasonable settlement of the claim in good faith and may then maintain an action against the insurer to recover the amount of the settlement").  Having abandoned its policyholder and having received notice regarding the mediation (unlike many cases finding a settlement enforceable where the insurer was not apprised of it post denial of the defense), NFI is in no position to contest that HE satisfied its duty to demonstrate that a "suit" within the meaning of NFI's policy language occurred.

5.      **NFI Never Asserted That HE Could Not Go Forward With The Mediation, Nor Did NFI Contest HE's Ability To Contend That The Mediation Would Meet The Requirements For A "Suit."**

Without a declaration or evidence before the court respecting how the mediation occurred, or what its role in the mediation was, NFI has no evidence to controvert HE's evidence.  By taking no action in this regard, NFI has waived the issue of "consent."  "California courts will find waiver when

16

a . . . party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such a right has been relinquished." *Essex Ins. Co. v. Heck*, 186 Cal.App.4th 1513, 1526 (2010) (citing *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 33-34 (1995).

## V.   NO EXCLUSIONS ASSERTED BY NFI APPLY

### A.   The "Intellectual Property" Exclusion Is No Bar To A Defense.

#### 1.   The Pertinent Policy Language Is Satisfied.

Potential coverage arises for "personal and advertising injury arising out of the infringement of copyright" where conduct falls within the exception for "infringement of copyright in your 'advertisement.'" NFI contends that "the only reasonable interpretation of this language" is that "the insured must infringe on a plaintiff's copyright by using copyrighted material in the insured's 'advertisement.'" [DKT 32, p. 17].  But that view was expressly rejected by the Ninth Circuit in *Street Surfing, LLC v. Great American E&S Ins. Co.*, 776 F.3d 603, 611 (9th Cir. (Cal.) 2014.  As it explained:

> We conclude that affixing the Street Surfing logo to the Wave was an 'advertisement' using Street Surfing's brand name and logo…The alleged conduct that met the requirement showing liability under offense (f) for "use of another's advertising idea in your 'advertisement'" was the display of Street Surfing's product "the Wave" at a retailer's store; not direct ''advertisement'' by the manufacturer or distributor (and insured) Street Surfing.

The retailer was neither owned, controlled nor an additional insured on the policy issued to Street Surfing.  Nonetheless, display of the insured's product in that venue met the "in your 'advertisement'" requirement.  Indeed, careful parsing of the policy language reveals why this is so.  Nothing about the term "advertisement" as defined in the policy means that the liability-creating display of the product must be a display by the insured; rather, the language requires only that the liability asserted against the insured be for an ''advertisement'' which the insured caused to occur.

Another decision to apply California law, *Lexington Ins. Co. v. MGA Entm't, Inc.,* 961 F. Supp. 2d 536, 559 (SDNY 2013), addressed the timing of when the products were released.  It determined that copyright infringement in your ''advertisement'" was implicated because:

> The Underlying Complaint's plain language alleges facts sufficient to raise the possibility of a potentially covered claim: Its allegations—that the Carter Bryant

sketches and all Bratz dolls are substantially similar to the Belair Images—are sweeping, and Belair sought redress based on "*any work* that infringes [his] copyright in the Belair images." (*Id.* at 556, n 37).[1]

Inferences supporting satisfaction of the ''advertisement'' prong within NFI's policies are compelling – especially where NFI's Opposition cites no cases supporting its narrow construction of its policy. "Under the personal injury [advertising injury] policy provisions [c]overage … is triggered by the *offense*, not the injury or damage which plaintiff suffers. … The triggering event is the insured's wrongful act, not the resulting injury to the third party claimant." *Atl. Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal.App.4th 1017, 1032 (2002).  The language at issue here is broader than that addressed by the distinguishable narrower predecessor coverage cases.

### 2.    NFI's Reliance On Cases Interpreting Broader Causal Nexus Policy Language In Earlier ISO Policy Forms Is Of No Moment

Each of the "advertising injury" causal nexus cases NFI cites in section B(3)(a) of its Opposition [Dkt. 32, pp. 17-19] is readily distinguishable, as each analyzes the broader predecessor ISO "advertising injury occurring in the course of advertising your products or services" causation provision, as applied to torts that, unlike copyright infringement, do not make advertising-driven display and exposure as grounds for asserted copyright infringement liability.[2]  *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1273-74 (1992) (no damages assertable for claims under Bus. & Prof. Code section 17200); *Simply Fresh Fruit, Inc. v. Continental Ins. Co*, 94 F.3d 1219 (122) (9th Cir. 1996) (trade secret misappropriation); *Hameid v. National Fire Ins. Co. of Hartford*, 31 Cal.4th 16, 22 (2003) (unfair competition); *Hartford Cas. Ins. Co. v. EEE Bus. Inc.*, No. C 09-01888 JSW, 2009 U.S. Dist. LEXIS 104994, 2009 WL 3809817 (N.D. Cal. Nov. 10, 2009)  (no advertising proven as basis for copyright infringement claims in indemnity analysis); *Educ. Impact v. Travelers Prop. Cas. Co. of Am.*, No. 15-

---

[1]    "[B]ecause injury from copyright infringement in an 'advertisement' emanates within the 'advertisement' itself—any injury caused by such alleged infringement would necessarily have been caused by that 'advertisement'."  David A. Gauntlett, *Insurance Coverage of Intellectual Property Assets*, §§ 16.06 B, p.16-48, 2014 Supplement, Walters Kluwer 2012, 2d Ed.

[2]    David A. Gauntlett, *New Appleman on Insurance Law*, § 30.01 (4)(a)(ii)(b)(3).  "Under the heading 'Impacts,' the Revision states: 'the change in this revision to personal and advertising injury results in broadenings in coverage in certain respects. … [T]he Personal and Advertising Injury coverage is at least equal to, if not broader than, that which current coverage provides.'"

1    cv-04510-EMC, 2016 U.S. Dist. LEXIS 176799, 2016 WL 7386139 (N.D. Cal. Dec. 21, 2016)

2            (sale of counterfeit software did not create liability based on advertising).

3            As the Second Circuit observed in *R.C. Bigelow v. Liberty Mutual Ins. Co.* 287 F.3d 242, 247-

4    248 (2d. Cir. 2002), "courts, however, have ruled the causal nexus requirement met where

5    advertisements depicted products with confusingly similar trademarks or trade dress."  Facilitating

6    access through HE's "intranet portal" to downstream OSPs that, in turn, allowed access to ISPs that

7    permitted users to procure movies like those the Claimant asserts were taken without compensation,

8    through no direct connection or fault of HE, creates an analogous alleged use by HE of an

9    "advertisement."  Allowing ″internet portal″ access so customers of HE could gain the ability to stream

10   movies through a downstream ISP is simply a different mode of advertising offered to attract business,

11   analogous to display of an infringing product or the provision of samples.  *Atl. Mut. Ins. Co. v. J. Lamb,*

12   *Inc.*, 100 Cal.App 4th 1017, 1034 (2002) ("[t]he scope of the duty does not depend on the labels given

13   to the causes of action in the third party complaint; instead it rests on whether the *alleged facts or known*

14   *extrinsic facts* reveal that the claim may be covered by the policy) (emphasis in original).

15           Equally pertinent is another technology coverage case, *Acuity v. Bagadia*, 750 N.W.2d 817, 824

16   (Wis. 2008).  There, the Wisconsin Supreme Court determined that, where UNIK was distributing

17   sample discs containing Symantec's copyrighted SystemWorks software without Symantec's

18   authorization, "the reference to supplying samples to interested buyers directly implicates UNIK's

19   activity infringing Symantec's copyright through advertising."  It further observed that "[g]enerally

20   speaking, advertising refers to calling the public's attention to a product or business by proclaiming its

21   qualities or advantages in order to increase sales or arouse a desire to buy or patronize."  *Id.*  So here,

22   just like providing product samples, allowing "internet portal" access is advertising.

23           *AMCO Ins. Co. v. Lauren-Spencer, Inc.*, 500 F.Supp.2d 721, 729 (S.D. Ohio 2007) is also

24   pertinent.  There, the court determined the "advertising injury" coverage could be triggered where

25   images were advertised in a way that favored their acquisition or incentivized their acquisition.  The

26   court reasoned:

27           The advertised images are not original to the Lauren-Spencer Defendants, despite the

28

**HE'S REPLY TO DEF. NFI'S OPP. TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

1

2

3

fact that they are responsible for the images; the Lauren-Spencer Defendants did not create the intellectual property shown via their handiwork.  AMCO is therefore incorrect in asserting that 'every element' of the brochure and website was original to and created by the Lauren-Spencer Defendants. … The insurance company's allegation may be true for most of the elements involved, but not for the infringing elements.

4

5

Also on point is *Columbus Farmers Market, LLC, v. Farm Family Casualty Ins. Co*., 2006 WL 3761987, *6 (D. N.J., Dec. 21, 2006), where the court explained

6

7

8

9

10

the Arista Litigation is causal… [t]he RIAA alleged that Plaintiffs are liable for contributory infringement.  An essential element of contributory infringement is that Plaintiffs 'materially contributed' to direct infringement (the sale of counterfeit and pirated CDs).  According to the complaint in the Arista Litigation, Plaintiffs 'materially contributed' by, among other things, advertising and promoting the Market … Plaintiffs allegedly materially contributed to copyright infringement by advertising and promoting the Market, [and] advertising on their website the availability of sound recordings on the premises.

11

12

13

14

15

The indistinguishable elements of all these coverage cases are compelling, especially as NFI offers no contrary authority, much less calling into question the logic of these thoughtful cases.  Here, the "infringement of copyright in your 'advertisement'" prong was met by the promotion of a pathway to stream products over an internet address (here alleged to infringe Claimant's movie copyrights) and by facilitating internet backbone access that met the expanding demand for prompt service.

16

17

**B.     HE's "Advertisement" Created A Causal Nexus To Alleged Copyright Infringement Liability Due To Promotion Of Internet Backbone Connectivity.**

18

19

Four cases evidence why the casual nexus element was satisfied here.  These courts' focus on how an "advertisement" creates liability for claims of copyright infringement is germane.

20

21

As explained in *Interface, Inc. v. Standard Fire Is. Co.,* 2000 U.S. Dist. LEXIS 14019 * 9, 10-11 (N.D. Ga., Aug. 15, 2000).

22

23

The 'advertisements, however, are a source of infringement and injury, independent from any impact on sales.  ... [T]he advertising itself infringed on the copyrights allegedly owned by CAF because the ads bore images of the patterns.  *See* 17 U.S.C. §106.  For that very reason, CAF sought production of Interface's promotional materials.

24

25

26

27

In *Century 21, Inc. v. Diamond State Ins. Co.,* 442 F.3d 79, 83 (2d Cir. (NY) 2006), addressing the predecessor policy language, the court nonetheless concluded that "a term as broad and multi-faceted as 'marketing' may be construed to include activities apart from selling and distribution that are 'within the embrace' of 'advertising' as that term is used in the policy to describe Century's

28

20

1    coverage."

2    *King v. Cont'l Western Ins. Co.,* 123 S.W.3d 259, 265 (Mo. App. 2003), stated:

3
4        As the trial court pointed out in the ruling, Continental knew King's business was custom
         homebuilding, and '[h]ad it wanted to limit the scope of the advertising injury coverage,
5        it could have chosen to define advertising or otherwise limited its coverage.  It did not
         do so and cannot now complain that it did not intend to provide the coverage its policy
6        provides on its face.'  Had Continental investigated the facts after the filing of the claim
         [and] accepted the defense of its insured, it would have discovered the infringement of
7        the plans coupled with the placement of the insured's sign in the yard during the
         construction placed the Wiley claim within the coverage of the policy written.[3]

8        In *Mid-Continental Casualty Co. v. Kipp Flores Architects, LLC*, 602 F. App'x 985, 995 (5th

9    Cir. (Tex.) 2015), the court, although addressing indemnity, determined that there is no requirement

10   that the infringing "advertisement" have swayed a particular buyer: "Hallmark's primary means of

11   marketing its construction business was through the use of the homes themselves, both through model

12   homes and yard signs on the property of infringing homes it had built, all of which were marketed to

13   the general public."

14       The same experiential aspect applies to the Google advertisement for HE's services launched

15   during the 2015 Policy period.  It highlighted the "port availability … rapid turnaround capability"

16   [Dkt. 28, Ng Decl., ¶ 5.]  This invitation to experience "more networks" and "lower latency" is an

17   explicit advertising come-on.

18           **C.    NFI's Reliance Upon The Exclusion For Insureds Whose Business Is As An
19                  "Internet Search, Access, Content Or Service Provider" Is Misplaced.**

20               **1.    The "Business Is" Predicate To The ISP Exclusion Is Narrowly
                        Construed.**
21

22       NFI finally argues that the "business is" predicate to the exclusion for advertising injury

23   "committed by an insured whose business is … [a]n Internet search, access, content or service provider"

24   applies to HE.  NFI claims that HE is "'principally engaged' in the business of providing "media or

25   internet-type services."  [Dkt. 32, Opp. Memo., p. 20.]

26   _____
     [3]    Citing David A. Gauntlett, Recent Developments in Intellectual Property Law, 37 TORT & INS.
27   L.J. 543, 550 (Winter 2002)

28
     **HE'S REPLY TO DEF. NFI'S OPP. TO MOTION FOR PARTIAL SUMMARY JUDGMENT**                    3:20-cv-05840-CRB

There are at least three glaring weaknesses with NFI's argument.  **First**, NFI completely fails to mention, much less distinguish, the only case in the United States that construes the "Internet search, access, content or service provider" exclusion, *Zurich Am. Ins. v. Sony Corp. of Am.*, No. 651982/2011, 2014 N.Y. Misc. LEXIS 5141 (Sup. Ct. Feb. 21, 2014).  **Second**, as *Sony Corp.* makes clear, HE is not an "Internet search, access, content or service provider."   **Third**, even if some of the services HE provides fall within this language, NFI has no evidence that HE is "principally engaged" in that business, much less that it "is" such a business.

### 2.   The *Sony Corp.* Case Is Directly On Point.

NFI's lengthy discussion of this exclusion is noteworthy for what it does *not* say.  NFI does not even mention, much less attempt to distinguish, *Sony Corp.*  That case found that the exclusion could not apply to Sony Computer Entertainment of America (SCEA).  As the *Sony Corp.* court explained, a previous federal case had described Sony's business as:

> develops and markets the PlayStation Portable hand-held device ("PSP") and the PlayStation 3 console ("PS3") (collectively, "Console" or "Consoles"). … Both Consoles allow users to play games, connect to the Internet, and access Qriocity, Sony Online Entertainment Services, and the Play Station Network ("PSN") (collectively, "Sony Online Services"). … Through the PSN, which is offered to consumers free of charge, users can engage in multi-player online games …, and for additional one-time fees, the PSN allows users to purchase video games, add-on content ("map packs"), demos, themes, movie trailers, TV shows, and movies (collectively, "Downloads"). Users can also access various prepaid third party services by connecting to Sony Online Services via their Consoles or computers, including Netflix, MLB.TV, and NHL Gamecenter LIVE (collectively, "Third Party Services").

*Id.* at *12, *quoting In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp.2d 942, 954 (S.D. Cal. 2014).

The *Sony Corp.* court concluded that Sony was not an entity whose business "is" Internet search, access, content or service, even though some of the activities in which it engaged might fall within the description of an Internet content or service provider.  Even if SCEA customers might have used its services to connect to the Internet, its business was not "as" an Internet service provider.

The *Sony Corp.* court specifically rejected the argument, adopted by NFI here, that the exclusion

should be read as applying to a business "principally engaged" in the business of providing internet-type services.  Rather, it found that the exclusion applies where the insured's business "is" as an Internet search, access, content or service provider.  Because Sony was "more than being an internet search, or access, or content or service provider" (*id.* at *13), the exclusion did not apply.

### 3. NFI Relies On Out-Of-State Decisions That Are Inconsistent With More Recent Decisions.

The out of state decisions NFI cites, such as *Ace American Ins. Co. v. Dish Network, LLC*, 173 F.3d 1128 (D. Colo. 2016) and *American Employers Ins. Co. v. DeLorme Publishing*, 39 F.Supp.2d 64 (D. Me. 1999), address the "publishing" exclusion.  These cases include *Corbis Corp. v. St. Paul Fire & Marine Ins. Co.*, 125 F. App'x 792 (9th Cir. 2005), a pre-2007 unpublished court of appeals decision, which construed an entirely different policy definition of publishing that is much broader than the "is" an "Internet search, access, content or service provider" clause at issue here.

The insured in *Sony Corp.*, SCEA, is much closer to a business that "is" an Internet search, access, content or service provider than HE.  HE provides, among other things, access to the Internet backbone, which actual internet service providers (ISPs) use to connect to the Internet.  It does *not* provide "access" or "service" directly to the Internet for users—in fact, to use HE's Tunnel Broker service (which is the service at issue in this lawsuit) a user must *already have* an Internet connection.  *See* Ng Decl., ¶¶ 12-13.

The goal of insurance policy construction is to protect the "objectively reasonable expectations of the insured."  *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990).  No objectively reasonable insured in HE's position would expect that this exclusion would apply to a business that does not provide direct access to the Internet or direct service connecting to the Internet.  The language excluding coverage for a business that "is an Internet search, access, content or service provider" must be narrowly construed.  *E.g.*, *Waller v. Truck Ins. Exch., Inc.*, 11 Cal 4th 1, 16 (1995).  To operate to exclude coverage, an exclusion must be "must be conspicuous, plain and clear."  *Steven v. Fidelity & Casualty Co.*, 58 Cal. 2d 862, 878 (1962).

1

2

### 4.     The Exclusion's Application To A Business That "Is" An Internet Service Or Access Provider Necessarily Limits Its Ambit.

No reasonable layperson would view the type of services HE provides as being either Internet access or Internet service.  Here, the word "business" in the policy language has been interpreted to require that the only conduct of the insured be that which is excluded.  This is simply an inaccurate characterization of HE's services and is the point that the *Zurich* case addressed at length, which NFI chose to ignore.  *See Hartford Cas. Ins. Co. v. Swift Distribution, Inc.*, 59 Cal.4th 277, 287 (2014) ("under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability … doubt as to whether an insurer owes a duty to defend must be resolved in favor of the insured").

The exclusion is not meant to include businesses that incidentally provide Internet services, but rather only to businesses which can be described *only* as engaging in such services, or in which such services necessarily occupy the vast majority of the insured's business activities.  *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 16 (1995) ([b]efore even considering exclusions, a court must examine the coverage provisions to determine whether a claim falls within the policy terms") (internal punctuation omitted).

To expansively construe this language as applying to a business such as HE, which does not directly provide either Internet service or access, is to expand exclusionary language which should rather be narrowly construed and would rewrite the exclusion in the insurer's favor.

### 5.     No Evidence Limits HE's Business To Providing Internet Access.

Finally, *even if* some part of HE's business can be characterized as providing Internet access, there is no evidence that HE's business "is" providing such access.  HE provides numerous services that cannot, by any tortured reasoning, be characterized as providing Internet access or service.  These include colocation (providing physical space for servers), provision of rooftop space for clients wishing to install dishes and antennas, IP transport (the transfer of data from one point to another within one network), web hosting (allowing web hosts to store website data on servers) and a DNS service, which translates website domain names to numerical IP addresses.  *See* Ng Decl. ¶¶ 13-18.  None of these

24

3:20-cv-05840-CRB

1   services constitutes the provision of Internet service or access.  Like the insured in *Sony Corp.*, at most

2   what HE provides is "sort of a hybrid" that might, two or three steps downstream from HE's services,

3   provide access to the Internet.  *See* 2014 N.Y. Misc. LEXIS 5141 at *13.

4        NFI argues, however, that the exclusion at issue applies if HE is "principally engaged" in the

5   business of providing "internet-type" services.  Opp. Memo., p. 20.  Not so.  The policy language cannot

6   be rewritten to serve NFI's purposes.  *Safeco Ins. Co. v. Robert S.*, 26 Cal.4th 758, 764 (2001) ("[w]e

7   cannot read into the policy what Safeco omitted").  The *Sony Corp.* court expressly rebuffed this

8   argument, noting that the exclusion at issue refers to an insured whose business "is" providing Internet

9   access or services, not "principally is."  *Id.*  Like SCEA, HE's business "is" not as an Internet access or

10  service provider, even if some of its services could be construed as "internet type" services (a term that

11  is not used in the policy).

12       Moreover, even if the exclusion is properly construed as applying where the insured's business

13  is "principally" that of providing Internet access or service, NFI has no evidence to show that HE's

14  business is "principally" of that type.  As noted, HE provides many services—such as colocation,

15  provision of rooftop access and DNS services—that cannot possibly be construed as Internet service or

16  access.  NFI provides no evidence demonstrating that providing Internet service is "principally" what

17  HE does.

18  **VI.    CONCLUSION**

19       For all the above reasons, a duty to defend appropriately arose for the express advertising injury

20  coverage for "infringement of copyright in your 'advertisement'" in offense (g) that is factually

21  implicated by the statements in the Cease and Desist letter, clarified by the Declaratory Relief Actions.

22
23   Dated:  November 3, 2020                **GAUNTLETT & ASSOCIATES**

24                                          By:    /s/ David A. Gauntlett
                                                   David A. Gauntlett
25                                                 James A. Lowe
                                           Attorneys for Plaintiff,
26                                         Hurricane Electric, LLC

27

28